# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| ANDREW DAVIS, Individually and on Behalf of All Others Similarly Situated,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>JOHN K. KEPPLER, THOMAS METH, SHAI S. EVEN, and MICHAEL A. JOHNSON,<br><br>　　　　Defendants. | Civil Action No. 8:23-cv-02474-MJM<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>JURY TRIAL DEMANDED |

**TABLE OF CONTENTS**

I.      NATURE OF THE ACTION AND OVERVIEW ................................................ 1

II.     JURISDICTION AND VENUE ...................................................................... 3

III.    PARTIES & RELEVANT NON-PARTIES ..................................................... 4

IV.     BACKGROUND REGARDING ENVIVA ...................................................... 6

        A.      Enviva's Primary Business Consists of Processing Trees Into Wood Pellets For Shipment To Be Burned As Fuel On Other Continents ................................... 6

        B.      Despite Incurring GAAP Losses, Defendants Marketed Enviva To Investors As A Growing Company With Dependable Cash Flows ........................................ 7

V.      DEFENDANTS CONCEALED MATERIAL FACTS CONCERNING ENVIVA'S FAILING BUSINESS .................................................................. 8

        A.      Enviva Stood To Lose Hundreds Of Millions Of Dollars On Its 4Q 2022 Wood Pellet Purchase Agreements .............................................................. 9

        B.      Enviva's Manufacturing Plants Experienced Severe Equipment Failures, Causing Significant Expenses And Production Shortfalls ................................... 21

        C.      Enviva's Excessive Employee Turnover Further Increased Costs And Reduced Production ........................................................................... 25

        D.      Enviva Cannibalized Future Earnings To Boost Its 2022 Results ....................... 26

        E.      The Price Escalation Provisions Of Enviva's Sale Contracts Failed To Compensate For Increased Production Costs ......................................... 26

        F.      Enviva's Financial Guidance For 3Q 2023 Depended On Assuming Wood Pellet Prices Much Higher Than Market Prices ...................................... 27

VI.     MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE BEGINNING OF THE CLASS PERIOD .......................................... 27

        A.      November 2-3, 2022 Enviva Reports 3Q 2022 Results ..................................... 28

        B.      November 28, 2022 Enviva 3Q 2022 Update Investor Presentation .................... 30

        C.      January 26, 2023, Thomas Meth Interview With The Wall Street Transcript .................................................................................... 30

        D.      February 8, 2023, Enviva Announces 4Q 2022 Dividend ................................. 31

        E.      March 1, 2023 Enviva Reports Full Year And 4Q 2022 Results ......................... 32

F.  April 2, 2023 Thomas Meth Interview With Enviva's Head Of HR ................... 38

G.  April 3, 2023 Enviva Investor Day ........................................................ 39

VII.  THE TRUTH BEGINS TO EMERGE, WHILE DEFENDANTS CONTINUE TO ISSUE MATERIALLY FALSE AND MISLEADING STATEMENTS ......................... 44

A.  May 3-4, 2023 Enviva Reports 1Q 2023 Results ................................... 44

B.  August 2-3, 2023 Enviva Reports 2Q 2023 Results ............................. 48

C.  November 9,  2023 Enviva Reports 3Q 2023 Results ........................... 51

VIII.  POST-CLASS PERIOD EVENTS ...................................................... 54

A.  Enviva's Board Initiates An Internal Investigation Into the 4Q 2022 Purchase Agreements ......................................................... 54

B.  Enviva Declares Bankruptcy ........................................................ 56

IX.  ADDITIONAL SCIENTER ALLEGATIONS ........................................ 56

A.  Defendants Held Themselves Out As Knowledgeable And Had Access To The Concealed Facts ......................................................... 57

B.  Defendants' Motive To Manipulate 4Q 2022 Earnings To Meet Their Overstated Guidance ......................................................... 62

C.  Keppler's Insider Trading And Defendants' Incentive Compensation Provided Additional Motives ......................................................... 67

D.  The Defendants Left Their Positions Under Suspect Circumstances .................. 69

E.  Pellet Manufacturing And Trading Were Core Operations For Enviva ............... 70

X.  LOSS CAUSATION ................................................................... 71

XI.  CLASS ACTION ALLEGATIONS .................................................. 71

XII.  UNDISCLOSED ADVERSE FACTS ................................................ 72

XIII.  APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE) ................................................................ 74

XIV.  NO SAFE HARBOR ................................................................. 76

XV.  CAUSE OF ACTION ................................................................ 76

XVI.  PRAYER FOR RELIEF .............................................................. 79

XVII.  JURY TRIAL DEMANDED ........................................................................................... 80

## **EXHIBIT LIST**

Exhibit 1 –    Standstill Deed between Enviva, LP, Enviva Pellets Waycross, LLC, and RWE Supply & Trading GmbH (Nov. 11, 2023)

Exhibit 2 –    CIF Master Agreement between RWE Supply & Trading Switzerland S.A. and Enviva, L.P. (Nov. 30, 2011)

Exhibit 3 –    CIF Biomass Fuel Supply Agreement between Enviva Inc. and BayWa AG (Aug. 2, 2022)

Exhibit 4 –    Attachment to email sent April 28, 2024 by counsel for the Enviva Board Special Committee concerning investigation of the 4Q 2022 Purchase Agreements

Exhibit 5 –    Redline Comparison to the first Amended Class Action Complaint For Violations Of The Federal Securities Laws (ECF No. 41)

Lead Plaintiff Andrew Davis and named plaintiffs Christine Alloro and Ted Goldstein ("Plaintiffs"), individually and on behalf of all others similarly situated, by and through their attorneys, allege the following based upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon personal knowledge. Plaintiffs' information and belief is based upon, among other things, their counsel's investigation, which includes, without limitation: (a) review and analysis of regulatory filings made by the Defendants (defined below) and/or Enviva Inc. ("Enviva" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of documents filed in *In re: Enviva Inc., et al.*, Case No. 24-10453 (Bankr. E.D. Va.); (c) interviews with former employees of Enviva; (d) review and analysis of press releases, investor presentations, conference calls, media reports, and analyst reports issued and disseminated by or about the Defendants and/or Enviva; and (e) review of other publicly available information concerning the Defendants and/or Enviva.

## I.    NATURE OF THE ACTION AND OVERVIEW

1.    This is a federal securities class action on behalf of a class consisting of all persons and entities who purchased the publicly traded common stock of Enviva between November 3, 2022 and November 8, 2023, both dates inclusive (the "Class Period"), and who were damaged thereby. Plaintiffs seek to recover compensable damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder.

2.    Enviva is the world's largest producer of industrial wood pellets. Enviva's business centers on processing wood into pellet form at its facilities in the U.S. Southeast, for sale and shipment to utilities in Europe and Asia, which burn the pellets to generate heat and electricity. Enviva also had a side business of buying and reselling wood pellets, which usually accounted for about 15-20% of its annual pellet sales prior to the Class Period.

1

3.      The Defendants were senior executive officers of Enviva. Defendant John Keppler served as Chief Executive Officer at the beginning of the Class Period until he was replaced by Defendant Thomas Meth (who was in turn replaced by Enviva at the end of the Class Period). Defendant Shai Even served as Chief Financial Officer until Enviva terminated his employment part way through the Class Period. Defendant Michael Johnson served as Chief Accounting Officer until his purported "resignation" part way through the Class Period. Keppler, Meth, Even, and Johnson are collectively referred to as the "Defendants."

4.      Defendants misled investors by portraying Enviva as a financially stable and growing company with profitable wood pellet trading activities. However, Defendants concealed from investors that the agreements Enviva entered in the fourth quarter of 2022 that required it to purchase large amounts of wood pellets over the next three years (the "4Q 2022 Purchase Agreements") were set at extremely high prices that would result in hundreds of millions of dollars in losses based on the market prices prevailing during the Class Period. *See, e.g.*, WALL STREET JOURNAL, *The Trade That Backfired for America's Biggest Wood-Pellet Exporter* (Nov. 22, 2023).

5.      Defendants further misled investors by concealing other material facts concerning Enviva's failing business, including that: (i) Enviva's manufacturing plants experienced severe equipment failures, causing substantial increased costs and reduced production; (ii) Enviva had excessive employee turnover that further increased costs and decreased production; (iii) Enviva gave future discounts to customers in exchange for immediate sales, cannibalizing future earnings to pad its 2022 results; (iv) the price escalation features of Enviva's sale contracts failed to compensate for its rising production costs; and (v) Enviva's 3Q 2023 earnings guidance depended on assuming wood pellet prices that were much higher than market prices.

6.      Investors suffered significant losses as the truth about Enviva's failing business became known. On May 4, 2023, only one month after Enviva's April 3 Investor Day event where Defendants had touted the Company's financial stability and growth, Defendants revealed poor 1Q 2023 results, slashed Envia's full year 2023 guidance, and announced that Enviva was eliminating its dividend in order to conserve cash. On this news Enviva's stock price fell by $14.34, or 67%, on extremely high trading volume. Defendants blamed factors including excessive repair and maintenance costs and low production levels, while still concealing that Enviva faced hundreds of millions of dollars in losses under the 4Q 2022 Purchase Agreements.

7.      When on November 9, 2023, Enviva's new leadership (each of the Defendants had by then been replaced) finally revealed $283 million of expected losses on the 4Q 2022 Purchase Agreements, and that this raised substantial doubt about Enviva's ability to continue as a going concern, Enviva's stock price fell by another $2.99, or 77%, again on exceptionally high trading volume.

8.      On March 12, 2024 Enviva declared bankruptcy, due to the 4Q 2022 Purchase Agreements and the other problems Defendants had concealed from investors.

9.      As a result of Defendants' misleading statements and omissions, and the resulting precipitous decline in the market value of Enviva's stock, Plaintiffs and other Class members have suffered significant losses and damages.

II.    **JURISDICTION AND VENUE**

10.     The claims asserted herein arise under Section 10(b) of the Exchange Act (15 U.S.C. §§ 78j(b)) and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

11.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

3

12.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa). Defendants worked out of Enviva's principal executive offices which are located in this District. The alleged misstatements entered and subsequent damages took place within this District. Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this District.

13.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## III.     PARTIES & RELEVANT NON-PARTIES

14.     Lead Plaintiff Andrew Davis, on behalf of himself, and as Trustee of the Katherine J. Davis Irrevocable Trust, as set forth in his previously filed certification (*see* ECF No. 15-5), incorporated by reference herein, purchased Enviva shares during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

15.     Plaintiff Christine Alloro, as set forth in her previously filed certification (*see* ECF No. 41-1), purchased Enviva shares during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

16.     Plaintiff Ted Goldstein, as set forth in his previously filed certification (*see* ECF No 41-2), purchased Enviva shares during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

17. Defendant John Keppler co-founded Enviva's predecessor in 2004 with Thomas Meth, and served as Enviva's (or its predecessor's) CEO and Chairman of its Board of Directors until November 2022, when he stepped down from his positions for medical reasons, while remaining a consultant and strategic advisor to the Company. From April 2023 to September 2023 Keppler served as the Executive Chairman of Enviva's Board of Directors. Since September 2023 Keppler has been a non-management member of Enviva's Board of Directors.

18. Defendant Thomas Meth co-founded Enviva's predecessor in 2004 with John Keppler, and served as Enviva's (or its predecessor's) Executive Vice President, Sales and Marketing, and later its Chief Commercial Officer, through June 2022. Since June 2022 Meth has served as Enviva's President. In November 2022 Meth replaced Keppler as Enviva's CEO. In November 2023, Enviva replaced Meth as CEO with Glenn Nunziata, while Meth remained as President.

19. Defendant Shai Even began serving as Executive Vice President and Chief Financial Officer of Enviva (or its predecessor) in June 2018. In March 2023 Enviva's chief accounting officer, Defendant Johnson, resigned, and Even became Enviva's chief accounting officer. In August 2023 Enviva terminated Even and replaced him as CFO with Glenn Nunziata.

20. Defendant Michael Johnson served as Vice President and Chief Accounting Officer of Enviva (or its predecessor) from July 2021 to March 2023, during which time he was designated as its principal accounting officer.

21. Non-party Enviva Inc. is incorporated in Delaware and maintains its principal executive offices at 7272 Wisconsin Ave., Suite 1800, Bethesda, Maryland. Enviva's shares are listed and trade on the New York Stock Exchange ("NYSE") under the ticker symbol "EVA". Enviva was named as a defendant in the initial complaint filed in this action (*see* ECF No. 1).

Following Enviva's bankruptcy Lead Plaintiff voluntarily dismissed his claims against the Company without prejudice (*see* ECF No. 38).

22.     Non-party Former Employee 1 ("FE1") was a Regional Director at Enviva from approximately May 2018 to October 2022. He led wood fiber procurement for seven of Enviva's 10 plants (Sampson, NC; Greenwood, SC; Hamlet, NC; Waycross, GA; Cottondale, FL; Amory, MS; and Lucedale, MS), and most recently reported directly to EVP of Operations Royal Smith.

23.     Non-party Former Employee 2 ("FE2") was a Financial Analyst at Enviva from approximately 2018 to 2021. He worked on projects for the finance team, including preparation for monthly financial review meetings. FE2's reporting lines changed repeatedly, as the finance team experienced high turnover with four different mangers and two VPs during his time at Enviva.

24.     Non-party Former Employee 3 ("FE3") was a Maintenance and Reliability Manager at Enviva from approximately July 2020 to June 2022, first at Enviva's Hamlet, North Carolina plant and then at its Southampton, Virginia plant. FE3 led the maintenance team at those plants. In this role FE3 interacted with senior Enviva personnel including Director of Maintenance and Reliability Matt Cutshall and  EVP of Operations Royal Smith.

25.     Non-party Former Employee 4 ("FE4") was a Process Engineer at Enviva from approximately July 2018 to July 2023. FE4 worked on a team of engineers supporting Enviva's plants on capital projects, ongoing operations initiatives, and advanced troubleshooting. FE4's team reported up through Enviva's VP of Operations and its EVP of Operations, Royal Smith.

## IV.    BACKGROUND REGARDING ENVIVA

### A.    Enviva's Primary Business Consists of Processing Trees Into Wood Pellets For Shipment To Be Burned As Fuel On Other Continents

26.     Enviva's primary business is to process wood fiber from trees into uniform pellets that can been stored, transported, and ultimately burned as fuel.

6

27.     During the Class Period Enviva owned and operated ten wood pellet manufacturing plants located throughout the U.S. Southeast, with a theoretical (or "nameplate") combined production capacity of 6.2 million metric tons per year, making Enviva the world's largest manufacturer of industrial wood pellets.

28.     Enviva's primary customers are heat and electric utilities in the U.K., European Union, and Japan, where burning wood pellets was considered a form of renewable energy and eligible for substantial government subsidies.

29.     Enviva sells most of its pellets under long-term contracts with such customers, and delivers its pellets by shipping them on dry bulk cargo oceangoing vessels.

30.     In addition to Enviva's primary business of manufacturing wood pellets for sale, Enviva also buys smaller quantities of wood pellets from other companies and resells them to Enviva's customers. Historically, about 15-20% of Enviva's annual pellet sales were purchased from other companies and then resold to Enviva's customers.

