# Exhibit 2

# CIF Master Agreement

This Master Agreement is dated the 30th day of November 2011 between:

(1)   **RWE Supply & Trading Switzerland S.A.**, a company incorporated under the laws of Switzerland, having its registered office at 1 rue de Jargonnant, 1207 Geneva, Switzerland ("**RWE**", and "**Seller**" or "**Buyer**", as the case may be, as per applicable Confirmation ); and

(2)   **Enviva, LP.**, a company incorporated under the laws of the state of Delaware, having its registered office at Trust Center, 1209 Orange Street, Wilmington, DE 19801 ("**Enviva**" and "**Seller**" or "**Buyer**", as the case may be, as per applicable Confirmation.

Seller and Buyer are hereinafter collectively referred to as "**Parties**" and, individually, as a "**Party**".

**WHEREAS:**

Seller wishes to sell and Buyer wishes to buy Product (as hereinafter defined), on the terms and conditions hereinafter appearing.

The Parties have entered into and/or anticipate entering into one or more Confirmations that are or will be governed by this Master Agreement.

Each Confirmation relates or will relate to the sale and purchase of Product for delivery on a CIF basis.

This Master Agreement (which includes its Annexes), governs all Confirmations the Parties shall enter into for the purchase, sale, delivery and acceptance of biomass, including any amendments on the purchase, sale, delivery and acceptance of biomass (each such transaction being a "Confirmation").

**IT IS HEREBY AGREED AS FOLLOWS:**

1.   **Definitions and Interpretation**

1.1   The following terms shall have the following meanings (unless the context shall require otherwise):

   "**Acceptance Level**" means the acceptance level for a characteristic as specified in the specification in Annex E (or as amended by the applicable Confirmation) outside which

US 1147334v.3

Buyer has the right to reject the Product in accordance with the terms of this Master Agreement;

"Affiliate" means in relation to any person or entity (the "First Entity"), a person or entity under the Control of the First Entity, that Controls the First Entity or that is under common Control with the First Entity;

"ARA" means Amsterdam, Rotterdam, Antwerp range;

"Actual NCVcp" means the average NCVcp of the Seller's Sub-Lots Samples, calculated in accordance with clause 17.8, or, where applicable, clause 19.3 of this Master Agreement;

"Biomass" means the definition as defined in Annex D and is referred to herein as Product;

"Buyer's Coverage Costs" means reasonable and documented costs incurred by Buyer as a result of the loss incurred, or that would be incurred, (as the case may be and without the obligation for the Buyer to enter into an alternate purchase) by the Buyer buying the relevant quantity of Product at the Market Price compared with the Contract Price, including but not limited to, costs of transportation and handling of the Product, deadfreight and interest calculated in accordance with the Default Interest Rate;

"CAD" means Canadian Dollar;

"CIF" means Cost Insurance Freight as per Incoterms® 2010;

"Charter Party" means a contract whereby the Owner of the Vessel contracts with Seller for the transportation of a Shipment or Shipments of Product delivered hereunder;

"Confirmation" means a transaction, in the form or substantially in the form set out in Annex C, for the purchase, sale, delivery and acceptance of Product, together with any additional terms agreed by the Parties. The provisions of this Master Agreement form an integral part of a Confirmation;

"Contract Quantity" means the total quantity expressed in Metric Tonnes agreed between the Parties to be delivered pursuant to each Confirmation;

"Contract Price" means the price agreed between the Parties to be payable for Shipments delivered pursuant to each Confirmation;

"Control" shall mean the power of a person or an entity to secure by means of the holding of shares or the possession of voting power in or in relation to a person or entity, or by virtue of powers conferred in any document or otherwise, that the affairs of such person or entity are conducted in accordance with the wishes of that person or entity whereby the holding of more than fifty per cent (50%) of the shares in such entity by a

2




person or entity, acting alone or in concert with others, is deemed to amount to "Control" as defined herein;

"**Day**" means the period beginning at 00.00 hours on a day and ending at 00.00 hours on the following day;

"**Default Interest Rate**" means the default interest rate specified as such in the applicable Confirmation;

"**Delivery Period**" means the period(s) specified in the applicable Confirmation as such period(s);

"**Directive**" means Directive 2003/87/EC of the European Parliament and of the Council of 13 October 2003 establishing a scheme for greenhouse gas emissions allowance trading and amending Council Directive 96/61/EC, as amended by Directive 2004/101/EC of the European Parliament and of the Council of 27 October 2004, and as may be amended from time to time;

"**Discharge Port**" means such port or ports where the Shipment is discharged as specified in a Confirmation;

"**Early Termination Payment**" or "**ETP**" means Early Termination Payment as defined in clause 26.3;

"**EUR**" or "**€**" means the Euro currency;

"**EURAL**" means the European list of waste products (assembled by the European Commission with criteria for hazardous materials);

"**Event of Default**" has the meaning as defined in clause 26.1;

"**Evoa**" means the European rules regarding export and import of waste products;

"**Extraneous Material**" means material that is not Product, including but not limited to metal, stone, pebbles, gravel, plastics, sacks, dunnage, large pieces of biomass (e.g. logs) or other foreign objects or material;

"**Giga Joules**" or "**GJ**" means one thousand million (1,000,000,000) Joules;

"**Holiday**" means any official state, provincial or national holiday in the place where the relevant contractual obligations will be fulfilled;

"**IEC**" means the International Electrotechnical Commission;

"**IMO**" means the International Maritime Organization;

3

US 1147334v.3



"**Incoterms®**" means the Incoterms® 2010 rules issued by the International Chamber of Commerce, recognising that "Incoterms" is a trademark of the International Chamber of Commerce;

"**ISO**" means the International Organization for Standardization;

"**Joule**" or "**J**" means a joule as defined in ISO 1000:1992 (E);

"**Loading Port**" means the port facility used by Seller for loading of a Shipment or Shipments hereunder;

"**Market Price**" means the price of Product as indicated by the available relevant market indices for industrial wood pellets pricing based on wood pellets settlement prices CIF Rotterdam or the price at which the relevant Party would be able to sell or purchase the quantity of under-delivered or under-accepted quantity in the market acting in a reasonable manner which will be determined by taking the average of the price quotations for the Product of similar quality and Discharge Port for a similar period obtained from at least two and no more than four independent internationally recognised dealers/brokers or counterparties (such brokers to be appointed by the non-defaulting Party).   When assessing Market Price, the non-defaulting Party may elect to either use market indices or may appoint brokers, in accordance with this Master Agreement.  For the avoidance of doubt neither the Buyer nor Seller is obliged to enter into a replacement transaction;

 "**Master**" means the Captain of the Vessel;

"**Master Agreement**" means this agreement together with the Confirmation(s);

"**Metric Tonne**" or "**MT**" means a metric tonne:  one thousand (1,000) kilograms;

"**MSDS**" means Material Safety Data Sheet;

"**NEN**" means the Nederlands Normalisatie Instituut (Dutch Normalisation Institute standard);

"**NEN-NE**" means the Dutch standard harmonized with standard set by the European Committee for Standardization (CEN);

"**Net Calorific Value**" or "**NCV**" means Net Calorific Value expressed in Giga Joules per Tonne or ("GJ/Tonne") as per ISO 1928;

"**NCVcp**" means Net Calorific Value at constant pressure;

"**Notice of Readiness**" or "**NOR**" means the notice tendered by the Master confirming the readiness of the Vessel to discharge the cargo at the Discharge Port;

"**NTA**" means the Nederlands Technische Afspraak;

4





"**Office Hours**" means the period between 09.00 and 17.00 hours on a Working Day;

"**Owner(s)**" means the owner or operator of the Vessel;

"**Party**" means either Buyer or Seller;

"**Product**" means Biomass of the type specified and defined in the applicable Confirmation and delivered or to be delivered pursuant to that Confirmation;

"**Quality Analysis Report**" means a report issued or to be issued by an Independent Laboratory verifying the compliance of the Product with the Specification as per the Confirmation;

"**SCIS**" means a Shipper Cargo Information Sheet;

"**Seller's Coverage Costs**" means reasonable and documented costs incurred by Seller as a result of the loss incurred, or that would be incurred, (as the case may be and without the obligation for the Seller to enter into an alternate sale) by the Seller selling the relevant quantity of Product at the Market Price compared with the Contract Price, including but not limited to, costs of transportation and handling of the Product, deadfreight and interest calculated in accordance with the Default Interest Rate. .

"**Shipment**" means a consignment of Product shipped on board Vessel(s) and delivered hereunder;

"**Specification**" means the quality specification for the Product delivered pursuant to the applicable Confirmation and as set out in Annex D to this Master Agreement or as attached to the applicable Confirmation (such attachment to override the terms of Annex D);

"**SSHEX**" means Saturdays, Sundays and Holidays excluded;

"**SSHINC**" means Saturdays, Sundays and Holidays included;

"**USD**" means United States Dollar currency;

"**Vessel(s)**" means the ocean/sea going vessel(s) chartered by Seller to load and carry the Shipment or Shipments hereunder;

"**Weather Working Day**" means a Day, or part of a Day during which it is or, if the performing Vessel is still waiting for her turn, it would be possible to unload the cargo without interference due to the weather. If such interference occurs (or would have occurred if work had been in progress) there shall be excluded from the laytime a period calculated by reference to the ratio the hours not actually worked bear to the normal working hours, including overtime, which would have or could have been worked but for

US 1147334v.3



that interference (for the avoidance of doubt, if the Vessel is on demurrage, time shall run continuously);

"**Working Day**" means any Day other than a Saturday, Sunday or Holiday;

"**WWDSHINC**" means Weather Working Days, Sundays and Holidays included;

"**WWDSSHINC**" means Weather Working Days Saturdays, Sundays and Holidays included;

"**WWDSHEX**" means Weather Working Days, Sundays and Holidays excluded;

"**WWDSSHEX**" means Weather Working Days, Saturdays, Sundays and Holidays excluded;

"**Year**" means a period between 00.00 hours any Day of a year to 00.00 hours the same Day the succeeding year.

1.2     Any reference in this Master Agreement to a "clause" or "Annex", is a reference to a clause of or Annex to this Master Agreement.

1.3     Headings and titles are for convenience only and do not affect the interpretation of this Master Agreement.

1.4     Unless the context otherwise requires, the singular shall include the plural and vice versa and any word or words herein defined in the singular shall have a corresponding meaning if used in the plural and vice versa.

1.5     Any reference, express or implied, to any statute, regulation, order, rule, by-law or any instrument having the force of law ("**enactment**") includes references to:

    1.5.1    that enactment as amended, extended or applied by or under any other enactment before or after the date of this Master Agreement;

    1.5.2    any enactment which that enactment re-enacts (with or without modification); and

    1.5.3    any subordinate legislation made (before or after the date of this Master Agreement) under any enactment.

1.6     References to a Party include that Party's transferees, successors and in each case in accordance with this Master Agreement.

1.7     The word "including" shall be construed without limitation.

1.8     In the event of any inconsistency between the terms of the main body of this Master Agreement and the terms of any applicable Confirmation or CIF Incoterms 2010, the

6

US 1147334v.3



terms of the applicable Confirmation shall prevail as to specific terms relating to price, quantity, payment and delivery, but otherwise the provisions of this Master Agreement control over any conflicting or inconsistent terms in any Confirmation or CIF Incoterms 2010, unless the Parties agree otherwise in writing.

1.9    All Confirmations and this Master Agreement shall form a single agreement between the Parties. The provisions of this Master Agreement constitute an integral part of each Confirmation.

(a)    Each Confirmation between the Parties for the sale and purchase of Product for delivery on a CIF delivery basis (unless otherwise expressly agreed by the Parties) shall be entered into pursuant to, on the terms of, and subject to, this Master Agreement.

(b)    The Parties intend that they are legally bound by the terms of each Confirmation from the moment they agree to those terms in a writing signed by both Parties.

(c)    All Confirmations are entered into in reliance on the fact that this Master Agreement and all Confirmations form a single agreement between the Parties.

