# Exhibit 3

*Execution Version*

# CIF BIOMASS FUEL SUPPLY AGREEMENT

**2 August 2022**

between

**BAYWA AG**

**as Buyer**

and

**ENVIVA INC.**

**as Seller**



## TABLE OF CONTENTS

1.   Definitions..................................................................................................1
2.   General.......................................................................................................6
3.   Term and Conditions Precedent.................................................................7
4.   Warranty of Title.......................................................................................8
5.   Delivery......................................................................................................9
6.   Loading and Ocean/Sea Transportation.....................................................9
7.   Discharge..................................................................................................12
8.   [Not Used]................................................................................................13
9.   Quality......................................................................................................13
10.  Sampling...................................................................................................15
11.  Testing and Analysis................................................................................16
12.  Weight Determination..............................................................................18
13.  Pricing and Payment................................................................................18
14.  Rejection...................................................................................................20
15.  Damages and Mitigation..........................................................................21
16.  [Not Used]................................................................................................23
17.  Force Majeure..........................................................................................23
18.  Default and Termination..........................................................................25
19.  Confidentiality.........................................................................................27
20.  Taxes........................................................................................................28
21.  Assignment...............................................................................................28
22.  Change in Law..........................................................................................29
23.  Governing Law and Dispute Resolution..................................................30
24.  Representations, Warranties and Covenants............................................31
25.  Miscellaneous..........................................................................................32


Annex A:     Special Terms
Annex B:     Addresses for Notices

i

## CIF BIOMASS FUEL SUPPLY AGREEMENT

This CIF Biomass Fuel Supply Agreement is entered into as of 2 August 2022 (the "*Effective Date*") by and between BayWa AG, a German corporation ("*Buyer*") and Enviva Inc., a Delaware corporation ("*Seller*", and together with Buyer, each a "*Party*" and collectively the "*Parties*").

WHEREAS, Seller wishes to sell, and Buyer wishes to buy, Biomass (as hereinafter defined) on the terms set forth herein;

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are acknowledged, the Parties agree as follows:

## 1.    DEFINITIONS

For purposes of this Agreement, except as otherwise expressly provided (or unless the context otherwise requires), the following terms shall have the following meanings:

| | |
|---|---|
| "*2022 Shipment No. 1*" | As defined in <u>Section 3.2.2(a)</u>. |
| "*2023 Shipment No. 2*" | As defined in <u>Section 3.2.2</u>. |
| "*Act of Insolvency*" | The occurrence of any one or more of the following events in respect of a Person:<br><br>(a) being dissolved (other than pursuant to a solvent consolidation, amalgamation or merger), becoming insolvent, being unable to pay its debts or failing, or admitting in writing its general inability to pay its debts as they become due;<br><br>(b) making a general assignment, arrangement or composition with or for the benefit of its creditors;<br><br>(c) instituting or having instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition being presented for its winding-up or liquidation, and, in the case of any such proceeding or petition instituted or presented against it, that proceeding or petition (i) results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding-up or liquidation or (ii) is not withdrawn, dismissed, discharged, stayed or restrained in each case within thirty (30) days of the institution or presentation of that proceeding or petition;<br><br>(d) having a resolution passed for its winding-up, official management or liquidation (other than pursuant to a solvent consolidation, amalgamation or merger);<br><br>(e) seeking or becoming subject to the appointment of an administrator, administrative receiver, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets; or |

1



| | |
|---|---|
| | (f)  causing or being subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in the foregoing clauses (a) through (e) (inclusive). |
| *"Affected Party"* | As defined in Section 17.1.2. |
| *"Affiliate"* | With respect to any Person, any other Person that is directly or indirectly controlling, controlled by or under common control with, such Person; provided that for purposes of this definition, "control" means the power to direct or cause the direction of the management and policies of a Person, directly or indirectly, whether through the ownership of voting interests, by contract or otherwise, and "controlling," "controlled by" and "under common control with" have corresponding meanings. |
| *"Agreement"* | This CIF Biomass Fuel Supply Agreement, including all Annexes and Schedules hereto. |
| *"Applicable Law"* | Any applicable law, statute, rule, regulation, ordinance, Permit, decision, order, judgment, agreement, directive, grant, concession, policy or other requirement and any form or decision of or determination by, or interpretation of any of the foregoing by, any Government Entity, in each case whether now or hereafter in effect. |
| *"ARA"* | Amsterdam, Antwerp, Ghent, or Rotterdam. |
| *"BayWa Facility"* | Storage point in Southern Germany which is accessible from ARA by a barge-to-truck logistics chain utilizing no more than one barge and one truck each per Shipment delivery. |
| *"Base Annual Quantity"* | As defined in the Special Terms. |
| *"Base Price"* | As defined in the Special Terms. |
| *"Base Shipment Size"* | As defined in the Special Terms. |
| *"Base Stow Factor"* | As defined in the Special Terms. |
| *"Basic Bunker Fuel Adjustment"* | As defined in the Special Terms. |
| *"Biomass"* | Wood pellets that conform to the Specifications. |
| *"Business Day"* | Any day upon which banks are open for business in New York, New York, and Munich, Germany, as applicable. |
| *"Buyer"* | As defined in the introductory paragraph hereof. |
| *"Buyer's Shortfall"* | As defined in Section 15.2. |
| *"Challenge Independent Laboratory"* | As defined in Section 11.4.2. |
| *"Challenge Quality Analysis Certificate"* | As defined in Section 11.4.2. |
| *"Challenge Sample"* | As defined in Section 10.4.2(b). |
| *"Change in Law"* | The introduction, adoption, promulgation, coming into effect, modification, change in interpretation or application, repeal, replacement, or other change, in each case after the Effective Date of any Applicable Law by any Government Entity. |

2



| *"Charter Party"* | A contract whereby an Owner contracts with Seller for the transportation of one or more Shipments. |
|---|---|
| *"CIF"* | Cost, Insurance and Freight as per Incoterms. |
| *"Commencement Date"* | As defined in the Special Terms. |
| *"Compliance Change"* | As defined in Section 22.2. |
| *"Confidential Information"* | As defined in Section 19.1. |
| *"Contract Quantity"* | The Base Annual Quantity to be delivered pursuant hereto during the Term, expressed in Tonnes, without consideration of Seller's option to vary the Annual Quantity in accordance with the Special Terms. |
| *"Contract Year"* | As defined in the Special Terms. |
| *"Default Rate"* | The lesser of (a) two percent (2%) per month and (b) the maximum rate permitted by Applicable Law. |
| *"Defaulting Party"* | As defined in Section 18.1.1. |
| *"Discharge Port"* | A port at which Buyer is to discharge Biomass in accordance herewith, as specified in the Special Terms. |
| *"Discharge Port Procedures"* | With respect to any Discharge Port, the policies and procedures in effect from time to time with respect to docking, berthing, discharging and similar matters. |
| *"Discharge Rate"* | As defined in the Special Terms. |
| *"Dispute"* | As defined in Section 23.2.1. |
| *"Early Termination Date"* | As defined in Section 18.2.1. |
| *"Early Termination Payment"* | As defined in Section 18.2.1. |
| *"Effective Date"* | As defined in the introductory paragraph hereof. |
| *"ETA"* | Estimated time of arrival. |
| *"Expiry Date"* | As defined in the Special Terms. |
| *"Extraneous Material"* | Material not included in the Specifications and not normally a constituent of Biomass, in quantities which would reasonably be expected to cause damage to handling equipment or burners. Examples of Extraneous Material may include pieces of metal, stone or foreign objects. |
| *"Financing Party"* | Any Person that provides debt, loans, credit or credit support, acts as counterparty on any interest rate or currency hedging arrangements, or provides other financing, to Seller. |
| *"First Installment"* | As defined in Section 13.2.1. |
| *"FM Quantity"* | As defined in Section 17.3.1. |
| *"Force Majeure Event"* | As defined in Section 17.1.2. |
| *"Gigajoule"* or *"GJ"* | One billion (1,000,000,000) Joules. |
| *"Government Entity"* | Any national, multi-national, regional, provincial, municipal or local authority, department, body, board, instrumentality, commission, corporation, branch, directorate, agency, ministry, court, tribunal, judicial authority, legislative body, administrative body, regulatory |

3



| | body, port authority, autonomous or quasi-autonomous entity or taxing authority or any political subdivision of any of the foregoing and any Person (whether autonomous or not) exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to any of the foregoing entities, having jurisdiction over the Person or matter in question. |
|---|---|
| **"Government Official"** | As defined in Section 25.13. |
| **"Handling Step"** | Any action taken to discharge, load, store, transfer, or otherwise move Biomass under this Agreement. For the avoidance of doubt, and as an example, each of the following shall each be considered one Handling Step: (i) the transfer of Biomass from a Vessel at the Discharge Port to a barge for inland transportation, (ii) the transfer of Biomass from a barge to a vehicle, (iii) unloading of a vehicle to a store and (iv) movement of Biomass through a transfer point on a conveyor belt. |
| **"IEC"** | International Electrotechnical Commission. |
| **"IMO"** | International Maritime Organization. |
| **"Incoterms"** | International Chamber of Commerce Incoterms® 2020 or such other version of such terms as the Parties may agree in writing shall apply. |
| **"Independent Inspection Company"** | As defined in Section 10.2.1. |
| **"Independent Laboratory"** | As defined in Section 10.4.2(a). |
| **"ISO"** | International Organization for Standardization. |
| **"Joule" or "J"** | A joule as defined in ISO 1000:1992 (E). |
| **"Load Port"** | Any port to which Seller is to deliver Biomass, as nominated in accordance with the Special Terms. |
| **"Load Port Weight Certificate"** | As defined in Section 12.1. |
| **"Lot Samples"** | As defined in Section 10.4.1. |
| **"Market Price"** | The price as indicated by Argus "Industrial Wood Pellets 90 day Index CIF NWE USD/MT current month average" for the relevant period for wood pellets plus a premium of $25/MT.<br><br>If Argus CIF NWE is not published with respect to the relevant period, unless the Parties mutually agreed to a new market index, the Market Price shall be determined by taking the average of price quotations obtained by the non-defaulting Party for wood pellets of similar quality and quantity as Biomass over the relevant period from at least two (2) and no more than three (3) independent internationally recognized dealers/brokers or counterparties (such dealers/brokers or counterparties to be appointed by the non-defaulting Party).<br><br>For the avoidance of doubt, the non-defaulting Party is not obliged to enter into any replacement transaction to determine the Market Price. |
| **"Master"** | The captain of the relevant Vessel. |
| **"Non-Affected Party"** | As defined in Section 17.1.2. |