**B.      Despite Incurring GAAP Losses, Defendants Marketed Enviva To Investors As A Growing Company With Dependable Cash Flows**

31.     Enviva reported substantial financial losses under U.S. Generally Accepted Accounting Principles ("GAAP") for the years leading up to the Class Period, and required outside financing in order to continue and grow its business. Enviva's SEC Form 10-K for the year 2021 (the last full year before the Class Period) reported the following annual net losses:

|          | **2021** | **2020** | **2019** |
|----------|----------|----------|----------|
| **Net loss** | $145,271,000 | $106,324,000 | $134,984,000 |

32.     Leading up to and during the Class Period, Defendants sought to attract investors and increase Enviva's stock price by portraying Enviva as a rapidly growing company that

7

generated reliable cash flows. Enviva's SEC form 10-K for the year 2021 reported the following

annual net revenues:

|  | 2021 | 2020 | 2019 |
|---|---|---|---|
| **Net revenue** | $1,041,678,000 | $874,962,000 | $683,568,000 |

33.     Defendants' public statements about Enviva emphasized the long-term nature of its

sales contracts, the creditworthiness of its customers, growing demand for wood pellets, and

favorable regulatory environments in its customers' locations. Defendants further emphasized the

purported reliability and low-cost nature of Enviva's manufacturing operations, and the purported

profitability of its wood pellet trading activities.

34.     Defendants downplayed Enviva's GAAP losses, and emphasized non-GAAP

financial measures created by Defendants to reflect positive earnings, such as "adjusted net

income," "adjusted gross margin," "distributable cash flow," and Defendants' preferred measure

of earnings, "adjusted EBITDA." Enviva's SEC Form 10-K for the year 2021 reported the

following annual adjusted EBITDA:

|  | 2021 | 2020 | 2019 |
|---|---|---|---|
| **Adjusted EBITDA** | $116,706,000 | $81,843,000 | $9,493,000 |

35.     Defendants touted to investors plans to double pellet production capacity and

adjusted EBITDA within five years. Defendants further touted Enviva's quarterly dividend

payments, which they characterized as safe and increasing.

## V.     DEFENDANTS CONCEALED MATERIAL FACTS CONCERNING ENVIVA'S FAILING BUSINESS

36.     Throughout the Class Period, Defendants knew, but failed to disclose to investors,

material information that created material risks for Enviva's business.

37.    Defendants concealed that the agreements Enviva entered in the fourth quarter of 2022 that required it to purchase large amounts of pellets over the next three years were set at high prices that would result in hundreds of millions of dollars in losses based on the market prices prevailing throughout the Class Period.

38.    Defendants likewise concealed that: (i) Enviva's manufacturing plants experienced severe equipment failures, causing substantial increased costs and reduced production; (ii) Enviva had excessive employee turnover that further increased costs and decreased production; (iii) Enviva gave future discounts to customers in exchange for immediate sales, cannibalizing future earnings to pad its 2022 results; (iv) the price escalation features of Enviva's sale contracts failed to compensate for its rising production costs; and (v) Enviva's 3Q 2023 earnings guidance depended on assuming wood pellet prices that were much higher than market prices.

39.    These concealed facts severely undermined Defendants' misleading public statements during the Class Period that portrayed Enviva as a financially stable and growing company with profitable wood pellet trading activities and reliable manufacturing facilities.

**A.    Enviva Stood To Lose Hundreds Of Millions Of Dollars On Its 4Q 2022 Wood Pellet Purchase Agreements**

40.    In 4Q 2022 Enviva entered into a series of transactions with its existing customer RWE Supply & Trading GmbH ("RWE"), under which (i) Enviva would sell RWE approximately 340,000 metric tons of wood pellets in 4Q 2022 (in addition to approximately 110,000 metric tons to be sold to RWE under pre-existing contracts), and (ii) Enviva agreed to purchase approximately 1,760,000 metric tons of wood pellets from RWE between 2023 and 2025 (the "4Q 2022 Purchase Agreements"). RWE is a German headquartered multinational energy company which generates electricity and trades related commodities including wood pellets.

41.     Information subsequently filed by RWE in support of its claims in Enviva's bankruptcy proceedings reveals additional details about the 4Q 2022 Purchase Agreements. Specifically, a Standstill Deed dated November 11, 2023 among RWE and two Enviva subsidiaries (Enviva, LP and Enviva Pellets Waycross, LLC) (*see* **Exhibit 1**) reflects that in the 4Q 2022 Purchase Agreements RWE was supposed to "sell Product back to Enviva" under the terms of the following confirmations pursuant to the two master agreements between RWE and Enviva:

(a)     Confirmation reference number 62579357, dated October 13, 2022, for Enviva's repurchase of 825,000 MT [metric tons] +/- 2% of Product between October 1, 2023 and December 31, 2025;

(b)     Confirmation reference number 63489992, dated November 22, 2022, for Enviva's repurchase of 306,500 MT +/- 10% of Product between June 1, 2023 and December 31, 2023;

(c)     Confirmation reference number 63814539, dated December 12, 2022, for Enviva's repurchase of 307,000 MT +/- 10% of Product between April 1, 2023 and July 31, 2023; and

(d)     Confirmation reference numbers 69753287 and 70250711, dated August 31, 2023 (being the date of [RWE]'s exercise of a Put Option granted by Enviva under a Put Option Agreement dated December 23, 2022), for Enviva's repurchase of 320,000 MT +/- 10% of Product between June 1, 2024 and December 31, 2025.

42.     While, beginning on March 1, 2023, Defendants first disclosed that Enviva would receive gross proceeds of approximately $175.1 million from its 4Q 2022 sales to RWE, and disclosed the total quantity of wood pellets that Enviva was required to buy from RWE over 2023-25, they still concealed from investors the elevated prices that Enviva was obligated to pay RWE.

43.     At the end of the Class Period on November 9, 2023, Enviva's new management (which had replaced the Defendants) revealed for the first time the following details concerning the timing, and approximate amounts and prices of the wood pellets that Enviva was required to buy from RWE under the 4Q 2022 Purchase Agreements, as compared to the expected resale value of the wood pellets  (based on then-current market prices):

|  | Metric Tons | Cost | Expected Resale Value | Expected Loss |
|---|---|---|---|---|
| 2023 | 800,000 | $296,300,000 | $156,900,000 | $139,400,000 |
| 2024 | 600,000 | $233,300,000 | $134,100,000 | $99,200,000 |
| 2025 | 300,000 | $111,800,000 | $67,000,000 | $44,800,000 |
| Total | 1,700,000 | $641,400,000 | $358,000,000 | $283,400,000 |

44.     Based on this information, Enviva had agreed to purchase wood pellets from RWE at approximately the following prices:

|  | Price per Metric Ton |
|---|---|
| 2023 | $370.38 |
| 2024 | $388.83 |
| 2025 | $372.67 |
| Weighted Average | $377.29 |

45.     More precisely, as revealed by Enviva's Standstill Deed with RWE (*see* **Exhibit 1**), as of November 11, 2023 there were 1,729,430 metric tons of wood pellets remaining to be purchased by Enviva from RWE under the 4Q 2022 Purchase Agreements, at an average weighted base price of $370.85 per metric ton, meaning Enviva was obligated to pay $641,359,115.50 in total. The differences between the numbers reflected in the Standstill Deed and those contained in or derived from Enviva's public disclosure are due to Enviva's use of approximate, rounded numbers in its public disclosure.

46.     Enviva's November 9, 2023 disclosures based the expected resale value of the wood pellets on "forward Argus prices published on November 1, 2023." Argus Media ("Argus")

11

is an independent provider of price information, consulting services, and industry conferences for commodities markets and the global energy industry. Among Argus's products and services is Argus Biomass Markets, a weekly newsletter that provides news, analysis and price information for biomass markets including wood pellets.

47.     Argus, including via its weekly Argus Biomass Markets newsletter, provides pricing information for wood pellets based on location, delivery date, and standard contract terms. Argus reports wood pellet prices for cif NWE, fob Baltic, fob Portugal, and various North American industrial wood pellet prices. "Cif" stands for cost, insurance and freight, and refers to an arrangement where the seller is responsible for a shipment and associated costs until it reaches its port of destination. "Fob" stands for free on board, and refers to an arrangement where the seller is only responsible for a shipment and associated costs until it is loaded onto a vessel. "NWE" stands for northwest Europe, and in the energy industry often refers specifically to ports in the region of Amsterdam, Rotterdam, and Antwerp (often abbreviated as "ARA").

48.     Based on the expected resale values reported by Enviva on November 9, 2023 and the price information reported in the November 1, 2023 Argus Biomass Markets newsletter, Enviva was referring to Argus's cif NWE prices, its fob Baltic prices, or its fob Portugal prices. Which particular prices Enviva was referring to cannot be determined due to the approximate numbers it provided. However, it appears likely that Enviva was referring to the Argus cif NWE prices, because Enviva's two master agreements with RWE reflected that sales would be made on a cif basis, and one of those agreements (under which the vast majority of Enviva's obligations to RWE were incurred) reflected that sales would be delivered in the ARA region. Furthermore, a March 19, 2024 article from Argus titled "Enviva's board probing 4Q22 transactions" states that

12

Enviva's purchase obligations were "at an average price around $377/t cif northwest Europe (NWE)."

49.    The December 22, 2010 Master CIF Contract for Deliveries of Biomass ("RWE 2010 Master Agreement") between certain predecessors and affiliates of Enviva and RWE, at Article 2.2, provides that "[e]ach Transaction relates or will relate to the sale and purchase of Biomass for delivery on a CIF basis." The November 30, 2011 CIF Master Agreement ("RWE 2011 Master Agreement") (*see* **Exhibit 2**) between certain predecessors and affiliates of Enviva and RWE, at Article 6.1, similarly provides that, except where inconsistent with the agreement's express terms "the Product delivered hereunder shall be delivered on a CIF basis." Annex C to the RWE 2011 Master Agreement contains the form of confirmation for individual transactions for wood pellet purchases and sales, and provides that "Delivery" will be "CIF ARA," that "Discharge Port" will be "ARA," and that "Contract Price" will be based on delivery "CIF ARA." The RWE 2011 Master Agreement's Article 1.1 defines "ARA" as "Amsterdam, Rotterdam, Antwerp range." According to the Standstill Deed, the RWE 2011 Master Agreement accounted for $343,920,504 (approximately 97%) of Enviva's liabilities to RWE under the 4Q 2022 Purchase Agreements, as compared to $11,079,496 (approximately 3%) for the RWE 2010 Master Agreement.

50.    The version of the RWE 2011 Master Agreement publicly disclosed by RWE in its claims filed in Enviva's bankruptcy redacts the names and signatures of its signatories. However, the RWE 2011 Master Agreement is initialed twice on each page, presumably by the signatories for RWE and Enviva. The following example of the initials is from page nine of the RWE 2011 Master Agreement:

13

By comparison to another publicly available Enviva contract, the initial on the left appears to be that of Defendant Meth.

51.     Enviva is a party to a CIF Biomass Fuel Supply Agreement dated August 2, 2022 with BayWa AG (the "BayWa Agreement") (*see* **Exhibit 3**). The BayWa Agreement is signed on behalf of Enviva by Defendant Meth:



52.     Like the RWE 2011 Master Agreement, the BayWa Agreement is initialed twice on each page. The following example of the initials is from page four of the BayWa Agreement:



The initial on the left appears to belong to Defendant Meth, based on comparison to his signature on the BayWa Agreement.

53.     The BayWa Agreement also shows that Enviva and the Defendants not only had access to Argus wood pellet pricing data, but even incorporated it into Enviva's contracts. Section 1 of the BayWa Agreement defines "Market Price," in relevant part, as "[t]he price as indicated by

14

Argus 'Industrial Wood Pellets 90 day Index CIF NWE USD/MT current month average' for the relevant period for wood pellets plus a premium of $25/MT." The BayWa Agreement also includes an Annex A listing the "Discharge Port" as "ARA," which the BayWa Agreement defines as "Amsterdam, Antwerp, Ghent, or Rotterdam." As reflected in Annex B to the BayWa Agreement, notices to Enviva pursuant to the agreement are to be sent to Defendant Meth, with a copy to Enviva's General Counsel.

54.     Enviva frequently cites Argus as a source of data for its investor presentations, and Enviva has participated in the annual Argus Biomass Conference. A paper published by Enviva titled "Biomass: Unlocking a Future Beyond Fossil Fuel," which includes an introductory letter from Defendant Meth, also includes a chart reflecting wood pellet prices for 2022-2027 described by Enviva as "Argus CIF ARA," in an apparent reference to Argus cif NWE price data. Enviva's schedule of assets and liabilities filed in its bankruptcy proceedings lists a prepayment made from Enviva to Argus with a current value of $20,093.30. *See In re: Enviva Inc., et al.*, Case No. 24-10453 (Bankr. E.D. Va.), ECF No. 386. Former Enviva Financial Analyst FE2 recalled that Enviva obtained some commodity pricing information from Argus, and on at least one occasion he logged in to an Argus database for his work.

55.     Enviva personnel including Defendants regularly followed wood pellet price indices such as those published by Argus. For example, Enviva refers to the recent levels of "biomass spot market prices, as well as the forward curve pricing of certain European indices" in its SEC Form 10-Q filings for 2Q 2022 (signed by Defendant Even with certification of accuracy signed by Defendant Keppler), 3Q 2022 (signed by Defendant Even with certification of accuracy signed by Defendant Keppler), and 2Q 2023 (signed by Defendant Even with certification of

accuracy signed by Defendant Meth), and in its Form 10-K filing for full year 2022 (signed by Defendants Meth, Even, and Johnson).

56.     The following chart shows Argus's weekly reported cif NWE wood pellet prices in dollars per metric ton over 2022-23, for delivery in the spot market (within 90 days), one year in the future, two years in the future, and three years in the future:



57.    The following chart shows Argus's weekly reported fob Baltic wood pellet prices in dollars (converted from euros based on daily closing price) per metric ton over 2022-23, for delivery in the spot market (within 90 days), one year in the future, two years in the future, and three years in the future:



58.     The following chart shows Argus's weekly reported fob Portugal wood pellet prices in dollars (converted from euros based on daily closing price) per metric ton over 2022-23, for delivery in the spot market (within 90 days), one year in the future, two years in the future, and three years in the future:



59.     Prices for spot market (within 90 days) and 1-year delivery of wood pellets were abnormally high during 4Q 2022 when Enviva entered the 4Q 2022 Purchase Agreements.

18

60.     By February 2023 prices for spot market and 1-year delivery of wood pellets had returned to their prior levels, substantially less than the abnormal highs of 4Q 2022, and remained at such lower levels throughout 2023.

61.     Even during 4Q 2022, prices for 2-year and 3-year delivery of wood pellets (*i.e.*, 2024 and 2025 forward prices) were far below the prices Enviva had agreed to pay of approximately $388.83 per metric ton for 2024 and $372.67 per metric ton for 2025. The highest 2024 or 2025 forward prices reported during 4Q 2022 were approximately $290 per metric ton.

62.     Due to the high prices contained in Enviva's 4Q 2022 Purchase Agreements, the Company at all times faced losses of hundreds of millions of dollars under those agreements, as shown by the contemporaneous Argus data available to the Defendants during the Class Period.