(d)    A Confirmation may be entered into by execution and delivery in counterparts (including by facsimile or e-mail transmission of signatures), which will be sufficient for all purposes to evidence a binding supplement to this Master Agreement.

2.    **Annexes**

2.1    The following Annexes are attached to and form part of this Master Agreement:

Annex A              Vessel Requirements, Specifications and Conditions
Annex B              Laytime Exclusions
Annex C              Template Confirmation
Annex D              Specification for Product
Annex E              Address for Notices
Annex F              Sustainability Requirements
Annex G              Credit Provisions

3.    **Key Obligations of the Parties**

7

US 1147334v.3



3.1 The Seller agrees to sell and deliver and the Buyer agrees to purchase and take delivery of Shipments in accordance with the terms of this Master Agreement.

3.2 The Buyer shall pay the Contract Price for Product delivered hereunder in accordance with the terms of this Master Agreement.

4. **Starting Date and Validity Period**

4.1 This Master Agreement is valid from the date of signature by both Parties and shall remain in force unless terminated by agreement of the Parties or pursuant to clause 26 (Termination).

5. **Transfer of Title and Risk**

5.1 Seller warrants that it is able to transfer to Buyer clean, full and marketable title to each Shipment delivered to Buyer and undertakes that the Product delivered hereunder shall be free from any liens, fees, charges, encumbrances, dues, and claims of any kind. Seller shall indemnify Buyer in respect of any claims, actions, liabilities, losses, damages and costs arising from Seller's breach of this clause.

5.2 Title to and risk of loss or damage to each Shipment of Product delivered hereunder shall pass from Seller to Buyer as the Product passes the rail of the respective Vessel at the Loading Port.

5.3 All environmental rights that accrue from the manufacturing of the Product delivered pursuant to this Master Agreement will be transferred to Buyer at the same time as title is transferred under this Master Agreement and will not be used by Seller and/or the government of the country of origin, to the extent legally permissible.

6. **Delivery**

6.1 Except where otherwise inconsistent with the express terms of this Master Agreement, the Product delivered hereunder shall be delivered on a CIF basis, as per Incoterms® 2010.

6.2 Product meeting the Specification (which shall be determined at the Loading Port) shall be delivered by the Seller to the Buyer at the Discharge Port during the Delivery Period(s).

7. **Vessel Nomination and Notices**

7.1 In respect of each Shipment hereunder, Seller shall, by no later than the period stipulated in the applicable Confirmation, nominate a Vessel meeting the requirements set out in Annex A, and which is in all respects suitable for loading and carrying Product. Seller (or Seller's representative) shall give notice of the nominated Vessel for the carriage of each Shipment, together with the date of expected readiness to load, the laytime

8



provisions (unless otherwise specified in the applicable Confirmation), demurrage and despatch rate applicable under the subject Charter Party (unless otherwise specified in the applicable Confirmation) and the approximate quantity of Product to be loaded. Buyer shall confirm acceptance of the nomination within one (1) Working Day of receipt, such acceptance not to be unreasonably withheld.

7.2    If the Vessel nominated by the Seller does not satisfy the requirements set forth in Annex A, the Buyer shall have the right to reject such nominated Vessel within one (1) Working Day of receipt by the Buyer of the Vessel nomination. If the Buyer rejects a Vessel nominated by the Seller in accordance with this clause, the Seller shall nominate another Vessel which satisfies the criteria set forth in Annex A. Such substitute Vessel shall be subject to the Buyer's right of rejection under this clause.

7.3    Seller is entitled to substitute the nominated Vessel, provided that the substitute Vessel meets the requirements set out in Annex A and is scheduled to arrive at the Loading Port no later than the originally nominated Vessel. Seller shall notify Buyer of such substitution as soon as possible but not later than two (2) Working Days before the expected arrival of the original Vessel at the Loading Port.

7.4    Seller shall keep Buyer informed of any changes of the date of the Vessel's expected time of arrival at the Loading Port notified to it by Owners.

7.5    Seller shall keep Buyer promptly informed of any circumstances which might reasonably be expected to have an impact on Seller's ability to deliver Shipments within the agreed Delivery Period(s) under this Master Agreement.

7.6    Upon nomination as per clause 7.1 above, Buyer will provide a Vessel/Shipment identification number to Seller. Seller and Buyer will use such identification number and the applicable Confirmation number on all correspondence, documents, analysis and invoices for such Shipment.

8.    Loading and Ocean/Sea Transportation

8.1    Seller shall enter into Charter Party(ies) with Owner(s) of Vessels nominated hereunder for carriage of Shipment(s). Seller shall procure from the Master(s) of the Vessel(s) clean shipped on board bills of lading consigned to Buyer's order, and evidencing the Shipment on board the Vessel(s) of the Product in apparent good order and condition.

8.2    Seller shall obtain any export license or other official authorisation and shall carry out all customs formalities necessary for the export of each Shipment. Licenses and permits shall be obtained in a timely manner such that loading of Shipment is not delayed. All costs associated with such licenses and permits, including the cost caused by any delay (except to the extent such delay is caused by an act or omission of Buyer, for which Buyer shall be responsible), are for the account of Seller.

9



8.3    Within two (2) Working Days of completion of loading of the Shipment, the Seller shall notify the Buyer:

8.3.1    that loading has been completed;

8.3.2    of the loaded quantity of Product in the Shipment;

8.3.3    the expected time and date of arrival of the Vessel at the Discharge Port.

8.4    No simultaneous loading shall be allowed in the case of co-shipment.

9.    **Discharge**

9.1    The Buyer guarantees to the Seller a safe berth facility or area at the Discharge Port suitable for nominated Vessels, where the Vessel can safely reach and safely leave and where she can always lie safely afloat during discharging.

9.2    Unless otherwise specified in the applicable Confirmation, the Seller shall cause a Notice of Readiness to be tendered by the Master of the Vessel or its agents by fax and/or telex and/or e-mail when the Vessel (i) is all fast at the Discharge Port, and (ii) is in all respects ready to discharge the Product, any time day or night, whether the Vessel has arrived at its designated berth at the Discharge Port or not, whether it is in free pratique or not, whether it is customs cleared or not, whether the berth is occupied or not or whether administrative port arrival procedures are completed or not.

9.3    If upon arrival of the Vessel at the Discharge Port the Vessel is otherwise entitled to tender Notice of Readiness in accordance with clause 9.2, but entry is not possible due to tide, then the Vessel will be entitled to tender Notice of Readiness upon first suitable tide.

9.4    All costs incurred in connection with discharging the Shipment at the Discharge Port, including without limitation stevedoring costs and all cargo dues or charges related to the Product at the Discharge Port or country of destination shall be for the Buyer's account. All costs incurred in relation to the carriage of the Shipment to the Discharge Port shall be for the Seller's account, including without limitation duties, fees, taxes, quay dues and any other charges due in respect of the Vessel, as well as pilotage, mooring and towage expenses incurred at the Discharge Port.

9.5    As between Buyer and Seller, Buyer shall be directly responsible to Owner of a Vessel for any damage and/or all time used or lost as a result of damage resulting from the negligence or recklessness of Buyer or its agents in respect of any damages and Buyer shall settle any such claims with Owner directly. Buyer will also be responsible for repairs resulting from the negligence or recklessness of Buyer in respect of any damages to the Vessel affecting the Vessel's seaworthiness, with any time lost for such repairs to count as laytime. Seller, if so requested, may render assistance to Buyer with Buyer's discussions with Owner.

US 1147334v.3





9.6 Cost for stevedoring overtime is for the account of Buyer unless Seller requests stevedoring overtime. Cost for overtime called by the port authority at the Discharge Port is for the account of Buyer. Cost for crew and officer overtime is for the account of Seller, unless caused by the Buyer.

9.7 The Seller undertakes that it shall attempt that the Owner and/or Master shall always provide the lights as onboard the Vessel at no additional expense whenever reasonably asked by Buyer during unloading.

9.8 Buyer shall discharge the Shipment in compliance with the International Maritime Solid Bulk Cargoes Code 2009 (IMSBC), as revised from time to time, and in accordance with all applicable laws, regulations and standards from time to time issued by any relevant governmental or other statutory body or authority but always in accordance with the Master's instructions and approval.

9.9 No simultaneous discharging allowed in the case of co-shipment.

## 10. Laytime and Demurrage

10.1 Unless otherwise specified in the applicable Confirmation, laytime shall commence six (6) hours after a valid NOR is tendered unless time is used for discharging operations before the expiry of this six hour period (in which case laytime shall run from the time discharging operations commence).

10.2 Laytime shall cease counting upon completion of discharge of the Vessel. The laytime allowed to Buyer shall be calculated as the bill of lading weight for the respective Shipment divided by the discharge rate specified in the applicable Confirmation and in accordance with the laytime provisions set out in the applicable Confirmation.

10.3 Time spent shifting from anchorage to discharge berth shall not count as laytime.

10.4 Buyer, subject to the consent of Seller, such consent not to be unreasonably withheld or delayed, can shift the Vessel at the Discharge Port from one berth to another or to anchorage. If Buyer exercises this right, any resulting shifting expenses shall be for Buyer's account and any time so used shall count as laytime or, if the Vessel is on demurrage, as demurrage.

10.5 Notwithstanding any other provisions herein regarding the counting of laytime and/or demurrage, any time used or lost due to any of the events as specified in Annex B shall not count as laytime. If the Vessel is on demurrage, it stays on demurrage, except as specified otherwise in Annex B

10.6 If the laytime used exceeds the laytime allowed, the Buyer shall pay demurrage to the Seller for all time lost per Day or pro rata after the expiration of the allowed laytime at the rate nominated as specified in the applicable Confirmation. The Seller shall give

11

US 1147334v.3



notice in writing to the Buyer, together with an invoice and such relevant supporting documentation as is available, of the claim for demurrage within sixty (60) Days after completion of discharge of a Shipment at the Discharge Port. The Buyer shall pay any agreed demurrage no later than thirty (30) days following receipt by the Buyer of such invoice.

10.7    If the laytime used is less than the laytime allowed, the Seller shall pay despatch to the Buyer for all laytime saved per Day or pro rata before the expiration of the allowed laytime at the rate specified in the applicable Confirmation. The Buyer shall give notice in writing to the Seller, together with an invoice and such relevant supporting documentation as is available, of the claim for despatch within sixty (60) Days after completion of discharge of a Shipment at the Discharge Port. The Seller shall pay any despatch no later than thirty (30) days following receipt by the Seller of such invoice.

10.8    To the extent not inconsistent with the terms of this Master Agreement all other laytime and demurrage terms, conditions and exceptions shall be as per the Charter Party.

10.9    The Buyer shall in no circumstances be liable to the Owner for any demurrage due under the Charter Party or under the original bills of lading. To the extent that Owner purports to exercise a lien over the Product at the Discharge Port in respect of demurrage, the Buyer may, acting reasonably, subject to the consent of the Seller, such consent not to be unreasonably withheld or delayed, pay and/or settle Owner's claim, and monies paid to Owner in accordance with this provision shall be applied in diminution of Buyer's liability to Seller pursuant to clause 10.6 (Laytime and Demurrage) and/or shall be deducted from monies otherwise payable pursuant to clause 10.7 (Laytime and Demurrage). The Buyer shall immediately provide written notice to the Seller of any such Owner's claims.

11.    **Agents**

The Seller may nominate an agent to provide agency services to the Seller at the Loading Port. The Buyer may nominate an agent to provide agency services to the Buyer at the Discharge Port. A Party shall be entitled to rely upon the other Party's agent and the actions of any such appointed agent shall be binding upon the appointing Party.