4



| | |
|---|---|
| *"Non-Defaulting Party"* | As defined in Section 18.1.1. |
| *"NOR"* | A "notice of readiness" tendered by a Master confirming a Vessel's readiness to discharge cargo at the Discharge Port. |
| *"Office Hours"* | The period between 09.00 and 17.00 hours (local time) on a Business Day. |
| *"Owner"* | The owner or operator of a Vessel. |
| *"Party"* and *"Parties"* | As defined in the introductory paragraph hereof. |
| *"Permit"* | Any waiver, franchise, exemption, variance, permit, clearance, registration, authorization, consent, decree, approval, license, filing, privilege, ruling, certification or order from or required to be obtained or maintained by any Government Entity. |
| *"Person"* | Any natural person, corporation, company, partnership (general or limited), limited liability company, business trust, Government Entity or other entity or association. |
| *"Primary Quality Analysis Certificate"* | As defined in Section 10.4.2(a). |
| *"Quarter"* | A calendar quarter. |
| *"Regulatory Bunker Fuel Adjustment"* | As defined in the Special Terms. |
| *"Rejection Limit"* | As defined in the Special Terms. |
| *"Rules"* | As defined in Section 23.2.1. |
| *"Second Installment"* | As defined in Section 13.2.2. |
| *"Seller"* | As defined in the introductory paragraph hereof. |
| *"Seller's Field Test Certificate"* | As defined in Section 10.5. |
| *"Seller's Shortfall"* | As defined in Section 15.1. |
| *"Seller's Shortfall Payment"* | As defined in Section 15.1. |
| *"Shipment"* | A consignment of Biomass to be shipped on board Vessel(s) and delivered by Seller to Buyer hereunder. |
| *"Shipment Price"* | As defined in Section 13.1. |
| *"Shipment Size"* | As defined in the Special Terms. |
| *"Special Terms"* | The Special Terms attached hereto as Annex A. |
| *"Specifications"* | The quality specifications for the Biomass to be delivered pursuant to this Agreement as set out in the Special Terms. |
| *"SSHINC"* | Saturdays, Sundays and holidays included. |
| *"Tax"* | Any present or future tax, levy, impost, duty, charge, assessment, royalty, tariff or fee of any nature (including interest, penalties and additions thereto) that is imposed by any Government Entity (whether or not for its benefit) in respect of any payment, nomination or allocation under this Agreement, and *"Taxes"* shall be construed accordingly. For the avoidance of doubt, Tax shall exclude: (a) any tax on net income or wealth; (b) a stamp, registration, documentation or similar tax; and (c) VAT. |
| *"Term"* | As defined in Section 3.1. |

5



| *"Tonne"* or *"MT"* | A metric tonne or one thousand (1,000) kilograms. |
|---|---|
| *"Umpire Laboratory"* | As defined in Section 11.4.4. |
| *"Umpire Quality Analysis Certificate"* | As defined in Section 11.4.4. |
| *"Umpire Sample"* | As defined in Section 10.4.2(b). |
| *"USD"* or *"$"* | United States Dollars. |
| *"VAT"* | Value-added tax and/or similar taxes. |
| *"Vessel Requirements"* | As defined in Section 6.5.4. |
| *"Vessel"* | An ocean or sea-going vessel to be used to load and carry a Shipment hereunder. |
| *"WWD"* | A working day, or part thereof, of 24 consecutive hours except for any time when weather prevents the loading or discharging of the Vessel or would have prevented it, had work been in progress. |

## 2.    GENERAL

2.1    Key Obligations of the Parties. Seller shall sell and deliver to Buyer, and Buyer shall purchase and receive from Seller, Biomass at the Shipment Price in accordance with this Agreement.

2.2    Interpretation. Except as otherwise set forth herein, or where the context of this Agreement otherwise requires:

2.2.1    headings and titles are for convenience only and do not affect the interpretation of this Agreement;

2.2.2    the gender of all words used herein shall include the masculine, feminine and neuter and the number of all words shall include the singular and plural;

2.2.3    the terms "hereof", "herein," "hereto" and similar words refer to this entire Agreement and not any particular Section, Annex or any other subdivision of this Agreement;

2.2.4    references to "Section" or "Annex" are to this Agreement unless specified otherwise;

2.2.5    reference to "this Agreement" (including any Annex hereto) or any other agreement or document shall be construed as a reference to such agreement or document as the same may be amended, modified, supplemented or restated, and shall include a reference to any agreement or document which amends, modifies, supplements or restates, or is entered into, made or given pursuant to or in accordance with its terms;

2.2.6    subject to Section 22, references to any law, statute, rule, regulation, notification or statutory provision (including Applicable Laws) shall be

6



construed as a reference to the same as it may have been, or may from time to time be, amended, modified or re-enacted;

2.2.7　references to any Person shall be construed as a reference to such Person's successors and permitted assigns;

2.2.8　references to "days" shall refer to calendar days;

2.2.9　"includes", "including" and similar phrases shall mean "including, without limitation"; and

2.2.10　all Annexes are incorporated herein and made a part of this Agreement for all purposes.

3.　**TERM AND CONDITIONS PRECEDENT**

3.1　Term. Subject to Section 3.2, this Agreement is effective as of the Effective Date and shall remain in force through and including the Expiry Date, unless sooner terminated in accordance herewith (the "***Term***").

3.2　Conditions Precedent.

3.2.1　All rights and obligations of the Parties under this Agreement with respect to the first Contract Year shall commence on the Effective Date. All rights and obligations of the Parties under Section 2 (*General*), this Section 3 (*Term and Conditions Precedent*), Section 15.7 (*No Punitive, Consequential or Similar Damages*), Section 19 (*Confidentiality*) and Sections 21 (*Assignment*) to 25 (*Miscellaneous*) (inclusive) shall commence on the Effective Date. In the event of any inconsistency between the terms of this Section 3 and any other terms of the Agreement, the terms of this Section 3 shall prevail.

3.2.2　All rights and obligations of the Parties under this Agreement with respect to the first Shipment of the second Contract Year ("***2023 Shipment No. 1***") shall commence on the date on which Buyer notifies Seller that Buyer has either satisfied or waived all the following conditions precedent:

(a)　Buyer has successfully secured storage in the Discharge Port for the first Shipment of the first Contract Year ("***2022 Shipment No. 1***");

(b)　Buyer has successfully secured inland logistics to transport 2022 Shipment No.1 from the Discharge Port to the BayWa Facility;

(c)　The quality of 2022 Shipment No. 1 as determined in accordance with this Agreement conforms with the Specifications; and

(d)　Buyer has caused an independent inspection company (that complies with ISO/IEC 17020) at Buyer's expense to perform field

7

tests in accordance with ISO 18846, and such independent inspection company has certified that the fines generated by each Handling Step of 2022 Shipment No. 1 between the Discharge Port and final storage at the BayWa Facility do not exceed one and a half percent (1.5%) per Handling Step; *provided* that (i) the Parties shall endeavor to limit such fine increases to one percent (1%) per Handling Step, and (ii) Buyer shall use commercially reasonable endeavours to procure that 2022 Shipment No. 1 is exposed to minimal handling and degradation between discharge at the Discharge Port and final storage at the BayWa Facility.

3.2.3 If the conditions precedent referred to in Section 3.2.2 are not satisfied or waived by Buyer within forty-two (42) days after completion of discharge of 2022 Shipment No. 1 at the Discharge Port, then Buyer may terminate this Agreement by notice to Seller, and no Party shall be liable to the other Party for damages or costs or expenses, or have any further liabilities, obligations or rights under this Agreement (other than those that have already accrued under Section 3.2.1); *provided, however*, that if Buyer does not exercise its termination right under this Section 3.2.3 within thirty (30) days from the first day when Buyer is entitled to exercise such termination right, then the conditions precedent referred to in Section 3.2.2 shall be deemed waived by Buyer.

3.2.4 All rights and obligations of the Parties under this Agreement with respect to the remainder of the Contract Quantity shall commence on the date on which Buyer notifies Seller that the condition precedent requiring the quality of 2023 Shipment No. 1 to conform with the Specifications, as determined in accordance with this Agreement, has been satisfied by Seller or waived by Buyer.

3.2.5 If the condition precedent referred to in Section 3.2.4 is not satisfied or waived by Buyer within two (2) Business Days after completion of discharge of 2023 Shipment No.1 at the Discharge Port, then this Agreement shall automatically be null and void, and no Party shall be liable to the other Party for damages or costs or expenses or have any further liabilities, obligations or rights under this Agreement (other than those that have already accrued under Section 3.2.1 and with respect to 2023 Shipment No.1).

## 4.    WARRANTY OF TITLE

4.1 Warranty of Title. Seller warrants that (a) it is able to fully and lawfully transfer title of each Shipment to Buyer and (b) the Biomass delivered hereunder shall be (to the extent Seller has received payment from Buyer) free from any liens, charges, encumbrances, and claims of any kind.

8



4.2    <u>Transfer of Title and Risk</u>. Title and risk of loss or damage to each Shipment shall pass from Seller to Buyer when the Biomass is placed onboard the Vessel at the Load Port.

## 5.    <u>DELIVERY</u>

5.1    <u>Terms of Delivery</u>. Except where otherwise inconsistent with the express terms of this Agreement, CIF Discharge Port Incoterms shall apply. For the avoidance of doubt, and notwithstanding Seller's shipping obligations pursuant to <u>Section 6</u>, delivery of all Biomass hereunder shall be final and effective upon passage of title to Buyer at the Load Port.

5.2    <u>Delivery Schedule/Load Port</u>. Seller shall deliver Biomass at the Load Port(s) in quantities, at a frequency and pursuant to the Specifications.

5.3    <u>Export/Import License</u>.

    5.3.1    Seller shall obtain any export license or other official authorization and shall carry out all customs formalities necessary for the export of each Shipment in a timely manner such that the loading and delivery of such Shipment are not delayed. All costs associated with such licenses, authorizations and formalities, including the direct costs reasonably incurred caused by any delay with respect thereto (except to the extent caused by an act or omission of Buyer, for which Buyer shall be responsible), are for the account of Seller.

    5.3.2    Buyer shall obtain any import license or other official authorization and shall carry out all customs formalities necessary for the import of each Shipment in a timely manner such that the arrival and discharging of such Shipment are not delayed. All costs associated with such licenses, authorizations and formalities, including the direct costs reasonably incurred caused by any delay with respect thereto (except to the extent caused by an act or omission of Seller, for which Seller shall be responsible), are for the account of Buyer. For the avoidance of doubt, as between Buyer and Seller, Buyer is the importer of record.

## 6.    <u>LOADING AND OCEAN/SEA TRANSPORTATION</u>

6.1    <u>Loading</u>. Seller shall load the Biomass onto the Vessel(s) at its own risk and expense and in all material respects in compliance with Applicable Law.

6.2    <u>Ocean/Sea Transportation</u>. Seller shall make all necessary arrangements for carriage of Shipments to the applicable Discharge Port.

6.3    Seller shall provide Buyer an ETA of the Vessel at the Load Port no later than seven (7) days prior to such ETA and promptly update Buyer with respect to any significant changes in such ETA. All information provided by Seller to Buyer pursuant to this <u>Section 6.3</u> shall be indicative only and not binding.

9



6.4    Seller shall procure and promptly provide to Buyer a copy of the bill(s) of lading issued by the Master(s) (or Owner's authorized agent) consigned to Buyer's order, and evidencing the Shipment(s) on board the Vessel(s) in apparent good order and condition.

6.5    <u>Vessel Nomination and Notices.</u>

    6.5.1    Seller shall determine the Load Port and Shipment Size of each Shipment in accordance with the Special Terms.

    6.5.2    Seller shall notify Buyer of the Vessel nominated by Seller for each Shipment by no later than seven (7) days prior to commencement of loading such Shipment. Such notification (and any notification for a substitute Vessel pursuant to Section 6.5.3) shall include (a) the Vessel(s) for the carriage of that Shipment including the Vessel's name and IMO number, (b) the demurrage rate specified in the applicable Charter Party, and (c) the approximate quantity of Biomass to be loaded.