63.     RWE's claims filed in Enviva's bankruptcy reveal that "[i]n the first quarter of 2023 and pursuant to the Debtors' request, the parties engaged in good faith negotiations in an attempt to work out a consensual solution to the Debtors' prepetition breaches of the Master Agreements. These negotiations have resulted in the execution of multiple standstill agreements to facilitate negotiations," including the November 11, 2023 Standstill Deed (*see* **Exhibit 1**). The recitals to the Standstill Deed likewise state that "since the first quarter of 2023 and at the request of Enviva, the Parties have been engaged in ongoing good faith negotiations regarding restructuring of the Parties' respective obligations under the Master Agreements, including with respect to the Repurchases."

64.     While concealing the high prices Enviva was required to pay under the 4Q 2022 Purchase Agreements, Defendants repeatedly admitted throughout 2023 that they did not expect wood pellet prices to return to abnormal highs as experienced in 4Q 2022. For example, in Enviva's March 1, 2023 earnings call Defendant Meth stated in response to an analyst's question concerning

anticipated 2023 spot sales, "market price was higher in the later part of 2022 than we had seen historically. And that is not something that we expect on a go-forward basis." Similarly, Defendant Even stated on that call that "higher prices over the course of 2023, [] is not part of our current guidance." During Enviva's April 3, 2023 Investor Day, Defendant Keppler stated that "our guidance for 2023 and beyond doesn't account for indeed the potential uplift in spot prices or some of the issues that resulted in the very, very high prices that we saw in 2022. Our guidance doesn't account for that." Also at the Investor Day, Defendant Meth stated, "[w]e do not expect the spot market to go back to levels that we had in 2022, just not."

65.     Defendants also knew that the prices of approximately $370-$388 per metric ton that Enviva had agreed to pay under the 4Q 2022 Purchase Agreements were vastly greater than the prices that Enviva obtained from customers under the long-term contracts that comprised 80-85% of Enviva's business. As stated in Enviva's Form 10-Q filed with the SEC on November 3, 2022, and signed by Defendant Even (with Defendant Keppler certifying its accuracy), Enviva had "current long-term contracted pricing of roughly $200 to $220 per MT across Enviva's weighted average portfolio." Similarly, as stated in Enviva's Form 10-K filed with the SEC on March 1, 2023, and signed by Defendants Meth, Even and Johnson, Enviva had "current long-term contracted pricing of roughly $200 to $235 per MT weighted average across our portfolio."

66.     Enviva's current CEO, Glenn Nunziata, filed a declaration in Enviva's bankruptcy proceedings, in which he describes events leading to the bankruptcy. *See In re: Enviva Inc., et al.*, Case No. 24-10453 (Bankr. E.D. Va.), ECF No. 27 (the "Nunziata Declaration"). As summarized in the Nunziata Declaration, "the longer-dated and fixed-price purchase components of the Q4 2022 Transactions were unhedged, and because the price for the to-be-purchased future volumes was significantly higher than the sales prices under pre-existing sales contracts for the

corresponding periods, the profitability of the Q4 2022 Transactions ultimately depended on the Company's ability to resell the to-be-purchased wood pellets under future short-term contracts or spot agreements at sales prices higher than the fixed future purchase price." Mr. Nunziata continued, "[i]n early 2023, however, market prices for wood pellets fell well below the prices experienced in the fourth quarter of 2022 and significantly lower than the fixed prices at which the Company agreed to purchase pellets from [RWE]. Those prices have not recovered. The purchase components of the Q4 2022 Transactions thus failed to produce positive economic results and, if completed as scheduled, would have put significant liquidity pressure on the Company."

**B.      Enviva's Manufacturing Plants Experienced Severe Equipment Failures, Causing Significant Expenses And Production Shortfalls**

67.      The Nunziata Declaration explains, under the heading "EVENTS LEADING TO THE CHAPTER 11 CASES," that "[o]ver roughly the past 18 months, the Company has faced significant financial and operational pressures." The Nunziata Declaration was dated and filed March 13, 2024, meaning that its reference to "roughly the past 18 months" begins in approximately September 2022.

68.      Mr. Nunziata goes on to explain, under the sub-heading "Challenges Facing The Company," that Enviva "has financially struggled due to" causes including "elevated and increasing operational costs," and "plant production issues." Mr. Nunziata explained that "[a]s the Company strove to increase revenue by increasing both production and production capacity, cost increases followed due to, among other things, capital expenditures, [and] increased maintenance."

69.      Former Enviva Process Engineer FE4 noted that Enviva's spending on reliability and maintenance for its plants was extremely high, and that Enviva was trying to crack down on such spending. FE4 recalled that when equipment broke, he and his colleagues were supposed to get it back up and running as quickly as possible, but at the same time Company leadership sought

21

the cheapest solutions to maintenance issues and resisted investing in new equipment. Enviva's reliability and maintenance problems continued to worsen, and by the time Defendant Keppler left Enviva, FE4's colleagues were frustrated with how Enviva was trying to run its plants.

70.    FE4 stated that by late 2022 problems at Enviva's Greenwood, South Carolina and Southampton, Virginia plants had become apparent to most people at the Company and were a significant focus. These plants struggled to achieve consistent production and experienced significant down time due to equipment breaking. FE4 recalled an all hands meeting called in or around early 2023 to support Southampton, which was experiencing problems with conveyors, dryers, and other equipment.

71.    FE4 recalled that wear and tear on equipment including conveyors was a big issue for Enviva. According to FE4 the high degree of wear on machinery was known to most Enviva personnel. FE4 also noted that during his time at Enviva the company switched from using mostly hardwood in its plants to mostly softwood, which was more corrosive and caused increased wear on the equipment.

72.    Former Enviva Maintenance and Reliability Manager FE3 recalled that equipment at Enviva's Hamlet, North Carolina plant wore out at an inordinately fast rate. He attributed this in part to Enviva having switched from a mix of approximately 70-80% hardwood and 20-30% softwood, to the opposite, with approximately 70-80% pine (which is softwood). According to FE3, pine has high moisture levels, which led to excessive corrosion and wear on Enviva's equipment, much of which was made out of cheaper carbon steel instead of more durable stainless steel. FE3 noted that the Hamlet, North Carolina Plant experienced five or six outages per year, each of which required Enviva to spend hundreds of thousands of dollars. FE3 stated that maintenance and upkeep costs for Enviva's plants were extremely high.

73.     When FE3 transferred to Enviva's Southampton, Virginia plant he had access to its financial information, invoices, and checkbooks, which showed the plant operating at a substantial loss. According to FE3 the Southampton plant was in poor condition with equipment falling apart, due in part to using a high proportion of pine. FE3 recalled that Southampton's problems and cost overruns were also due in part to a failed expansion after which its equipment did not work properly. According to FE3, the Southampton plant was not even close to achieving its stated maximum production level.

74.     FE3 also recalled that many of Enviva's plants lacked maintenance staff qualified to fix the plants' equipment, which caused Enviva to incur substantial expense to hire contractors. For example, FE3 stated that Enviva paid Clemens Industrial and Oak Ridge Industries approximately $4-$5 million each annually for maintenance and outage work. FE3 further identified contractor IBS as performing substantial  work for Enviva  relating to its conveyors.

75.     FE3 stated that Enviva's plants experienced about five to seven multi-day outages per year in order to rebuild equipment, along with additional shorter outages for repairs. In particular, FE3 recalled that the Southampton plant spent millions of dollars for outages and emergencies, above regular maintenance costs.

76.     Former Enviva Regional Director FE1 recalled that in or about 2019 the Company switched from using a predominantly hardwood mix to a predominantly pine mix at its Sampson, North Carolina and Greenwood, South Carolina plants. According to FE1, pine resin caused equipment to rust and corrode, resulting in serious mechanical problems. Maintenance issues were widely known at Enviva and FE1 recalled that they were discussed in daily meetings at its plants.

77.     On September 28, 2023, Enviva gave a tour of its Southampton, Virginia wood pellet manufacturing plant to analysts from J.P. Morgan, RBC Capital Markets, and others. In

23

notes regarding the visit, the analysts revealed the depths of Southampton's longstanding operational problems.

78.    For example, in a note titled "Southampton Plant Visit: ~$100mm Of Burned Capital; Operations Back To Where They Started," J.P. Morgan analyst Mark Strouse wrote that the plant's poor performance was due in part to a botched expansion project that Enviva began in 2019 and completed in 2021, to add a second dryer to the facility (raw wood fiber contains moisture that must be dried out in order to produce useable fuel pellets). According to the note, "[t]he plant was not constructed, nor retrofitted, to adequately process the second dryer, as the additional output regularly overwhelmed other stages in the production process, causing frequent extended down times, sporadic daily outputs, and material cash burn." Strouse estimated, based on information supplied by Enviva, that Enviva had spent approximately $65 million on the expansion, and stated that "EVA has said the TTM PF [trailing twelve month pro forma] EBITDA as of 1Q23 was a loss of more than $40mm," resulting in an overall destruction of approximately $100 million. The note stated that "we were surprised to learn the full extent of the capital destruction from a poorly executed expansion at Southampton."

79.    Similarly, in a note titled "Takeaways from Enviva Facility Tour," RBC Capital Markets analyst Elvira Scotto wrote that "[i]n the trailing 12 months ending March 31, 2023, the Southampton plant lost $40MM." Scotto further wrote that "[w]ith dryer uptime in the low-80% range (vs ~95% for all other plants), Southampton became one of EVA's highest cost facilities."

80.    On August 3, 2023 Defendants held Enviva's 2Q 2023 earnings call, in which Defendant Meth admitted, "[p]rior to the operational changes that started to take hold in June, Southampton [had] been operating unprofitably for a number of quarters."

24

C.    **Enviva's Excessive Employee Turnover Further Increased Costs And Reduced Production**

81.    In the Nunziata Declaration, Enviva's current CEO admits under the headings "EVENTS LEADING TO THE CHAPTER 11 CASES" and "Challenges Facing The Company," that as Enviva "strove to increase revenue by increasing both production and production capacity, cost increases followed due to, among other things, . . . increased labor costs due to utilizing temporary labor caused by increasing employee turnover."

82.    Mr. Nunziata continued to explain that in 2022, "[i]ncreased levels of personnel turnover further impacted the Company's business in terms of both labor costs and productivity, as it is costly and time consuming to train new employees," and that "[t]hose challenges resulted in their own incremental costs, reduced availability at the Company's facilities, and depressed aggregate production levels."

83.    Former Enviva Regional Director FE1 noted high employee turnover at Enviva, which he attributes to toxic behavior from managers including Defendant Keppler and EVP of Operations Royal Smith, and a culture at the top of the Company that was hostile to employees. FE1 recalled that Royal Smith would curse employees out and threaten to fire them in meetings. According to FE1, multiple employees were fired on the spot for challenging executives' statements. For example, after being questioned by a plant manager for Ahoskie, North Carolina (who was eventually fired), Defendant Keppler stated that he would have fired the employee on the spot if there hadn't been so many other people in the room.

84.    FE1 recalled learning at one point that Enviva experienced a 55% turnover rate on a company-wide basis.

85.    Former Enviva Financial Analyst FE2 similarly reported very high rates of turnover and a toxic environment on the finance team. According to FE2, in his roughly three years at

25

Enviva, the finance team had approximately 15 analysts, four different managers, and two different VPs. These high rates of turnover created problems because, for example, an employee with important financial data stored only on their computer would leave the company, and Enviva would then lose that information.

### D.   Enviva Cannibalized Future Earnings To Boost Its 2022 Results

86.   In the Nunziata Declaration, Enviva's current CEO admits under the headings "EVENTS LEADING TO THE CHAPTER 11 CASES" and "Challenges Facing The Company," that Enviva "paid some customers to defer or cancel pellet shipments under lower-margin long-term contracts so that the Company could sell the pellets on the spot market at higher prices and greater profitability."

87.   Mr. Nunziata continued, "[a]lthough these strategies had a positive impact on revenue and EBITDA in the relevant current period, the transactions resulted in reduced pricing (in the form of discounts on future contracted volumes) for the remainder of the contracted period."

### E.   The Price Escalation Provisions Of Enviva's Sale Contracts Failed To Compensate For Increased Production Costs

88.   In the Nunziata Declaration, Enviva's current CEO admits under the headings "EVENTS LEADING TO THE CHAPTER 11 CASES" and "Challenges Facing The Company," that Enviva "has financially struggled due to" causes including "a failure of contractual escalators to  appropriately scale with actual costs."

89.   As Mr. Nunziata explained, although Enviva's long-term sale contracts "tend to include provisions that provide margin protection and price escalators, certain of these escalators were tied to foreign price indices rather than U.S. price indices and proved to be insufficient to offset the cost increases, particularly due to U.S. inflation, and other pressures the Company has faced."

90.     On August 3, 2023 Defendants held Enviva's 2Q 2023 earnings call, in which Defendant Meth admitted, "[w]e've also been having constructive conversations with our customers regarding raising sales prices of some of our legacy contracts given that our whole industry has been suffering from cost . . . increases that have outpaced sales price increases over the past couple of years."

**F.      Enviva's Financial Guidance For 3Q 2023 Depended On Assuming Wood Pellet Prices Much Higher Than Market Prices**

91.     During Enviva's August 3, 2023 earnings call, Defendants repeatedly emphasized that their guidance for 3Q 2023 did not depend on spot market sales. However, as admitted by Glenn Nunziata in Enviva's November 9, 2023 earnings call at the end of the Class Period, "[i]n August 2023, when we reaffirmed our expectations for third quarter, including an adjusted EBITDA range of $60 million to $80 million, we factored in a significant volume of spot sales. We assumed an average sales price on this volume that was much higher than our contracted book."

92.     Enviva's Form 10-Q filed with the SEC on August 3, 2023 reported "current long-term contracted pricing of roughly $200 to $220 per MT across Enviva's weighted average portfolio." At the time of Enviva's August 3, 2023 earnings call, wood pellet spot prices (*i.e.*, for delivery within 90 days) were approximately $203-$213 per metric ton (depending on which index is used). As such, Defendants had no basis to assume a "significant volume" of 3Q 2023 spot sales at an average sales price "that was much higher than our contracted book."

**VI.     MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE BEGINNING OF THE CLASS PERIOD**

93.     Defendants made numerous materially misleading statements over the Class Period, many of which were similar. For the sake of brevity, Plaintiffs only allege herein certain key and/or representative misleading statements.

A.    **November 2-3, 2022 Enviva Reports 3Q 2022 Results**

94.    The Class Period begins on November 3, 2022. After the close of stock market trading on November 2, 2022, Enviva published a press release titled "Enviva Reports 3Q 2022 Results."

95.    The press release quoted Defendant Meth as stating, "[p]roductivity improvements across our manufacturing facilities, including debottlenecking, asset utilization increases, and the capacity expansions we have underway, are resulting in production rates that we expect to translate to over 6 million tons next year, and when combined with our improving supply chain conditions and the constructive pricing environment, particularly in Europe, are expected to not only provide modest opportunities in fourth-quarter 2022 to drive incremental margin and cash flow, but also set the stage for substantial growth in 2023 and beyond."