12.    **Insurance**

Seller shall procure and maintain in place, at the Seller's sole cost and expense, an insurance policy against all risks of carriage for a Shipment under this Master Agreement including, but not limited to, marine, war, strikes, riots, and civil commotions risks to the CIF value plus 10% of each Shipment deliverable. Such insurance is to be effected subject to English law with first-class European underwriters, which for the purpose of settlement and disputes maintain an address of service in London, (or at Seller's option, subject to U.S. law with an American "A" rated insurance company) in accordance with the

US 1147334v.3





provisions of a standard Lloyd's Marine Insurance Policy and subject to Institute Cargo Clauses (A), Institute War Clauses, Institute Strikes, Riots and Civil Commotions Clauses and which provide for loss resulting from Heating, Sweating and Spontaneous Combustion. The benefit of such insurance is to accrue to the Buyer upon passing of the risk in the Product. The insurance policy or certificate is to be made out to bearer and fully transferable. Insurance is to operate from warehouse at Loading Port to warehouse quayside or into barges/lighters at the Discharge Port.

13. **Sustainability**

13.1 Seller shall ensure that all Product delivered under this Master Agreement shall comply with the sustainability requirements of the applicable Confirmation as well as Annex F, Part 1 and Part 2.

14. **Inspection**

14.1 Each Party or its representatives shall at reasonable times be allowed from time to time to inspect the Product at the producer's production facility or the storage and loading facilities, or the Vessel at its own expense and risk before loading and during loading. Each of Buyer or Seller, as the case may be, or its representatives, shall also be allowed to inspect the Product prior to and during the discharging in accordance with the applicable terminal regulations. Each of the Buyer and Seller, as the case may be, shall give the other Party reasonable advance written notice of its intention to inspect pursuant to this clause.

14.2 Each Party shall cooperate fully with the other Party in arranging inspection and during any inspection under this clause 14. Seller shall provide Buyer or its representatives with such information regarding origin, logistics or quality of the Product as Buyer or its representatives may reasonably request.

14.3 Any inspection of Vessels, loading facilities, or producer's production facility, by Buyer or Seller, as the case may be, or its agents shall be conducted at that Party's own risk and expense.

15. **Quality**

15.1 The Seller shall ensure that each Shipment hereunder shall be free flowing, of substantially uniform quality, readily able to be handled, shall be materially free of Extraneous Material and shall be fully suited for bulk sea and inland water transport.

15.2 Product delivered hereunder shall comply with the Specification. The quality of each Shipment shall be determined at the Loading Port in accordance with clause 17 (Sampling and Analysis) below. However, the presence of any material amounts of Extraneous Material shall be determined by the Buyer at either the Discharge Port or the Loading Port in accordance with the provisions of clause 16 (Contamination).

13



16.    **Contamination**

16.1    If a Shipment is found by Buyer on discharge to contain material amounts of Extraneous Material, Buyer shall immediately inform Seller, and Buyer shall appoint an independent surveyor within forty eight (48) hours after discovery of the Extraneous Material, at Buyer's sole cost and expense, to conduct an inspection of the Shipment. If the independent surveyor verifies that the Shipment supplied by Seller contains material amounts of Extraneous Material, then subject to clause 16.2, Seller and Buyer shall cooperate in good faith to provide Seller an opportunity to conform the Shipment within a reasonable time at no cost to Buyer.

16.2    Under no circumstances shall Seller be liable for the replacement or remedy of a Shipment or for any costs, damages or losses incurred by Buyer if the Extraneous Material was introduced after completion of loading of the Vessel, it being acknowledged and agreed by the Parties that Buyer shall bear the burden of proof to establish that such Extraneous Material was present in the Shipment prior to completion of loading.

16.3    In the event that the affected portion of a Shipment containing material amounts of Extraneous Material cannot be or is not conformed by Seller within a reasonable time, then Buyer may notify Seller in writing of its intention to reject the affected portion of such Shipment. Such notice in writing from Buyer shall call upon Seller to conform the affected portion of such Shipment within three (3) Working Days of the date of the notice. Should Seller not conform the affected portion of such Shipment within three (3) Working Days then Buyer may on written notice reject the affected portion of such Shipment in accordance with clause 21 below.

17.    **Sampling and Analysis**

17.1    Sampling shall be carried out at the Loading Port during loading of the Vessel.

17.2    The Seller shall appoint at its own expense an independent inspection company (the "**Independent Inspection Company**") to perform supervision during loading of the Vessel, to take samples of the Product in accordance with the terms of this Master Agreement, to issue the Quality Condition Certificate (as defined in clause 17.11.5, below) and to instruct a duly accredited laboratory (to be nominated by the Seller and also at Seller's own expense) to test and analyse the samples (the "**Independent Laboratory**"). The Independent Laboratory shall test and analyse the samples, in respect of all quality parameters detailed in the specification in Annex D and/or the applicable Confirmation (with the exception of the three quality parameters specified in clause 17.11.5, below) and shall issue a "**Quality Analysis Report**".

14

US 1147334v.3





17.3   The Buyer shall have the right to appoint its own independent inspection company at the Loading Port at its own sole cost and expense to supervise the Independent Inspection Company.

17.4   The Independent Inspection Company and any independent inspection company appointed pursuant to this clause 17 shall comply with NEN-EN-ISO/IEC 17020. The Independent Laboratory and any other independent laboratory appointed pursuant to this clause 17 shall be NEN-EN-ISO/IEC 17025 accredited, and they shall be further accredited/certified to analyse in accordance with the analysis standards as detailed within the Specification at Annex D. Sampling and preparation shall be executed in accordance with "NTA 8202 - Sampling and sample preparation of solid recovered fuels" or equivalent NEN sampling standard. All analysis shall be carried out in accordance with the relevant standards identified in the Specification.

17.5   Buyer and Seller shall each have the right to be represented at their own respective expense during all aspects of sampling, preparation, testing and analysis. If the Buyer exercises its right to appoint its own independent inspection company at the Loading Port, all samples referred to in this clause 17 (Sampling and Analasys) shall be sealed by both the Seller's and Buyer's independent inspection agents.

17.6   The Seller shall ensure that the Independent Inspection Company takes samples per 2000 Metric Tonne lots from various places of the Shipment so as to compose representative sample(s) of the Product shipped, in accordance with NTA 8202 or equivalent NEN sampling standard ("Lot Samples").

17.7   The Seller shall procure that each of the Lot Samples shall be split in four equal parts as follows (the "Sub-Lot Samples"):

    17.7.1   one for Seller (the "Seller's Sub-Lot Samples");

    17.7.2   one for Buyer (the "Buyer's Sub-Lot Samples");

    17.7.3   one for referee purposes (the "Referee Sub-Lot Samples"); and

    17.7.4   one for composing the composite sample (the "Composite Sub-Lot Samples").

17.8   Each of the Seller's Sub-Lot Samples shall be forwarded by the Independent Inspection Company to the Independent Laboratory for analysis on behalf of and for the account of Seller. The Independent Laboratory shall analyse each of the Seller's Sub-Lot Samples for NCVcp and moisture and the results (the "Seller's Sub-Lot Samples Analyses") shall be averaged in order to establish the NCVcp at loading ("Actual NCVcp") and moisture at loading, which shall be included within the Quality Analysis Report. The Seller shall ensure that a copy of the Seller's Sub-Lot Samples Analyses is provided to the Buyer together with the Quality Analysis Report.

15



17.9    Each of the Buyer's Sub-Lot Samples shall be forwarded to Buyer at Buyer's expense. Buyer may choose to analyse these samples by another independent laboratory for NCVcp or moisture at its own expense. If Buyer wishes to analyse Buyer's Sub-Lot Samples for NCVcp or moisture, then the Buyer's Sub-Lot Samples must be forwarded to an independent laboratory for analysis within the later of 10 days of receipt of Buyer's Sub-Lot Samples or 10 days of the date of discharge of the applicable Shipment.

17.10   Each of the Referee Sub-Lot Samples shall be sealed by the Independent Inspection Company and be kept by them in a safe place for at least ninety (90) days for the purpose of additional analysis of NCVcp or moisture if required.

17.11   All of the Composite Sub-Lot Samples taken in respect of a Shipment shall be combined in one single composite sample (the "Composite Sample") which shall be further divided into 3 parts as follows:

    17.11.1 one sample shall be forwarded by the Independent Inspection Company to the Independent Laboratory (the "Seller's Composite Sample") which shall be analysed in accordance with the quality parameters as set out in the Specification at Annex D (with the exception of the three quality parameters detailed in clause 17.11.5, below).

    17.11.2 one sample shall be forwarded to the Buyer (the "Buyer's Composite Sample"), which the Buyer may choose to analyse at its own expense; and

    17.11.3 one sample shall be kept as a referee sample (the "Referee Composite Sample") in a safe place for at least ninety (90) Days by the Independent Inspection Company.

    17.11.4 The contractual standards for the methods of analysis and the quality parameters to be met are specified in Annex D (Specification) and/or the applicable Confirmation. The Independent Laboratory shall produce a Quality Analysis Report in respect of all quality parameters detailed within the Specification at Annex D (with the exception of the three quality parameters specified in clause 17.11.5, below).

    17.11.5 Temperature, fines and water damage are to be measured and certified at Loading Port by the Independent Inspection Company which shall produce a Quality Condition Certificate in respect of these three quality parameters.

17.12   The Seller shall ensure that all testing and analysis shall be conducted and all required instructions given to the Independent Laboratory as soon as possible after sampling but in any event no later than seven (7) Working Days after preparation of the samples. The Independent Laboratory shall forward the Quality Analysis Report simultaneously to Buyer and Seller. The Quality Analysis Report shall state all seal references of the sample(s).

16

US 1147334v.3




17.13    Unless otherwise stated in the applicable Confirmation, the Quality Analysis Report and the Quality Condition Certificate shall be final and binding on the Parties for all purposes under this Master Agreement, save as provided in clauses 17.14 and 19.2 below or in the case of fraud or manifest error.

17.14    Upon receipt of the Quality Analysis Report, either Party may, within three (3) Working Days of receipt, at its own expense, challenge the result for any characteristic contained in the Quality Analysis Report and elect for the Referee Composite Sample to be submitted to a mutually acceptable independent laboratory (the "**Referee Laboratory**") appointed by such Party. If not so challenged within such three (3) Working Day period, the Quality Analysis Report shall be final and binding on the Parties for all purposes under this Master Agreement, except in the case of fraud or manifest error. Such Party shall procure that the Referee Laboratory shall perform an analysis of the challenged characteristic(s) and issue to Buyer and Seller a certificate (the "**Referee Certificate**") certifying the results of such analysis. The results set forth in the Referee Certificate for any challenged characteristic(s) shall be final and binding on the Parties for all purposes under this Master Agreement, except in the case of fraud or manifest error.

17.15    Notwithstanding anything herein to the contrary, in the event of any conflict in results between a Composite Sample and any Sub-Lot Samples, the Composite Sample shall control, except with respect to determination of NCVcp.

18.    **Weight determination**

18.1    The weight of each Shipment shall be determined at the Loading Port at Seller's expense by means of certified scale weights or, if not available, by draught survey of the Vessel, conducted by an independent marine surveyor designated by Seller with the approval of Buyer. Such approval shall not be unreasonably withheld or delayed. The Seller shall procure that the independent marine surveyor shall issue to Buyer and Seller a certificate certifying the weight of the Shipment (the "**Weight Certificate**"), which shall be final and binding on the Parties, except in the case of fraud or manifest error or in the case of clause 18.2 below.

18.2    Buyer has the right, at its own expense, by instructing its own independent marine surveyor, to certify the weight at Discharge Port by certified scale weights, by draft survey of barges (where the Product is discharged into barges) and if not available by draft survey of the Vessel. In the event that the difference between Seller's and Buyer's draft survey figures is greater than 0.2%, the arithmetic average of the Seller's and the Buyer's draught survey results shall be deemed to be the revised figure for the purposes of the Weight Certificate for the relevant Shipment, and this revised figure shall be final and binding on the Parties, except in the case of fraud or manifest error.

19.    Price

US 1147334v.3



19.1 In respect of each Shipment hereunder Buyer shall pay to Seller the Contract Price as stipulated in the applicable Confirmation (as adjusted in accordance with the provisions set forth therein) based on the Weight Certificate (whether revised or not, in accordance with clause 18.2, above) and Actual NCVcp of the subject Shipment (as determined in accordance with clauses 17.8 or 19.3).