    6.5.3    Seller may substitute a different Vessel for any nominated Vessel; <u>provided</u> that the substitute Vessel has an ETA at the Load Port not substantially later than the originally nominated Vessel, unless otherwise agreed by Buyer. Seller shall notify Buyer of any proposed Vessel substitution not later than two (2) Business Days before the ETA of the original Vessel at the Load Port.

    6.5.4    Each Vessel nominated by Seller, including each substitute Vessel, shall meet the following requirements ("**Vessel Requirements**"):

        (a)    be a single deck self-trimming bulk carrier;

        (b)    be geared or non-geared;

        (c)    be classed Lloyds 100 A1 or equivalent by the applicable classification society;

        (d)    be of such design and construction as not to interfere with, delay or disrupt discharging of the Vessel;

        (e)    comply with all applicable Discharge Port Procedures;

        (f)    have a maximum age of twenty-five (25) years; and

        (g)    be in compliance with the requirements of the International Management Code for the Safe Operation of Ships and for Pollution Prevention (ISM Code). Seller shall provide Buyer copies of the relevant Document of Compliance (DOC) and Safety Management Certificate (SMC) upon request.

10



6.5.5 Buyer may only reject a Vessel nominated by Seller if (a) the Vessel does not meet the Vessel Requirements, <u>and</u> (b) Buyer notifies Seller of the rejection within one (1) Business Day in Germany of Seller's notice of nomination pursuant to <u>Section 6.5.2</u> or <u>Section 6.5.3</u>.

6.5.6 Each Party shall use the IMO number provided pursuant to <u>Section 6.5.2</u> on all correspondence, documents, analysis and invoices relating to such Shipment.

6.6 <u>Discharge Port Information Exchange</u>.  Buyer shall keep Seller reasonably informed of (a) all Discharge Port Procedures and (b) any material regulations and limitations specified by the harbor authorities at the Discharge Port.

6.7 Seller shall provide Buyer an ETA of the Vessel at the Discharge Port within two (2) Business Days following completion of loading and promptly update Buyer with respect to any significant changes in such ETA. All information provided by Seller to Buyer pursuant to this <u>Section 6.7</u> shall be indicative only and not binding.

6.8 <u>Insurance</u>.

6.8.1 Without limiting Seller's liability hereunder, Seller shall procure and maintain during the performance of its obligations, at its own expense, insurance, against all risks of carriage including marine, war, strikes, riots and civil commotions, for the benefit of Buyer, in an amount equal to one hundred ten percent (110%) of the Base Price for each Shipment multiplied by the weight of such Shipment. The minimum requirements of such insurance shall be as follows:

(a) insurance shall be with insurance companies who possess a credit rating from A.M. Best at least equal to A-VII;

(b) insurance shall be in accordance with the provisions of a standard Lloyd's Marine Insurance Policy or equivalent and which provides coverage on an "all risks" basis including for loss resulting from spontaneous combustion, all with deductibles no greater than one-half of one percent (0.5%) of the whole Shipment value;

(c) insurance shall incorporate (i) the Institute Cargo Clauses (A) dated January 1, 2009, (ii) Institute War Clauses dated January 1, 2009, and (iii) Institute Strike Clauses (Cargo) dated January 1, 2009; without deductibles;

(d) insurance shall be effective from the time when title passes from Seller to Buyer to quayside at the Load Port;

(e) the benefit of such insurance shall pass to Buyer simultaneously with the passing of the risk in the Biomass to Buyer;



(f)     Buyer and any person providing funding to Buyer shall be named as loss payees as far as their interests appear; and

(g)     the insurance policy or certificate of insurance is to be fully transferable and shall be passed to Buyer promptly following the benefit in such insurance and the risk in the Biomass having passed to Buyer in accordance with Section 6.8.1(e).

6.8.2   Seller shall, at the request of Buyer, produce certified copies of the policies or insurance certificates with the necessary information, including the expiry date, relating to all insurances taken out by Seller in accordance with Section 6.8.1.

6.9     Agents.  Buyer may appoint an agent to act as its authorised agent at the Load Port. Seller may appoint an agent to act as its authorised agent at the Discharge Port. Each Party may rely upon the other Party's authorised agent and the actions of any such authorised agent shall be binding upon the appointing Party. Seller and Buyer may nominate for Owner's consideration the Vessel's agent at the Load Port and Discharge Port, respectively.

## 7.    DISCHARGE

7.1     Notice of Readiness; Laytime.  Buyer is permitted an amount of laytime at the Discharge Port determined by dividing the bill of lading weight by the Discharge Rate. Seller shall cause the NOR to be tendered by the Vessel at the Discharge Port by telex, radio, email or telephone (and if by radio or telephone, subsequently confirmed in writing) to Buyer. NOR may be tendered upon arrival of the Vessel at the Discharge Port, any time day or night, SSHINC, whether in port or not, whether in berth or not, whether in free pratique or not and whether customs cleared or not. Laytime shall commence upon the earlier of (a) twelve (12) hours after NOR is tendered and (b) when the Vessel is all fast alongside the discharging berth, any time day or night, in free pratique or not and whether customs cleared or not, SSHINC. Laytime shall cease counting upon completion of discharging and, if applicable, completion of final draft survey.

7.2     Demurrage.  Seller may provide laytime calculations and related invoices to Buyer from time to time and shall provide the final calculations and invoice within ten (10) Business Days after discharging is complete. Such calculations shall be final and binding unless disputed by Buyer within ten (10) Business Days following delivery thereof by Seller, with any such dispute to be accompanied by reasonable supporting documentation and, if not resolved by the Parties within fifteen (15) Business Days, resolved in accordance with Section 23.2. If laytime used exceeds laytime allowed, Buyer shall pay demurrage to Seller for such exceedance. Any such exceedance (a) of no more than 360 hours shall be paid at the rate nominated by Seller pursuant to Section 6.5.2, (b) over 360 hours but no more than 720 hours shall be paid at twice the nominated rate and (c) over 720 hours shall be paid at four times the nominated rate. For the avoidance of doubt, once demurrage has begun,

12



it shall continue until the Biomass has been completely discharged from the Vessel pursuant to this Section 7 and the Special Terms. If laytime used is less than laytime allowed, Seller shall pay despatch to Buyer for all laytime saved at the rate nominated by Seller which shall in any event be consistent with the rate specified in the relevant Charter Party. The Party owing demurrage or despatch pursuant to this Section 7.2 shall pay such owed amounts within ten (10) Business Days following receipt of the invoice therefor.

7.3 Costs.

7.3.1 Buyer shall pay (a) all costs in connection with discharging the Shipment at the Discharge Port, including stevedore costs and all cargo dues or charges related to the Biomass at the Discharge Port or country of destination; (b) all discharging arrangements with Government Entities, stevedores, Owner(s) and other third parties at the Discharge Port; (c) Owner(s) for any damages to the Vessel and/or all time used or lost as a result of such damages, and Buyer shall settle any such claims with Owner(s) directly; and (d) for repairs of any damages to the Vessel, with any time lost as a result of such repairs to count as laytime. Seller, if requested by Buyer, shall render reasonable assistance to Buyer in conjunction with Buyer's discussions with Owner(s).

7.3.2 Buyer shall pay all duties, fees, Taxes, quay dues and any other charges due at the Discharge Port in respect of the Vessel, as well as pilotage, mooring and towage expenses incurred at the Discharge Port.

7.3.3 All amounts payable by Buyer in accordance with this Section 7.3 shall be invoiced and paid pursuant to Section 13.4.

7.4 Overtime. Costs for stevedoring overtime at the Discharge Port called for by Seller shall be for Seller's account. Costs for all other overtime at the Discharge Port shall be for Buyer's account.

7.5 Safe Berth. Buyer guarantees to Seller a safe port and a safe berth facility or area for the Vessel at the Discharge Port that can accommodate Vessels meeting the Vessel Requirements and where the Vessel can safely reach and safely leave and always lie safely afloat.

7.6 Buyer shall promptly discharge each Shipment in compliance with (a) the International Maritime Solid Bulk Cargoes Code (IMSBC Code), 2016 edition, (b) all Applicable Laws and (c) the Master's instructions.

8. **[NOT USED]**

9. **QUALITY**

9.1 Quality Requirements.

13

9.1.1   Biomass delivered hereunder shall comply with the Specifications.

9.1.2   Seller shall cause each Shipment, when loaded, to be of substantially uniform quality; free of material amounts of Extraneous Material; free flowing; readily able to be unloaded and handled; and fully suited for bulk sea transport, free grab discharge, and inland transport.

9.2   <u>Non-Compliance with Quality Requirements.</u>

9.2.1   If a Shipment or portion thereof does not comply with <u>Section 9.1.1</u>, in any material respect, Seller shall use commercially reasonable endeavours to conform it to the requirements of <u>Section 9.1.1</u> and Buyer shall take all reasonable steps requested by Seller to assist therewith; <u>provided</u> that Seller shall be responsible for all reasonable and documented, out of pocket costs incurred by Buyer at Seller's direction. As soon as reasonably practicable after becoming aware that a Shipment or portion thereof does not comply with Section <u>9.1.1</u> in any material respect, Seller shall propose to Buyer a plan to conform such non-compliance within a reasonable time period (determined with regard to the nature and extent of the non-compliance). If the Shipment or portion thereof is not so conformed within such reasonable time specified by Seller, Buyer may then reject the Shipment pursuant to <u>Section 14</u>.

9.2.2   If the Biomass as delivered is found by Buyer on discharge to contain material amounts of Extraneous Material, Buyer shall inform Seller and Buyer shall appoint an independent surveyor, at Buyer's sole cost and expense, to conduct an inspection of the delivered Biomass. If the independent surveyor verifies that the Biomass supplied by Seller contains material amounts of Extraneous Material, then Buyer may provide written notice thereof to Seller detailing the nature and extent of any such noncompliance and thereupon Seller shall, at its sole cost and expense, conform such non-compliance and Seller shall reimburse Buyer for the cost of the independent surveyor. If Seller fails to conform such non-compliance within a reasonable time (determined with regard to the nature and extent of the non-compliance), Seller shall be required to replace any such defective portion of the Shipment at no cost to Buyer. The amount of such affected portion that is not otherwise replaced shall be deemed a Seller's Shortfall pursuant to <u>Section 15.1</u>; <u>provided</u>, <u>however</u>, that under no circumstances shall Seller be liable for replacement of Biomass or for any costs, damages or losses incurred by Buyer if the Extraneous Material was introduced after the applicable Biomass was loaded onto the Vessel, and Buyer shall bear the burden of proof to establish that such Extraneous Material was present in the Shipment prior to loading.

9.2.3   Seller has the right to be represented at its own expense and risk during discharge of Biomass from the Vessel.

14

9.3     Certificate of Origin.  Seller shall provide a certificate of origin, issued by an independent certification organization recognized and acceptable by the customs authorities in the applicable country or countries of destination in respect of each Shipment.

## 10.   SAMPLING

10.1    Each Shipment shall be sampled and tested at the Load Port(s) in accordance with this Section 10.

10.2    Sampling Procedures.

10.2.1  Seller shall select an independent inspection company (subject to Buyer's approval, not to be unreasonably withheld, conditioned or delayed) (the "*Independent Inspection Company*") to, at Seller's expense, take samples of the Biomass at the Load Port(s) during loading of the Vessel.

10.2.2  Buyer may, at its sole cost and expense, appoint its own independent inspection company at the Load Port(s) for supervising and auditing purposes.

10.2.3  Any independent inspection company appointed by either Party shall comply with ISO/IEC 17020, unless and for so long as the Parties otherwise mutually agree.