96.    The statements identified in the preceding paragraph were materially false and/or misleading, and/or failed to disclose material adverse facts because, as Defendants knew or recklessly disregarded: Enviva's manufacturing facilities suffered from severe equipment failures that decreased production and increased expenses; the Southampton expansion had failed; and these facts created material risks to Enviva's growth.

97.    On November 3, 2022 Defendants held Enviva's 3Q 2022 earnings call.

98.    On the earnings call, Defendant Meth stated "[a]nd in addition to our continuous long-term contracting activities, the same tailwinds that drive the longer-term contracts are driving new highly-accretive near-term opportunities with existing and new customers. And although the near-term opportunities don't reflect the same tenor of our long-term contracts, they and other transactions where we are managing dislocations within our customers' demand profile are a durable component of our business and will continue to drive value over the long term."

28

99.     The statements identified in the preceding paragraph were materially false and/or misleading, and/or failed to disclose material adverse facts because, as Defendants knew or recklessly disregarded: Enviva's near-term contracting activities were driven in substantial part by giving customers discounts on future purchases in order to free up pellets for immediate sale, and so would destroy value over the long term; and on October 13, 2022 Enviva had agreed to repurchase large volumes of wood pellets from RWE over 2024 and 2025 at prices substantially in excess of forward prices for those time periods and Enviva's long-term contracted sales pricing.

100.    Defendant Meth also stated on the earnings call that:

Enviva has a demonstrated track record of procuring volumes from different suppliers and geographies and selling them profitably into spot market opportunities in our long-term contracts. Market data suggests that volumes can be purchased on an FOB basis in the Pacific Rim for less than $200 per metric ton. Market data also points to trading prices currently north of $400 per metric ton in European markets. For companies like Enviva with large-scale portfolios of customers and shipping partners, these types of market dislocations can provide an opportunity to drive incremental value while meeting the needs of our customers. This is a market tailwind that we may talk more frequently about in the future.

101.    The statements identified in the preceding paragraph were materially false and/or misleading, and/or failed to disclose material adverse facts because, as Defendants knew or recklessly disregarded: on October 13, 2022 Enviva had agreed to repurchase large volumes of wood pellets from RWE over 2024 and 2025 at prices substantially in excess of forward prices for those time periods and Enviva's long-term contracted sales pricing, severely undermining Enviva's ability to resell those volumes at a profit.

102.    On the earnings call, Defendant Keppler stated "[t]he headline price increases, obviously, headline price increases margin. And it's an all-of-the-above impact, right? The fact that the inflationary provisions within each of our contracts are providing meaningful, durable pricing

29

increases and increased margin at frankly, a faster rate than we're seeing some of the impact on the cost tower. But that's why the business model works well, right?"

103. The statements identified in the preceding paragraph were materially false and/or misleading, and/or failed to disclose material adverse facts because, as Defendants knew or recklessly disregarded: the inflationary provisions in Enviva's contracts were not sufficient to offset its rising costs.

**B.      November 28, 2022 Enviva 3Q 2022 Update Investor Presentation**

104. Enviva published an investor presentation dated November 28, 2022 and titled "3Q 2022 Update."

105. The investor presentation quotes Defendant Meth as stating, "[t]he combination of pricing escalators in our contracts, our repricing of certain of our historical contracts, our entry into new, higher priced contracts, and a production and cost position that continues to improve, means that our margins are expanding significantly and durably."

106. The statements identified in the preceding paragraph were materially false and/or misleading, and/or failed to disclose material adverse facts because, as Defendants knew or recklessly disregarded: pricing escalators in Enviva's contracts failed to offset increased costs of production; Enviva's production and cost position were harmed by severe equipment failures and excessive employee turnover; and these facts created material risks to Enviva's margins.

**C.      January 26, 2023, Thomas Meth Interview With The Wall Street Transcript**

107. The Wall Street Transcript published excerpts from an interview with Defendant Meth, dated January 26, 2023.

108. The interviewer asked, "[h]ow would you outline your priorities for this year and in the next year or two?" Defendant Meth responded in part, "in addition to growing and developing

our infrastructure, we're paying a healthy dividend. We can do both and we'll certainly continue to do that."

109. The statements identified in the preceding paragraph were materially false and/or misleading, and/or failed to disclose material adverse facts because, as Defendants knew or recklessly disregarded: market prices for wood pellets, and Enviva's long-term contracted sales prices, were far below the prices Enviva had agreed to pay in the 4Q 2022 Purchase Agreements; Enviva suffered from severe equipment failures and excessive employee turnover that increased costs and decreased production; in order to increase 2022 sales Enviva gave customers discounts on future purchases; price escalation features in Enviva's contracts did not offset its rising production costs; and these facts created material risks to Enviva's ability to grow and pay dividends. By January 26, 2023, market prices indicated that Enviva would lose approximately $197-$230 million on the 4Q 2022 Purchase Agreements.

**D.     February 8, 2023, Enviva Announces 4Q 2022 Dividend**

110. Enviva published a press release dated February 8, 2023 titled "Enviva Declares Quarterly Dividend."

111. The press release quoted Defendant Meth as stating, "[a]s we execute our strategic plan, our goal is to achieve new levels of durable cash flow, and the continued market tailwinds we are experiencing provide us tremendous confidence in our ability to deliver on our long-term growth objectives."

112. The statements identified in the preceding paragraph were materially false and/or misleading, and/or failed to disclose material adverse facts because, as Defendants knew or recklessly disregarded: Enviva faced the severe market headwind of market pricing for wood pellets substantially below the prices it had agreed to pay in the 4Q 2022 Purchase Agreements, which

created material risks to Enviva's long-term growth objectives. By February 8, 2023, market prices indicated that Enviva would lose approximately $244-$266 million on those purchases.

**E.     March 1, 2023 Enviva Reports Full Year And 4Q 2022 Results**

113.    On March 1, 2023 Enviva published a press release titled "Enviva Reports 4Q and Full-Year 2022 Results, Provides 2023 Guidance, and Announces New Customer Agreements."

114.    The press release quoted Defendant Meth as stating, that in 2022 Enviva "generated significant cash, especially in the fourth quarter, which sets the stage for solid growth in 2023 and beyond."

115.    The statements identified in the preceding paragraph were materially false and/or misleading, and/or failed to disclose material adverse facts because, as Defendants knew or recklessly disregarded: the steps Defendants took to generate cash in 4Q 2022 would substantially increase future costs and decrease future revenue; market prices for wood pellets, and Enviva's long-term contracted sales prices, were far below the prices Enviva had agreed to pay in the 4Q 2022 Purchase Agreements; in order to increase 2022 sales Enviva gave customers discounts on future purchases; and these facts created material risks to Enviva's growth. By March 1, 2023, market prices indicated that Enviva would lose approximately $263-$282 million on the 4Q 2022 Purchase Agreements.

116.    The press release also quoted Defendant Meth stating "I am most focused on improving operational performance and cost management in our plants and ports. In 2023, we expect to drive increased output from these assets, and together with procured volumes, we aim to sell close to 7 million metric tons at higher prices than we have seen historically, and at a meaningfully lower cost position, achieved by higher plant utilization, a stable and fully staffed workforce, and improved supply chain conditions relative to the challenges of 2022."

32

117.    The statements identified in the preceding paragraph were materially false and/or misleading, and/or failed to disclose material adverse facts because, as Defendants knew or recklessly disregarded: Enviva suffered from severe equipment failures and excessive employee turnover that reduced production and increased costs.

118.    On March 1, 2023 Enviva filed with the SEC its Form 10-K for the year 2022. The 10-K was signed by Defendants Meth, Even, and Johnson.

119.    Enviva's Form 10-K stated that "[i]n addition to generating durable cash flow from long-term take-or-pay off-take contracts, we monitor sustained dislocations in the marketplace, and opportunistically transact when pricing dynamics and contract flexibility provide avenues to generate incremental gross margin. Furthermore, our off-take contracts generally provide us with the opportunity to flex a certain percentage of contracted shipments up or down. That flexibility, enabled by our multi-plant profile, multi-deep water marine terminals and our long-term shipping contracts, can create opportunities to optimize our gross margin when we sell under short-term contracts in times when spot market prices are elevated or, conversely, when we purchase third-party volumes during times when spot market prices are depressed."

120.    The statements identified in the preceding paragraph were materially false and/or misleading, and/or failed to disclose material adverse facts because, as Defendants knew or recklessly disregarded: Enviva had committed to purchase large volumes of pellets at elevated prices when the spot market was near all-time highs; market prices for wood pellets, and Enviva's long-term contracted sales prices, were far below the prices Enviva had agreed to pay in the 4Q 2022 Purchase Agreements; and Enviva had to give customers discounts on future purchases in order to "flex" its shipments down to create opportunities for spot market sales. By March 1, 2023,

market prices indicated that Enviva would lose approximately $263-$282 million on the 4Q 2022 Purchase Agreements.

121. The Form 10-K further stated that "[o]ur facilities are designed to operate 24 hours per day, 365 days per year, although we schedule up to 15 days of planned maintenance for our wood pellet production plants during each calendar year. There are no regularly required major turnarounds or overhauls."

122. The statements identified in the preceding paragraph were materially false and/or misleading, and/or failed to disclose material adverse facts because, as Defendants knew or recklessly disregarded: Enviva suffered from severe equipment failures and excessive employee turnover that reduced production and increased costs; and Enviva's plants regularly experienced multi-day outages to rebuild equipment.

123. The Form 10-K stated that "[r]ecent biomass spot market prices, as well as the forward curve pricing of certain European indices, have exceeded $345 per MT, representing a substantial premium to the current long-term contracted pricing of roughly $200 to $235 per MT weighted average across our portfolio, and we were able to capture some of that differential during the year ended December 31, 2022."

124. The statements identified in the preceding paragraph were materially false and/or misleading, and/or failed to disclose material adverse facts because, as Defendants knew or recklessly disregarded: as of March 1, 2023, spot market prices for European indices were approximately $203-$215 per metric ton, the highest forward price for those indices was approximately $235 per metric ton, and such spot market and forward prices had not exceeded $345 per metric ton since December 2022.

125. On March 1, 2023 Defendants held Enviva's 4Q 2022 earnings call.

34

126. On the earnings call Defendant Meth stated "during the fourth quarter of 2022, we planned our third-party pellet purchases for 2023 and beyond. As many of you know, historically, about 15% to 20% of our annual volumes sold are sourced from third parties . . . 2022 was a little different because the war in Ukraine shot up about 10% of the world's biomass supply. And the spike in pellet prices made it uneconomical for us to procure the same level of third-party pellets this past year. During the fourth quarter, we entered into a long-term purchase agreement with 1 of the largest biomass trading companies in the world who is also 1 of the largest consumers of biomass in Europe and is 1 of our long-standing customers."

127. The statements identified in the preceding paragraph were materially false and/or misleading, and/or failed to disclose material adverse facts because, as Defendants knew or recklessly disregarded: Enviva had locked in the "uneconomical" prices from 4Q 2022 for large volumes of pellet purchases the Company was required to make over the next three years; and market prices for wood pellets, and Enviva's long-term contracted sales prices, were far below the prices Enviva had agreed to pay in the 4Q 2022 Purchase Agreements. By March 1, 2023, market prices indicated that Enviva would lose approximately $263-$282 million on the 4Q 2022 Purchase Agreements.

128. On the earnings call, Defendant Meth continued, "[i]t's important to note that we have collected cash in full for these sales the customers' biomass power generation facilities have fully consumed our pellets and nothing has changed with the underlying fundamentals and operating model of our business . . . roughly $89 million of gross margin and adjusted EBITDA is not being recognized in fourth quarter 2022 results but will be recognized in future years. And our current expectation is that approximately half of the deferred benefit will be recognized in 2024

35

with the other half in 2025. Again, no change to our business. Cash collected in full -- just a change in reporting periods as to when the benefit of the sales will be recognized."

129. The statements identified in the preceding paragraph were materially false and/or misleading, and/or failed to disclose material adverse facts because, as Defendants knew or recklessly disregarded: in addition to the deferred benefits discussed by Defendants, Enviva would incur hundreds of millions in costs on the closely related 4Q 2022 Purchase Agreements. By March 1, 2023, market prices indicated that Enviva would lose approximately $263-$282 million on the 4Q 2022 Purchase Agreements.

130. RBC Capital Markets analyst Elvira Scotto asked "[c]an you just provide a little more detail or walk through this deferred gross margin?" Defendant Meth responded in part "we sold 450,000 tons to this customer. And the underlying margin that we would have generated from the customer was about $32 million in incremental margin. At the same time, we found an opportunity to buy volumes for future periods from that same counterparty. And we do that routinely. As we've said, 15% to 20% of our volumes come from third-party purchases. And in this particular case, it was very attractive to do for future periods."

131. The statements identified in the preceding paragraph were materially false and/or misleading, and/or failed to disclose material adverse facts because, as Defendants knew or recklessly disregarded: during 4Q 2022, prices for 2-year and 3-year delivery of wood pellets (*i.e.*, 2024 and 2025 forward prices) were far below the prices Enviva had agreed to pay of approximately $388.83 per metric ton for 2024 and $372.67 per metric ton for 2025; the highest 2024 or 2025 forward prices reported during 4Q 2022 were approximately $290 per metric ton; and market prices for wood pellets, and Enviva's long-term contracted sales prices, were far below the prices Enviva

had agreed to pay in the 4Q 2022 Purchase Agreements. By March 1, 2023, market prices indicated that Enviva would lose approximately $263-$282 million on the 4Q 2022 Purchase Agreements.

132.   RBC Capital Markets analyst Elvira Scotto also asked "what's embedded in your 2023 guidance for the spot shipments . . . ?" Defendant Meth responded in part "[a]s you've heard us talk about the contracting environment that we're in, given the alternatives of the high-priced alternatives of any fossil fuel plus carbon pricing for the -- not only today, but also from a future forward curve perspective, we do see a very favorable pricing environment. We have executed some of these contracts that will flow through our revenue line."

133.   The statements identified in the preceding paragraph were materially false and/or misleading, and/or failed to disclose material adverse facts because, as Defendants knew or recklessly disregarded: by March 1, 2023, future forward curves indicated that Enviva would lose approximately $263-$282 million on the 4Q 2022 Purchase Agreements.

134.   Continuing his response to the analyst's question, Defendant Meth stated, "[n]ow let's turn to the cost side. I think the biggest difference you will see comes from improved fixed cost absorption. Why do we have such conviction around that fixed cost absorption is because our plants have proven that they can do it in the later part of 2022 . . . In addition to that, we had very accretive upsizing opportunities over the last year or 2 in some of our existing plants. They have been completed. And those plants have shown that they have broken through previous bottlenecks to now deliver volumes at an elevated rate. That fixed cost absorption will be a major driver for our conviction in our increased guidance range for 2023."

135.   The statements identified in the preceding paragraph were materially false and/or misleading, and/or failed to disclose material adverse facts because, as Defendants knew or recklessly disregarded: Southampton's expansion to add a second dryer had created bottlenecks and

37

the plant was losing tens of millions of dollars; and Enviva suffered from severe equipment failures and excessive turnover that decreased production and increased expenses.