19.2 If the NCVcp result from Buyer's Sub-Lot Samples (if Buyer chooses to analyse Buyer's Sub-Lot Samples for NCVcp and moisture in accordance with clause 17.9) deviates by more than 0.2 GJ per Metric Tonne from the Actual NCVcp (as established from the analysis of Seller's Sub-Lot Samples by the Independent Laboratory in accordance with clause 17.8), then Buyer may request a further test to be conducted by a mutually acceptable independent laboratory, which will analyse the Referee Sub-Lot Samples for NCVcp and moisture (the "**Referee Test**").

19.3 If clause 19.2, above, is operated, then a new Actual NCVcp (the NCVcp and moisture at loading) for that Shipment shall be re-calculated as follows:

(a) If the Referee Test result is closer to the Seller's Sub-Lot Samples result (as was originally assessed as per clause 17.8), then the average of these two figures shall be the revised Actual NCVcp figure and shall be final.

(b) If the Referee Test result is closer to the Buyer's Sub-Lot Samples result (as was originally assessed as per clause 17.9), then the average of these two figures shall be the revised Actual NCVcp figure and shall be final.

(c) If the Referee Test result is exactly in the middle of the Buyer's Sub-Lot Samples result and the Seller's Sub-Lot Samples result, then the Referee Test result only shall be the revised Actual NCVcp figure and shall be final.

20. **Payment**

20.1 The Contract Price for each Shipment shall be paid in two (2) instalments in accordance with this clause 20.

20.2 The first instalment shall be 90 % of the Contract Price, and shall be paid within five (5) Working Days of presentation by the Seller of electronic or email copies of the following documents to Buyer, provided that, Buyer shall not be obligated to tender payment to Seller until Buyer shall have received original documents where called for below:

20.2.1 All originals of the freight payable clean on board bill(s) of lading, made out to the order of Buyer and signed by the Master of the Vessel or Owner's authorised agent;

18

US 1147334v.3



20.2.2  Copy of Master's authorisation if the bill(s) of lading have been signed by the agent;

20.2.3  Original Weight Certificate;

20.2.4  Quality Analysis Report for the Shipment;

20.2.5  Original invoice;

20.2.6  Original insurance policy or duly signed certificate;

20.2.7  Quality Condition Certificate;

20.2.8  MSDS.

20.3  The second instalment shall be the balance of the Contract Price, and shall be paid within ten (10) Working Days after complete discharge of the Shipment in question provided that all of the documentation identified in the required sustainability documents as per Annex F have been received by Buyer.

20.4  All payments shall be made in the currency specified in the applicable Confirmation.

20.5  Any dispute in relation to any payment in respect of any particular Shipment shall not affect any of the Parties' obligation(s) in respect of any other Shipment.

20.6  If on any Day the Parties are required to pay each other one or more amounts, whether under this Master Agreement or otherwise, then such amounts with respect to each Party shall be aggregated and the Parties shall discharge their respective payment obligations by the Party owing the greater aggregate amount paying the other Party the difference between their respective aggregate amounts.

20.7  Without prejudice to any other rights and remedies under this Master Agreement or otherwise, if either Party fails to make payment of any amount in full when the same is due and payable under this Master Agreement, such Party shall pay interest to the other Party on such part of such amount as remains outstanding from time to time at the Default Interest Rate, such interest to compound monthly and to run from the due date until the date payment is received.

21.  **Rejection**

21.1  Without prejudice to any rights of rejection that Buyer may have under any applicable law or common law, Buyer has the right to reject a part of, or the entirety of any Shipment, whichever is applicable, if:

21.1.1  the final and binding result for any characteristic set forth in the Quality Analysis Report, Quality Condition Certificate or the Referee Certificate, as the case may

19



be, falls outside of the Acceptance Level for such characteristic (each such characteristic and corresponding Acceptance Level being specified in Annex D (Specification) and/or the applicable Confirmation); or

21.1.2 the Shipment cannot be conformed to the required quality and/or because material amounts of Extraneous Material cannot be removed (after the Seller has had an opportunity to remedy the Extraneous Material in accordance with clauses 16.1, 16.2 and 16.3 above); or

21.1.3 the Shipment does not fulfil the requirements of the Buyer in accordance with clause 13 (Sustainability Requirements).

21.2    In the event of Buyer's rejection for reasons of Extraneous Material (but only after the provisions of clauses 16.1, 16.2 and 16.3 have been complied with), Seller shall refund to Buyer any costs of Shipment which Buyer may have incurred.

21.3    In the event that the Buyer attempts to reject part of, or the entirety of, any Shipment, and it is ultimately determined that Buyer had no right to do so under clauses 21.1.1, 21.1.2 or 21.1.3, then Buyer shall pay to Seller all reasonable costs which Seller may have incurred as a result of such wrongful rejection.

21.4    Upon the Buyer giving a valid notice of rejection to Seller, any title and/or risk of the Product so rejected shall immediately pass to Seller, and the Buyer shall be discharged from all obligations under this Master Agreement in relation to the rejected Product as of the time of the giving of such notice of rejection.

21.5    In the event Buyer rejects Product in accordance with this clause 21, Buyer may, within seven (7) Days of such rejection, request Seller to deliver a further quantity of Product equal to the quantity rejected, and to contractual specifications, in which event the Seller must comply with Buyer's request as soon as reasonably possible. Any such further delivery shall be on the same terms as the rejected Shipment or partial Shipment. In the event that the Buyer does not request Seller to deliver such further quantity under this clause 21.4, such further quantity shall be deemed cancelled and the provisions of clause 22 (Damages; Mitigation) shall apply.

21.6    In the event that Buyer elects to reject part of a Shipment and accept part of that same Shipment, the Contract Price shall be reduced pro rata to the amount of Shipment accepted. To the extent that the first instalment paid by Buyer pursuant to clause 20.2 above exceeds the Contract Price after adjustment to take account of rejected Product, Seller shall reimburse Buyer within seven (7) Working Days of a written demand.

21.7    Any acceptance by Buyer of any Product which Buyer may contractually be entitled to reject shall not be construed as a waiver of any of Buyer's rights under this Master Agreement and shall not affect any other Shipment under this Master Agreement.

20



**22.    Damages; Mitigation**

22.1    In the event of any rejection by the Buyer in accordance with clause 21 and/or clause 16 or if the Seller fails to deliver all or any part of a Shipment within the Delivery Period, unless such failure is due to a Force Majeure Event as is defined in clause 24 or the acts or omissions of the Buyer or any agent of the Buyer, then the Seller shall pay Buyer's Coverage Costs to the Buyer in respect of such Shipment or part thereof. The Buyer shall calculate the Buyer's Coverage Costs and shall set out the amount so payable in an invoice to the Seller and show in reasonable detail how it is calculated and the Seller shall pay the Buyer's invoice within ten (10) Working Days of receipt.

22.2    If the Buyer fails to accept delivery of all or any part of any Shipment within the Delivery Period, unless such failure is due to a Force Majeure Event as defined in clause 24 or the acts or omissions of the Seller or any agent of the Seller then, the Buyer shall pay Seller's Coverage Costs to the Seller in respect of such Shipment or part thereof. The Seller shall calculate the Seller's Coverage Costs and shall set out the amount so payable in an invoice to the Buyer and show in reasonable detail how it is calculated and the Buyer shall pay the Seller's invoice within ten (10) Working Days of receipt.

22.3    In the event of any breach of contract other than those set out in clauses 22.1 and 22.2 above, the Party in breach shall indemnify the other Party in respect of all reasonable, evidenced and direct liabilities, costs, expenses, damages and losses suffered or incurred by the Party not in breach. Nothing in this clause shall restrict or limit a Party's general obligation at law to mitigate any losses suffered or incurred as a result of an event that may give rise to a claim under this clause, nor limit any other right of such Party under this Master Agreement.

22.4    Each Party hereby agrees that the payment obligations set forth in this clause 22 are reasonable in light of the anticipated harm and the difficulty of estimation or calculation of actual damages and represent a genuine pre-estimate of the Party's loss. Each Party hereby waives the right to contest such payment as void or unenforceable, as amounting to a penalty or otherwise.

22.5    Notwithstanding anything herein to the contrary, the Parties shall use commercially reasonable efforts to cooperate to mitigate losses and damages that may otherwise be incurred under this Master Agreement.

**23.    Liability**

Except where otherwise provided expressly in this Master Agreement, neither Party shall be liable for any loss of profit or of revenue or of goodwill, or business interruption damages, or losses suffered under any other contract, or special, consequential, incidental, punitive, exemplary or indirect damages, whether in contract, tort or

US 1147334v.3



otherwise, arising out of or in connection with the performance, failure to perform or termination of this Master Agreement.

24.   **Force Majeure**

24.1   Neither Buyer nor Seller shall be responsible for any failure to fulfil their respective obligations under this Master Agreement if fulfilment has been prevented, delayed, hindered or curtailed by the occurrence of a force majeure event as defined in this clause 24 (a "**Force Majeure Event**").

24.2   For the purposes of this Master Agreement, a Force Majeure Event shall constitute any circumstances whatsoever which are beyond the control of the Party claiming force majeure which it could not reasonably have avoided or overcome and which prevents, hinders or delays the claiming Party from performing or procuring performance of its delivery or acceptance obligations, and includes (without limitation) the following: any act of God or the elements, earthquakes, floods, landslides, hurricanes, civil disturbances, sabotage, acts of public enemies, war, blockades, insurrections, riots, epidemics, fires or explosions.  For the avoidance of doubt, a lack of funds, the availability of a more attractive market, changes in law or regulations affecting Buyer's ability to use the Product or inefficiencies in operations shall not constitute a Force Majeure Event.

24.3   The provisions of this clause 24 shall not apply unless the Party wishing to be relieved from liability has, as soon as practical but at the latest within  five (5) Working Days of the occurrence of the event or circumstance giving rise to the claim of a Force Majeure Event, notified the other Party of its intention to claim Force Majeure, the nature of the Force Majeure Event and the estimated duration of such Force Majeure Event. Failure to give such notice within five (5) Working Days shall constitute a waiver of any right to rely on such Force Majeure Event. In conjunction with Seller's reliance on a Force Majeure Event to excuse non-performance or delayed performance of any of its delivery obligations under this Master Agreement, Seller shall use reasonable efforts to procure from other sources similar (or as similar as possible) Product for delivery to Buyer, on similar terms and conditions to those contained in the applicable Confirmation.  Seller shall give Buyer detailed information regarding any substitute Product so sourced, and Buyer shall, within three (3) Working Days after receipt of such information from Seller, confirm whether the proposed substitute Product is acceptable.

24.4   Subject to clause 24.3 above, the time allowed to the Seller to make, or the Buyer to receive, Shipments hereunder shall be extended during any period in which such Shipment(s) shall be delayed or prevented by reason of any of the foregoing causes up to a period of thirty (30) Days.  If any Shipment hereunder shall be so delayed or prevented for more than thirty (30) Days, either Party may elect to be excused from performing such Shipment upon giving written notice within five (5) Working Days of the expiry of

US 1147334v.3




the said thirty (30) Day period. The performance of obligations under this Master Agreement shall be resumed as soon as reasonably possible after such Force Majeure Event has ceased and Shipments not delivered or received during the existence of a Force Majeure Event shall be replaced or rescheduled and Parties will agree in writing on a new shipping schedule for the suspended Shipments.

24.5    If a Force Majeure Event continues for sixty (60) consecutive Working Days, the non-claiming Party may terminate the applicable Confirmation (s) by giving to the Party claiming such Force Majeure Event three (3) Working Days' written notice of its intention to terminate pursuant to this sub-clause. In such case no Early Termination Payment will be due by either Party.

25.    **Credit Provisions**

Buyer and Seller will comply with their respective obligations under Annex G (Credit Provisions).