10.2.4  Each Party has the right, at its own expense, to be represented during all aspects of sampling.

10.3    Sampling Standards.  All sampling procedures shall be carried out in accordance with the Specifications and ISO 18135 except to the extent the Parties otherwise mutually agree. All samples collected by an independent inspection company appointed by Buyer shall be sealed.

10.4    Preparation of Samples for Testing.

10.4.1  Seller shall cause the Independent Inspection Company to take samples of the Biomass being loaded onto the Vessel per 2,000 MT lots or per barge (if applicable) ("*Lot Samples*") from various points within the Biomass so as to assemble representative sample(s) of the Biomass shipped, in accordance with the relevant sampling standard pursuant to Section 10.3.

10.4.2  All of the Lot Samples taken in respect of a Shipment shall be combined into a single composite sample which shall be divided into three (3) parts as follows:

(a)     one part, which shall be forwarded to an independent laboratory selected by Seller (subject to Buyer's approval, not to be unreasonably withheld, conditioned or delayed) (the "*Independent*

15

*Laboratory*") which shall analyze such sample, at Seller's expense, for the parameters indicated for laboratory analysis in the "Performed by" column of the table set forth in the Specifications for purposes of a certificate to be issued by the Independent Laboratory verifying the compliance of the Biomass with the Specifications (the "***Primary Quality Analysis Certificate***"); and

(b)     two parts (a "***Challenge Sample***" and an "***Umpire Sample***"), which shall be forwarded to the Independent Laboratory to be kept in a safe place for at least ninety (90) days for the purpose of additional analysis if required pursuant to Section 11.4.

10.5     Temperature, Fines and Extraneous Materials.  Seller shall cause the Independent Inspection Company at Seller's expense to perform a field test to determine the (a) temperature of, (b) percentage by weight of 3.15 millimeter fines in, and (c) Extraneous Materials in, the Biomass in each Shipment in accordance with the Specifications. Seller shall, or shall cause the Independent Inspection Company to, issue a certificate to both Parties certifying the results of such temperature, fines and Extraneous Materials measurements at the Load Port ("***Seller's Field Test Certificate***"). Seller's Field Test Certificate shall be final and binding on the Parties, except in the case of fraud or manifest error.

## 11.     TESTING AND ANALYSIS

11.1     Analysis Standards.

11.1.1 All testing and analysis shall be conducted in accordance with the Specifications. Any independent laboratory appointed by either Party shall be ISO/IEC 17025 accredited.

11.1.2 If, at any time after the Effective Date, (a) testing or analysis standards are implemented which are applicable to the analysis of the Biomass or any of its parameters; (b) a Government Entity requires the use of other standards for the testing or analysis of the Biomass or any of its parameters; or (c) any sampling or testing standard referenced in this Agreement is updated, then, subject to Section 22, the Parties shall agree as soon as reasonably possible the changes necessary to the Specifications to reflect such standard(s), and such changes may be incorporated without requiring amendment to this Agreement.

11.2     Reporting of Analysis Results.  All tests and analysis results shall be reported in accordance with this Section 11. Certificate(s) of analysis shall state all seal references of the sample(s).

11.3     Timeliness of Analysis Results.  All testing and analysis shall be conducted as soon as possible after sampling but, in any event, no later than seven (7) Business Days after the Independent Laboratory receives the samples and all related instructions.

16



Seller shall cause the Independent Laboratory to forward the Primary Quality Analysis Certificate directly to Buyer and Seller.

11.4    Final and Binding Quality Analysis:

11.4.1  The Primary Quality Analysis Certificate shall be final and binding on the Parties, save as provided in Section 11.4.2 or Section 11.4.4 or in the case of fraud or manifest error.

11.4.2  Up until seven (7) days after receipt of the analysis results, either Party may at its own expense challenge any fact, finding or result contained in the Primary Quality Analysis Certificate and elect for the Challenge Sample to be submitted to an independent laboratory appointed by such Party and approved by the other Party (the "*Challenge Independent Laboratory*"), such approval not being unreasonably withheld, conditioned or delayed. Such Party shall cause the Challenge Independent Laboratory to analyze the challenged portion of the Primary Quality Analysis Certificate and issue to Buyer and Seller a certificate certifying the results of such analysis (the "*Challenge Quality Analysis Certificate*").

11.4.3  The Parties shall agree on the final values and results to be used for the final quality determination and, unless otherwise agreed, the preference shall be:

(a)     the Primary Quality Analysis Certificate;

(b)     the Challenge Quality Analysis Certificate; or

(c)     the average of the values of the Primary Quality Analysis Certificate and the Challenge Quality Analysis Certificate.

11.4.4  If no agreement can be reached as to which results to use, either or both Parties may cause the Umpire Sample to be submitted to a mutually-agreed independent laboratory (the "*Umpire Laboratory*"). In such case, the appointing Party or Parties shall arrange for the Umpire Laboratory to analyze the challenged portion of the Primary Quality Analysis Certificate and issue to Buyer and Seller a certificate certifying the results of such analysis (the "*Umpire Quality Analysis Certificate*"). In such case, the average value of the parameter(s) in question from the two (2) quality analyses most closely in agreement (i.e., of the Primary Quality Analysis Certificate, the Challenge Quality Analysis Certificate, and the Umpire Quality Analysis Certificate) shall be final and binding for all purposes, save in the cases of fraud or manifest error. The Parties shall equally share all costs of shipping and analysis of the Umpire Sample.

11.4.5  Either Party may, at its own expense, retain sample volumes of Biomass, all Primary Quality Analysis Certificates, Challenge Quality Analysis Certificates and Umpire Quality Analysis Certificates as part of its insurance records for purposes of establishing baseline values for Biomass.

17

## 12.    WEIGHT DETERMINATION

12.1    Measurement of Shipment Weight.  The weight of each Shipment shall be determined at the Load Port(s), at Seller's expense, by a draft survey of the loaded Vessel. Any draft survey shall be conducted by an independent licensed marine surveyor appointed by Seller with Buyer's approval, not to be unreasonably withheld, conditioned or delayed. Seller shall cause the surveyor to issue to Buyer and Seller a certificate certifying the weight of the Shipment at the Load Port(s) (the "*Load Port Weight Certificate*"), which shall be final and binding on the Parties and shall be used for the purposes of calculating the Purchase Price for the relevant Shipment, except, in each case, in the case of fraud or manifest error.

## 13.    PRICING AND PAYMENT

13.1    Price.

13.1.1    The price for each Shipment (the "*Shipment Price*") shall be equal to: (a) the weight of the Shipment in Tonnes, multiplied by (b) the Base Price for the Shipment (as defined below), plus (c) the Bunker Fuel Adjustment, plus (d) the Discharge Port Adjustment.

13.1.2    The Shipment Price excludes VAT. To the extent that any VAT is properly due in respect of a Shipment, such VAT shall be payable by Buyer at the prevailing rate at the time of invoice.

13.2    Payment.  Buyer shall pay the full amount of the Shipment Price for each Shipment in two (2) installments, as follows:

13.2.1    First Installment.  Subject to Section 13.5.4, the first installment of the Shipment Price ("*First Installment*") shall be 90% of the Shipment Price based upon the Load Port Weight Certificate and without the Bunker Fuel Adjustment or, if applicable, the Discharge Port Adjustment. Buyer shall, subject to Section 13.5.4, pay the First Installment within seven (7) Business Days following receipt of a valid invoice therefor from Seller, which invoice shall be valid when Buyer has received a copy (or original if specified) of each of the following:

(a)    originals of all clean on board bill(s) of lading, made out to the order of Buyer and signed by the Master (or by Owner's authorized agent if a copy of the Master's authorization is included);

(b)    Primary Quality Analysis Certificate;

(c)    Load Port Weight Certificate;

(d)    Seller's Field Test Certificate; and

(e)    certificate of origin, pursuant to Section 9.3.

18



13.2.2 <u>Second Installment</u>. The second installment of the Shipment Price ("*Second Installment*") shall be the remainder of the Shipment Price with the Bunker Fuel Adjustment and, if applicable, the Discharge Port Adjustment. Buyer shall pay the Second Installment upon completion of the discharge of the applicable Shipment and within seven (7) Business Days following Buyer's receipt of a valid invoice therefor from Seller, which invoice shall include, if applicable, Challenge Quality Analysis Certificate and/or Umpire Quality Analysis Certificate.

13.3    <u>Payment Currency</u>. All payments shall be made in immediately available funds in the currency specified in the Special Terms.

13.4    <u>Obligation of Payment</u>.

13.4.1  Any dispute in relation to any payment in respect of any particular Shipment shall not affect either Party's obligations in respect of any other Shipment. Buyer shall pay all invoiced amounts when due without setoff or withholding of any kind. All amounts under this Agreement shall be due and payable within fourteen (14) Business Days following receipt of an invoice therefor unless otherwise specified.

13.4.2  Notwithstanding <u>Section 13.4.1</u>, if Buyer disputes in good faith any invoiced amount, Buyer shall not be obligated to pay such disputed portion of the invoiced amount within the required payment term, and shall, prior to the expiration of the payment term, notify Seller in writing of its reasons for withholding the disputed amount. Buyer will thereafter pay such disputed amount to Seller upon and in accordance with the resolution of such dispute in accordance with the Agreement, together with late interest in accordance with <u>Section 13.5.3</u>.

13.5    <u>Interest and Late Payments</u>.

13.5.1  If Buyer fails to pay any portion of the First Installment or the Second Installment in full when due, Seller may, in addition to any other rights and remedies available to it under this Agreement, elect by written notice to Buyer to have title to the Biomass comprising the applicable Shipment revert to Seller, and upon delivery of such notice, title to such Biomass shall immediately pass to Seller, such quantity of Biomass shall be considered Buyer's Shortfall and Buyer shall pay Seller in respect of such quantity of Biomass in accordance with <u>Section 15.2</u>. Upon such title transfer, Seller shall be relieved of all delivery and other obligations to Buyer with respect of such Shipment. Buyer shall execute all such documents and take all other steps required or requested by Seller to give effect to any passage of title pursuant to this <u>Section 13.5.1</u>, whereupon Seller shall return to Buyer any portion of the applicable Shipment Price theretofore received from Buyer, less any amount owed to Seller pursuant to the first sentence of this <u>Section 13.5.1</u>.

19



13.5.2 Notwithstanding anything to the contrary herein, in no event shall (a) Buyer commence or continue discharging any Shipment prior to payment in full of the First Installment and, to the extent then due and payable, any applicable Second Installment, or (b) Seller be required to commence or complete loading of any Shipment while all or any part of the Shipment Price for such Shipment or any previous Shipment is past due and owing (excluding any disputed amount withheld in accordance with Section 13.4.2), except, in each case, to the extent that such failure of Buyer to timely pay such Shipment Price in full is caused by Seller's failure to timely deliver the invoice therefor or the documentation described in clauses (a) through (e) of Section 13.2.1 to Buyer.

13.5.3 Without prejudice to any other rights and remedies under this Agreement or otherwise, if either Party fails to make payment of any amount in full when the same is due and payable under this Agreement, such Party shall pay interest to the other Party on any such outstanding amount at the Default Rate, compounded monthly. Such interest shall accrue until the outstanding amount is paid in full.