**F.      April 2, 2023 Thomas Meth Interview With Enviva's Head Of HR**

136.    On    April    2,    2023    Enviva    posted    a    video    to    YouTube (https://www.youtube.com/watch?v=Q7VHma36B-E) in which Defendant Meth is interviewed by Enviva's Chief Administrative & People Officer, Roxanne Klein.

137.    In the video, Klein asks, "[w]e have seen a dip in the market recently.  From your seat, from your vantage point,  how do you view this change, and  what do you see as the path forward?" Defendant Meth responded in part, "I know we're going to see tremendous growth.  Not only from a volumetric perspective, but also from a margin perspective. Our cost position will come down to more historic levels, and at the same time our revenues will grow because the ability to pay of our customers is much higher. Both of those together, I think  we are going to be in fantastic shape, and our valuation will certainly see the benefit of that. Let's talk about the revenue side. We have very healthy inflationary adjustments in our contracts with our customers." Defendant Meth continued, "[w]ith that, when costs go down,  revenues go up, margins expand.  The tailwinds of growth that we see  in Asia, in the U.S. and in Europe,  I think our investors will also see  that this is a fantastic investment.  And with that, certainly I would think  that the stock price will show a recovery."

138.    The statements identified in the preceding paragraph were materially false and/or misleading, and/or failed to disclose material adverse facts because, as Defendants knew or recklessly disregarded: market prices for wood pellets, and Enviva's long-term contracted sales prices, were far below the prices Enviva had agreed to pay in the 4Q 2022 Purchase Agreements; Enviva had been attempting to renegotiate the 4Q 2022 Purchase Agreements with RWE since the first quarter of 2023; Enviva suffered from severe equipment failures and excessive employee

38

turnover that increased costs and decreased production; in order to increase 2022 sales Enviva gave customers discounts on future purchases; price escalation features in Enviva's contracts did not offset its rising production costs; and these facts created material risks to Enviva's growth, margins, valuation, and stock price. By April 2, 2023, market prices indicated that Enviva would lose approximately $262-$281 million on the 4Q 2022 Purchase Agreements.

### G.    April 3, 2023 Enviva Investor Day

139.    On April 3, 2023 Defendants held Enviva's Investor Day event at the New York Stock Exchange, giving presentations and responding to analysts' questions.

140.    Defendant Keppler stated, "the physical liquidity challenges in this market means that from time to time, we can make incremental margin associated with managing the dislocations in that business . . . 2022, that part of the business was a larger part of the business than it has been historically . . . But our core business is selling volumes under long-term contracts to our customer set. So that's not going to be a significant part of our business going forward that created so much of the confusion, I think, as part of 2022 financials."

141.    The statements identified in the preceding paragraph were materially false and/or misleading, and/or failed to disclose material adverse facts because, as Defendants knew or recklessly disregarded: the 4Q 2022 Purchase Agreements would have a highly significant negative impact on Enviva's business going forward; and market prices for wood pellets, and Enviva's long-term contracted sales prices, were far below the prices Enviva had agreed to pay in the 4Q 2022 Purchase Agreements. By April 3, 2023, market prices indicated that Enviva would lose approximately $262-$281 million on the 4Q 2022 Purchase Agreements.

142.    Defendant Keppler further stated at the Investor Day, "we have plenty of liquidity, complemented by growing long-term cash flows that protect our stable dividend, and enable us to invest in projects with strong returns."

143. The statements identified in the preceding paragraph were materially false and/or misleading, and/or failed to disclose material adverse facts because, as Defendants knew or recklessly disregarded: market prices for wood pellets, and Enviva's long-term contracted sales prices, were far below the prices Enviva had agreed to pay in the 4Q 2022 Purchase Agreements; Enviva had been attempting to renegotiate the 4Q 2022 Purchase Agreements with RWE since the first quarter of 2023; Enviva suffered from severe equipment failures and excessive employee turnover that increased costs and decreased production; in order to increase 2022 sales Enviva gave customers discounts on future purchases; price escalation features in Enviva's contracts did not offset its rising production costs; and these facts created material risks to Enviva's liquidity, cash flows, and ability to pay dividends. By April 3, 2023, market prices indicated that Enviva would lose approximately $262-$281 million on the 4Q 2022 Purchase Agreements.

144. At the Investor Day, Defendant Meth stated that "I will take a few minutes and explain what is commercial activity. Where is that coming from? And why is it accretive and happens every year and is about 15% to 20% of our overall EBITDA historically, and we expect that in the future. As our EBITDA growth, the absolute number will go up, but the importance will not go up, right? It's just a repeatable part of our business because we are solving issues in the supply chain that are accretive for us."

145. The statements identified in the preceding paragraph were materially false and/or misleading, and/or failed to disclose material adverse facts because, as Defendants knew or recklessly disregarded: the 4Q 2022 Purchase Agreements were not accretive to Enviva, and would have highly important negative effects on Enviva's business; market prices for wood pellets, and Enviva's long-term contracted sales prices, were far below the prices Enviva had agreed to pay in the 4Q 2022 Purchase Agreements; and Enviva had been attempting to renegotiate the 4Q 2022

Purchase Agreements with RWE since the first quarter of 2023. By April 3, 2023, market prices indicated that Enviva would lose approximately $262-$281 million on the 4Q 2022 Purchase Agreements.

146.    Defendant Meth also stated, "for 2023, and I said this earlier, our focus is to execute in operations to drive costs down, and the big part of how you drive cost down is creating more volume. As the leader of this company, that is one of my key areas of focus and it has been for the last couple of months. In 2022, many of our expansion projects hit the necessary nameplate capacities, right? As we come out of the early days of this year, and we've produced in March and April, seen really, really good progress in making more tons at lower cost."

147.    The statements identified in the preceding paragraph were materially false and/or misleading, and/or failed to disclose material adverse facts because, as Defendants knew or recklessly disregarded: Enviva suffered from severe equipment failures and excessive turnover that decreased production and increased expenses; and Southampton's expansion had failed and the plant did not produce at levels close to its nameplate capacity.

148.    At the Investor Day, Defendant Meth also stated, "I want to remind you, and we talked about this, that we have this deferred gross margin transaction last year of a total of $89 million. And there is an overhang of $12 million in Q1, and that's the last of those that we have to put our balance sheet and regain through our income statement over '24 and '25."

149.    The statements identified in the preceding paragraph were materially false and/or misleading, and/or failed to disclose material adverse facts because, as Defendants knew or recklessly disregarded: the 4Q 2022 Purchase Agreements created a substantial financial overhang; and market prices for wood pellets, and Enviva's long-term contracted sales prices, were far below the prices Enviva had agreed to pay in the 4Q 2022 Purchase Agreements. By April 3, 2023, market

prices indicated that Enviva would lose approximately $262-$281 million on the 4Q 2022 Purchase Agreements

150. Defendant Even stated at the Investor Day, "[w]e recognize that you have questions. Can Enviva execute this growth program without issuing additional equity? Can Enviva execute this growth program while maintaining the dividend, is a dividend safe? Enviva can execute its growth program, building 4 plants over the next 4 years. Without issuing additional equity. We can do both. We can build the 4 plants over the next 4 years and pay dividend." Defendant Even similarly stated, "[a]nd now before I turn it back to Thomas for wrap up and Q&A, I would like to remind you that Enviva can execute on its growth plan program, building 4 plants over the next 4 years without issuing additional equity. Our dividend is safe. We can do both. We can grow the company, build the 4 plants over the next 4 years, while maintaining and having the potential for the dividend to grow over time."

151. The statements identified in the preceding paragraph were materially false and/or misleading, and/or failed to disclose material adverse facts because, as Defendants knew or recklessly disregarded: market prices for wood pellets, and Enviva's long-term contracted sales prices, were far below the prices Enviva had agreed to pay in the 4Q 2022 Purchase Agreements; Enviva had been attempting to renegotiate the 4Q 2022 Purchase Agreements with RWE since the first quarter of 2023; Enviva suffered from severe equipment failures and excessive employee turnover that increased costs and decreased production; in order to increase 2022 sales Enviva gave customers discounts on future purchases; price escalation features in Enviva's contracts did not offset its rising production costs; and these facts created material risks to Enviva's ability to grow and to pay dividends. By April 3, 2023, market prices indicated that Enviva would lose approximately $262-$281 million on the 4Q 2022 Purchase Agreements.

152. At Enviva's Investor Day event, Defendant Meth stated, "[w]e don't need to raise additional equity, and we will continue to pay the dividend at current levels."

153. The statements identified in the preceding paragraph were materially false and/or misleading, and/or failed to disclose material adverse facts because, as Defendants knew or recklessly disregarded: market prices for wood pellets, and Enviva's long-term contracted sales prices, were far below the prices Enviva had agreed to pay in the 4Q 2022 Purchase Agreements; Enviva had been attempting to renegotiate the 4Q 2022 Purchase Agreements with RWE since the first quarter of 2023; Enviva suffered from severe equipment failures and excessive employee turnover that increased costs and decreased production; in order to increase 2022 sales Enviva gave customers discounts on future purchases; price escalation features in Enviva's contracts did not offset its rising production costs; and these facts created material risks to Enviva's ability to pay dividends. By April 3, 2023, market prices indicated that Enviva would lose approximately $262-$281 million on the 4Q 2022 Purchase Agreements.

154. During the question and answer session, Enviva's VP of Investor Relations, Kate Walsh, read a question from an investor asking, "can you just give us a bit more detail on how you see that $100 million being driven out of our cost tower?" Defendant Meth responded in part, "So the biggest part is volume. We've built Lucedale . . . [t]he remainder of the other expansions have come to a conclusion last year. We hit the necessary daily numbers, September, October, November of last year in some of the plants like Southampton and so on and so forth. And that will flow through as well."

155. The statements identified in the preceding paragraph were materially false and/or misleading, and/or failed to disclose material adverse facts because, as Defendants knew or recklessly disregarded: Enviva suffered from severe equipment failures and excessive turnover that

decreased production and increased expenses; and Southampton's expansion had failed and the plant was producing well below its stated capacity.

## VII. THE TRUTH BEGINS TO EMERGE, WHILE DEFENDANTS CONTINUE TO ISSUE MATERIALLY FALSE AND MISLEADING STATEMENTS

156. Over May 3-4, 2023, and again on November 9, 2023, the material risks and adverse information previously concealed by Defendants' false and misleading statements and omissions, and/or the effects thereof, were revealed. As a result, Enviva's stock price suffered dramatic losses. Over this period Defendants continued to make misleading statements and continued to conceal material information from investors.

### A. May 3-4, 2023 Enviva Reports 1Q 2023 Results

157. On May 3, 2023, after the close of stock market trading, Enviva published a press release titled, "Enviva Reports First-Quarter 2023 Results, Updates 2023 Guidance, Changes Capital Allocation Priorities, and Announces New Contract." The press release announced that Enviva was eliminating its dividend "to preserve liquidity," slashing its full year 2023 guidance, and had achieved very poor 1Q 2023 results.

158. The press release quoted Defendant Meth, "[w]e know what the specific issues are: contract labor is too high, discipline around repairs and maintenance spend is insufficient, wood input costs need to come down further and stay there, and utilization rates at specific plants need to improve and stabilize at those improved levels." The press release also quoted Defendant Meth as stating that "[o]perating cost overages and production challenges were key drivers behind the first quarter's poor performance."

159. In the press release Enviva reported only $21.3 million of adjusted gross margin for 1Q 2023, or less than half of its 1Q 2022 level.

160.    The press release stated that "management is reducing its estimates for full-year produced volumes in 2023 to be approximately 5 million to 5.5 million MT, as compared to our prior forecast of 5.5 million to 6.0 million MT." The press release likewise stated that "Adjusted EBITDA for 2023 is projected to be within a range of $200 million to $250 million, which is reduced from previously provided guidance of $305 million to $335 million."

161.    On May 4, 2023 during stock market trading hours Defendants held Enviva's 1Q 2023 earnings call.

162.    On the earnings call, Defendant Meth stated "we had approximately $10 million of unplanned repairs and maintenance expenses during the quarter. This is very high. Unpacking this a bit in select plants, operations leadership and prioritized production over cost management, and we saw cost overages as a result. I call these tonnes at any cost and that isn't the way to run a plant."

163.    Defendant Meth also stated on the earnings call "[t]he third area of pressure on our results this quarter relates to approximately $5 million of costs incurred related to professional fees, some tied to plant optimization initiatives. We have one plant that is significantly underperforming our expectations, and we have a highly specialist firm engaged to help us turn it around. And those isolated costs are reported in the first quarter. We also incurred extra accounting and financing fees during the quarter, in part due to the complicated fourth quarter and year-end we went through."

164.    On the earnings call, Defendant Meth stated that "[f]our of our plants performed reliably, but in production rates or costs that are off from the demonstrated performance. 2 of our plants, Greenwood and [Southampton] are what we call dryer limited meaning that we're either bottlenecked at the drive because of its inherent evaporative limitations to reduce the moisture content in the raw material, which is the case at Greenwood or on a reliability or operability basis which is the case at [Southampton], where the original [dry line] needs refurbishment."

45

165.    Defendant Meth admitted on the earnings call, "[a]nd where we have struggled a little bit is certainly on the reliability of those new plants. We have certainly struggled a little bit with third-party cost management, and we have struggled with turnover, right?" Defendant Meth further stated, "[w]e're certainly working very hard to train people. The issue with turnover is not that you can't replace people, but it takes 6 months for these people to be the necessary operators that they can actually problem solve independently in a . . . plant."

166.    Defendant Meth also revealed on the earnings call that "productivity is driven by uptime of the plants, in addition to cost management. And the uptime of the plants is not -- in some plants, it's not quite where it needs to be."

167.    On this news, Enviva's share price fell $14.34 as compared to the prior day closing price, or 67%, to close at $7.01 on May 4, 2023, on exceptionally heavy trading volume.

168.    Analysts linked the decline in Enviva's share price to the revelation of this new information. JP Morgan analyst Mark Strouse published a note on May 5, 2023 in which he noted that "EVA's stock sold off ~67% yesterday after reporting 1Q results far below expectations and cutting its FY23 guidance, owing to lower FY volumes and lingering cost headwinds." Strouse wrote, "we expect the stock to be in the penalty box given poor execution and messaging, particularly given the short time frame since the early-April Analyst Day financial update," and noted the "significantly inaccurate 1Q earnings commentary at the April analyst day." Strouse slashed his price target for Enviva stock from $44 to $12.

169.    Similarly in a May 4, 2023 note Truist Securities analyst Jordan Levy reduced his price target for Enviva from $40 to $10, and changed its rating from "buy" to "sell," commenting that "[f]ollowing continued operational & financial shortfalls culminating in a surprise dividend cut & significant guide down, we're reducing our outlook for EVA."

46

170.   Although the truth and/or materialization of concealed risks were partially revealed to the market over May 3-4, 2023, Defendants continued to mislead investors.

171.   On May 4, 2023 Enviva filed with the SEC its Form 10-Q for 1Q 2023. The 10-Q was signed by Defendant Even, and was accompanied by certifications signed by Defendants Even and Meth stating that "[b]ased on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report." Those certifications were materially false and/or misleading, and/or failed to disclose material adverse facts for the reasons set forth below with respect to the statements in the Form 10-Q.