26.    **Termination**

26.1    **Events of Default**

The occurrence at any time of one or more of the events specified below with respect to a Party (the "**Defaulting Party**") is an event of default ("**Event of Default**"):

26.1.1    except as otherwise constituting a separate event under clause 26.1.5, the Defaulting Party commits a material breach or is in default of the material terms of this Master Agreement, and fails to rectify such breach or default, to the extent that such breach or default is capable of remedy, within fourteen (14) Working Days from receipt of written notice of such breach or default from the other Party;

26.1.2    the Defaulting Party is in material and ongoing breach of its obligations set out in Annex F (Sustainability Requirements) and such breach is not cured within sixty (60) Working Days from receipt of written notice of such non-compliance;

26.1.3    the Defaulting Party fails to comply with the credit provisions as per Annex G and such failure is classified as a Event of Default as detailed in Annex G;

26.1.4    the Defaulting Party does not pay in full on the due date any amount payable by it under this Master Agreement and such non-payment is not remedied within ten (10) Working Days following receipt of written notice of such default from the other Party;

26.1.5    the Defaulting Party fails to deliver or accept (as the case may be) three (3) or more Shipments under this Master Agreement, even in circumstances where, in

23

US 1147334v.3



accordance with clause 22 (Damages; Mitigation) the Defaulting Party has paid damages to the other Party in respect of its failure to perform.

26.1.6    the Defaulting Party is dissolved (other than pursuant to a consolidation, amalgamation or merger);

26.1.7    the Defaulting Party becomes insolvent or is unable to pay its debts as they become due;

26.1.8    the Defaulting Party has a resolution passed for its winding-up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger);

26.1.9    the Defaulting Party seeks or becomes subject to the appointment of an administrator, liquidator, receiver, or other similar official for it or for all or substantially all of its assets;

26.1.10  the Defaulting Party makes a general assignment, arrangement or composition with or for the benefit of its creditors; or

## 26.2    Early Termination

On and at any time after the occurrence of an Event of Default, the Party not subject to such Event of Default (the "**Non-Defaulting Party**") shall have the right, in addition to any and all remedies available hereunder or pursuant to applicable law, to terminate this Master Agreement with immediate effect ("**Early Termination**"), by giving written notice to the Defaulting Party which shall specify the reason for termination and shall designate a Day as an early termination date (an "**Early Termination Date**"). From and after the Early Termination Date, all further payments and performance in respect of all Contract Quantities shall be released (and not merely suspended). In case of Early Termination, the existing duties and obligations of the Parties shall be replaced by the obligation of the Defaulting Party to pay the Early Termination Payment (defined in clause 26.3.1, below) to the Non-Defaulting Party as calculated in accordance with clause 26.3.2. The Early Termination Payment shall be calculated by the Non-Defaulting Party and sent to the Defaulting Party within sixty (60) Working Days from the Early Termination Date.

## 26.3    Early Termination Payment

26.3.1    On, or as soon as reasonably practicable after, the Early Termination Date is declared pursuant to clause 26.2, the Non-Defaulting Party shall in good faith calculate an amount being the loss with respect to this Master Agreement to be

US 1147334v.3




received or paid by it as a result of the termination of this Master Agreement (the "**Early Termination Payment**")

26.3.2    The Early Termination Payment shall be a calculation of the Losses that the Non-Defaulting Party incurs as a result of the termination of the Master Agreement. For the purpose of this clause 26.3.2, the term "Losses" means any and all losses, costs and expenses reasonably incurred by the Non-Defaulting Party in connection with the termination of this Master Agreement, determined in a commercially reasonable manner, including, but not limited to, charter and Vessel costs, shipping and loading costs, freight charges, and replacement costs; provided, however, that in case of a termination by the Buyer, the term "Losses" shall be limited to the actual Buyer's Coverage Costs incurred by the Buyer

26.3.3    In calculating the Early Termination Payment, the Non-Defaulting Party may, but is not obliged to, calculate its Losses as of the Early Termination Date without entering into any replacement transactions. However, the Non Defaulting Party may enter into a replacement transaction at the Non Defaulting Party's option. The Parties agree that an amount calculated and payable under this clause 26 is a genuine pre-estimate of loss and not a penalty. Except as otherwise provided in this Master Agreement, neither Party will be entitled to recover any additional damages as a consequence of the termination of this Master Agreement.

26.3.4    The defaulting Party (the "**Defaulting Party**") shall pay the Early Termination Payment to the Non-Defaulting Party on or before that date that is five (5) Working Days after the date the Defaulting Party receives the calculation of the Early Termination Payment from the Non-Defaulting Party.

26.3.5    Any Early Termination Payment payable to one party (the "**Payee**") by the other party (the "**Payer**"), in circumstances where there is a Defaulting Party and an Event of Default will, at the option of the Non-Defaulting Party (and without prior notice to the Defaulting Party) be reduced by its set-off against any other amounts ("**Other Amounts**") payable by the Payee to the Payer (whether or not under this Master Agreement, matured or contingent and irrespective of the currency, place of payment or place of booking of the obligation). To the extent that any Other Amounts are so set-off, these Other Amounts will be discharged promptly and in all respects. The Non-Defaulting Party will give notice to the other Party of any set-off affected.

27.    Assignment

27.1    Prohibition on Assignment

25

US 1147334v.3

Neither Party, including its successor or surviving entity or transferee in case of a change of control, amalgamation or merger, shall be entitled to assign its rights and obligations under this Master Agreement to any other person or entity, without prior written consent of the other Party (which shall not be unreasonably withheld or delayed). Notwithstanding the foregoing, a Party may assign its rights and obligations under this Master Agreement to an Affiliate, provided that if in the reasonable opinion of the other Party such Affiliate is not of an equivalent or greater creditworthiness, such Party shall continue to comply with its respective credit support obligations under Annex G.

28.     **Confidentiality**

28.1    The terms and conditions of this Master Agreement (hereinafter referred to as **"Confidential Information"**) shall, at any time after signature of this Master Agreement until the expiry of two (2) Years after this Master Agreement has been terminated, be treated as confidential and shall not be disclosed in whole or part by either Party to any third party without the prior written consent of the other Party. Any breach of this clause 28 shall not entitle the other Party to terminate this Master Agreement.

28.2    Notwithstanding the provisions of this clause 28, neither Party shall be required to obtain the prior written consent of the other Party in respect of disclosure of Confidential Information:

28.2.1   to Affiliates of such Party, provided that such Party shall require such Affiliates to keep the Confidential Information confidential on the same terms as are provided in this clause 28;

28.2.2   to persons professionally engaged by or on behalf of such Party, including employees of a Party;

28.2.3   to any government or governmental or regulatory agency having jurisdiction over such Party, but only to the extent that such Party is required by such government or governmental agency or regulatory agency to make disclosure and such government or governmental or regulatory agency is allowed under the laws and regulations to ask for the Confidential Information;

28.2.4   to any lending or other financial institution in connection with the financing of such Party's operations; or

28.2.5   to the extent required by any applicable law, rule and regulation or by any judicial, arbitral or administrative proceeding.

provided that the disclosing Party shall keep the disclosure of the Confidential Information to the minimum necessary for the purpose for which it is disclosed.

US 1147334v.3




28.3    Notwithstanding the forgoing, each Party shall have the right to make a public statement or press release with respect to the existence of this Master Agreement or the transactions contemplated by this Master Agreement, upon the prior written approval of the other Party (which shall not be unreasonably withheld or delayed).

29.    **Taxes**

All export duties, taxes, dues and levies present or in the future in the country of origin respectively in the country where the Loading Port is located are for Seller's risk and account and are already included in the agreed Contract Price and will not be charged in addition to the Seller. All import duties, taxes, dues and levies present or in the future in the country of destination are for Buyer's risk and account. Seller warrants the free export of the Product from the country of origin respectively from the country where the Loading Port is located and any export licenses, restrictions and quotas that are required or which are introduced in the country of origin respectively in the country where the Loading Port is located after the date of this Master Agreement up to the moment of delivery.

30.    **Notices**

30.1    Any notice or consent to be given by one Party relating to this Master Agreement shall be given or made in writing to the other Party at the address(es) provided for in Annex E. or in the absence of such express provision, at the other Party's registered office or such other address or contact number as that Party shall advise in writing to the other Party. Any notices so given shall be deemed to have been received:

30.1.1    if delivered by hand (including delivery by commercial express courier), on the Working Day delivered or on the first Working Day following the date of delivery if delivered on a Day other than a Working Day or after 5pm at the place of delivery.

30.1.2    if sent by registered post, on the Day of actual receipt as evidenced by signed return receipt or similar evidence;

30.1.3    in case of a fax transmission, on the Day of transmission if that Day is a Working Day in the receiving country or on the first Working Day after transmission if that Day is not a Working Day in the receiving country or if transmission is effected outside the receiving Party's stated normal Office Hours, provided that a valid transmission report confirming good transmission is generated.

31.    **Inurement**

US 1147334v.3



This Master Agreement shall bind and inure to the benefit of the Parties and their respective successors and permitted assigns.

32.    **Amendment**

This Master Agreement may only be amended in writing signed by both Parties.

33.    **Severability**

If any provision of this Master Agreement is found to be void and unenforceable, such provision is deemed to be deleted from this Master Agreement and the remaining provisions of this Master Agreement shall continue to have full force and effect. The Parties shall, in such event, meet in good faith and seek to agree to a mutually satisfactory valid and enforceable substitute provision implementing, to the fullest extent possible, the intentions of the Parties at the time this Master Agreement was made.

34.    **Entire Agreement**

This Master Agreement (together with all Annexes, Confirmations, schedules and exhibits), constitutes the entire agreement of the Parties with respect to the subject matter hereof and, except as herein stated and in the instruments and documents to be executed and delivered pursuant hereto, contains all of the representations, undertakings, and agreements of the Parties in respect of the subject matter hereof. This Master Agreement supersedes all prior meetings, correspondence, and negotiations between the Parties. There are no representations, warranties, covenants, agreements, or collateral understandings, oral or otherwise, expressed or implied, understandings or agreements of any kind between the Parties hereto, in respect of the subject matter hereof, except as contained herein.

35.    **Rights and remedies not exhaustive**

Any rights or remedies conferred on either Party under this Master Agreement shall be in addition to rights which that Party would otherwise have at law, except as otherwise expressly provided herein with respect to limitation of recoverable damages.

36.    **Non-Waiver of rights**

Neither Party shall be deemed to have waived any right, power or privilege under this Master Agreement unless such waiver is in writing and duly executed by the Party. No failure or delay in exercising a right hereunder shall be deemed as a waiver thereof by either Party. No exercise or partial exercise of any right, power or privilege under this Master Agreement shall preclude any other or further exercise thereof or of any other right, power or privilege.

37.    **Third Parties**

US 1147334v.3





A person who is not a party to this Master Agreement has no right under the Contracts (Rights of Third Parties) Act 1999 or any other applicable law to enforce any term herein, provided that this shall not affect any right or remedy of a third party which exists or is available apart from that Act.

### 38. Governing Law and Disputes

38.1   This Master Agreement and any non-contractual obligations arising out of or in connection with it shall be governed by and construed in accordance with English law, applied without giving effect to any provisions thereof that would otherwise require the application of the law of any other jurisdiction.

38.2   The United Nations Convention on Contracts for International Sale of Goods shall not apply to this Master Agreement.

38.3   Any dispute (a "**Dispute**") arising from or connected with this Master Agreement (including a dispute regarding the existence, validity or termination of this Master Agreement or the consequences of its termination), shall be referred to and finally resolved by arbitration under the Rules of the London Court of International Arbitration (the "**Rules**"), which Rules are deemed to be incorporated by reference into this clause except as expressly amended.

38.4   The tribunal shall consist of three arbitrators, two of whom shall be nominated by each Party respectively. The seat of the arbitration and the venue of all hearings shall be London, United Kingdom and the language of the arbitration shall be English.

38.5   The Parties agree that the arbitral tribunal shall have power to award on a provisional basis any relief that it would have power to grant on a final award.

38.6   Without prejudice to the powers of an arbitrator provided by the Rules, statute or otherwise, the arbitral tribunal shall have power at any time, on the basis of written evidence and the submissions of the Parties alone, to make an award in favour of the claimant (or the respondent if a counterclaim) in respect of any claims (or counterclaims) to which there is no reasonably arguable defence (either substantively or except as to the amount of any damages or other sum to be awarded).