13.5.4 If Buyer fails to pay when due any portion of the Shipment Price of one or more Shipments on three (3) or more occasions during the Term, then Buyer shall, upon request by Seller, pay the Shipment Price in relation to all future Shipments in advance pursuant to this Section 13.5.4 until it has provided evidence reasonably satisfactory to Seller that the reasons for the previous late payments have been rectified. The First Installment in respect of each such Shipment shall be based upon Seller's estimated loading quantity of such Shipment and shall be due and payable by Buyer by the later of (a) five (5) Business Days following receipt of an invoice therefor from Seller or (b) thirty (30) days prior to Seller's estimated commencement of loading date for such Shipment. In such case, the documents required to accompany the First Installment invoice in Section 13.2.1 shall be required only in respect of the Second Installment.

## 14. **REJECTION**

14.1 <u>Events of Rejection</u>. Notwithstanding anything to the contrary in this Agreement, Buyer may only reject a part of, or the entirety of, any Shipment after complying with the sampling, inspection and other procedures described in this Agreement, including in Sections 9, 10 and 11; provided, however, that Buyer may not reject all or a portion of any Shipment later than five (5) Business Days after (a) it knew or should have known of the circumstance giving rise to its right to reject, or (b) if earlier, commencement of discharge of the Shipment. Subject to the foregoing sentence, Buyer may reject all or a portion of a Shipment only:

14.1.1 as permitted pursuant to Section 9.2.1 where the Shipment (or portion thereof) cannot be conformed to the requirements of Section 9.1;

20



provided that in any such event, the Parties shall use commercially reasonable endeavours to segregate portions of the Biomass in any Shipment in order to minimize the quantity of Biomass that cannot be conformed to the requirements of Section 9.1 and is, as a result, subject to rejection by Buyer. For the avoidance of doubt, to the extent that any Biomass can be so segregated, the portion of any Shipment that satisfies the requirements of Section 9.1 shall not be subject to rejection by Buyer.

14.2    Title and Risk Relating to Rejection. Upon Buyer giving a notice of rejection to Seller, any title and/or risk of the rejected Biomass shall immediately pass to Seller, and Buyer shall be discharged from all obligations under this Agreement in relation to the rejected portion of the Biomass identified in such notice Buyer shall execute all such documents and take all other steps required to give effect to any passage of title pursuant to this Section 14.2. Buyer shall cooperate with Seller to segregate rejected volumes and shall take such actions as Seller may reasonably request to store, transfer or otherwise dispose of such volumes. Seller shall reimburse Buyer for all reasonable and documented, out-of-pocket costs of such storage, transfer or disposal.

14.3    Effect of Rejection. If Buyer properly rejects Biomass in accordance with this Section 14, Buyer may, within seven (7) days of such rejection, request that Seller deliver a further quantity of Biomass equal to the quantity rejected, in which event Seller shall comply with Buyer's request as soon as reasonably practicable. Any such further delivery shall be on the same terms as the rejected Shipment or partial Shipment (with such changes with respect to delivery time or Vessel size as the Parties may mutually agree) or such other terms as the Parties may agree. If Buyer does not request that Seller deliver a further quantity under this Section 14.3, such further quantity shall be deemed cancelled and Section 15.1 shall apply.

14.4    Reimbursement for Partially-Accepted Biomass. If Buyer rejects only part of a Shipment, the Shipment Price shall be reduced *pro rata* to the amount of the Shipment accepted. If the Shipment Price paid by Buyer exceeds the reduced Shipment Price, Seller shall reimburse Buyer within seven (7) Business Days of a written demand for such excess.

## 15.    DAMAGES AND MITIGATION

15.1    Seller's Shortfall. Unless excused by a Force Majeure Event or Buyer's failure to perform, if (a) Buyer properly rejects all or part of any Shipment in accordance with Section 14.1 and replacement Biomass has not been provided pursuant to Section 14.3, (b) any portion of a Shipment contains significant amounts of Extraneous Material and is not otherwise replaced pursuant to Section 9.2.2, or (c) Seller fails to deliver a quantity of Biomass in a relevant delivery period (the applicable quantity of Biomass, "***Seller's Shortfall***"), Seller shall pay Buyer an amount per Tonne of Seller's Shortfall equal to the positive difference, if any, between the Market Price and the Base Price, payable for that volume plus all direct losses and costs (including legal costs, transportation costs, storage costs, handling costs, and

21

administrative and management costs) incurred by Buyer as a result of Seller's failure pursuant to the immediately preceding clause (a), (b) or (c), and direct damages and expenses suffered or incurred by Buyer as a result of entering into any purchase agreements for Seller's Shortfall on reasonably similar terms after taking into account any gains or savings by Buyer due to mitigating its losses, costs, damages and expenses (a "***Seller's Shortfall Payment***").

15.2  Buyer's Shortfall.  Unless excused by a Force Majeure Event or Seller's failure to perform, if (a) Buyer rejects, or indicates that it will not accept, all or part of any Shipment other than in accordance with Section 14.1, (b) Buyer fails to comply with, or indicates to Seller that it intends not to comply with, in whole or in part, its obligations pursuant to Section 7 with respect to any quantity of Biomass, or (c) Seller elects to cause title to revert to Seller with respect to all or part of a Shipment pursuant to Section 13.5.1 (the applicable quantity of Biomass, "***Buyer's Shortfall***"), Buyer shall pay Seller an amount per Tonne of Buyer's Shortfall equal to the positive difference, if any, between the Base Price and the Market Price, payable for that volume plus all direct losses and costs (including legal costs, transportation costs, dead freight, storage costs, handling costs, hedging break costs, and administrative and management costs) incurred by Seller as a result of Buyer's failure pursuant to the immediately preceding clause (a), (b) or (c), and direct damages and expenses suffered or incurred by Seller as a result of entering into any sale agreements for Buyer's Shortfall on reasonably similar terms after taking into account any gains or savings by Seller due to mitigating its losses, costs, damages and expenses.

15.3  The liable Party pursuant to Section 15.1 or Section 15.2 shall pay amounts owed pursuant thereto within ten (10) Business Days following receipt of an invoice therefor, together with reasonable supporting documentation.

15.4  The Parties agree that it is difficult or impossible to determine with precision the amount of damages that would be incurred by Buyer or Seller resulting from any act or omission, as the case may be, described in Section 15.1 or Section 15.2; any sums payable under Section 15.1 or Section 15.2 because of such acts or omissions, as the case may be, are damages and not a penalty, and are fair and reasonable and any such sums represent a reasonable and genuine pre-estimate of fair compensation for the losses that may reasonably be anticipated from such acts or omissions, as the case may be. Each Party waives any right to claim or assert that the damages contemplated under Section 15.1 or Section 15.2 represent a penalty or do not represent a reasonable and genuine pre-estimate by the Parties as to the loss or damage likely to be suffered in these circumstances.

15.5  Mitigation.  Notwithstanding anything herein to the contrary, the Parties shall use commercially reasonable endeavours to mitigate losses and damages that may otherwise be incurred under this Agreement.

15.6  Sole Remedy.  For breach of any provision hereof for which an express remedy or measure of damages is provided, such express remedy or measure of damages shall

22



be the sole and exclusive remedy, the obligor's liability shall be limited as set forth in such provision and all other remedies or damages at law or in equity are waived.

15.7    No Punitive, Consequential or Similar Damages.  Except to the extent permitted under Sections 7.3, 15.1, 15.2, 18.2.2, 18.2.3 or damages incurred due to a breach of Section 19 or Section 25.13, neither Party shall be liable for any loss of profit or of revenue or of goodwill, or business interruption damages, or losses suffered under any other contract, or special, consequential, incidental, punitive, exemplary or indirect damages, whether in contract, indemnity, tort or otherwise, arising out of or in connection with the performance, failure to perform or termination of this Agreement, save that nothing in this Agreement limits any liability which cannot be limited by law, including liability for: (a) death or personal injury caused by negligence; (b) fraud or fraudulent misrepresentation; or (c) breach of the terms implied by section 12 of the Sale of Goods Act 1979.

## 16.    [NOT USED]

## 17.    FORCE MAJEURE

17.1    Obligations upon Force Majeure Event.

17.1.1  To the extent such performance is prevented, hindered or delayed by a Force Majeure Event, a Party is not responsible or liable for any delay or failure in the performance of its obligations under this Agreement other than in respect of the obligation to make any payment as required by this Agreement and any obligations which have accrued prior to the Force Majeure Event, including Buyer's obligations with respect to any Shipment that has commenced loading prior to the Force Majeure Event, subject to such Party's compliance with Section 17.2 and further subject to the Parties' rights and obligations under Section 17.3.

17.1.2  A "*Force Majeure Event*" is any event or circumstance that occurs beyond the control of, and without the fault or negligence of, the Party claiming force majeure (the "*Affected Party*" and the other Party being the "*Non-Affected Party*"), and which could not reasonably have been avoided or overcome. A Force Majeure Event may include the following, to the extent that each satisfies the foregoing requirements: any act of God or the elements, earthquakes, floods, landslides, hurricanes, civil disturbances, sabotage, acts of public enemies, war, blockades, insurrections, riots, pandemic, epidemics, fires or explosions.

17.1.3  The Affected Party shall have the burden of demonstrating the existence, effect and consequences of the applicable Force Majeure Event.

17.1.4  For the avoidance of doubt, a lack of funds, changes in market conditions (including the unavailability of subsidies), loss of markets, changes in market pricing, the availability of a more attractive market, any Change in

23



Law, or inefficiencies in operations shall not constitute a Force Majeure Event.

17.2    Notification. No Party shall be entitled to relief pursuant to this Section 17 unless (a) the Affected Party gives the Non-Affected Party written notice within five (5) days of the occurrence of the event or circumstance giving rise to the claim of a Force Majeure Event, or as soon as practicable thereafter, describing the particulars and estimated duration of the Force Majeure Event and the proposed cure, (b) on at least a monthly basis, or as otherwise reasonably requested by the Non-Affected Party, the Affected Party provides the Non-Affected Party with information on any developments relating to the Force Majeure Event, including the measures being taken by the Affected Party to resume normal performance of its obligations under such Agreement, (c) any prevention or delay of, or hindrance to, the Affected Party's performance is of no greater scope and of no longer duration than is reasonably attributable to the Force Majeure Event, (d) the Affected Party uses commercially reasonable endeavours to remedy the delay or failure to perform its obligations under this Agreement, and (e) the Affected Party promptly notifies the Non-Affected Party when the Affected Party is able to resume performance of its obligations under this Agreement.

17.3    Effect of Force Majeure Event.

17.3.1    Subject to the Affected Party's compliance with Section 17.2 and subject to the remaining provisions of this Section 17.3, Seller's obligations to deliver and transport, and Buyer's obligations to accept delivery of, the quantity of Biomass that is affected by the Force Majeure Event (the "*FM Quantity*") shall be deemed cancelled, and the Contract Quantity and applicable Annual Quantity shall be deemed decreased accordingly.

17.3.2    Within seven (7) days after receiving a notification from the Affected Party pursuant to clause (e) of Section 17.2, the Non-Affected Party has the right, but not the obligation, to request that the Affected Party sell or purchase, as applicable, a further quantity of Biomass equal to the FM Quantity, in which event the Affected Party shall comply with the Non-Affected Party's request as soon as practicable (and in the event that the Term needs to be extended to accommodate the FM Quantity, such resulting extension of the Term shall be no greater than the duration of the Force Majeure Event). Any such further delivery shall be on the same terms applicable to the FM Quantity (or any applicable portion thereof, with such changes with respect to delivery time or Shipment Size as the Parties may mutually agree) or such other terms as the Parties may agree.