172.   Enviva's Form 10-Q stated that, "[i]n the fourth quarter of 2022, we entered into agreements with a customer to purchase approximately 1.8 million MT of wood pellets between 2023 and 2025 (the 'new purchase agreements'). The new purchase agreements were priced at market prices in effect at the time of the agreements."

173.   The statements identified in the preceding paragraph were materially false and/or misleading, and/or failed to disclose material adverse facts because, as Defendants knew or recklessly disregarded: during 4Q 2022, prices for 2-year and 3-year delivery of wood pellets (*i.e.*, 2024 and 2025 forward prices) were far below the prices Enviva had agreed to pay of approximately $388.83 per metric ton for 2024 and $372.67 per metric ton for 2025; the highest 2024 or 2025 forward prices reported during 4Q 2022 were approximately $290 per metric ton; market prices for wood pellets, and Enviva's long-term contracted sales prices, were far below the prices Enviva had agreed to pay in the 4Q 2022 Purchase Agreements; and Enviva had been attempting to renegotiate the 4Q 2022 Purchase Agreements with RWE since the first quarter of 2023. By May 4, 2023,

market prices indicated that Enviva would lose approximately $256-$298 million on the 4Q 2022 Purchase Agreements.

174. On Enviva's 1Q 2023 earnings call Defendant Meth stated "we did have some shipments that were subject to the deferred gross margin transactions accounting with similar treatment to what we saw at year-end. This accounted for approximately $4.6 million, and we expect the deferral to reverse in 2024 and 2025."

175. The statements identified in the preceding paragraph were materially false and/or misleading, and/or failed to disclose material adverse facts because, as Defendants knew or recklessly disregarded: market prices for wood pellets, and Enviva's long-term contracted sales prices, were far below the prices Enviva had agreed to pay in the 4Q 2022 Purchase Agreements; and Enviva had been attempting to renegotiate the 4Q 2022 Purchase Agreements with RWE since the first quarter of 2023. By May 4, 2023, market prices indicated that Enviva would lose approximately $256-$298 million on the 4Q 2022 Purchase Agreements.

### B. August 2-3, 2023 Enviva Reports 2Q 2023 Results

176. On August 2, 2023 Enviva filed with the SEC its Form 10-Q for 1Q 2023, which was published on SEC's public EDGAR database the following morning. The 10-Q was signed by Defendant Even, and was accompanied by certifications signed by Defendants Even and Meth stating that "[b]ased on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report." Those certifications were materially false and/or misleading, and/or failed to disclose material adverse facts for the reasons set forth below with respect to the statements in the Form 10-Q.

177. The Form 10-Q stated that "[o]ur primary liquidity needs are to fund working capital, service our debt, invest in maintenance capital expenditures, expansion and optimization of our plants, and greenfield construction projects, or, secondarily, where determined in the discretion of the board of directors of the Company (the 'Board'), to pay dividends or repurchase our common stock . . . We believe cash on hand, cash generated from our operations and the availability of our senior secured revolving credit facility will be sufficient to meet our primary liquidity requirements."

178. The statements identified in the preceding paragraph were materially false and/or misleading, and/or failed to disclose material adverse facts because, as Defendants knew or recklessly disregarded: market prices for wood pellets, and Enviva's long-term contracted sales prices, were far below the prices Enviva had agreed to pay in the 4Q 2022 Purchase Agreements; Enviva had been attempting to renegotiate the 4Q 2022 Purchase Agreements with RWE since the first quarter of 2023; Enviva had already failed to perform as required under Confirmation reference number 63814539, dated December 12, 2022, for Enviva's repurchase of 307,000 MT +/- 10% of Product between April 1, 2023 and July 31, 2023; in order to increase 2022 sales Enviva gave customers discounts on future purchases; and these facts created material risks to Enviva's liquidity. By August 2, 2023, market prices indicated that Enviva would lose approximately $257-$271 million on the 4Q 2022 Purchase Agreements.

179. On August 3, 2023 Defendants held Enviva's 2Q 2023 earnings call.

180. On the earnings call, Defendant Meth stated, "[a]s we look to the second half of this year and what we expect to achieve, we are maintaining our full 2023 adjusted EBITDA guidance range of $200 million to $250 million, and we're updating our quarterly expectations for third and fourth quarter adjusted EBITDA. For third quarter, we're stepping down our expectations

49

from the previous range of $70 million to $90 million of adjusted EBITDA to a range of $60 million to $80 million." Defendant Meth continued, "[t]he significant step-up in earnings expected in the quarter over third quarter is underpinned by a number of factors that we have good visibility into."

181.   The statements identified in the preceding paragraph were materially false and/or misleading, and/or failed to disclose material adverse facts because, as Defendants knew or recklessly disregarded: Enviva's guidance assumed a significant volume of 3Q 2023 spot sales at an average sales price that was much higher than current market prices or Enviva's contracted sales prices; market prices for wood pellets, and Enviva's long-term contracted sales prices, were far below the prices Enviva had agreed to pay in the 4Q 2022 Purchase Agreements; Enviva had been attempting to renegotiate the 4Q 2022 Purchase Agreements with RWE since the first quarter of 2023; Enviva had already failed to perform as required under Confirmation reference number 63814539, dated December 12, 2022, for Enviva's repurchase of 307,000 MT +/- 10% of Product between April 1, 2023 and July 31, 2023; in order to increase 2022 sales Enviva gave customers discounts on future purchases; and these facts created material risks to Enviva's guidance. By August 3, 2023, market prices indicated that Enviva would lose approximately $257-$271 million on the 4Q 2022 Purchase Agreements.

182.   On the earnings call RBC Capital Markets analyst Elvira Scotto asked, "just help me understand the guidance for the rest of the year, what percent of that is based on some of this potential spot business that you referenced?" Defendant Meth responded, "[l]ook, I think the way to look at this is that if some of that happens as part of the commercial activity, it will happen in Q4. And if we're successful in that, it certainly helps us to get to the higher end of the range. That's the order of magnitude that we're seeing for that part of the business."

183.    The statements identified in the preceding paragraph were materially false and/or misleading, and/or failed to disclose material adverse facts because, as Defendants knew or recklessly disregarded: Enviva's guidance assumed a significant volume of 3Q 2023 spot sales at an average sales price that was much higher than current market prices or Enviva's contracted sales prices; and market prices for wood pellets, and Enviva's long-term contracted sales prices, were far below the prices Enviva had agreed to pay in the 4Q 2022 Purchase Agreements. By August 3, 2023, market prices indicated that Enviva would lose approximately $257-$271 million on the 4Q 2022 Purchase Agreements.

184.    On the earnings call Truist Securities analyst Jordan Levy asked, "I appreciate you didn't have any additional deferred [gross] -- deferred margin transactions this quarter, which is good to see. Is it fair to say you don't anticipate any more of these transactions as we get into 3Q and 4Q?" Defendant Meth responded, "Jordan, we -- our forecast does not include any incremental deferred gross margin transactions."

185.    The statements identified in the preceding paragraph were materially false and/or misleading, and/or failed to disclose material adverse facts because, as Defendants knew or recklessly disregarded: the 4Q 2022 Purchase Agreements would have a material adverse impact on Enviva's results for the second half of 2022; and market prices for wood pellets, and Enviva's long-term contracted sales prices, were far below the prices Enviva had agreed to pay in the 4Q 2022 Purchase Agreements. By August 3, 2023, market prices indicated that Enviva would lose approximately $257-$271 million on the 4Q 2022 Purchase Agreements.

**C.    November 9, 2023 Enviva Reports 3Q 2023 Results**

186.    On November 9, 2023, before the beginning of stock market trading, Enviva published a press release titled "Enviva Reports 3Q 2023 Results." The press release reported, among other things that Glenn Nunziata would replace Defendant Meth as CEO, that Enviva

51

achieved very poor 3Q 2023 results well below Defendants' recent guidance, that Enviva was withdrawing its 2023 guidance, that Enviva expected $283 million of losses on the 4Q 2022 Purchase Agreements, and that there was substantial doubt about Enviva's ability to continue as a going concern.

187. The press release stated that "during the third quarter of 2023, the Company determined that the Southampton plant operated most cost effectively with a single dryer line. Therefore, it permanently shut down the second, underperforming dryer line and as a result, it recognized an impairment expense of $21.2 million."

188. The press release reported "adjusted EBITDA for third-quarter 2023 of $36.6 million as compared to $60.6 million for third-quarter 2022."

189. The press release disclosed that "the Q4 2022 Transactions have had a significant negative impact on the Company's profitability, cash flows, and liquidity due to the negative current spread between the sale and purchase prices of the agreements and the anticipated loss on resale of those volumes within an unfavorable pricing environment in the wood pellet spot market."

190. The press release also disclosed that due to factors including the foregoing problems, there was "substantial doubt regarding the Company's ability to continue as a going concern."

191. Also on November 9, 2023, before the beginning of stock market trading, Enviva filed with the SEC its Form 10-Q for 3Q 2023.

192. The 10-Q revealed that "[w]ith respect to the Q4 2022 Transactions, as of September 30, 2023, the Company . . . is obligated to purchase approximately 1.7 million MT of wood pellets through 2025 for a total of approximately $641.4 million, of which 0.8 million MT

for $296.3 million is related to 2023, 0.6 million MT for $233.3 million is related to 2024 and 0.3 million MT for $111.8 million is related to 2025."

193.    The 10-Q further revealed that "Assuming sales based on forward Argus prices published on November 1, 2023 for the delivery dates of these volumes under the respective purchase contracts, the aggregate sales value of the volumes we have agreed to purchase would have been approximately $156.9 million in 2023, $134.1 million in 2024, and $67.0 million in 2025 which would indicate that resales of the volumes purchased under the Q4 2022 Transactions into the spot market would have a negative impact on our profitability, cash flows, and liquidity of $139.4 million in 2023, $99.2 million in 2024, and $44.8 million in 2025. As of the date of these interim financial statements there has been no significant changes to the Argus forward pricing since November 1, 2023."

194.    On this news, Enviva's share price fell $2.99 as compared to the prior day closing price, or 77%, to close at $0.85 on November 9, 2023, on extraordinarily heavy trading volume.

195.    Analysts linked the decline in Enviva's share price to the revelation of this new information. JP Morgan analyst Drew Chamberlain published a note on November 10, 2023 in which he wrote that "EVA reported 3Q results below expectations, withdrew FY23 guidance, and provided further detail on a 4Q22 transaction that forced the company into issuing a going concern notice . . . We are slashing our estimates, removing our YE24 price target, and downgrading to Underweight." Chamberlain also wrote "Despite shares trading down ~75% to below $1 yesterday, we are downgrading our rating to Underweight and withdrawing our YE24 price target as we believe the near-term risk/reward is unjustifiable."

196.    Chamberlain's note pointed out that the price details of the 4Q 2022 Purchase Agreements were previously unknown to investors, stating "4Q22 transaction update - the

previously unknown: Per EVA's 10-Q filing released yesterday, EVA agreed to purchase the 1.8mm MTs on a fixed-contract at ~$377/MT, a price near the all-time high spot prices from 2H22 and well-above EVA's existing average contracted off-take ($215-225/MT) and current spot rates (~$200/MT)." Chamberlain continued "[w]e believe the price/cost delta implied in the transaction was paramount to the company's going concern notice."

197.    Chamberlain further noted that "[d]espite consistent messaging down playing the spot market's importance to achieving FY23 guidance/medium-term targets and the company placing outsized focus on internal operational improvements, the YTD spot market deterioration has proven too severe for cost reductions to offset and, more importantly, shed additional light on the large 4Q22 transaction that is set to cost EVA hundreds of millions."

## VIII.   POST-CLASS PERIOD EVENTS

### A.    Enviva's Board Initiates An Internal Investigation Into the 4Q 2022 Purchase Agreements

198.    According to the Nunziata Declaration, "The board of directors of Enviva . . . initiated an independent investigation in early November 2023, to be conducted by a special committee of the Board, to review, among other things, the Q4 2022 Transactions, including the corporate authorizations in connection therewith. Despite their magnitude, the Q4 2022 Transactions were not disclosed to, considered, or approved by the Board when entered into by management. Baker Botts LLP ["Baker Botts"] is currently in the process of conducting an independent investigation at the direction of the special committee of the Board [the "Special Committee]."

199.    Enviva subsequently revealed additional information concerning the Special Committee's investigation in filings made in its bankruptcy proceedings. On June 10, 2024 Enviva filed a declaration from Baker Botts partner Bridget Moore which described the investigation and

included as an annex an email dated April 28, 2024 from Baker Botts to counsel for the Official Committee of Unsecured Creditors (Akin Gump Strauss Hauer & Feld LLP), along with three attachments: (i) "a list of transactions within the scope of the Investigation"; (ii) "a list of the diligence requests sent to the Company in connection with . . . transactions . . . identified as relevant to the Investigation"; and (iii) a third attachment that "addressed specific questions posed by Akin, and provided detail on the requests, search terms, interviews, and other information associated with the investigation into the Q4 2022 Transactions."

200.    The first attachment listed transactions under investigation including those relating to: (i) "[t]he Q4 2022 Transactions with RWE Supply & Trading GmbH"; (ii) Enviva's 2023 Separation and General Release Agreement with Defendant Even; (iii) Enviva's 2023 appointment of Defendant Keppler as Executive Chairman of Enviva's Board; (iv) the 2022 departure of Defendant Keppler from Enviva and concurrent appointment of Defendant Meth as CEO; and (v) various employment agreements with Defendants Keppler, Even, and Johnson.

201.    The third attachment (*see* **Exhibit 4**), providing details of Baker Botts' investigation into the 4Q 2022 Purchase Agreements, listed 16 custodians whose Microsoft Office365 accounts were searched for relevant emails and documents, including each of Defendants Meth, Keppler, Even, and Johnson. It also listed a narrower subset of 11 of the 16 custodians whose Microsoft Teams chats were searched, also including each of Defendants Meth, Keppler, Even, and Johnson. The attachment listed 15 officers and employees who were interviewed including Defendants Keppler and Meth (Defendants Johnson and Even were no longer employed by Enviva as of the interviews, which were conducted over December 2023 – February 2024, though several of their former subordinates in finance and accounting were interviewed).

202.    The third attachment also listed the 18 search terms used by Baker Botts to identify potentially relevant documents. These included "RWE*", "dirty hedge", and "meet guidance". The attachment also identified other documents requested by Baker Botts and received from Enviva, including: (i) "[r]elevant RWE contracts from Q4 2022 (i.e., four x buy/sell transactions)"; (ii) "earnings call transcripts" and "investor presentations" (*i.e.* documents containing Defendants' allegedly misleading statements); and (iii) documents relating to Defendants' compensation and stock trading (*e.g.*, "[i]nformation on how bonus is determined and when a bonus is paid," and "[p]olicy/procedures/guidance on insiders ability to trade").

## B.    Enviva Declares Bankruptcy

203.    On March 12, 2024, Enviva and various of its subsidiaries and affiliates filed for bankruptcy. As detailed in the Nunziata Declaration, among the key causes leading to Enviva's bankruptcy were: (i) the 4Q 2022 Purchase Agreements; (ii) operational problems at Enviva's manufacturing plants; (iii) high employee turnover; (iv) Enviva giving future discounts to customers in exchange for immediate sales; and (v) the price escalation features of Enviva's sale contracts failing to compensate for its rising production costs.