38.7   The Parties hereby expressly waive, and agree not to assert, any rights to refer points of law or to appeal to the courts, to the extent that they can validly waive these rights under applicable law.

38.8   Nothing in this clause shall be construed as preventing either Party from seeking conservatory or similar interim relief in any court of competent jurisdiction.

### 39. Representations & Warranties

US 1147334v.3



39.1   On the date of this Master Agreement, each Confirmation and upon delivery of each Shipment under the same, each Party represents, warrants and undertakes to the other that:

39.1.1   the entry into and performance of this Master Agreement has been duly authorized by all necessary corporate or other organizational actions on its respective part, and does not violate or conflict with its organisational documents or any law to which it is subject;

39.1.2   it has procured or shall procure any and all necessary governmental and other third party permits, approvals and licences in connection with the entry into, delivery and performance of this Master Agreement;

39.1.3   no Event of Default has occurred and is continuing and no such event or circumstance would occur as a result of its entering into or performing its obligations under this Master Agreement;

39.1.4   it is acting for its own account (and not as advisor, agent, broker or in any other capacity), has made its own independent decision to enter into this Master Agreement and each Confirmation and as to whether this Master Agreement and each Confirmation is appropriate or proper for it based on its own judgment. It is not relying upon the advice or recommendations of the other Party in doing so and is capable of assessing the merits of, and understands and accepts, the terms, conditions and risks of this Master Agreement;

39.1.5   it is not insolvent and there are no pending or threatened legal or administrative proceedings to which it is a party which to the best of its knowledge would materially adversely affect its ability to perform any Confirmation under this Master Agreement, or that it could become insolvent;

39.1.6   its obligations under this Master Agreement are legally valid and binding obligations, enforceable in accordance with their terms, subject to applicable bankruptcy, insolvency or other similar laws relating to or affecting the enforcement of creditors' rights generally and to general principles of equity; and

39.1.7   save for the representations and warranties made in this clause 39, it has not entered into this Master Agreement in reliance on any warranty or representation made by the other Party or its employees or agents.

40   **Counterparts**

40.1   This Master Agreement may be executed in any number of counterparts, each of which when executed and delivered shall constitute an original of this Master Agreement, but all the counterparts shall together constitute the same Master Agreement. Signatures of the parties transmitted by facsimile or Portable

US 1147334v.3



Document Format (PDF) shall be deemed to be their original signatures for all purposes.

31

US 1147334v.3



IN WITNESS WHEREOF this Master Agreement has been executed by the Parties on this 30th Day of November, 2011

SIGNED for and on behalf of **RWE Supply & Trading Switzerland S.A**

)
)
)
)
)
)
)
)

SIGNED for and on behalf of **Enviva, LP**

)
)
)
)
)
)
)
)

32

US 1147334v.3



## Annex A

## Vessel requirements, specifications, and conditions

Seller warrants and undertakes that (provided that the Seller may from time to time request that the Buyer consent to minor variations to such requirements, such consent to be unreasonably withheld or delayed):

(a) the Vessel is a single deck bulk carrier or Ore/Bulk/Oil carrier (OBO) classed Lloyds + 100 A1 or equivalent with self-trimming or boxed holds without obstacles and without obstructing bulkheads;

(b) each Vessel shall be maximum twenty (20) years old on completion of voyage for all destinations.

(c) each Vessel shall be in every respect suitable to enter, berth at and leave the declared Loading Port and Discharge Port;

(d) each Vessel shall be in every respect suitable for the loading and carriage of the Product cargo and that prior to commencement of loading the Vessel's cargo space is swept and clean and ready to receive cargo;

(e) each Vessel shall be in every respect suitable for carrying out proper draft surveys;

(f) each Vessel shall be in every respect suitable for the grab discharge of in bulk and no cargo is to be loaded in deeptanks or bunkers or in any other compartment not readily accessible to grabs;

(g) deeptanks, tunnels, tanktops, access ladders, brackets, bilges, manhole covers/bolts, pipes and all other provisions within Vessel's holds shall be properly protected against damage by stevedore's grabs;

(h) each Vessel shall be fully compliant with and have on board all relevant and current certificates required by Loading Port and Discharge Port. In particular, if the Vessel is an OBO (Oil, Bulk and Ore cargoes), Seller shall procure a gas free certificate at the Loading Port and Discharge Port and Seller shall ensure that such certificate remains valid throughout the whole of the loading and discharging operations. The Vessel's cargo gear, hold ladders and all other equipment shall comply with the regulations and requirements of the Loading Port and Discharge Port;

33

US 1147334v.3



(i)    each Vessel shall comply with the ISPS code, IMO regulations and recommendations applicable to the carriage of Product currently enforces at the time of loading and/or discharge;

(j)    each Vessel shall comply with the requirements of the International Safety Management (ISM) Code. Upon request Seller shall provide a copy of the relevant Document of Compliance (DOC), and Safety Management Certificate (SMC).

34

US 1147334v.3





# Annex B

## Laytime exclusions

Subject to clause (Discharge 11.4), any time lost or consumed due to any of the following shall not count as used time, except if the sea vessel is already on demurrage:

(a) Seller's failure to comply with Vessel requirements set out in this Master Agreement;

(b) Delay to the Vessel in reaching and securely mooring at the berth caused by conditions not reasonably within Buyer's control;

(c) problems arising directly or indirectly from Vessel's flag, crewing arrangements, previous trading, age or ownership;

(d) delay in berthing, unberthing, or discharging due to fire, floods, rain, frosts, fog, snow, storms, winds, ice, perils of the sea or other waters;

(e) problems arising directly or indirectly from the condition of the cargo;

(f) total stoppage of all discharge activities due to strike, weather condition, accident or any other cause whatsoever not within Buyer's control (even if the Vessel is at layby berth or anchorage and affected indirectly);

(g) the Master/Owners conducting business or operations on behalf of the Vessel (e.g. taking bunkers, victualling) which disrupts the discharge of the Product;

(h) any dispute(s) of whatsoever nature occasioning a stoppage of Owner's crew, boatmen, pilots or other workmen essential to the movement, working, or unloading the Vessel;

(i) Vessel's physical inability to discharge cargo, including but not limited to insufficient ballasting/deballasting capacity;

(j) Vessel not being ready to discharge in all respects upon presenting;

(k) obtaining pratique after berthing, even if Notice of Readiness was tendered without pratique;

(l) opening and closing of hatches;

35

US 1147334v.3

(m)     shifting on or between berths ordered by the Master or required due to failure, breakdown or other inadequacy attributable to the sea vessel;

(n)     unless on demurrage, Force Majeure event (although no deduction of time shall be allowed for Force Majeure unless due notice in writing be given at the time to Seller in accordance with clause **25 (Force Majeure)**of the Master Agreement);

(o)     prohibition of discharging of the Vessel at any time by Seller or operators of the Vessel or by governmental authorities except where discharge is not permitted due to neither original bill of lading or original bill of lading nor Buyer's letter of indemnity being available at Discharge Port in time; and

(p)     arrest, detention, or seizure of the Vessel by or on behalf of a third party not connected with Buyer .

36

US 1147334v.3





## Annex C

## BIOMASS CIF SUPPLY CONFIRMATION

This Confirmation supplements, forms part of, and is subject to, the Master Agreement dated [x ], as amended and supplemented from time to time (the "**Master Agreement**") and as made between [x] and [x].

All provisions contained in the Master Agreement govern this Confirmation except as expressly modified below.
This Confirmation constitutes a "Confirmation" as referred to in the Master Agreement.

If this Confirmation correctly sets forth the terms of our agreement, please execute the copy of this Confirmation and return it to [x] by facsimile/e-mail/courier

| | |
|---|---|
| Seller: | [RWE or Enviva, as applicable] |
| Buyer: | [RWE or Enviva, as applicable] |
| Product: | Wood Pellets as per specification in Annex D |
| Origin: | Any |
| Contract Quantity: | _____ Metric Tonnes +/- 10% at Seller's option |
| Shipment Quantity: | 25,000 Metric Tonnes +/- 10% at Seller's option |
| Quality Specification | As per Annex D and Specification parameters as attached to this Confirmation. |
| Delivery: | CIF ARA |
| Loading Port: | TBN |
| Discharge Port: | ARA |
| Delivery Period: | _____ |
| Contract   Price | The Contract Price for each Shipment shall be determined in accordance with the following provisions. |

US 1147334v.3



| | |
|---|---|
| and Price Adjustment: | Buyer shall pay [....][*currency*] basis CIF ARA[*discharging*] port delivery excluding VAT per Tonne based on [....] GJ/tonne ("the **Base Price**").<br><br>Price Adjustment: The Base Price shall be adjusted as per the below formula to reflect the actual NCVcp of the Product as determined in accordance with the terms of the Master Agreement:<br><br>$$\frac{\text{Actual NCVcp (GJ/Tonne) x Base Price}}{[....] \text{ GJ/Tonne}}$$<br><br>The price as determined in accordance with the above formula for each Shipment shall be the Contract Price in respect of that Shipment.<br>The Contract Price includes all taxes (excluding VAT). |
| Nomination of Vessel: | Seller shall nominate a Vessel in accordance with clause 8.1 (Nominations and Notices) not less than [....] consecutive Days prior to estimated time of arrival of the Vessel at Loading Port |
| Nomination of Discharge Port: | Where the Buyer is entitled to nominate from a range of Discharge Ports then the Buyer must nominate the Discharge Port(s) to the Seller within 30 Working Days prior to loading. |
| Notice of Readiness | Seller shall cause a Notice of Readiness to be tendered by the Master of the Vessel or its agents by fax and/or telex and/or e-mail when the Vessel (i) is all fast at the Discharge Port, and (ii) is in all respects ready to discharge the Product, any time day or night SATPMSHEX, whether the Vessel has arrived at its designated berth at the Discharge Port or not, whether it is in free pratique or not, whether it is customs cleared or not, whether the berth is occupied or not or whether administrative port arrival procedures are completed or not. |
| Laytime Provision at Discharge Port | |
| Discharge Rate | |
| Demurrage/ Despatch Rate: | |
| Independent Inspection Company | |

US 1147334v.3




| | |
|---|---|
| Sustainability Requirements | As per Annex F. The cost of the inspection body [....] regarding the sustainability requirements of Annex F shall be paid by the [....]. Any additional external cost to be for the account of the [....]. Any internal cost to be for the own party's account. Any significant additional cost related to agreed changes to Annex F to be for the party requesting the change.<br><br>[....] shall be instructing the inspection body [....] directly to arrange the sustainability [certification].<br><br>[....] shall give the inspection body [....] explicit permission to share all information regarding the certification process with the Buyer.<br><br>Deadline for compliance of the Sustainability Requirements is: [....] |
| Conditions Precedent | |
| Default Interest Rate: | |
| Other Document Instructions | |

On behalf of Buyer,                                    On behalf of Seller

US 1147334v.3



# Annex D
# Wood Pellet Specification

**Product Specification**

"Biomass" or Product means material product consisting of vegetable matter from an agricultural or forestry source (no animal contents allowed) which can be used as a fuel for the purpose of recovering its energy content and also the following residue which can be used as a fuel:

(a)     vegetable residue from agriculture and forestry;

(b)     fibrous vegetable residue from virgin pulp production and from production of paper from pulp, if it is co-incinerated at the place of production and the heat generated is recovered;

(c)     wood residue with the exception of wood residue which may contain halogenated organic compounds or heavy metals as a result of treatment with wood preservatives or coating, and which includes in particular such wood residue originating from construction and demolition waste;

Product delivered hereunder shall not qualify as waste in accordance with either EURAL and/or Evoa regulations.

The Product to be Delivered hereunder shall comply with the specifications attached to the applicable Confirmation, and shall be certified as such by the independent inspection companies and laboratory appointed in accordance with the provisions of the Master Agreement, applying the analysis standards set out in the Wood Pellet Specifications table attached to the applicable Confirmation.