24

## 18.   **DEFAULT AND TERMINATION**

18.1   Early Termination.

18.1.1   This Agreement may be terminated upon written notice by a Party at any time for any of the following reasons, and the terminating Party shall be the "**Non-Defaulting Party**" and the other Party shall be the "**Defaulting Party**":

(a)   by either Party if the other Party (i) breaches any payment obligation hereunder and fails to cure such breach within ten (10) Business Days after written notice thereof from the Non-Defaulting Party or (ii) breaches any one or more payment obligations hereunder on three (3) or more occasions during the Term after written notice thereof from the Non-Defaulting Party;

(b)   by Seller if Buyer breaches Section 25.13;

(c)   by Buyer if Seller breaches Section 25.13;

(d)   by the Non-Defaulting Party if the Defaulting Party commits or suffers an Act of Insolvency; or

(e)   by either Party if, other than due to a Force Majeure Event, the Defaulting Party is in material breach of its obligations hereunder (other than an obligation described in the other sub-paragraphs of this Section 18.1.1), and the Defaulting Party has failed to cure such breach within thirty (30) days after written notice thereof; provided, however, that such period shall be extended by up to a further sixty (60) days if, and for so long as, the Defaulting Party is diligently pursuing cure thereof.

18.1.2   The rights conferred in this Section 18.1 are in addition to any other rights either Party has under this Agreement.

18.1.3   If a Force Majeure Event claimed by one Party continues for one hundred eighty (180) consecutive days, the Non-Affected Party may terminate this Agreement by giving to the Affected Party three (3) Business Days' written notice of its intention to terminate pursuant to this Section 18.1.3.

18.2   Early Termination Payment.

18.2.1   In case of termination of this Agreement pursuant to Section 18.1, a notice of termination shall be sent by the Non-Defaulting Party specifying the reason for termination and designating a day as an early termination date (an "**Early Termination Date**"). From and after the Early Termination Date, all further performance in respect of all Biomass quantities hereunder shall be released. In case of termination based on Section 18.1.1, after settling

25

any amounts owed for performance rendered prior to the Early Termination Date, the existing duties and obligations of the Parties shall be replaced by the obligation of the Defaulting Party to make a payment (an "*Early Termination Payment*") to the Non-Defaulting Party as calculated in accordance with Section 18.2.2 or Section 18.2.3, as applicable. The Non-Defaulting Party shall calculate the Early Termination Payment and notify the Defaulting Party thereof within ten (10) Business Days after the Early Termination Date, and the Defaulting Party shall, within ten (10) days of receiving such notice, pay to the Non-Defaulting Party an amount equal to the Early Termination Payment.

18.2.2  If Buyer is the Non-Defaulting Party, the Early Termination Payment shall equal the sum of the following:

    (a)    for each Quarter or part thereof of the remaining Term,

        (i)    any positive difference between the Market Price for such Quarter determined by Buyer acting in a commercially reasonable manner and the Base Price for such Quarter; multiplied by

        (ii)    the corresponding unfulfilled portion of the Contract Quantity for each such Quarter or part thereof based upon evenly spread distribution of the Contract Quantity throughout the remaining Term; and

    (b)    all direct losses, costs, damages and expenses (including legal costs, administrative and management costs and any third party payments) suffered or incurred by Buyer as a result of termination and/or entering into any sale and purchase agreements on reasonably similar terms to this Agreement for the unfulfilled quantity for the remainder of the Term after taking into account any gains or savings by Buyer due to mitigating its losses, costs, damages and expenses.

18.2.3  If Seller is the Non-Defaulting Party, the Early Termination Payment shall equal the sum of the following:

    (a)    for each Quarter or part thereof of the remaining Term,

        (i)    any positive difference between the Base Price for such Quarter and the Market Price for such Quarter determined by Seller acting in a commercially reasonable manner; multiplied by

        (ii)    the corresponding unfulfilled portion of the Contract Quantity for each such Quarter or part thereof based upon evenly spread distribution of the Contract Quantity throughout the remaining Term; and

26



(b)    all direct losses, costs, damages and expenses (including legal costs, administrative and management costs and any third party payments) suffered or incurred by Seller as a result of the termination and/or entering into any sale and purchase agreements on reasonably similar terms to this Agreement for the unfulfilled quantity for the remainder of the Term after taking into account any gains or savings by Seller due to mitigating its losses, costs, damages and expenses.

18.2.4  The Parties agree that: (a) it is difficult or impossible to determine with precision the amount of damages that would be incurred by Buyer or Seller resulting from a termination pursuant to this <u>Section 18</u>; and (b) any sums payable under this <u>Section 18</u> because of such a termination are not a penalty and represent a fair, reasonable and genuine pre-estimate of fair compensation for the losses that may reasonably be anticipated from such termination.

18.2.5  Notwithstanding <u>Section 18.2.2</u> and <u>Section 18.2.3</u> above if this Agreement is terminated pursuant to a continuing Force Majeure Event pursuant to <u>Section 18.1.3</u>, no Early Termination Payment will be due by either Party.

## 19.   <u>CONFIDENTIALITY</u>

19.1    The existence of and the terms of this Agreement and information disclosed by or on behalf of either Party to the other Party or its representatives in connection herewith ("***Confidential Information***") shall, during the Term and until the expiration of thirty-six (36) months thereafter, be treated as confidential by each Party and shall not be disclosed to any third party without the prior written consent of the other Party, not to be unreasonably withheld, conditioned or delayed, except that consent shall not be required for disclosure which:

19.1.1  is or hereafter comes into the public domain otherwise than as a result of a breach of this <u>Section 19</u>;

19.1.2  is required to be disclosed by any judicial process, arbitral proceeding, requirement of Applicable Law or pursuant to any Government Entity, or by the regulations of any recognized exchange upon which the share capital of the receiving Party (or any Affiliate of the receiving Party) is or is proposed to be from time to time listed or dealt in, in each case provided that disclosure shall be strictly limited to such requirement;

19.1.3  is furnished to the receiving Party's Affiliates or its or their officers, employees, directors, agents, bona fide proposed assignees or transferees, consultants and/or professional, legal, financial, accounting and tax advisors, in each case to the extent that disclosure is reasonably necessary or desirable for purposes related to this Agreement and provided that the recipient agrees to keep such information confidential on terms no less onerous than those set out in this <u>Section 19</u>;

27



19.1.4 is furnished to the receiving Party's Affiliates or its or their current or prospective banks, financiers or insurers or respective consultants and advisors provided that the recipient agrees to keep such information confidential on terms no less onerous than those set out in this Section 19;

19.1.5 consists of Confidential Information the receiving Party already knew or had, on a non-confidential basis, prior to receipt from or on behalf of the disclosing Party hereunder; or

19.1.6 consists of Confidential Information the receiving Party independently developed or acquired without a breach of this Section 19.

19.2 Notwithstanding the foregoing, Seller is permitted to make a public announcement regarding this Agreement, which may include information about Annual Quantity and Delivery Period.

19.3 Neither Party may terminate this Agreement due to a breach of this Section 19.

## 20.   TAXES

20.1 All export duties, Taxes, dues and levies present or in the future (a) in the country of origin for any Biomass delivered hereunder are for Seller's risk and account and (b) otherwise are for Buyer's risk and account.

## 21.   ASSIGNMENT

21.1 Except as otherwise expressly provided in this Section 21, neither Party may assign, novate or transfer this Agreement or its rights and obligations hereunder, in whole or in part, by operation of law or otherwise, without the prior written consent of the other Party (such consent not to be unreasonably withheld, conditioned or delayed), and any purported assignment, novation or transfer made other than in accordance with this Section 21 shall be null and void. Notwithstanding the foregoing, the following are permitted:

21.1.1 collateral assignment by Seller to the Financing Parties, and further assignment by the Financing Parties following any foreclosure of their security interest in this Agreement, in which case neither Seller nor the Financing Parties shall have any liability with respect to the future performance of this Agreement; and

21.1.2 assignment or transfer by a Party to an Affiliate of such Party or, pursuant to clause (v) below, another entity; provided, however, that, in the case of any such assignment or transfer, the assigning Party shall (a) notify the other Party of the assignment or transfer (and identify the name of, and notice address information for, such transferee) and (b) remain jointly and severally liable for the transferred obligations, unless (and except as hereinafter provided) the assignment or transfer is made to: (i) an Affiliate that is the successor to substantially all assets of such Party, (ii) in the case

28



of Seller, Enviva Inc. or the successor to substantially all assets of Enviva Inc., (iii) in the case of Seller, a direct or indirect wholly-owned subsidiary of Enviva Inc. or of the successor to substantially all assets of Enviva Inc., if the performance of all such subsidiary's obligations under this Agreement is guaranteed by Enviva Inc. or such successor in form and substance reasonably acceptable to Buyer, (iv) any other Affiliate of Buyer or Seller, as applicable, if the performance of all such Affiliate's obligations under this Agreement is guaranteed by the assigning Party, in form and substance reasonably acceptable to the non-assigning Party, or (v) any other entity reasonably satisfactory to the other Party. In each of the foregoing sub-clauses (i) through (v), the transferor shall, from and after the effectiveness of such assignment or transfer, have no liability with respect to the future performance of this Agreement.

## 22.    CHANGE IN LAW

22.1    Illegality. If it becomes illegal as a result of a Change in Law for a Party to perform any or all of its obligations under this Agreement:

22.1.1    the affected Party shall be excused performance (other than performance of payment obligations) for so long and to the extent so prohibited;

22.1.2    the Parties shall meet within fifteen (15) Business Days of notice by either Party to seek to amend this Agreement such that neither Party is prohibited by Applicable Law from performing its obligations under this Agreement, while maintaining the same commercial balance between the Parties as existed immediately prior to such Change in Law; and

22.1.3    the occurrence of any such Change in Law shall not be a basis for either Party to terminate this Agreement.

22.2    Other Change in Law. Notwithstanding anything in this Agreement to the contrary, in the event there is any Change in Law with respect to any jurisdiction other than any jurisdiction where the Biomass originates (which shall include any increase in the costs or changes in rules, procedures or requirements imposed on Seller to comply with any requirements imposed on the Biomass) (each a "*Compliance Change*"), that (i) increases the costs incurred by either Party in performing its obligations under this Agreement or (ii) reduces the commercial value for either Party from the performance of this Agreement, then:

22.2.1    the affected Party shall promptly notify the non-affected Party of such Compliance Change and the Parties shall reasonably collaborate to minimize the impact thereof;

22.2.2    any increase in costs to Buyer, or reduced commercial value to Buyer, of performing its obligations hereunder resulting from such Compliance Change (including in respect of Buyer's obligations to comply with

29



Applicable Law), shall be borne by Buyer, and shall not be reallocated between the Parties;

22.2.3 subject to <u>Section 22.2.4</u>, Seller shall use commercially reasonable endeavours, at Buyer's sole cost and expense, to alter its production, procurement and/or processing of the Biomass in order to comply with the Compliance Change; and

22.2.4 all costs incurred by Seller pursuant to <u>Section 22.2.3</u>, together with any increase in costs to Seller, or reduced commercial value to Seller, of performing its obligations hereunder as a result of such Compliance Change (including in respect of Seller's obligations to comply with Applicable Law), shall be for Buyer's account. Seller may, at its option and effective immediately, either (a) increase the Base Price to allocate all such costs and reduction in value to Buyer or (b) invoice Buyer therefor, in each case from time to time as Seller reasonably determines necessary or appropriate. Seller shall provide reasonable documentation of such costs and reduction in value to Buyer simultaneously with increasing the Base Price or sending such invoice, or as soon thereafter as is practicable. Buyer shall pay Seller for (i) such Base Price increase(s) in accordance with <u>Section 13</u> or (ii) such invoice(s) within ten (10) Business Days following receipt.