## IX.    ADDITIONAL SCIENTER ALLEGATIONS

204.    Defendants Keppler, Meth, Even, and Johnson, because of their positions with Enviva, possessed the power and authority to control the contents of Enviva's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. The Defendants were provided with copies of Enviva's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed

56

from, the public, and that the positive representations that Defendants made were then materially false and/or misleading.

A.    **Defendants Held Themselves Out As Knowledgeable And Had Access To The Concealed Facts**

205.    As alleged in this Complaint, Defendants repeatedly held themselves out as knowledgeable regarding the subject matter of the alleged misrepresentations and omissions. The positions of the Defendants, as Enviva's senior executive officers, gave them responsibility for and access to information concerning such information.

206.    Defendant Keppler co-founded Enviva's predecessor in 2004 with Thomas Meth, and served as Enviva's (or its predecessor's) CEO and Chairman of its Board of Directors until November 2022. In these roles, according to Enviva's SEC filings, Keppler was "responsible for setting our strategic direction and leading our growth from a start-up company to the world's leading producer of wood biomass fuels." According to Enviva's SEC filings, Defendant Keppler, "has developed a wealth of experience in business strategy and operations and a keen knowledge of the renewable energy sector."

207.    Defendant Even began serving as Executive Vice President and Chief Financial Officer of Enviva (or its predecessor) in June 2018, and in March 2023 became Enviva's chief accounting officer. In these roles, according to Enviva's SEC filings, Defendant Even "leads Enviva's finance, accounting, and information technology organizations and provides strategic leadership on finance matters." According to Enviva's SEC filings, Defendant Even "has over 25 years of experience with operational and strategic finance."

208.    Defendant Michael Johnson served as Vice President and Chief Accounting Officer of Enviva (or its predecessor) from July 2021 to March 2023, during which time he was designated as its principal accounting officer. In this role, according to Enviva's SEC filings, Johnson "is

57

responsible for managing Enviva's accounting systems and financial controls with a focus on ensuring timely and accurate internal and external financial reporting and maintaining regulatory compliance." According to Enviva's SEC filings, "Mr. Johnson is an accomplished finance professional with years of experience as an accounting and controllership leader for public companies within the energy industry."

209.    Defendant Meth co-founded Enviva's predecessor in 2004 with John Keppler, and served as Enviva's (or its predecessor's) Executive Vice President, Sales and Marketing, and later its Chief Commercial Officer, through June 2022. In these roles, according to Enviva's SEC filings, Meth was responsible for Enviva's "commercial customer relations as well as our market development, international government relations, sustainability, customer fulfillment, and commercial and shipping services." According to Enviva's SEC filings "Mr. Meth led the Company to grow to become the largest wood pellet supplier in the world and is widely regarded as one of the key industry experts globally."

210.    Defendant Meth monitored wood pellet market price data, for example stating in Enviva's November 3, 2022 earnings call for 3Q 2022 that "[m]arket data suggests that volumes can be purchased on an FOB basis in the Pacific Rim for less than $200 per metric ton. Market data also points to trading prices currently north of $400 per metric ton in European markets." Similarly, on Enviva's March 1, 2023 earnings call for 1Q 2023 Meth stated that "we monitor dislocations in the marketplace and are increasingly transacting when pricing dynamics and contract flexibility provide opportunities to generate incremental gross margin."

211.    Defendant Meth was responsible for and involved in Enviva's contract negotiations. For example, on Enviva's November 3, 2022 earnings call for 3Q 2022 Defendant Keppler stated, "Thomas [Meth] and the team have done a very, very good job of looking and

58

working with our customers on repricing certain of our legacy contracts." At Enviva's April 3, 2023 Investor Day Defendant Meth stated concerning "marketing or the contracting activities and markets and regulatory environment" that "I'm closer than anybody else" and "I do this every day, and I'm in the middle of it." When Enviva replaced Defendant Meth as CEO with Glenn Nunziata, Mr. Nunziata stated on Enviva's November 9, 2023 3Q 2023 earnings call that "we have asked Thomas Meth to focus his energies almost exclusively on renegotiating our existing customer contracts, given his long-standing relationships and understanding of each customer." According to Former Enviva Regional Director FE1, the personnel primarily responsible for negotiating Enviva's contracts were Defendant Meth and Craig Lorraine (who currently serves as Enviva's Senior Vice President for Fiber, Logistics, and Port Operations), who shared a close working relationship with each other.

212. Defendant Meth had extensive knowledge relating to the 4Q 2022 Purchase Agreements. For example, on Enviva's March 1, 2023 earnings call for 1Q 2023 (*i.e.*, when Enviva first disclosed the existence, but not the prices, of the 4Q 2022 Purchase Agreements), Defendant Meth described the 4Q 2022 Purchase Agreements, Enviva's related sales to the same counterparty, and the resulting accounting treatment, stating in part:

> During the fourth quarter, we entered into a long-term purchase agreement with 1 of the largest biomass trading companies in the world who is also 1 of the largest consumers of biomass in Europe and is 1 of our long-standing customers. It is this customer to whom we sold available shipments during the fourth quarter. This customer had elevated demand during the fourth quarter due to their strategy to manage through the energy scarce European winter. From an accounting perspective, because we sold volumes to the same customer that we entered into a long-term purchase agreement with the GAAP accounting rules require us to treat both the sales contract and long-term purchase contract as a contract, modification of our original sales contract. This accounting treatment differed from our expectations and as well as from the assumptions that underpinned our guidance ranges. It's important to note that we have collected cash in full for these sales the customers' biomass power generation facilities have fully consumed our pellets and

59

nothing has changed with the underlying fundamentals and operating model of our business.

In response to an analyst's question concerning the 4Q 2022 Purchase Agreements, Defendant Meth further stated "we sold 450,000 tons to this customer. And the underlying margin that we would have generated from the customer was about $32 million in incremental margin. At the same time, we found an opportunity to buy volumes for future periods from that same counterparty . . . And in this particular case, it was very attractive to do for future periods."

213.    Defendant Meth also held himself out as knowledgeable about operational issues at Enviva's plants, stating on Enviva's March 1, 2023 earnings call for 1Q 2023 "we are laser focused on improving operational performance and cost management across our asset fleet," and that "I'm really looking forward to having the opportunity to do a much deeper dive on the attributes of operational improvement and our expected plant level efficiency improvement at our upcoming Investor Day." At Enviva's April 3, 2023 Investor Day Defendant Meth stated, "for 2023 . . . our focus is to execute in operations to drive costs down, and the big part of how you drive cost down is creating more volume. As the leader of this company, that is one of my key areas of focus and it has been for the last couple of months." Defendant Meth also stated at the Investor Day "I go to the plants basically every week with the team to make sure that the team knows how important it is to hit the numbers."

214.    Defendant Even also monitored wood pellet market price data, for example stating in Enviva's November 3, 2022 earnings call for 3Q 2022 that "[r]ecent biomass spot market prices, as well as the forward curve pricing of certain European biomass indices, have exceeded $400 dollars per metric ton, which represents a substantial premium to the current long-term contracted pricing across Enviva's weighted average portfolio."

215.    Defendant Even was also knowledgeable concerning matters relating to the 4Q

2022 Purchase Agreements. For example, on Enviva's March 1, 2023 earnings call for 1Q 2023, Defendant Even described Enviva's related sales to the same counterparty, and the resulting accounting treatment for the combined sales and 4Q 2022 Purchase Agreements, stating in part "[d]istributable cash flow for the fourth quarter 2022 was an outflow of $1.7 million as compared to this year of $42.8 million and $54.9 million for the fourth quarter 2021 on a recast and non-recast basis, respectively. The decrease year-over-year was driven by the impact of the deferred gross margin transaction of approximately $89 million. And it is important to note that all of the cash has been collected with respect to the deferred gross margin transaction." In response to an analyst's question concerning the 4Q 2022 Purchase Agreements and related sales, Defendant Even stated, "we collected 100% of the cash from the sale of $175 million. About $102 million was collected during the fourth quarter of 2022. And the rest after the kind of like -- after the beginning of the year."

216.    When RWE included in its publicly available bankruptcy claims the RWE 2010 Master Agreement and RWE 2011 Master Agreement between certain affiliates and predecessors of Enviva and RWE, and certain amendments and other agreements related thereto, it for the most part redacted the identities of Enviva's signatories and contact persons under the agreements. However, it did not redact certain contact information in the November 11, 2023 Standstill Deed (*see* **Exhibit 1**) and three related letters (RWE's January 16, 2024 Termination Notice, its January 26, 2024 Notice of Conditional Extension Period, and its February 16, 2024 Notice of Nonpayment). Section 7(c) of the Standstill Deed  provides  that notices to Enviva shall be sent to Jason Paral, who at the time was Enviva's Senior Vice President, General Counsel, and Secretary, and also to Enviva's outside counsel at Vinson & Elkins LLP. Each of the three letters was also sent to Mr. Paral's attention, copying Enviva's outside counsel at Vinson & Elkins LLP.

Furthermore, as shown *supra* in Part V.A, Defendant Meth appears to have initialed each page of the RWE 2011 Master Agreement, pursuant to which 97% of Enviva's liabilities under the 4Q 2022 Purchase Agreements were incurred. These facts provide yet further evidence that matters relating to the 4Q 2022 Purchase Agreements were handled at Enviva's highest levels, including by its senior executive officers such as the Defendants.

**B.    Defendants' Motive To Manipulate 4Q 2022 Earnings To Meet Their Overstated Guidance**

217.    "Earnings manipulation" or "earnings management" occurs when a company's managers alter its financial results in ways that do not reflect its true performance. Earnings manipulation is a well-known and fairly common practice, and has been a target for SEC enforcement for a number of years. *See, e.g.*, WALL STREET JOURNAL, *SEC Is Focusing on Earnings Manipulation by Companies* (Mar. 10, 2023). Common earnings manipulation techniques used to overstate company performance include accelerating income into current periods, deferring expenses into later periods, or using accounting gimmicks to achieve similar effects.

218.    As in the case of Enviva, earnings manipulation can become a recurring practice at a company, as its managers (such as the Defendants) continue manipulating earnings in successive periods to counteract the negative effects of prior manipulated results. Also as in the case of Enviva, this self-perpetuating pattern often comes to light only when the scale of earnings manipulation has become too great to conceal any longer, setting up an eventual crash in financial results.

219.    Because Enviva incurred substantial financial losses every year it required outside financing in order to continue and grow its business. Leading up to the Class Period, Defendants had a history of issuing artificially inflated financial guidance for Enviva in order to attract

investment and increase Enviva's share price.  Defendants then manipulated Enviva's earnings to attempt to bridge the gap to their unrealistic guidance.

220.   As the head of wood fiber procurement for seven of Enviva's manufacturing plants, FE1 was regularly involved in providing information about anticipated fiber costs for use in Enviva's quarterly and annual forecasting. The cost of wood fiber to process into finished pellets was a substantial part of Enviva's overall cost of production. According to FE1, the price for one "green ton" (2,000 lbs. including moisture) of wood fiber at the plant (*i.e.*, inclusive of payment to the landowner for the fiber, and the cost to cut it down and transport it to the plant) was usually in the range of $32 to $38. Every quarter FE1 and his team would prepare and internally submit forecasts for fiber prices based on the available data and their professional experience. FE1's track record in forecasting fiber prices was highly accurate, with actual prices differing from his forecasted numbers by only about 1.0-1.5% on average.

221.   Nonetheless, Enviva executives consistently changed FE1's forecasted fiber prices to use drastically lower numbers when creating Enviva's quarterly and annual projections, despite being repeatedly informed by FE1 and his team that the lower numbers were not possible. FE1 recalled that Enviva routinely forecasted prices of about $17 to $18 per green ton of wood fiber delivered at the plant. Around January 2019 FE1 even informed his superiors Wade Nottingham (VP of Fiber Procurement) and Dan Bacon (Finance Director) in an email that the order to drastically revise down the forecasted fiber prices was "cooking the books." The instructions to falsify the forecasted fiber prices were handed down to FE1 through EVP of Operations Royal Smith. FE1 does not know where Smith obtained these instructions, but believes he reported to Defendant Keppler. FE1 attended quarterly meetings where Keppler was present, and at which Enviva's forecasting was discussed.

222.     According to FE1 Enviva frequently missed its quarterly and annual projections by large amounts, due in substantial part to higher than projected wood fiber costs on the one hand, and higher than projected operational costs on the other hand.

223.     Former Enviva Financial Analyst FE2 worked on projects including preparation for monthly financial review meetings that were often attended by some or all of Defendants Meth, Keppler, and Even, and at which the topics to be addressed often included shortfalls in Enviva's results as compared to its financial projections.

224.     In FE2's experience, Enviva management repeatedly implemented changes in order to try to meet earnings targets.

225.     According to FE2 Enviva's financial planning used unreasonable assumptions, at the direction of C-suite executives. For example, that Enviva's dividends could be covered in part by 3% cost reductions at its plants every year, and that the plants would operate with barely any down time.

226.     FE2 also reported that Enviva often asked certain customers to agree to high wood pellet sales prices up front, which Enviva said it would change to low prices later. FE2 believes that such decisions required the approval of senior executives including Defendant Meth, who at the time was Enviva's Chief Commercial Officer.

227.     According to FE2, Enviva's decisions concerning when to capitalize expenses (thereby deferring most of their financial impact to later periods) did not make sense, and the accounting team frequently changed how expenses were capitalized. FE2 recalled that Enviva found unusual ways to reduce or defer reported costs, but that such "solutions" often only half-fixed one problem by replacing it with a new one.

228.    Heading into 4Q 2022, Enviva's history of earnings manipulation had set up a substantial shortfall as compared to Defendants' financial guidance for the full year 2022 and 4Q 2022.

229.    On October 3, 2022, and again on November 2, 2022, Enviva issued guidance for $240 million to $260 million of Adjusted EBITDA for the full year 2022. Based on Enviva's reported $136.6 million of Adjusted EBITDA reported for the first three quarters of 2022, this implied guidance of $103.4 million to $123.4 million for 4Q 2022 Adjusted EBITDA, meaning that Enviva projected it would earn over 40% of full year 2022 Adjusted EBITDA in the fourth quarter.

230.    As discussed above, in 4Q 2022 Enviva entered into a series of transactions with its existing customer RWE, under which (i) Enviva would sell RWE approximately 340,000 metric tons of wood pellets in 4Q 2022 (in addition to approximately 110,000 metric tons to be sold to RWE under pre-existing contracts), and (ii) Enviva agreed to purchase approximately 1,760,000 metric tons of wood pellets from RWE between 2023 and 2025, and the prices for the 2024 and 2025 purchases were set substantially in excess of the forward prices reported in 4Q 2022.

231.    Enviva reported selling 3,627,000 metric tons of wood pellets in the first three quarters of 2022, and 4,654,000 metric tons for the full year, meaning that the Company sold 1,027,000 metric tons during the fourth quarter. The additional 340,000 metric tons sold to RWE under the 4Q 2022 Purchase Agreements represented 33% of Enviva's 4Q 2022 sales by weight.