The Wood Pellets must be derived from 100% clean, virgin (untreated) softwood or hardwood, sawdust, wood chips, wood residues, free from any recovered, recycled or waste wood with 100% of the energy content from non-fossil fuel sources, free from contamination and conforming to the Specification.

*Acceptance Level.* This is the parametric level outside which Buyer has the right to reject the Product in accordance with the terms of this Master Agreement.

*Expected Level.* This is the parametric level at which the Product is expected to be Delivered by Seller under normal circumstances.

US 1147334v.3



The specific parameters of the Specification are to be attached to the applicable Confirmation.

41

US 1147334v.3





## Annex E

Addresses for Notices Per clause 30 (Notices) of the Master Agreement:

| Contact Information of RWE Supply and Trading Switzerland SA | | |
|---|---|---|
| Contractual: | ██████████████ | |
| Operational: | ██████████████ | |
| Invoices: | ██████████████ | |

| Contact Information of Enviva, LP | | |
|---|---|---|
| Contractual: | ██████████████ | |
| Operational: | ██████████████ | |
| Contract Execution: | ██████████████ | |

Initials Buyer :

Initials Seller -

US 1147334v.3









Initials Buyer :

Initials Seller :

Page 2

US 1147334v.3



## Annex F

### Sustainability Requirements

The below sustainability requirements may be amended from time to time to reasonably reflect the prevailing best sustainability practises.

The Seller will co-operate with any request of the Buyer to audit the supply chain relating to the Product, the original cultivation site and its history of land use, and relevant production facilities, storage or loading facilities, transportation and the certification scheme adopted and shall use its best efforts to procure the co-operation of its suppliers and counterparties in respect of such audit. The Seller gives the Buyer the right to disclose information from this audit.

The Seller shall respond to requests for further information from the Buyer, any certification body or any competent authority or to fill any data gaps.

The Seller will enable the Buyer to comply with the information and reporting requirements relating to sustainability of feedstock imposed under Applicable Law and Seller gives the Buyer the right to disclose such information.

## Part 1:

### Green Gold Label

Seller expects its suppliers to Deliver Green Gold Label (GGL) certified Product. This is a certification process that aims to prevent the use of biomass leading to unintended consequences including the loss of biodiversity, deforestation and excessive use of water. It is a standard that aims to guarantee the sustainability of the Product Delivered by Seller.

### Track& trace

The quality system to certify products under GGL is a track & trace system for biomass, from (residual) products back to the sustainable source. Under the GGL certification a supplier must be able to track & trace sustainability information including but not limited to:

Initials Buyer :

Initials Seller :

US 1147334v.3







**RWE**
The energy to lead

(a)    information and/or certificates to prove source, origin, nature quantities as well as the use of all raw biomass

(b)    information and/or certificates to prove source, origin, nature, quantities, destinations as well as the use of all products

(c)    information and/or certificates to prove source, origin, nature, quantities, additives and substances for manufacturing as well as the composition of the prepared biomass

The raw biomass used to produce the end product must be certified by GGL approved agricultural certification systems or approved forest management certification systems (see www.controlunion.com/certification or www.greengoldcertified.org for the approved systems. The last provides more details on the Green Gold Label process)

(d)    The amount of end product on which GGL can be claimed is proportionally related to the raw biomass that is certified under the GGL standards (the mass balance)

(e)    Written proof must be provided and the original documents required in the GGL certification process must be kept for at least five years.

*Preventing pollution*

To prevent pollution or mixing with non-GGL products the transport used must be clean:

Received GGL biomass must be checked to see if it complies with the GGL requirements. If there is any doubt about this, the processing of this product may not be commenced until conformity with the GGL standards is proven.

(f)    Biomass that contains substances which are prohibited by the GGL must be stored and processed separately from the non-polluted product.

*Procedures & plans*

A GGL system plan must be maintained that describes the processes, including the point of risks and the flow diagram. Also a system ensuring the product quality must be developed and implemented.

The processing facility and its equipment must comply with the legislation of the country where the facility is established.

(g)    An implemented safety plan is required and the described safety measures must be implemented.

Initials Buyer :

Initials Seller :

Page 4

US 1147334v.3





_**Certification Process**_

      (h)     Pre-scope:

The certification body (e.g. Control Union) informs the supplier (often during a visit) about the requirements for the certification. After the pre-scope there is time for the supplier to implement changes that are necessary for the certification

      (i)     Audit:

The supplier is audited by the certification body for the GGL. If the audit is positive, the GGL certification is granted, if the audit is negative the supplier has a certain amount of time (as per the GGL standard) to solve the problems. If deemed necessary by the certification body, a second audit will take place.

      (j)     Follow up audit:

There will be a yearly inspection to check if the criteria are still being met

      (k)     Delivery of certified biomass:

When certified biomass is Delivered, the supplier has to deliver proof of the origin of the biomass to the certification body. This proof is used to track the biomass through the chain and provide the GGL certificate.

# Part 2:
**Specific Requirements relating to the Renewables Obligation Order**

The Seller shall, prior to the unloading of each Shipment, issue to the Buyer a certificate ("Certificate of Origin") confirming for all Deliveries:

      (a)     that the Product constitutes biomass as defined in the Renewables Obligation Order 2006, is a non waste material, with 100% of the energy content coming from plant material;

      (b)     that the Product is not a fossil fuel and has not been derived directly or indirectly from fossil fuels;

      (c)     details of the controls which were/are in place in relation to the sourcing, transportation and where applicable, processing of the Product;

Initials Buyer :

Initials Seller :

US 1147534v.3







**RWE**
The energy to lead

(d)   the origin of the Product including, where the Product is plant matter or derived from plant matter, the country where the plant matter which was grown; or, if this information is unavailable, the country from where the Seller obtained the Product;

(e)   whether or not the Product is a by-product of a process;

(f)   whether any of the Product or any matter from which it was derived was certified under an environmental quality assurance scheme, and, if so, the name of the scheme, according to the Seller's best knowledge and belief;

(g)   where the Product is plant matter or derived from plant matter, the use to which the land on which the plant matter was grown has been put since 30th November 2005, according to the Seller's best knowledge and belief

The Seller will provide the Buyer with information to the best of the Seller's knowledge and belief, in accordance with clause 54 of Statutory Instrument 2009/785 (being the Renewables Obligations Order) as amended by clause 12 of The Renewables Amendment Order 2011, which has come into force on 1 April 2011. Where any of the information is not known, Seller to provide the main reasons why that information is not known.

**Example Certificate of Origin:**

To:
[Buyers Details]

From:
[Seller's Details]

**CERTIFICATE OF ORIGIN**

| Element | Detail | Description |
|---|---|---|
| The type of biomass | The material from which the biomass was composed (for example, whether it was composed of wood) | |
| The form of the biomass | Where the biomass can take different forms | |
| Mass | Where the biomass was solid, its mass | |
| Volume | Where the biomass was fluid, its volume when measured at 25 degrees Celsius and 0.1 megapascal | |
| By-product | Whether the biomass was a by-product of a process | |

Initials Buyer :

Initials Seller :

US 1147334v.3





**RWE**
The energy to lead

| Waste | Whether the biomass was a waste | |
|---|---|---|
| Country of Origin | Where the biomass was plant matter or derived from plant matter, the country where the plant matter was grown | |
| Country of purchase | Where the information specified in the above paragraph is not known or the biomass was not plant matter or derived from plant matter, the country from which the operator obtained the biomass | |
| Energy crop including types and proportions | Whether any of the consignment was an energy crop or derived from an energy crop and, if so the proportion of the consignment which was an energy crop, and the type of energy crop contained in the consignment | |
| Environmental quality assurance schemes | Whether the biomass or any matter from which it was derived was certified under an environmental quality assurance scheme and, if so, the name of the scheme | |
| Land Use | Where the biomass was plant matter or derived from plant matter, the use to which the land on which the plant matter was grown and has been put since 30th November 2005 | |

Signature of Seller:

[Seller's company name]

[Responsible Person]

_____

[Place, Date]

Initials Buyer :

Initials Seller :

Page 7

US 1147334v.3







## Annex G – Credit Provisions

**Party A:** Enviva LP
**Party B:** RWE Supply & Trading Switzerland S.A.

1. **Definitions:**

1.1     **"Breach of Covenant"** means Party A fails to comply with one or any or all of the covenants set out in clause 4 of this Annex F, and fails to cure such non-compliance within thirty (30) days (or sixty (60) days in the case of a breach of clause 4.1) after written notice thereof from Party B;

1.2     **"Cash Available for Debt Service"** means the cash flow available for debt service and shall be calculated as the sum of net income, amortization, depreciation, interest expense and other non cash and discretionary items;

1.3     **"Contractual Confirmation Period"** means, in respect of any Confirmation, the period between the date the first delivery occurs and the date all performance under the relevant Confirmation has taken place;

1.4     **"Credit Rating"** means in respect of an Entity any of the following: (i) the long-term unsecured, unsubordinated (unsupported by third party credit enhancement) public debt rating; (ii) the debt issuer's credit rating; or (iii) the corporate credit rating given to that entity, in each of cases (i) to (iii) by Standard & Poor's Rating Group (a division of McGraw-Hill Inc.) (**"Standard & Poor's"**) or Moody's Investor Services Inc (**"Moodys"**);

1.5     **"Credit Support Document(s)"** means, at the date of this Master Agreement, as specified below (if any), and shall additionally consist of any credit support as the Parties later agree upon in any Confirmation. Such additional Credit Support Document(s) may include, without limitation, a parent company guarantee, bank guarantee, letter of awareness, letter of credit or any other form of credit support agreement:

1.5.1 Party A's Credit Support Document, as at the date of this Master Agreement, shall be: [ ] and

1.5.2 Party B's Credit Support Document, as at the date of this Master Agreement, shall be [ ];

1.6     **"Credit Support Provider"** means the issuer or provider of any Credit Support Document.

1.7     **"Cross Default Threshold"** means:

1.7.1 with respect to Party A, the lower of US dollars 15,000,000 and three percent (3%) of the Tangible Net Worth of Party A or its Credit Support Provider; and

Initials Buyer :

Initials Seller :

US 1147334v.3





1.7.2 with respect to Party B, the lower of Euros 15,000,000 and three percent (3%) of the Tangible Net Worth of Party B or its Credit Support Provider;

1.8 **"Debt Service Coverage Ratio"** means the cash flow available for debt service calculated as Cash Available for Debt Service divided by the sum of principal repayment, interest expense and lease payments;

1.9 **"EBITDA" means earnings before interest, taxes, depreciation and amortization as set out in the latest audited consolidated financial statements of the Entity in question;**

1.10 **"Entity"** means an individual, government or state or division thereof, government or state agency, corporation, partnership or such other entity as the context may require.

1.11 **"Enviva Group" means, at any time, the group of companies comprising Enviva LP and its Affiliates at that time.**

1.12 **"Foreign Exchange Hedging Transactions"** means any transaction for fixing the rate of exchange of currencies (including an agreement with respect thereto) which is a rate swap transaction, basis swap, forward rate transaction, foreign exchange transaction, cap transaction, floor transaction, collar transaction, currency swap transaction, cross-currency rate swap transaction, currency option or any other similar transaction (including any option with respect to any of these transactions), or any combination of these transactions;

1.13 **"Freight Hedging Transactions"** means any transaction in relation to the procurement or fixing the price of ocean freight transportation (including an agreement with respect thereto) which is a voyage charter, time charter or any other type of contract for the charter of vessel(s), forward freight agreement, commodity forward transaction, freight transaction, rate swap transaction, basis swap, forward rate transaction, commodity swap, commodity option, cap transaction, floor transaction, collar transaction, or any other similar transaction (including any option with respect to any of these transactions), or any combination of these transactions;

1.14 **"Interest Coverage Ratio"** shall be calculated as by Cash Available for Debt Service divided by the sum of interest expense and lease payments;

1.15 **"JV Assets"** means any facilities developed and or purchased by Party A where equity investment participation has been taken by an Affiliate of Party B in a manner consistent with the terms of the JV Agreement Term Sheet signed by Party A and an Affiliate of Party B on August 16, 2011.