## 23.    **GOVERNING LAW AND DISPUTE RESOLUTION**

23.1    <u>Governing Law.</u>

23.1.1 This Agreement and any dispute arising under it shall be governed by, and construed in accordance with, English law without regard to its choice of law rules.

23.1.2 The United Nations Convention on Contracts for International Sale of Goods shall not apply to this Agreement.

23.2    <u>Dispute Resolution.</u>

23.2.1 Any dispute arising out of or in connection with this Agreement, including regarding the existence, validity or termination of this Agreement or the consequences of its nullity (a "*Dispute*"), shall be referred to and finally resolved by arbitration under the International Chamber of Commerce ("*ICC Court*") Arbitration Rules in effect at the time thereof (the "*Rules*"). The seat of the arbitration and the venue of all hearings shall be London, England and the language of the arbitration shall be English.

23.2.2 The number of arbitrators shall be three (3), who shall be appointed by agreement or nomination of the Parties.

23.2.3 At the earliest opportunity, the tribunal shall, in consultation with the Parties, set out a procedural timetable and procedural measures in

30



accordance with the Rules. The tribunal shall render a final award in any arbitration within six (6) months of the appointment of the arbitrators. This time limit may only be extended with the consent of the Parties or by the tribunal for good cause shown, provided that no award shall be invalid even if it is not rendered within the time period herein specified, or not rendered within any extended period.

23.2.4 The arbitral tribunal shall have power to award on a provisional basis any relief that it would have power to grant on a final award. Without prejudice to the powers of an arbitrator provided by the Rules, by statute or otherwise, the arbitral tribunal shall have power at any time, on the basis of written evidence and the submissions of the Parties alone, to make an award in favor of the claimant (or the respondent if a counterclaim) in respect of any claims or counterclaims to which there is no reasonably arguable defense (either substantively or as to the amount of any damages or other sums to be awarded). The Parties hereby agree to exclude any rights to refer points of law or to appeal to the courts to the extent that they can validly waive these rights under Applicable Law.

23.2.5 Nothing in this Section 23.2 shall be construed as preventing either Party from seeking conservatory or similar interim relief in any court of competent jurisdiction.

23.2.6 Any arbitration award shall be enforceable by any court having jurisdiction over the Party and its respective Affiliates against which the award has been rendered, or wherever assets of the Party or their respective Affiliates against which the award has been rendered can be located, and shall be enforceable in accordance with the United Nations Convention on the Reciprocal Enforcement of Arbitral Awards (1958).

## 24. REPRESENTATIONS, WARRANTIES AND COVENANTS

24.1 Each Party represents and warrants to the other, as of the Effective Date, as follows:

24.1.1 it is duly organized and validly existing under the laws of the jurisdiction of its formation and has (or, for Permits not required by Applicable Law for the current stage of operations, reasonably expects to have when required by Applicable Law) all necessary Permits required by Applicable Law to perform its obligations under this Agreement (other than those Permits the failure of which to obtain could not reasonably be expected to have a material adverse effect on its ability to perform its obligations under this Agreement);

24.1.2 it has full power and authority to execute and deliver this Agreement and to perform its obligations hereunder, and the execution, delivery and performance of this Agreement by it have been duly authorized by all necessary action on the part of such Party;

31



24.1.3 this Agreement has been duly executed and delivered by such Party and is the legal, valid and binding obligation of such Party enforceable in accordance with its terms;

24.1.4 the execution, delivery and performance of this Agreement by such Party and the consummation of the transactions contemplated hereby do not and will not contravene the constitutive documents of such Party and do not conflict with or result in a breach of or default under any indenture, mortgage, lease, agreement, instrument, judgment, decree, order or ruling to which such Party is a party or by which it or any of its properties is bound or affected; and

24.1.5 save for the representations and warranties made in this Section 24, it has not entered into this Agreement in reliance on any warranty or representation made by the other Party or its employees or agents.

## 25. MISCELLANEOUS

25.1 Notices. Any notice, request or other communication to be given or made under this Agreement shall be in writing. Any such communication may be delivered by hand, certified or registered mail, facsimile or established courier service to the Party's address specified in Annex B or at such other address as such Party notifies to the other Party from time to time; provided, however, that deliveries may be made by electronic mail to the extent that the receiving Party has provided an e-mail address in Annex B or otherwise in accordance with this Section 25.1. Unless otherwise provided herein, all notices, requests or other communications hereunder shall be effective at the end of Office Hours on the day actually received, if received during Office Hours on a Business Day, and otherwise shall be effective at the close of Office Hours on the first Business Day after the day on which received.

25.2 Cooperation with Financing Efforts. Buyer shall cooperate with Seller's efforts in obtaining and maintaining financing on a non-recourse (or other) basis. Without limiting the generality of the foregoing, Buyer shall execute such documents (including consents, direct agreements, certificates and legal opinions) as Seller or the Financing Parties may reasonably request in connection with Seller's efforts to obtain and maintain such financing.

25.3 Successors and Assigns. This Agreement shall inure to the benefit of, and be binding upon, the successors and permitted assigns of the Parties.

25.4 Amendment. No amendment, supplement or other modification of this Agreement shall be valid unless evidenced in writing and signed by both Parties.

25.5 No Waiver. Either Party's waiver of any breach or failure to enforce any of the terms of this Agreement at any time shall not in any way affect, limit, modify, or waive such Party's right thereafter to enforce or compel strict compliance with every term hereof, any course of dealing or custom of the trade notwithstanding.



25.6 <u>Survival of Termination</u>.  Any provision of this Agreement that contemplates performance subsequent to termination of this Agreement, including, for the avoidance of doubt, Section 23.2, shall survive such termination and continue in full force and effect for the limited purposes set forth therein.

25.7 <u>Non-Recourse</u>.  The Parties' respective obligations hereunder are intended to be the obligations of the respective Parties only and no recourse for any obligation of a Party hereunder, or for any claim based thereon or otherwise in respect thereof, shall be had against any incorporator, shareholder, partner, member, officer or director, or Affiliate, as such, past, present or future of such Party, except if and to the extent expressly agreed.

25.8 <u>Severability</u>.  If any provision of this Agreement is found to be void or unenforceable, such provision shall be deemed to be deleted from this Agreement and the remaining provisions of this Agreement shall continue to have full force and effect. The Parties shall, in such event, negotiate in good faith to seek to agree to a mutually satisfactory valid and enforceable substitute provision implementing to the fullest extent possible the intentions of the Parties at the Effective Date.

25.9 <u>Entire Agreement</u>.  This Agreement constitutes the entire agreement of the Parties with respect to the subject matter hereof and, except as herein stated and in the instruments and documents to be executed and delivered pursuant hereto, contains all of the representations, undertakings and agreements of the Parties in respect of the subject matter hereof. This Agreement supersedes all prior meetings, correspondence, and negotiations between the Parties. There are no representations, warranties, covenants, agreements or collateral understandings, oral or otherwise (express or implied) of any kind between the Parties in respect of the subject matter hereof, except as contained herein. Without limiting the foregoing, warranties of merchantability and fitness for a particular purpose are expressly disclaimed and waived.

25.10 <u>Rights and Remedies Not Exhaustive</u>.  Subject to <u>Section 15.6</u>, and except as otherwise expressly set forth herein, any rights or remedies conferred on either Party under this Agreement shall be in addition to rights and remedies such Party would otherwise have at law or in equity.

25.11 <u>Third Parties</u>.  A Person who is not a party to this Agreement shall not have any rights under the Contracts (Rights of Third Parties) Act 1999 to enforce any term of this Agreement.

25.12 <u>Counterparts; Electronic Signatures</u>.  This Agreement may be executed in counterparts, each of which shall be considered an original, but all of which shall together constitute one and the same instrument. Any executed counterpart may be delivered in portable document format (.pdf) or by other electronic means and, when so delivered, shall be legally enforceable in accordance with its terms.

25.13 <u>Anti-Bribery, Corruption and Counterparty Integrity; Sanctions</u>.



25.13.1 Each Party represents, warrants and covenants to the other Party that (a) it shall take no action in relation to this Agreement that would be in violation of, or would subject the other Party to any liability for, or penalty under, the applicable anti-corruption laws and regulations of any country, including the United States of America, in connection with any business venture or contract in which the other Party is a participant; and (b) no payments of money or anything of value shall be offered, promised or paid, directly or indirectly, to any Government Official to influence the acts of such a Government Official, to induce the Government Official to use his or her influence with a government or an instrumentality thereof, or to obtain an improper advantage in connection with any business venture or contract in which the other Party is a participant. Each Party shall provide the other Party with such further assurances or certificates that the other Party may request from time to time during the term of this Agreement relating to its compliance with this paragraph. For purposes of this paragraph, "*Government Official*" means any (i) elected or appointed official of a national, regional, provincial, state or local government body, department or agency, whether in the executive, legislative, administrative or judicial branches of government; (ii) government employee or other Person acting under a delegation of authority from a government to carry out government responsibilities; (iii) political party, party official or candidate for political office; (iv) official or employee of a public international organization such as the World Bank or United Nations, or any department or agency of these types of organizations; (v) official, representative or employee of a company that is under even partial ownership or control by a government, including employees of state-owned companies and instrumentalities (e.g., employees of state-owned utility companies), even if the companies are operated like privately-owned corporations; (vi) members of a royal family; and (vii) close relatives of any Government Official (such as spouses, dependents or immediate family).

25.13.2 Each Party acknowledges that any Biomass supplied by Seller to Buyer pursuant to this Agreement is subject to the requirements of U.S. export controls laws and regulations, including the Export Administration Regulations. Each Party agrees that it will comply with all applicable export control and trade sanctions laws and regulations, and Buyer will not supply or export, directly or indirectly, any Biomass provided hereunder to any other party that is restricted under export controls, for any prohibited end use, or to any country to which the U.S. Government at the time of export requires an export license or other governmental approval, without first obtaining the written consent to do so from Seller and the Department of Commerce or other agency of the U.S. Government when required by an applicable statute or regulation. Buyer will not supply, directly or indirectly any Biomass, or request Seller to direct delivery of any Biomass, to any party that is the target of sanctions imposed by the U.S. government, the United Kingdom, or the European Union, or that is in a destination that is the subject of an embargo imposed by the U.S. government, including Cuba,

34

Iran, North Korea, Syria, and the Crimea region of Ukraine, except in accordance with US sanctions laws and regulations and other Applicable Law. Each Party may terminate, cancel or otherwise be excused from performing any obligations it may have under this Agreement if (a) the other Party engages in any conduct related to this Agreement that leads to a violation of applicable export controls or trade sanctions laws or regulations, or (b) notwithstanding anything to the contrary in Section 22.1, the Applicable Law related to export controls or trade sanctions changes, thereby making it impermissible for Seller to supply the Biomass.

[*Remainder of Page Intentionally Left Blank*]

35

**IN WITNESS WHEREOF**, the Parties have executed this Agreement as of the Effective Date.

Buyer:

BAYWA AG

By: _____

Name:

Title:  Leiter GE
        Holzpellets

Seller:

ENVIVA INC.