232.    After Defendants had entered into the 4Q 2022 Purchase Agreements and related sale agreements with RWE, they decided that applicable accounting rules required deferral of a portion of the revenue and earnings resulting from the sales. As stated by Defendant Meth on

65

Enviva's March 1, 2023 earnings call for 4Q 2022 "[t]his accounting treatment differed from our expectations and as well as from the assumptions that underpinned our guidance ranges."

233. Excluding the effect of the unexpected accounting deferral, Enviva reported $107.5 million of Adjusted EBITDA for 4Q 2022, and $244.1 million for the full year 2022, toward the lower ends of Defendants' guidance ranges.

234. Enviva's additional 4Q 2022 sales to RWE of 340,000 metric tons occurred at elevated spot market prices upwards of $389 per metric ton, as compared to the majority of Enviva's sales that were made under its long-term contracts at rates of roughly $200 to $220 per metric ton. As such, Enviva's 4Q 2022 sales to RWE generated a disproportionately large amount of Enviva's 4Q 2022 (well above 33%) and full year 2022 Adjusted EBITDA (excluding the effects of the unexpected accounting deferral).

235. Without the additional 4Q 2022 sales to RWE, Enviva's Adjusted EBITDA would have fallen far short of Defendants' full year 2022 and 4Q 2022 guidance.

236. Defendants repeatedly emphasized the importance of meeting Enviva's earnings guidance for 4Q 2022, as part of the growth story that they sought to present to investors. For example, Enviva's March 1, 2023 press release reporting its 4Q 2022 and full year 2022 results quoted Defendant Even as stating "[a]chieving fourth-quarter and full-year 2022 adjusted EBITDA within our target ranges, prior to the Deferred Gross Margin Transactions, represents an important milestone for us . . . Enviva is a company with a robust backlog of fully contracted long-term revenues and a strong growth profile with a large and growing high-quality customer base around the globe. As we execute our growth strategy, we plan to prioritize leverage and coverage improvements while we complete our transformation into a fully self-funding growth company." And Defendant Meth stated on Enviva's March 1, 2023 earnings call for 4Q 2022 that "but for an

66

unanticipated accounting treatment -- we achieved our adjusted EBITDA guidance for both fourth quarter and full year 2022" and that "the strong end to 2022 paves the way for a solid 2023."

### C. Keppler's Insider Trading And Defendants' Incentive Compensation Provided Additional Motives

237. On December 5, 2022, Defendant Keppler filed a Form 4 with the SEC to report changes in his beneficial ownership of Enviva stock. The form reflected a sale by Keppler of 200,000 shares for $55 per share on December 2, 2022, meaning that Keppler had obtained $11 million from the sale. The form also showed that Keppler owned 773,572 shares after the transaction, meaning that he had sold 20.5% of his Enviva stock.

238. This was the first such sale reported by Keppler since he began filing SEC beneficial ownership reports for Enviva stock in 2015.

239. Keppler's stock sale came shortly after Enviva's agreements on October 13, 2022 and November 22, 2022 to purchase more than one million metric tons of wood pellets from RWE at elevated prices over 2023-2025, and before any information about those agreements was disclosed to the public.

240. Keppler's Form 4 stated that he "sold the securities reported herein principally for estate planning and charitable purposes, which include supporting several personal philanthropic initiatives." However, that very general description fails to explain why the stock was sold, as stock can be contributed to charities and transferred to a decedent's estate. If Keppler believed Enviva stock to be poised for future appreciation, presumably he would want his estate and philanthropic initiatives to benefit from its continued ownership.

241. Defendants obtained generous salaries, bonuses, and incentive compensation through their employment with Enviva, a substantial portion of which depended on Enviva meeting Adjusted EBITDA targets or targets relating to Enviva's stock price performance.

242.   The following table summarizes the 2022 compensation for Defendants Meth, Keppler, and Even (Enviva did not report similar information for Defendant Johnson):

|  | 2022 Base Salary | Target AICP Bonus | 2022 Bonus Paid | Target LTIP Value | 2022 Total Compensation |
|---|---|---|---|---|---|
| Meth | $750,000 | 150% of salary | $439,078 | 250% of salary | $1,847,803 |
| Keppler | $1,000,000 | 150% of salary | $816,934 | 340% of salary | $4,330,359 |
| Even | $490,000 | 125% of salary | $367,528 | 250% of salary | $1,724,196 |

243.   Enviva's Annual Incentive Compensation Plan ("AICP") is a short-term cash incentive compensation plan. For 2022, eligibility for an AICP award was conditioned on Enviva achieving $275 million of Adjusted EBITDA. Although Enviva did not meet that threshold, it nonetheless awarded Defendants substantial bonuses ("2022 Bonus Paid") in the form of equity-based awards. According to Enviva's Schedule 14A filed with the SEC on March 5, 2021, these discretionary bonuses were given "to reward adjusted EBITDA within the revised guidance range for 2022, excluding the impact of certain accretive sales transactions in fourth-quarter 2022 which required different accounting treatment as compared to our guidance assumptions, as well as adjusted EBITDA growth year-over-year."  Enviva's Long-Term Incentive Plan ("LTIP") provides equity based incentive compensation, 50% of which is time-based and vests over a four-year period, and the other 50% of which is performance-based and dependent on Enviva's stock price performance.

244.   Defendant Johnson's July 27, 2021 employment agreement with Enviva states that he is to receive an annual base salary of $300,000, an annual bonus (subject to performance targets to be set by the Board) with a minimum target value of 50% of base salary, and LTIP awards with a target value of 75% of base salary. Enviva did not disclose his total compensation for 2022.

245.   For 2022, the median annual total compensation of all Enviva employees (other than Defendant Meth) was $63,834. As such, Defendant Meth received compensation 29 times that

of the median employee, Defendant Even received compensation 27 times that of the median employee, and Defendant Keppler received compensation 67 times that of the median employee.

**D.     The Defendants Left Their Positions Under Suspect Circumstances**

246.    Each of the Defendants "resigned," was replaced, or was terminated from positions with Enviva during or at the end of the Class Period, under suspect circumstances.

247.    On March 27, 2023 Enviva announced that "[o]n March 21, 2023, Michael A. Johnson gave notice of his resignation from his position as Vice President and Chief Accounting Officer." Enviva did not provide any reason for Johnson's purported resignation. Johnson's purported resignation came a mere three weeks after Enviva first announced that its GAAP results for 4Q 2022 were far below its guidance, due in large part to "unanticipated accounting treatment" for its 4Q 2022 sales to RWE in connection with the 4Q 2022 Purchase Agreements, which was not "the accounting treatment we had expected and which informed our guidance." Defendant Johnson's publicly available LinkedIn profile does not list any employment since he left Enviva. Enviva did not hire a replacement for Defendant Johnson, rather his duties as principal accounting officer were taken over by Defendant Even.

248.    On August 30, 2023, Enviva announced that "Shai S. Even was separated from his position as Executive Vice President and Chief Financial Officer of the Company (and his role as the Company's principal accounting officer), effective as of August 29, 2023." Enviva did not provide any reason for Even's separation. Enviva separated Defendant Even from his position in the midst of the Company's bleak performance, mounting financial pressures, and a cost-cutting corporate restructuring. Defendant Even's publicly available LinkedIn profile does not list any employment since he left Enviva. Enviva replaced Defendant Even as Executive Vice President, Chief Financial Officer, and principal accounting officer with Glenn Nunziata.

69

249.    On September 19, 2023, as problems continued to mount at Enviva, the Company announced that Defendant Keppler "resigned as Executive Chairman of the Board and as an executive officer of the Company, effective immediately, as he continues to focus on treatment and recovery from recent heart health challenges," and that he "will continue to serve as a non-management member of the Board."

250.    Finally, on November 9, 2023 Enviva announced that "Enviva's board of directors has appointed Glenn Nunziata as interim CEO in addition to his role as CFO, succeeding Thomas Meth, who has served as CEO since November 2022. Mr. Meth will remain President and, given his deep history contracting Enviva's business, will focus his time on renegotiating existing customer contracts." In its Form 10-Q filed that day, Enviva clarified that "the Board changed Thomas Meth's role from Chief Executive Officer and President to President of the Company." Enviva did not provide any reason for replacing Defendant Meth as CEO. This announcement came on the same day that Enviva belatedly revealed $283 million in expected losses on the 4Q 2022 Purchase Agreements, disclosed "substantial doubt about the Company's ability to continue as a going concern" as a result, and implicitly revealed that in the 2Q 2023 earnings call Defendant Meth had misrepresented the basis for Enviva's 3Q 2023 guidance.

### E.    Pellet Manufacturing And Trading Were Core Operations For Enviva

251.    Wood pellet manufacturing and sales was a core operation for Enviva. Historically, manufacturing and selling Wood pellets accounted for 80-85% of Enviva's business.

252.    Enviva's side business of buying wood pellets from other companies and reselling them to customers was also a core operation for Enviva. Apart from manufacturing wood pellets, this was Enviva's only other business activity, and historically accounted for 15-20% of Enviva's business.

## X. LOSS CAUSATION

253. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs and the Class.

254. During the Class Period, Plaintiffs and the Class purchased Enviva's shares at artificially inflated prices and were damaged thereby. The price of the Company's shares significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## XI. CLASS ACTION ALLEGATIONS

255. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities who purchased the publicly traded common stock of Enviva between November 3, 2022 and November 8, 2023, both dates inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

256. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Enviva's shares actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are at least hundreds or thousands of members in the proposed Class. Millions of Enviva shares were traded publicly during the Class Period on the NYSE. Record owners and other members of the Class may be identified from records maintained by Enviva or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

71

257. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

258. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

259. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Enviva; and

(c) to what extent the members of the Class have sustained damages and the proper measure of damages.

260. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XII.   UNDISCLOSED ADVERSE FACTS

261. The market for Enviva's shares was open, well-developed and efficient at all relevant times. As a result of Defendants' materially false and/or misleading statements, and/or failures to disclose, Enviva's shares traded at artificially inflated prices during the Class Period.

72

Plaintiffs and other members of the Class purchased Enviva's shares relying upon the integrity of the market price of the Company's shares and market information relating to Enviva and have been damaged thereby.

262. During the Class Period, Defendants materially misled the investing public thereby inflating the price of Enviva's shares, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading. The statements and omissions were materially false and/or misleading for the reasons set forth herein and because they failed to disclose material adverse information and/or misrepresented the truth about Enviva's business, operations, and prospects as alleged herein.

263. At all relevant times, the material misrepresentations and omissions and undisclosed scheme particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiffs and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Enviva's prospects and engaged in a scheme to do the same. These material misstatements and/or omissions and/or conduct had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its prospects, thus causing the Company's shares to be overvalued and artificially inflated at all relevant times. Defendants' materially false and/or misleading statements and/or conduct during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's shares at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

### XIII. APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

264. The market for Enviva's shares was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, Enviva's shares traded at artificially inflated prices during the Class Period. Plaintiffs and other members of the Class purchased the Company's shares relying upon the integrity of the market price of Enviva's shares and market information relating to Enviva, and have been damaged thereby.

265. During the Class Period, the artificial inflation of Enviva's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiffs and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Enviva's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of Enviva and its business, operations, and prospects, thus causing the price of the Company's shares to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company shares. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's shares at such artificially inflated prices, and each of them has been damaged as a result.

266. At all relevant times, the market for Enviva's shares was an efficient market for the following reasons, among others:

(a) Enviva shares met the requirements for listing, and were listed and actively traded on the NYSE, a highly efficient and automated market;

74

(b)    As a regulated issuer, Enviva filed periodic public reports with the SEC and/or the NYSE;

(c)    Enviva regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d)    Enviva was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

267.    As a result of the foregoing, the market for Enviva's shares promptly digested current information regarding Enviva from all publicly available sources and reflected such information in Enviva's share price. Under these circumstances, all purchasers of Enviva's shares during the Class Period suffered similar injury through their purchase of Enviva's shares at artificially inflated prices and a presumption of reliance applies.

268.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have

considered them important in making investment decisions. Given the importance of the Class Period material omissions set forth above, that requirement is satisfied here.

## XIV.   NO SAFE HARBOR

269.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Enviva who knew that the statement was false when made.

## XV.   CAUSE OF ACTION

**Violation of Section 10(b) of The Exchange Act and
Rule 10b-5(a) — (c) Promulgated Thereunder
Against All Defendants**

270.   Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

271.   During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (iii) cause Plaintiffs

76

and other members of the Class to purchase Enviva's shares at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

272. Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's shares in an effort to maintain artificially high market prices for Enviva's shares in violation of Section 10(b) of the Exchange Act and Rule 10b-5(a) — (c). All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

273. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Enviva's financial well-being and prospects, as specified herein.

274. Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Enviva's value, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Enviva and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's shares during the Class Period.

77

275.    Each of the Defendants' primary liability and controlling person liability arises from the following facts: (i) the Defendants were high-level executives at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as an officer of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

276.    Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Enviva's prospects from the investing public and supporting the artificially inflated price of its shares. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

277.    As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Enviva's shares was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's shares were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the shares trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiffs and the other members of the Class acquired Enviva's shares during the Class Period at artificially high prices and were damaged thereby.

278.    At the time of said misrepresentations and/or omissions, Plaintiffs and other members of the Class were unaware of their falsity and believed them to be true. Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding Enviva, which was not disclosed by Defendants, Plaintiffs and other members of the Class would not have purchased their Enviva shares, or, if they had acquired such shares during the Class Period, they would not have done so at the artificially inflated prices which they paid.

279.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

280.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's shares during the Class Period.

## XVI.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

(a)    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)   Awarding compensatory damages in favor of Plaintiffs and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)   Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)   Such other and further relief as the Court may deem just and proper.

## XVII.  JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

DATED: August 2, 2024

**WEISBROD MATTEIS & COPLEY PLLC**

By: */s/ William E. Jacobs*
Stephen A. Weisbrod (# 14795)
William E. Jacobs (#21975)
3000 K Street NW, Suite 275
Washington, D.C. 20007
Telephone: (202) 499-7900
Email:  sweisbrod@wmclaw.com
wjacobs@wmclaw.com

*Liaison Counsel for Lead Plaintiff Andrew Davis,
Named Plaintiffs Christine Alloro and Ted Goldstein,
and the Proposed Class*

**GLANCY PRONGAY & MURRAY LLP**

By: */s/ Garth Spencer*
   (signed by William E. Jacobs with permission of
   Garth Spencer)
Robert V. Prongay (*pro hac vice*)
Charles H. Linehan (*pro hac vice*)
Pavithra Rajesh (*pro hac vice*)
Garth Spencer (*pro hac vice*)
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email:  rprongay@glancylaw.com
clinehan@glancylaw.com
prajesh@glancylaw.com
gspencer@glancylaw.com

*Lead Counsel for Lead Plaintiff Andrew Davis, Named
Plaintiffs Christine Alloro and Ted Goldstein, and the
Proposed Class*

**PROOF OF SERVICE**

I, the undersigned say:

I am not a party to the above case and am over eighteen years old.

On August 2, 2024, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the District of Maryland, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on August 2, 2024.

*s/ William E. Jacobs*