1.16 **"Letter of Credit"** means an irrevocable standby letter of credit payable on demand in the form or substantially in the form set out in Annex F and issued by a financial institution whose credit

Initials Buyer

Initials Seller

US 1147334v.3






rating is at least A- with a stable outlook by Standard & Poor's or the Moody's equivalent credit rating of at least A3, with a stable outlook.

1.17 **"Material Adverse Change"** has the meaning set out in clause 3.2 of this Annex E;

1.18 **"Performance Assurance"** means a Letter of Credit in a form and amount reasonably acceptable to the Requesting Party provided that such amount shall not exceed the aggregate amount of Performance Assurance limits specified in all Confirmations (excluding any Confirmation under which all obligations have been fully performed).

1.19 **"Production Capacity"** means, in respect of a production facility, the nameplate capacity of such production facility, allowing for maintenance and downtime;

1.20 **"Requesting Party"** has the meaning defined within clause 3.1 of this Annex E;

1.21 **"Security Interest"** means any pledge, mortgage, charge, lien, right of set-off, retention of title or any other security interest whatsoever or any other agreement or arrangement having the effect of conferring security, howsoever created or arising;

1.22 **"Specified Indebtedness"** means any financial indebtedness (whether present or future, contingent or otherwise, principal or surety or otherwise) for borrowed money (which includes debts payable to Affiliates as well as debt instruments to financial institutions). Specified Indebtedness excludes any financial indebtedness of a Party's Affiliate("the Primary Obligor"), unless such Party or another Affiliate of such Party (not being the Primary Obligor) is any way responsible for repayment of such Specified Indebtedness (including but not limited to in its capacity as an additional obligor or guarantor);

1.23 **"Specified Transaction"** means, (a) any transaction (including an agreement with respect thereto) now existing or hereafter entered into between one Party to this Master Agreement (or any Credit Support Provider of such Party) and the other Party to this Master Agreement (or any Credit Support Provider of such other Party) which is a commodity forward transaction, freight transaction, rate swap transaction, basis swap, forward rate transaction, commodity swap, commodity option, equity or equity index swap, equity or equity index option, bond option, interest rate option, foreign exchange transaction, cap transaction, floor transaction, collar transaction, currency swap transaction, cross-currency rate swap transaction, currency option or any other similar transaction (including any option with respect to any of these transactions), (b) any combination of these transactions and (c) any other transaction identified as a Specified Transaction in this Master Agreement;

1.24 **"Tangible Net Worth"** of an Entity means the sum of all paid up shareholder cash contributions to the share capital account or any other capital account of such entity ascribed for such purposes

Initials Buyer :

Initials Seller :

US 1147334v.3





of that entity and any accumulated retained earnings less any accumulated retained losses and intangible assets including, but not limited to, goodwill;

1.25 "**Total Capitalisation**" means in respect of the relevant period the sum of Total Debt and all paid up shareholder cash contributions to the share capital or any other capital account of the Entity in question; and

1.26 "**Total Debt**" means in respect of the relevant period the sum of financial indebtedness for borrowed money (which includes debts payable to affiliated companies as well as debt instruments to financial institutions) of the Entity in question.

2.    **Credit Events of Default**

2.1    It is an Event of Default entitling the Non-Defaulting Party to terminate this Master Agreement in accordance with the Early Termination provisions of clause 25.2 of this Master Agreement if any of the following events occur with respect to a Party or its Credit Support Provider, as applicable:

2.1.1    **Specific Indebtedness and Cross Default**

(a)    any default, event of default or other similar condition or event (howsoever described) in respect of such Party or such Party's Credit Support Provider (other than a bank) (or, in the case of Party A only, any other Affiliate of such party) under one or more agreements or instruments relating to Specified Indebtedness of any of them (individually or collectively) with an aggregate outstanding principal balance of not less than the Cross Default Threshold in respect of that Party which has resulted in such Specified Indebtedness becoming, or being capable at such time of being declared, due and payable; or

(b)    any failure of a Party or its Credit Support Provider (other than a bank) (or, in the case of Party A only, any other Affiliate of such party) (individually or collectively) to make one or more payments in an aggregate amount of not less than the Cross Default Threshold in respect of that Party under one or more agreements or instruments relating to Specified Indebtedness (after giving effect to any applicable notice requirement or grace period);

2.1.2    **Specified Transaction**

(a)    a Party or its Credit Support Provider defaults under a Specified Transaction or any credit support arrangement relating to a Specified Transaction and, after giving effect to any applicable notice requirement or grace period, such default results in a liquidation of, an acceleration of obligations under, or an early termination of, that Specified Transaction; or

Initials Buyer :

Initials Seller

Page 11

US 1147334v.3





(b)    a Party or its Credit Support Provider disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity of, a Specified Transaction or any credit support arrangement relating to a Specified Transaction;

### 2.1.3 Failure of Credit Support/Performance Assurance

(a)    a Party or its Credit Support Provider or provider of Performance Assurance affirms, disclaims, revokes, repudiates or rejects in whole or in part, or challenges the validity of any Credit Support Document or Performance Assurance provided by it or otherwise fails to comply with or perform its obligations under or in respect of such Credit Support Document or Performance Assurance and such failure is continuing;

(b)    a Party fails to deliver or maintain in full force and effect a Credit Support Document in accordance with this Annex E or any relevant Confirmation or any Credit Support Document is due to expire or terminate within 30 (thirty) days; or

(c)    a Party fails to deliver or increase (as applicable) Performance Assurance in accordance with this Annex E or any relevant Confirmation or any Performance Assurance is due to expire or terminate within 30 (thirty) days.

## 3. Performance Assurance

**3.1 Right to Require Performance Assurance:** At any time, when a Party (the "**Requesting Party**") believes in good faith that a Material Adverse Change or a Breach of Covenant has occurred in respect of a Party (the "**Affected Party**"), the other Party (the " Requesting Party") shall be entitled to require, by written notice, that the Affected Party provide in the Requesting Party's reasonable discretion, Performance Assurance or increase any Performance Assurance previously provided. Upon receipt of such written notice, the other Party shall within ten (10) Working Days (unless otherwise stated) provide to the Requesting Party the Performance Assurance required or increase any pre-existing Performance Assurance (as applicable).

**3.2 Material Adverse Change.** A Material Adverse Change shall have occurred with respect to a Party if any one or more of the following events has occurred and is continuing:

**3.2.1 Credit Rating of Credit Support Provider or Provider of Performance Assurance that is a Bank:** if the Credit Rating of a bank serving as the Party's Credit Support Provider or provider of Performance Assurance is withdrawn or downgraded below A-stable outlook by Standard and Poor's or A3 stable outlook by Moody's;

**3.2.2 Provision of Financial Statements:**





Following a request by Party B, Party A fails:

(a) within 180 days following the end of its fiscal year to deliver a copy of its, and for such period that Party A's obligation are supported by a Credit Support Provider, its Credit Support Provider's annual report, such annual report(s) prepared in accordance with generally accepted accounting principles in the relevant jurisdiction and containing audited consolidated financial statements for such fiscal year (including cashflow statements and accompanying notes in their original form);

(b) within sixty (60) days after the end of each of its first three fiscal quarters of each fiscal year, to deliver a copy of its quarterly report containing unaudited consolidated financial statements (including any available cashflow statements or accompanying notes in their original form), prepared in accordance with generally accepted accounting principles in the relevant jurisdiction; or

(c) not less than thirty (30) days before the beginning of its fiscal year, to deliver a copy of its internally prepared projected annual report for the following fiscal year containing unaudited consolidated financial statements (including any available cashflow statements or accompanying notes in their original form), prepared in accordance with generally accepted accounting principles in the relevant jurisdiction.

3.2.3 **Maintenance of Ownership**

(a) if Party A ceases to maintain direct or indirect ownership of all material operational assets owned as of the date of this Master Agreement, and, as from the date of first ownership by Party A, its share of any of the JV Assets, excluding any sale of assets that have been previously consented to in writing by Party B, such consent not be unreasonably withheld or delayed. For the purpose of this clause 3.2.3, it shall be reasonable for Party B to withold its consent if, in its reasonable opinion, the result of the relevant change in ownership would result in Party A not being of an equivalent creditworthiness or greater creditworthiness than prior to such change in ownership;

(b) if Party A does not own, directly or indirectly, all material operational assets which are owned by the Enviva Group.

3.2.4 **Amalgamation/Merger:** if a Party or its Credit Support Provider undergoes a change of control, consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, or reorganises, incorporates, reincorporates or reconstitutes

 



into or as another entity, or another entity transfers all or substantially all its assets to, or reorganises, incorporates or reincorporates or reconstitutes into or as, such party or its Credit Support Provider and;

(i) the creditworthiness of such party, its Credit Support Provider or the resulting, surviving, transferee or successor entity is materially weaker than that of the Party or such Credit Support Provider, as the case may be, immediately prior to such action;

(ii) the resulting, surviving, transferee or successor entity fails to assume all the obligations of that Party or such Credit Support Provider under this Master Agreement and/or relevant Confirmation or any Credit Support Document to which it or its predecessor was a party either by operation of law or pursuant to an agreement reasonably satisfactory to the requesting Party; or

(iii) the benefits of any Credit Support Document cease or fail to extend (without the consent of the Requesting Party) to the performance by such resulting, surviving, transferee or successor entity of its obligations under this Master Agreement and/or relevant Confirmation.

4.    **Party A Covenants**

Party A covenants that from the date of this Master Agreement until the date on which all obligations of Party A under all Confirmations have been satisfied in full that:

4.1    **Contracts for Freight & Foreign Exchange**

4.1.1    Party A shall ensure that it maintains Freight Hedging Transactions for no more than 100% of its forecast freight requirements in each future quarter from the date of this Master Agreement until the date on which all obligations under all Confirmations are forecast to be satisfied and where such forecast requirements shall be based on contracted sales of Product by Party A on a fixed price, CIF basis;

4.1.2    Party A shall ensure that it maintains Foreign Exchange Hedging Transactions for no more than 100% of its forecast receipts of currencies other than US Dollars in each future quarter from the date of this Master Agreement until the date on which all obligations under all Confirmations are forecast to be satisfied and where such forecast requirements shall be based on forecast receipts of such other currencies from contracted sales of Product by Party A.

4.2    **Financial Covenants**

Initials Buyer :

Initials Seller :

US 1147334v.3





4.2.1   Its Total Debt shall at all times not exceed 75% of its Total Capitalisation;

4.2.2   The Debt Service Coverage Ratio shall remain above 1.1 at all times;

4.2.3   The Interest Coverage Ratio shall remain above 1.5 at all times.

**Minimum Cash Balance**

It will hold a minimum of four million US Dollars (US$ 4,000,000) in cash at the end of every 3 month period (the first such period commencing on the first day of the calendar quarter in which the date of Master Agreement falls). If Party A breaches such covenant, the Performance Assurance which it is required to provide pursuant to clause 3.1 shall constitute a Letter of Credit in such sum so as to ensure that the cash balance held, plus the Letter of Credit, is equal to at least four million US Dollars (US$4,000,000). Such obligation to provide a Letter of Credit shall continue until such time as the cash position is restored to four million US Dollars (US$4,000,000). For the avoidance of doubt, any Letter of Credit issued as a result of a breach of this clause 4.3 shall be in addition to any other existing Letter of Credit provided by Party A under Clause 3 or otherwise;

4.3   **Limit on Sales from JV Assets**

During the Contractual Confirmation Period, not more than 90% of Production Capacity of each of the JV Assets shall be committed under contracted sales of Product by Party A.

5.   **Notice**

As soon as a Party becomes aware of any event which, after satisfaction of any requirement for the giving of notice or the lapse of time, or both, would become an Event of Default pursuant to clause 2 above or a Material Adverse Change or a Breach of Covenant, the Party shall within five (5) Working Days, notify the other Party of such occurrence. Failure to provide such notice shall not alter any applicable cure period for any Event of Default, Material Adverse Change or Breach of Covenant.