By: _____

Name:  THOMAS META

Title:  PRESIDENT

**ANNEX A**

**SPECIAL TERMS**

| | | |
|---|---|---|
| 1. | **Specifications:** | See Schedule 1 hereto. In addition, Seller shall provide (i) valid EnPlus A1 claims and (ii) valid PEFC Controlled Sources claims for the Biomass. |
| 2. | **Annual Quantity:** | With respect to the first Contract Year, Base Annual Quantity of ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮<br><br>With respect to the second Contract Year, Base Annual Quantity of ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮<br><br>With respect to each of the subsequent Contract Years, Base Annual Quantity of ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ |
| 3. | **Load Port:** | Seller's option. For the avoidance of doubt, Seller may elect to load Biomass onto a Vessel at more than one Load Port. |
| 4. | **Discharge Port:** | ARA, to be nominated by Buyer no later than the completion of loading, or other ports as nominated by Buyer pursuant to the succeeding paragraph with appropriate adjustments to the Shipment Price for change in freight costs determined pursuant to the succeeding paragraph ("*Discharge Port Adjustment*").<br><br>Buyer may, with written notice given not less than five (5) days prior to the commencement of loading for a Shipment, request Seller to send the Shipment to any other port, subject to such other port being able to accommodate any Vessel that satisfies the Vessel Requirements. Upon such request, Seller shall notify Buyer of the documented reasonable costs, if any, that will be payable by Buyer to Seller as compensation for Seller's compliance with such request, and Buyer shall within one (1) Business Day thereafter notify Seller whether Seller shall proceed to send the Shipment to such other port, in which case Seller shall send the Shipment to such other port, with all documented reasonable costs associated with the change of Discharge Port payable by Buyer. |
| 5. | **Discharge Rate:** | ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ |
| 6. | **Base Price:** | With respect to the first Contract Year: ▮▮▮▮▮▮<br><br>With respect to the second Contract Year: ▮▮▮▮▮▮<br><br>Commencing on the third Contract Year and for all subsequent Contract Years: the average of the Argus CIF Northwest Europe |

ANNEX A-1



| | | |
|---|---|---|
| | | (NWE) Wood Pellets within 90 days (spot) Week index prices for the four (4) weeks immediately preceding the date on which the bill of lading of such Shipment is issued ▮ |
| 7. | **Bunker Fuel Adjustment:** | The Shipment Price for each Shipment shall be adjusted by the sum of the Basic Bunker Fuel Adjustment and Regulatory Bunker Fuel Adjustment, as respectively defined below. |
| 8. | **Basic Bunker Fuel Adjustment:** | The sum of: <br><br> ███████████████████████ |
| 9. | **Regulatory Bunker Fuel Adjustment:** | If any Government Entity requires changes impacting the cost of energy for marine transportation of Biomass and such changes are not covered by the Basic Bunker Fuel Adjustment, the costs of such changes for each Shipment shall be calculated on an open book basis and passed through to Buyer such that the same/original time charter equivalent is obtained. Such changes include, but are not limited to:<br><br>(i) any convention, law, regulation or custom (whether or not in force at the date of the Agreement) that prohibits or restricts a Vessel from burning certain types of fuel (including Marine Fuel 0.5% Bunker, marine diesel oil, or Marine Gasoil 0.1%), or requires a Vessel burning any such fuel to proceed only at reduced speed;<br><br>(ii) any tax, charge, fine or similar provision that applies to the purchase, burning or emissions created by such fuel; and<br><br>(iii) any emissions trading or similar scheme under which allowances or credits are used, purchased or traded.<br><br>Notwithstanding the foregoing, if any convention, law, regulation, custom (whether or not in force at the date of this |



ANNEX A-2



| | |
|---|---|
| | Agreement) or fuel availability prohibits or restricts a Vessel from burning Marine Fuel 0.5% Bunker or Marine Gasoil 0.1%, the Parties agree that the Basic Bunker Fuel Adjustment definition will be adjusted to refer to the type(s) of fuel reasonably expected by Seller to be burned by Vessels, and the Parties shall collaborate to amend this Agreement to adjust the Basic Bunker Fuel Adjustment definition accordingly.<br><br>Notwithstanding the foregoing, should any changes giving rise to a Regulatory Bunker Fuel Adjustment impact the factors used in calculating the Basic Bunker Fuel Adjustment, to the extent that any factors for the Basic Bunker Fuel Adjustment are rendered inapplicable by such changes, Seller shall adjust such factors on an open-book basis so that the same/original time charter equivalent is obtained and the cost of the changes is passed through to Buyer (but, for the avoidance of doubt, without duplication or overlap with any related costs already passed through to Buyer). |
| **10.  Payment Currency:** | All amounts payable under this Agreement shall be denominated and payable in USD. |
| **11.  Shipment Size:** | ███████████████████████████████████████<br><br>The weight of a Shipment may exceed the upper tolerance of the Shipment Size where the excess weight is due to the actual stowage factor for such Shipment being less than the Base Stow Factor, subject to the approval of Buyer (not to be unreasonably withheld, delayed or conditioned). |
| **12.  Delivery Schedule:** | The Shipment for the first Contract Year will have and a firm 20-day arrival window at Discharge Port (the "*Arrival Window*") that falls after October 1, 2022. Seller shall notify Buyer of the Arrival Window no later than thirty (30) days prior to the beginning of such Arrival Window.<br><br>Starting from the second Contract Year, Seller shall notify Buyer of the Arrival Window for each Shipment no later than sixty (60) days prior to the beginning of the applicable Arrival Window; provided that with respect to each Contract Year, the Arrival Windows shall be fairly evenly spread through each Contract Year.<br><br>Subject to Buyer's consent (not to be unreasonably withheld, conditioned or delayed) Seller may adjust the Arrival Window by |

ANNEX A-3



|  | giving the Buyer no less than 30 days' notice in advance of commencement of such Arrival Window. |
|---|---|
| **13. Delivery Period:** | From October 1, 2022 (the "*Commencement Date*") through and including December 31, 2026 (the "*Expiry Date*").<br><br>Each "*Contract Year*" is a calendar year; except for the first Contract Year, which shall commence on the Commencement Date and continue through December 31, 2022. |

ANNEX A-4

*Schedule 1 to Annex A*

## Specifications

| PARAMETERS AND REJECTION LIMITS | Units | Standard* | Limit / Tolerance | | Performed by |
|---|---|---|---|---|---|
| Sampling & Sample Prep | | ISO 18135 or ISO 14780 | Limit | Tolerance | Insp |
| Additives & Binders | %wt, ar | | ≤ 2% | | Sellers Declaration |
| **Bulk Physical Parameters** | | | | | |
| Fines ≤ 3.15 mm | %wt, ar | ISO 18846 | ≤5 | 0 | Insp |
| Diameter | mm | ISO 17829 | ≤ 6 | 1 | Lab |
| Pellets < 50mm in Length | %wt, ar | ISO 17829 | > 99,9 | 0 | Lab |
| Pellets < 40mm in Length | %wt, ar | ISO 17829 | > 99,0 | 0 | Lab |
| Bulk Density | kg/m3 | ISO 17828 | 600 to 750 | 0 | Lab |
| Durability | %wt, ar | ISO17831-1 | > 98,0 | 0 | Lab |
| **Proximate Analysis, arb** | | | | | |
| Total Moisture | % wt, ar | ISO 18134 | ≤10,0 | 0 | Lab |
| NCV (at const. pressure) | GJ/mt, ar | ISO 18125 | ≥16,5 | 0 | Lab |
| Ash | % wt, db | ISO 18122 | ≤0,7 | 0 | Lab |
| Ash Fusion Deformation (oxidising) | deg C | ISO 21404 | > 1200 | 0 | Lab |
| **Ultimate Analysis, arb** | | | | | |
| Nitrogen | %wt, db | ISO 16948 | ≤0,30% | 0,00% | Lab |
| Sulfur | %wt, db | ISO 16994 | ≤0,04% | 0,00% | Lab |
| Chlorine | %wt, db | ISO 16994 | ≤0,02% | 0,00% | Lab |
| **Major and Minor Metals** | | | | | |
| As | mg/kg, db | ISO 16968 | ≤1 | 0 | Lab |
| Cd | mg/kg, db | ISO 16968 | ≤0,5 | 0 | Lab |
| Cr | mg/kg, db | ISO 16968 | ≤10 | 0 | Lab |
| Cu | mg/kg, db | ISO 16968 | ≤10 | 0 | Lab |
| Pb | mg/kg, db | ISO 16968 | ≤10 | 0 | Lab |
| Hg | mg/kg, db | ISO 16968 | ≤0,1 | 0 | Lab |
| Ni | mg/kg, db | ISO 16968 | ≤10 | 0 | Lab |
| Zn | mg/kg, db | ISO 16968 | ≤100 | 0 | Lab |

Performed by:

    (a)  Lab: analyses will be performed by the Independent Laboratory

    (b)  Insp: test will be performed by the Independent Inspection Company;

    (c)  Insp & Lab: means a field test will be performed by the Independent Inspection Company and the final value will be analyzed by the Independent Laboratory.

\* If the "Standard" column includes more than one standard, the applicable standard shall be based on Seller's declaration, or if not declared by Seller, reasonably determined by the Independent Laboratory or the Independent Inspection Company, as applicable.



**ANNEX B**

**ADDRESSES FOR NOTICES**

| Seller: | |
|---|---|
| | Invoices:<br>7272 Wisconsin Ave., Suite 1800<br>Bethesda, MD 20814 USA<br>Attention: Accounts Payable<br>Phone: +1 240 482 3837<br>E-mail: Enviva_Invoicing@envivabiomass.com<br><br>Notices:<br>7272 Wisconsin Ave., Suite 1800<br>Bethesda, MD 20814 USA<br>Attention: Thomas Meth<br>President<br>Phone: +1 301 657 5560<br>E-mail:Thomas.Meth@envivaboimass.com<br><br>With a copy to:<br>87272 Wisconsin Ave., Suite 100<br>Bethesda, MD 20814 USA<br>Attention: William H. Schmidt, Jr.<br>Executive Vice President, Chief Development Officer, and General Counsel<br>Phone: +1 240 482 3840<br>E-mail: William.Schmidt@envivabiomass.com |
| **Buyer:** | |
| | Invoices :<br>BayWa AG<br>Energie<br>Arabellastr. 4<br>81925 München / Germany<br>E-mail: Rechnungseingang.Energie@baywa.de<br><br><br>Shipment:<br>Dr. Roland Braun<br>Leiter Logistik Holzpellets<br>BayWa AG<br>Energie<br>Arabellastr. 4<br>81925 München / Germany<br>Phone: +49 89 9222 - 2029<br>E-Mail: roland.braun@baywa.de |

ANNEX B-1



| | Notice:<br>Emil Sopper<br>BayWa AG<br>Energie<br>Arabellastr. 4<br>81925 München / Germany<br>Phone: +49 89 92223259<br>E-Mail: emil.sopper@baywa.de<br><br>Notice:<br>Christian Zimmermann<br>Leiter Einkauf<br>Geschäftseinheit Holzpellets<br>BayWa AG<br>Energie<br>Arabellastraße 4<br>81925 München / Germany<br>Phone: +49 89 9222 2543<br>E-Mail: christian.zimmermann@baywa.de |
| --- | --- |

ANNEX B-1