**UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND**

| | |
|---|---|
| **ANDREW DAVIS**, et al., | **Case No. 8:23-CV-02474-MJM** |
| Plaintiffs, | |
| v. | |
| **JOHN K. KEPPLER,** et al., | |
| Defendants. | |

**DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**

**TABLE OF CONTENTS**

**Page**

I.      PRELIMINARY STATEMENT ................................................................................ 1

II.     FACTUAL BACKGROUND................................................................................... 4

        A.      Enviva's Business Model................................................................................ 5

        B.      Enviva's Stock Market Declines in 2023........................................................ 5

        C.      Enviva Files for Bankruptcy .......................................................................... 6

III.    LEGAL STANDARD............................................................................................. 6

IV.     ARGUMENT ......................................................................................................... 8

        A.      Plaintiffs' Section 10(b) claim fails because Plaintiffs failed to allege an
                actionably misleading statement. ................................................................... 8

                1.      Category A: Statements regarding inflationary pressures and facility
                        capacity (Statements 1–4 (¶¶ 102, 105, 121, 154)).............................. 8

                2.      Category B: Statements regarding dislocation transactions in general
                        (Statements 5–9 (¶¶ 98, 100, 119, 140, 144)). .................................... 10

                3.      Category C: Statements about particular market dislocation transactions
                        (Statements 10–22 (¶¶ 123, 126, 128, 130, 148, 172, 174)). ............. 11

                4.      Category D: Vague positivity about Enviva's recent results and future
                        prospects (Statements 17–22 (¶¶ 111, 114, 132, 134, 137, 146))....... 14

                5.      Category E: Statements about Enviva's dividend and liquidity
                        (Statements 23–27 (¶¶ 108, 142, 150, 152, 177)). ............................. 16

                6.      Category F: Forward-looking projections about Enviva's financial
                        performance (Statements 28–32 (¶¶ 95, 116, 180, 182, 184))........... 18

                7.      Category G: SOX Certifications (Statement 33–34 (¶¶ 171, 176)). ... 21

        B.      Plaintiffs fail to satisfy the PSLRA's high standards for pleading scienter............... 22

                1.      The Complaint does not plead particularized facts establishing that any
                        Defendant made any statement with scienter....................................... 23

                        a.      The Complaint all but ignores Defendants Keppler and Johnson in
                                its attempts to allege scienter. ................................................. 23

                        b.      The Complaint does not plead particularized facts establishing that
                                Defendant Even made any statements with scienter................... 25

                        c.      The Complaint does not plead particularized facts establishing that
                                Defendant Meth made any statements with scienter................... 25

                2.      The Complaint's remaining scienter allegations fall far short of alleging
                        an intent to defraud with particularity............................................... 26

V.      CONCLUSION...................................................................................................... 30

i

# TABLE OF AUTHORITIES

**Cases**

*Acito v. IMCERA Grp., Inc.*,
47 F.3d 47 (2d Cir. 1995) ................................................................................................ 27

*Amalgamated Bank as Tr. for LongView Collective Inv. Funds v. Maximus, Inc.*,
771 F. App'x 238 (4th Cir. 2019) .................................................................................... 7

*Anderson v. StoneMor Partners, L.P.*,
296 F. Supp. 3d 693 (E.D. Pa. 2017) ............................................................................. 21

*Andropolis v. Red Robin Gourmet Burgers, Inc.*,
505 F. Supp. 2d 662 (D. Colo. 2007) ............................................................................. 29

*Ash v. PowerSecure Int'l, Inc.*,
2015 WL 5444741 (E.D.N.C. Sept. 15, 2015) ............................................................... 28

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ......................................................................................................... 6

*Boykin v. K12, Inc.*,
54 F.4th 175 (4th Cir. 2022) ...................................................................................... 7, 20

*Dice v. Channeladvisor Corp.*,
671 F. App'x 111 (4th Cir. 2016) .................................................................................... 8

*Dura Pharm., Inc. v. Broudo*,
544 U.S. 336 (2005) ......................................................................................................... 1

*Emps.' Ret. Sys. of the City of Baton Rouge & Par. of E. Baton Rouge v. MacroGenics, Inc.*,
61 F.4th 369 (4th Cir. 2023) .................................................................................... passim

*Fanucchi v. Enviva Inc.*,
2024 WL 3302564 (D. Md. July 3, 2024) ............................................................... 10, 23

*Fire & Police Pension Ass'n of Colo. v. Abiomed, Inc.*,
778 F.3d 228 (1st Cir. 2015) .......................................................................................... 28

*Hillson Partners Ltd. P'ship v. Adage Inc.*,
42 F.3d 204 (4th Cir. 1994) ........................................................................................... 17

*In re Acterna Corp. Sec. Litig.*,
378 F. Supp. 2d 561 (D. Md. 2005) .......................................................................... 22, 27

*In re Alamosa Holdings, Inc.*,
382 F. Supp. 2d 832 (N.D. Tex. 2005) ........................................................................... 29

*In re Criimi Mae, Inc.*,
94 F. Supp. 2d 652 (D. Md. 2000) .......................................................................... 24, 29

*In re Cryomedical Scis., Inc. Sec. Litig.*,
884 F. Supp. 1001 (D. Md. 1995) ................................................................................... 22

*In re First Union Corp. Sec. Litig.*,
128 F. Supp. 2d 871 (W.D.N.C. 2001) ........................................................................... 28

*In re Genworth Fin. Inc. Sec. Litig.*,
  103 F. Supp. 3d 759 (E.D. Va. 2015) ................................................................... 7

*In re Hertz Glob. Holdings Inc.*,
  905 F.3d 106 (3d Cir. 2018) ................................................................................ 29

*In re Hum. Genome Scis. Inc. Sec. Litig.*,
  933 F. Supp. 2d 751 (D. Md. 2013).................................................................... 7

*In re Humphrey Hospitality Trust, Inc. Securities Litigation*,
  219 F. Supp. 2d 675 (D. Md. 2002).............................................................. 17, 18

*In re LifeLock, Inc. Sec. Litig.*,
  690 F. App'x 947 (9th Cir. 2017) ........................................................................ 7

*In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*,
  543 F. Supp. 3d 96 (D. Md. 2021), *aff'd* 31 F.3d 898 (4th Cir. 2022) .............. 11, 21

*In re PEC Solutions Sec. Litig.*,
  2004 WL 1854202 (E.D.Va. May 25, 2004) ...................................................... 28

*In re Pfizer, Inc. Sec. Litig.*,
  538 F. Supp. 2d 621 (S.D.N.Y. 2008) ............................................................... 25

*In re Plains All Am. Pipeline, LP Sec. Litig.*,
  245 F. Supp. 3d 870 (S.D. Tex. 2017) ......................................................... 10, 22

*In re Plug Power, Inc. Sec. Litig.*,
  2022 WL 4631892 (S.D.N.Y. Sept. 29, 2022)................................................... 28

*In re Sinclair Broad. Grp., Inc. Sec. Litig.*,
  2020 WL 571724 (D. Md. Feb. 4, 2020) ..................................................... 10, 13

*In re Triangle Capital Corp. Sec. Litig.*,
  988 F.3d 743 (4th Cir. 2021) ..................................................................... 7, 9, 29

*In re Under Armour Sec. Litig.*,
  342 F. Supp. 3d 658 (D. Md. 2018)..................................................................... 9

*In re Under Armour Sec. Litig.*,
  409 F. Supp. 3d 446 (D. Md. 2019).............................................................. 2, 7

*In re Veon Ltd. Sec. Litig.*,
  2018 WL 4168958 (S.D.N.Y. Aug. 30, 2018).................................................... 21

*Iron Workers Local 16 Pension Fund v. Hilb Rogal & Hobbs Co.*,
  432 F. Supp. 2d 571 (E.D. Va. 2006) ................................................................ 22

*Janies v. Cempra, Inc.*,
  816 F. App'x 747 (4th Cir. 2020) ................................................................... 7, 22

*Janus Cap. Grp., Inc. v. First Derivative Traders*,
  564 U.S. 135 (2011)........................................................................................... 7

*KBC Asset Mgmt. NV v. DXC Tech. Co.*,
  19 F.4th 601 (4th Cir. 2021) ................................................................... 7, 27, 30

*Lerner v. Nw. Biotherapeutics*,
 273 F. Supp. 3d 573 (D. Md. 2017) ................................................................. 24, 28

*Longman v. Food Lion, Inc.*,
 197 F.3d 675 (4th Cir. 1999) ...................................................................................... 15

*Lorusso v. Boulder Brands, Inc.*,
 2017 WL 4365180 (D. Colo. Mar. 1, 2017) ............................................................. 21

*Maguire Fin., LP v. PowerSecure Int'l*, Inc.,
 876 F.3d 541 (4th Cir. 2017) ................................................................................. 8, 23

*Marsh Grp. v. Prime Retail, Inc.*,
 46 F. App'x 140 (4th Cir. 2002) ......................................................................... 16, 17

*Matrixx Initiatives, Inc. v. Siracuasano*,
 563 U.S. 27 (2011) ....................................................................................................... 19

*McDonald v. Kinder-Morgan, Inc.*,
 287 F.3d 992 (10th Cir. 2002) ..................................................................................... 9

*Miller v. Premier Corp.*,
 608 F.2d 973 (4th Cir. 1979) ...................................................................................... 17

*Nat'l Elevator Indus. Pension Fund v. Conagra Brands, Inc.*,
 2022 WL 1449184 (7th Cir. May 9, 2022) .......................................................... 11, 28

*Okla. Firefighters Pension & Ret. Sys. v. K12, Inc.*,
 66 F. Supp. 3d 711 (E.D. Va. 2014) .......................................................................... 10

*Phillips v. LCI Int'l, Inc.*,
 190 F.3d 609 (4th Cir. 1999) ................................................................. 20, 24, 25, 27

*Pipefitters Local No. 636 Defined Ben. Plan v. Tekelec*,
 2013 WL 1192004 (E.D.N.C. March 22, 2013) ................................................... 2, 18

*Plumbers & Pipefitters Local Union 719 Pension Fund v. Zimmer Holdings, Inc.*,
 679 F.3d 952 (7th Cir. 2012) ...................................................................................... 27

*Proter v. Medifast, Inc.*,
 2013 WL 1316034 (D. Md. Mar. 28, 2013) .............................................................. 28

*R2 Invs. LDC v. Phillips*,
 401 F.3d 638 (5th Cir. 2005) ...................................................................................... 13

*Raab v. Gen. Physics Corp.*,
 4 F.3d 286 (4th Cir. 1993) .................................................................................. passim

*Ronconi v. Larkin*,
 253 F.3d 423 (9th Cir. 2001) ...................................................................................... 19

*S.E.C. v. Espuelas*,
 579 F. Supp. 2d 461 (S.D.N.Y. 2008) ....................................................................... 29

*San Antonio Fire & Police Pension Fund v. Syneos Health Inc.*,
 75 F.4th 232 (4th Cir. 2023) ............................................................................... passim

*San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos.*,
   75 F.3d 801 (2d Cir. 1996) ................................................................................ 28

*Santa Fe Industries Inc. v. Green*,
   430 U.S. 462 (1977) .......................................................................................... 1

*Shah v. GenVec, Inc.*,
   2013 WL 5348133 (D. Md. Sept. 20, 2013) ........................................................ 7

*Smallen v. The Western Union Co.*,
   950 F.3d 1297 (10th Cir. 2020) ........................................................................ 28

*Smith v. Circuit City Stores, Inc.*,
   286 F. Supp. 2d 707 (E.D. Va. 2003) ................................................................ 23

*Teachers' Ret. Sys. of La. v. Hunter*,
   477 F.3d 162 (4th Cir. 2007) ......................................................................... 1, 7

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007) ................................................................................... 22, 30

*Tuchman v. DSC Commc'ns Corp.*,
   14 F.3d 1061 (5th Cir. 1994) ........................................................................... 27

*U.S. ex rel. Wilson v. Kellogg Brown & Root, Inc.*,
   525 F.3d 370 (4th Cir. 2008) ............................................................................. 6

*Xia Bi v. McAuliffe*,
   927 F.3d 177 (4th Cir. 2019), *as amended* (July 9, 2019) .................................... 8

*Yates v. Mun. Mortg. & Equity, LLC*,
   744 F.3d 874 (4th Cir. 2014) ........................................................... 8, 24, 29, 30

**Statutes**

15 U.S.C. § 77k .................................................................................................. 8

15 U.S.C. § 78u-5(c)(1) ................................................................................. 7, 20

**Rules**

Fed. R. Civ. P. 9(b) ....................................................................................... 2, 7

**Regulations**

17 C.F.R. § 240.10b-5 ................................................................................... 8, 15

17 C.F.R. §§ 240.13a-14 .................................................................................. 21

17 C.F.R. §§ 240.15d-14 .................................................................................. 21

## I.   PRELIMINARY STATEMENT

This is a securities fraud lawsuit in which Plaintiffs, former investors in Enviva Inc., seek to hold several of the Company's former officers liable for declines in the price of Enviva stock suffered in May and November 2023.  Enviva manufactures and sells wood pellets to utilities for use in the generation of heat and electricity.  Enviva also has a long history of purchasing wood pellets for resale to customers when demand exceeds Enviva's production capacity.  This case focuses on a series of such transactions entered into in the fourth quarter of 2022.  At that time, Enviva and a longtime European trading partner reached an agreement for Enviva to both sell the partner wood pellets in late 2022 and also purchase wood pellets from the partner in 2023, 2024, and 2025.  If, as Enviva believed would occur at the time, world demand for wood pellets had continued to outstrip supply and drive market prices higher during those future periods, Enviva would have profited significantly from the arrangement.  In fact, however, that viewpoint proved wrong.  Market prices for wood pellets fell in the first half of 2023 and, unlike in prior years, failed to recover in the second half of 2023.  As a result, the 4Q 2022 agreements threatened Enviva with substantial losses.  Following the announcement of this news and other disappointing financial results, Enviva's stock price declined and Enviva eventually filed for bankruptcy protection.

Plaintiffs now seek to recover for these stock market losses.  But the federal securities laws do not provide investors with "broad insurance against market losses."  *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 345 (2005).  As the Supreme Court has long made clear, the federal securities laws were not intended to provide a remedy for incorrect business judgment or even "instances of corporate mismanagement." *Santa Fe Indus. Inc. v. Green*, 430 U.S. 462, 474–79 (1977).  Nor do courts permit pleading "fraud by hindsight"—claiming that because later events turned out unfavorably, any earlier, rosier statements must have been fraudulent. *Teachers' Ret. Sys. of La. v. Hunter*, 477 F.3d 162, 183 (4th Cir. 2007).  But this is precisely what Plaintiffs

1

attempt in this case: to reverse engineer a securities fraud claim out of disappointing corporate results. Such an effort does not suffice to survive the pleadings stage.

Instead, to survive dismissal, a plaintiff must allege with particularity—in accordance with the heightened pleading requirements of Rule 9(b) and the Private Securities Litigation Reform Act ("PSLRA")—that a corporate officer made materially false statements with the intent to deceive investors at the time they were made. These heightened pleading requirements impose "no small burden" on securities plaintiffs. *In re Under Armour Sec. Litig.*, 409 F. Supp. 3d 446, 458 (D. Md. 2019). Plaintiffs fail to carry this burden here for two main reasons.

*First*, Plaintiffs have failed to adequately allege a single actionably misleading statement. In fact, the Complaint does not dispute the accuracy of most of the statements that it puts at issue. Instead, Plaintiffs complain that Defendants did not couple these (undisputedly accurate) statements of fact with speculative predictions about how Enviva would fare financially under the 4Q 2022 agreements. But to allege a securities fraud claim, it does not suffice to contend that a disclosure could have contained additional details—much less that it could have been coupled with conjecture about potential future results. Rather, to sufficiently allege a material misstatement, a plaintiff must identify particular and material facts that cannot be squared with the statement. For the litany of statements of (uncontested) fact that they seek to put at issue, this is a burden that Plaintiffs cannot meet.

The remaining statements largely consist of general optimism about Enviva's business and future growth prospects. Under longstanding Fourth Circuit precedent, however, "future business predictions must constitute 'specific guarantees' to be material for the purposes of securities fraud." *Pipefitters Local No. 636 Defined Ben. Plan v. Tekelec*, 2013 WL 1192004, at *8 (E.D.N.C. March 22, 2013) (quoting *Raab v. Gen. Physics Corp.*, 4 F.3d 286, 289 (4th Cir. 1993)).

2

Here, far from being "specific guarantees," the statements Plaintiffs identify are substantively identical to statements that the Fourth Circuit has repeatedly found immaterial and inactionable as a matter of law. Plaintiffs' claims based upon such statements must be dismissed here.

*Second*, even if Plaintiffs had alleged a materially misleading statement, they fail to meet the PSLRA's high standard for alleging that Defendants acted with an intent to defraud investors. Indeed, the Complaint is uniquely deficient in this respect. Most securities fraud plaintiffs seek to meet the PSLRA's scienter requirements by identifying an internal report presented to the defendants at odds with their public statements, or a former employee that can identify particular information presented to the defendants that contradicts their public statements. Here, despite having conducted the extensive due diligence referenced in their Complaint and having prepared three separate complaints over the past year, Plaintiffs have done none of that.[1] Instead, as to each Defendant, they seek to allege scienter based on speculation and pleading tropes that Fourth Circuit courts have consistently rejected. These attempts come nowhere close to meeting the PSLRA's high bar for pleading scienter with regard to each individual defendant:

- **Michael A. Johnson**. Far from alleging that Defendant Johnson spoke with scienter, the Complaint fails to even allege that Johnson was the speaker for any of the statements at issue. Instead, the Complaint seeks to attribute two statements to Johnson based on his signing of Enviva's 2022 SEC Form 10-K. ¶¶ 119, 121. But these statements merely acknowledge uncontested facts. *See id.* Plaintiffs do not— and could not possibly—allege facts sufficient to show that Johnson intended to deceive investors by signing a Form 10-K with these uncontroversial observations. In fact, the Complaint almost entirely ignores Johnson in its scienter section. It seeks to base its allegation of scienter solely upon the fact that Johnson had an executive position at Enviva. But it is well-established in the Fourth Circuit that such "positional scienter" allegations do not suffice.

- **John K. Keppler**. Plaintiffs' attempt to plead scienter as to Defendant Keppler fails for similar reasons. As with Defendant Johnson, Plaintiffs' attempt to impute scienter to Keppler based on his executive position at Enviva fails as a matter of law. Perhaps aware of this deficiency, Plaintiffs also point to Keppler's sale of a

---

[1] Plaintiffs cite to statements of four former employees, but none of them allege any specific interactions with the individual Defendants.

fraction of his Enviva stock holdings in late 2022, in an attempt to suggest that he had a motive to defraud investors. In fact, however, that sale was part of a series of transactions that arose in connection with Keppler's stepping down from Enviva's CEO position in November 2022 to focus on a heart condition. In connection with his departure, Keppler received over 240,000 shares of Enviva stock, 200,000 of which he sold to another Enviva director. In other words, Keppler's net exposure to declines in Enviva stock (and those of other Enviva insiders) **increased** during the proposed Class Period. Plaintiffs have thus failed to allege that Keppler (or any Defendant) had a financial incentive to defraud investors—a fact that, under recent Fourth Circuit law "'weighs heavily' against [plaintiffs] in the scienter analysis." *San Antonio Fire & Police Pension Fund v. Syneos Health Inc.*, 75 F.4th 232, 242 (4th Cir. 2023).

- **Shai S. Even**. Plaintiffs make similar arguments against Defendant Even, arguing that his executive position and signature on SEC filings shows his intent to defraud. These arguments fare no better as to Even than they do as to the other Defendants. Plaintiffs are thus left to speculate that Even must have intended to defraud investors because he disclosed details about the 4Q 2022 agreements to investors early in the proposed Class Period. But this is simply a non sequitur. Plaintiffs cannot allege with particularity that Even knew information contrary to his public statements merely from the fact that he made other (undisputedly accurate) disclosures to investors. Indeed, if anything, the making of such disclosures suggests an intent to inform—not defraud—investors.

- **Thomas Meth**. As to Defendant Meth, beyond the failed allegations Plaintiffs make against all Defendants, the Complaint relies on an allegation that Meth was "responsible for and involved in Enviva's contract negotiations." ¶ 211. But as the Fourth Circuit recently confirmed, alleged involvement in a contested program does not suffice to allege scienter. *Syneos*, 75 F.4th at 242. After all, such involvement does not show that a defendant "learned any specific information" at all—let alone that he learned information at odds with his public statements. *Id.*

In short, Plaintiffs have no well-pled allegations that any Defendant made any statement with an intent to defraud. The Complaint should be dismissed with prejudice.

## II.    FACTUAL BACKGROUND

Enviva Inc. ("Enviva" or the "Company") is a Delaware corporation with its headquarters in Bethesda, Maryland. *See* Second Amended Complaint (ECF 48) (the "Complaint") at ¶ 21.[2]

Defendant John K. Keppler served as Enviva's Chairman and Chief Executive Officer from

---

[2] Citations in the format "¶ _" are citations to the specified paragraph of the Complaint.

2004 until November 2022, "when he stepped down from his positions for medical reasons." ¶ 17. Keppler then served as Executive Chairman of the Board from April to September 2023, and as an independent board member thereafter. *Id.* Defendant Thomas Meth served as Enviva's Chief Executive Officer from November 2022 to November 2023, and as President from June 2022 to the present. ¶ 18. Defendant Shai S. Even served as Enviva's Executive Vice President and Chief Financial Officer from June 2018 to August 2023. ¶ 19. Defendant Michael A. Johnson served as Enviva's Vice President and Chief Accounting Officer from June 2021 to March 2023. ¶ 20.

### A.    Enviva's Business Model

Enviva owns and operates wood pellet production plants where it aggregates wood fiber and processes it into wood pellets. *See* ¶¶ 26–27. Enviva then sells the wood pellets, primarily to customers in the UK, Europe, and Japan, as a form of renewable energy. ¶ 28. In addition, Enviva has historically fulfilled a portion of its customers' demand by buying wood pellets from other companies. ¶ 30. For example, in the fourth quarter of 2022, Enviva entered into a series of transactions with an existing customer, RWE Supply & Trading GmbH ("RWE"), under which it would sell 450,000 metric tons of wood pellets to RWE in late 2022 and purchase approximately 1.8 million metric tons of wood pellets from RWE between 2023 and 2025  (the "4Q 2022 agreements"). ¶ 40. On April 3, 2023, Defendants held an Investor Day where they gave presentations and answered analyst questions. ¶ 139.

### B.    Enviva's Stock Market Declines in 2023

On May 3, 2023, Enviva announced weaker-than-expected first quarter 2023 financial results. *See* ¶ 157. The Company also announced that it would be eliminating its dividend and reducing its 2023 guidance for pellet production and Adjusted EBITDA. *Id.* Enviva's stock price fell from a prior close of $14.34 to $7.01 on May 4, 2023. ¶ 167.

Later, on November 9, 2023, Enviva announced financial results for the third quarter of

2023 that fell short of the prior guidance. ¶ 186. It also withdrew its 2023 guidance. *Id.* The Company noted that these results, in part, reflected a negative impact on the Company's profitability caused by the 4Q 2022 transactions with RWE. ¶ 189. It stated that "[a]t the time that we entered into the[] purchase contracts, we believed that the global wood pellet market was substantially short for the foreseeable future"—*i.e.*, that an excess of demand over supply would keep prices at, or above, the market prices seen in 4Q 2022. *See* Ex. 1, at 12, 27–28 (A0014, A0029–A0030) (Q3 2023 10-Q). For this reason, the Company believed that the 4Q 2022 transactions provided an opportunity "to reduce [its] exposure to further increases in wood pellet market prices." *Id.* In fact, however, the opposite happened: "Market prices for wood pellets during 2023 [fell] well below the elevated spot market and forward prices experienced during the fourth quarter of 2022." *Id.* As a result, as of November 9, 2023, absent a change in market prices, Enviva faced an obligation to purchase significant volumes of wood pellets from RWE at prices that would likely exceed the prices at which it could sell them to other customers. *See* ¶ 193. Enviva's stock price then fell from $3.84 to $0.85. ¶ 94.

### C.    Enviva Files for Bankruptcy

On March 12, 2024, Enviva filed a petition for relief under chapter 11 of the United States Bankruptcy Code. Plaintiffs subsequently dismissed their claims against Enviva. ECF 37.

### III.    LEGAL STANDARD

To survive a motion to dismiss, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Because Plaintiffs' allegations sound in fraud, each alleged misrepresentation must also meet the heightened pleading standards of Rule 9(b), which requires plaintiffs to lay out with particularity "the who, what, when, where and how" of their allegations. *U.S. ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 379 (4th Cir. 2008). Plaintiffs' claims are also subject to the

heightened pleading standard of the PSLRA, which requires plaintiffs to explicitly and precisely set out why each challenged statement was false or misleading and why the speaker knew the statement was misleading. *Teachers' Ret. Sys. of La.*, 477 F.3d at 172.[3]

These heightened pleading requirements "are an unusual deviation from the usually lenient requirements of federal rules pleading." *In re LifeLock, Inc. Sec. Litig.*, 690 F. App'x 947, 949 (9th Cir. 2017). "The various requirements are not satisfied merely by making a complaint long." *Id.* at 950. Rather, to survive a motion to dismiss, a complaint must both be able to withstand an exacting "statement-by-statement analysis" of objective falsity[4] and also plead detailed facts raising a "cogent and compelling" inference that the defendants made the statements with intent to defraud investors.[5] Moreover, the PSLRA shields from liability forward-looking statements accompanied by meaningful cautionary language. *See* 15 U.S.C. § 78u-5(c)(1). In light of these requirements, surviving dismissal in a securities fraud action imposes "no small burden" on securities plaintiffs, *Under Armour*, 409 F. Supp. 3d at 458, and the Fourth Circuit has regularly found plaintiffs to have fallen short.[6]

---

[3] On a motion to dismiss "[i]n a securities fraud action, the Court may also consider statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the Securities and Exchange Commission, analyst reports, documents upon which Plaintiffs relied in bringing suit, and matters of which the Court may take judicial notice." *In re Hum. Genome Scis. Inc. Sec. Litig.*, 933 F. Supp. 2d 751, 753 n.1 (D. Md. 2013). In addition, "district courts in this circuit routinely take judicial notice of newspaper articles, analysts' reports, and press releases in order to assess what the market knew at particular points in time, even where the materials were not specifically referenced in the complaint." *Shah v. GenVec, Inc.*, 2013 WL 5348133, at *1 n.1 (D. Md. Sept. 20, 2013). Thus, the Court should consider each of the exhibits filed with this motion, which consist of public documents filed with the SEC (Exs. 1 (A0001–A0052), 4 (A0218–A0373), 10–11 (A0484–A0487), 14 (A0579–A0618)) and other publications available to investors introduced for the purpose of indicating what information was available to investors (Exs. 2–3 (A0053–A0217), 5–9 (A0374–A0483), 12–13 (A0488–A0578), 15 (A0619–A0622).

[4] *In re Genworth Fin. Inc. Sec. Litig.*, 103 F. Supp. 3d 759, 771 (E.D. Va. 2015).

[5] *Under Armour*, 409 F. Supp. 3d at 458. Because Plaintiffs have not brought a claim for "control person" liability under the Exchange Act, each Defendant must be dismissed unless Plaintiffs' allegations show that he personally made an actionably misleading statement with scienter. *Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011) (§ 10(b) liability cannot apply to any person who is not the "maker" of an actionable misstatement).

[6] *E.g.*, *Emps.' Ret. Sys. of the City of Baton Rouge & Par. of E. Baton Rouge v. MacroGenics, Inc.*, 61 F.4th 369 (4th Cir. 2023); *Syneos*, 75 F.4th 232; *Boykin v. K12, Inc.*, 54 F.4th 175 (4th Cir. 2022); *In re Marriott Int'l, Inc.*, 31 F.4th 898 (4th Cir. 2022); *In re Triangle Capital Corp. Sec. Litig.*, 988 F.3d 743 (4th Cir. 2021); *KBC Asset Mgmt. NV v. DXC Tech. Co.*, 19 F.4th 601 (4th Cir. 2021); *Janies v. Cempra, Inc.*, 816 F. App'x 747 (4th Cir. 2020); *Amalgamated Bank as Tr. for LongView Collective Inv. Funds v. Maximus, Inc.*, 771 F. App'x 238 (4th Cir. 2019); *Xia Bi v.*

## IV.   ARGUMENT

### A.   Plaintiffs' Section 10(b) claim fails because Plaintiffs failed to allege an actionably misleading statement.

The Complaint's sole cause of action is for securities fraud under Section 10(b) of the Exchange Act.  ¶¶ 270–80.  In order to state a Section 10(b) claim, a plaintiff must identify an "untrue statement of a material fact" or a statement rendered materially misleading by the omission of a material fact.  17 C.F.R. § 240.10b-5; 15 U.S.C. § 77k.  Here, the Complaint should be dismissed because Plaintiffs have not alleged a single actionably misleading statement.[7]

#### 1.   Category A: Statements regarding inflationary pressures and facility capacity (Statements 1–4 (¶¶ 102, 105, 121, 154)).

The statements Defendants have grouped into Category A make factual observations about Enviva's (i) contracts (Statements 1 & 2 (¶¶ 102, 105)) and (ii) facilities (Statements 3 & 4 (¶¶ 121, 154)).  These statements are inactionable for a simple reason: "the facts [the Complaint] alleges do not contradict [them]." *Marriott*, 31 F.4th at 902.

*First,* Statements 1 and 2 discuss "inflationary provisions" in Enviva's contracts. Statement 1 was made in November 2022 in response to an analyst who—after noting that Enviva's adjusted gross margin per metric ton had increased—asked "what the biggest drivers are of that increase." Ex. 2, at 12 (A0064) (Q3 2022 Earnings Call Transcript).  In response, Defendant Keppler noted that there were numerous factors, one of which was "the inflationary provisions within each of our contracts."  ¶ 102.  Statement 2, made just a few days later by Defendant Meth, on November 11, 2022, similarly notes that "pricing escalators in [Enviva's] contracts" had been

---

*McAuliffe*, 927 F.3d 177 (4th Cir. 2019), *as amended* (July 9, 2019); *Dice v. Channeladvisor Corp.*, 671 F. App'x 111 (4th Cir. 2016); *Maguire Fin., LP v. PowerSecure Int'l*, Inc., 876 F.3d 541 (4th Cir. 2017); *Yates v. Mun. Mortg. & Equity, LLC*, 744 F.3d 874 (4th Cir. 2014).

[7] Because Plaintiffs' claims depend on a statement-by-statement analysis, Defendants have created Appendix A, which numbers each allegedly misleading statement and organizes the statements into various categories.  References herein to "Statement _" are references to the statements as numbered in Appendix A.

contributing to expansion of the Company's margins.  ¶ 105.

Plaintiffs argue that Statements 1 and 2 were misleading because, according to a declaration by Enviva's new interim CEO, Enviva's pricing escalators failed to fully offset cost increases that occurred in *2023* due to a disparity between U.S. and foreign inflation rates.  ¶ 89 (quoting Ex. 3 ¶ 83 (A0100) (Nunziata Decl.) (referring to cost increases and high inflation "***[i]n early 2023***" (emphasis added))).  But Statements 1 and 2 describe factors that led to Enviva's margin expansion in *2022*.  Plaintiffs do not—and could not—challenge the fact of Enviva's 2022 margin expansion or the contribution of pricing escalators to it.  And Enviva's 2022 descriptions of 2022 successes are not rendered misleading by inflationary issues Enviva faced the following year.  *See In re Under Armour Sec. Litig.*, 342 F. Supp. 3d 658, 680 (D. Md. 2018) ("To be actionable, a statement or omission must have been misleading at the time it was made; liability cannot be imposed on the basis of subsequent events." (citation omitted)).[8]

*Second*, in Statements 3 and 4, Defendants note that Enviva's "facilities are designed to operate 24 hours per day, 365 days per year" and that capacity expansions at these facilities concluded in 2022.  ¶¶ 121, 154.  Again, "[t]he 'basic problem' with the complaint on this point is that 'the facts it alleges do not contradict [Enviva's] public disclosures.'"  *Marriott*, 31 F.4th at 902.  Instead, Plaintiffs argue that these statements were misleading because "Enviva suffered from severe equipment failures."  ¶¶ 122, 155.  But these statements do not guarantee that Enviva's equipment would not fail.[9]  Indeed, they do not say anything about how the plants would operate

---

[8] *See also McDonald v. Kinder-Morgan, Inc.*, 287 F.3d 992, 998 (10th Cir. 2002) ("It is well-established that the accurate reporting of historic successes does not give rise to a duty to further disclose contingencies that might alter the revenue picture in the future."); *Triangle*, 988 F.3d at 753 (noting that pleading fraud by hindsight is "precisely what Congress intended for the PSLRA to eliminate").

[9] In fact, Defendants repeatedly warned investors that their production capacity *was* susceptible to such risks.  For example, in every quarterly or annual report filed with the SEC or earnings release issued to investors during the proposed Class Period, Enviva warned that "the volume and quality of products that we are able to produce…could be adversely affected by, among other things, operating or technical difficulties at our wood pellet production plants." *E.g.* Ex. 8, at 29 (A0462) (Mar. 1, 2023 Press Release).  Since investors were put on notice of the very risks that

9

in the future.  They state (uncontested) facts about how Enviva's facilities were "designed" and the status of their construction.  Nothing in the Complaint addresses—let alone contradicts—those facts.  *E.g.*, *Okla. Firefighters Pension & Ret. Sys. v. K12, Inc.*, 66 F. Supp. 3d 711, 726 (E.D. Va. 2014) (alleged compliance program shortcomings "do not make false any of K12's statements that it had developed the described compliance systems").

Plaintiffs are thus left to argue that Statement 4 is misleading because Enviva's Southampton, Virginia "plant was producing well below its stated capacity" in 2023.  ¶ 155.  But Statement 4 does not say that Southampton was producing at maximum capacity in 2023.  It states that the plant hit "necessary daily numbers" in "September, October, [and] November" of *2022*.  ¶ 154.  The Complaint never so much as alleges what these "necessary daily numbers" were, let alone plead with particularity facts to show that Southampton did not reach them in those months. Instead, Plaintiffs merely allege that the plant faced various challenges.  But since Statement 4 does not deny the existence of such challenges, this does not suffice to plead with particularity that Statement 4 was actionably misleading.  *See, e.g.*, *In re Plains All Am. Pipeline, LP Sec. Litig.*, 245 F. Supp. 3d 870, 917 (S.D. Tex. 2017) (alleged problems with program do not suffice to allege falsity where they are not "incompatible" with the challenged statement).

2.    **Category B: Statements regarding dislocation transactions in general (Statements 5–9 (¶¶ 98, 100, 119, 140, 144)).**

Next, Plaintiffs challenge a series of statements in which Defendants noted that Enviva had "historically" obtained "15% to 20%" of its EBITDA from spot transactions that take advantage

---

Plaintiffs contend were omitted, these statements could not be actionable even if they did suggest something about Enviva's equipment failure rate.  *See In re Sinclair Broad. Grp., Inc. Sec. Litig.*, 2020 WL 571724, at *10 (D. Md. Feb. 4, 2020) (potentially misleading statement that transaction was with an "unrelated party" was inactionable where "the details of [that party's] relationship [to the defendants]…were already in the public domain"); *Fanucchi v. Enviva Inc.*, 2024 WL 3302564, at *6 (D. Md. July 3, 2024) (statement that could suggest Enviva did not source whole trees inactionable where other disclosures acknowledged that Enviva did so).

of "market dislocations."[10]  ¶¶ 98, 100, 119, 140, 144.  As with the Category A statements, the Complaint does not dispute the accuracy of these assertions.  Instead, Plaintiffs complain that Statements 5–9 did not divulge additional information about particular "market dislocation" transactions that Plaintiffs find misguided.  For instance, Plaintiffs contend that the statements are actionable because "on October 13, 2022 Enviva had agreed to repurchase large volumes of wood pellets from RWE over 2024 and 2025 at prices substantially in excess of forward prices for those time periods." ¶ 101.  But this does nothing to "contradict [Enviva's] public disclosures," *Marriott*, 31 F.4th at 902, which say nothing about any particular transaction or future prices.

Unable to allege that Statements 5–9 were inaccurate or untrue, Plaintiffs suggest that they "failed to disclose material adverse facts."  *E.g.* ¶ 101.  But "Rule 10b-5 does not contain a 'freestanding completeness requirement' because '[n]o matter how detailed and accurate disclosure statements are, there are likely to be additional details that could have been disclosed but were not.'"  *In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 543 F. Supp. 3d 96, 134 (D. Md. 2021), *aff'd* 31 F.4th 898 (4th Cir. 2022).  Instead, to be actionable under the securities laws, a plaintiff must specify "the reason or reasons why the statement is misleading," not simply why the statements were incomplete.  *Id*.  The Category B statements are thus not actionable.[11]

### 3. Category C: Statements about particular market dislocation transactions (Statements 10–22 (¶¶ 123, 126, 128, 130, 148, 172, 174)).

The statements Defendants have grouped into Category C are similar to those in Category B.  The difference is that, rather than addressing market dislocation transactions in general, the

---

[10] In other words, Enviva would monitor the marketplace "to opportunistically transact when pricing dynamics and contract flexibility provided avenues to generate incremental gross margin" by buying or selling wood pellets based on advantageous market pricing.  Ex. 4, at 4, 30, 35 (A0224, A0271, A0280) (2022 10-K).

[11] Some of the Category B statements also contain vaguely upbeat observations that unspecified such transactions "will continue to drive value" over an undefined "long term" (¶ 98), serve as a "tailwind" (¶ 100), and "can create opportunities" (¶ 119).  These assertions are inactionable puffery.  *See infra* § IV.A.4; *Nat'l Elevator Indus. Pension Fund v. Conagra Brands, Inc.*, 2022 WL 1449184, at *1 (7th Cir. May 9, 2022) (statement that entity would "serve as a catalyst to accelerate value creation for shareholders" dismissed as "at once a projection and puffery").

Category C statements discuss particular such transactions.  ¶¶ 123, 126, 128, 130, 148, 172, 174.

Specifically, they discuss the transactions that occurred in the "fourth quarter of 2022" in which

Enviva "sold 450,000 tons to [a] customer" and agreed "to buy volumes for future periods from

that same counterparty." *Id.* [12]  While Enviva collected "cash in full for these sales," the statements

noted that "roughly $89 million of gross margin and adjusted EBITDA" would not be recognized

until future periods due to technical accounting issues.  ¶ 128.

The Complaint disputes none of these facts.  Indeed, the Complaint elsewhere concedes

that Defendants "described the 4Q 2022 Purchase Agreements" in detail "on Enviva's March 2,

2023 earnings call"—*i.e.*, at the same time the earliest of the Category C statements was made.

¶ 212.    For instance, Defendants "disclosed that Enviva would receive gross proceeds of

approximately $175.1 million from its 4Q 2022 sales to RWE, and disclosed the total quantity of

wood pellets that Enviva was required to buy from RWE over 2023-25." ¶ 42.  And they disclosed

that the "agreements to purchase wood pellets from that same customer" were at a "fixed price per

metric ton" that "exceed[s] the original selling prices of the pellets under [Enviva's] modified

contract" with RWE.  Ex. 4, at 65 (A0330) (2022 10-K).

Despite this fulsome disclosure and their inability to contest the accuracy of any of the

Category C statements, Plaintiffs contend that these statements are actionable because they failed

to predict that in future years Enviva "would incur hundreds of millions in costs on the . . . 4Q

2022 Purchase Agreements." ¶ 129.  Plaintiffs do not cite a single SEC rule or accounting principle

that would require such a prediction—because there are none.

For example, in a prior case a company stated in SEC filings that it was "obligated to tender

---

[12] Statement 16 (¶ 174) is about a different transaction entirely, which occurred in 1Q 2023. *See* ¶ 174. Yet Plaintiffs allege that it was misleading because it did not disclose additional facts about "the 4Q 2022 Purchase Agreements." ¶ 175.  This allegation fails not only for the reasons discussed in this section, but also because these additional facts are not even related to the transaction in question.

for approximately $160.0 million of its . . . Senior Notes" by a particular date.  *R2 Invs. LDC v.*

*Phillips*, 401 F.3d 638, 642 (5th Cir. 2005).  Similar to here, the plaintiff alleged that this statement

was misleading because it was made "without ever disclosing the fact that [the company] either

did not have the cash to make the payments required or was relying on risky contingencies to

supply sufficient cash."  *Id.*  The court dismissed, holding that "[t]he fact that [the company] may

not be able to complete the tender offer on time does [not] make the statement that [the company]

*has an obligation* to repurchase the Senior Notes untrue or misleading."  *Id.*

So it is here, too.  Whether "future market prices" suggested Enviva would lose money on

the 4Q 2022 transactions in no way contradicts the Category C statement's observation that Enviva

entered into those transactions.  *Id.*  The Category C statements are thus inactionable.  *Id.*; s*ee also*

*Raab*, 4 F.3d at 289 (a company's "accurate reporting of [] past results" does not "require the

company to speculate on the effect" future events might "have on its future [results]"); *Sinclair*,

2020 WL 571724, at \*6 ("Accurate statements of historical fact are not actionable under §

10(b)[.]").

Indeed, this is especially so here because the "future market prices" Plaintiffs refer to do

not purport to come from any actual "market," but merely from a third party's best guess of what

prices may turn out to be in the future.[13]  For the same reason, Plaintiffs are incorrect when they

suppose that Enviva's 1Q 2023 10-Q was referring to Argus' forward estimates when it stated that

the 4Q 2022 agreements "were priced at market prices."  ¶¶ 172–73.  That statement referenced

the "market prices" seen in actual markets in 4Q 2022, which were undisputedly consistent with

those Enviva agreed to in the 4Q 2022 agreements, ¶ 234 (acknowledging 4Q 2022 "spot market

prices upwards of $389" per MT), not conjecture about future prices from a third party.

---

[13] *See* Ex. 12, at 8 (A0495) (Argus Biomass Methodology) (conceding that "forward" prices are based on, among other things, "market survey results and various types of other market information").

#### 4.    Category D: Vague positivity about Enviva's recent results and future prospects (Statements 17–22 (¶¶ 111, 114, 132, 134, 137, 146)).

The statements Defendants have grouped into Category D are vague, positive remarks about Enviva's priorities, past results, and prospects for future success. ¶¶ 111, 114, 132, 134, 137, 146. For example, Statement 18 remarks that Enviva's 2022 financial results "set[] the stage for solid growth in 2023 and beyond." ¶ 114. Similarly, Statement 22 remarks that Enviva had "seen really good progress in making more tons at lower cost." ¶ 146. And Statement 21 states "I think we are going to be in fantastic shape." ¶ 137.

Such loosely optimistic statements are omnipresent in corporate releases and are not actionable under the federal securities laws. The reason, as the Fourth Circuit has observed, is that "[n]o reasonable investor would rely on [them]." *Raab*, 4 F.3d at 290. "Analysts and arbitrageurs rely on facts in determining the value of a security, not mere expressions of optimism from company spokesmen." *Id.* In *Raab*, for example, the court considered challenges to statements strikingly similar to those in Category D. Specifically, the defendant company had stated:

- "Regulatory changes…have created a marketplace for the DOE Services Group with an expected annual growth rate of 10% to 30% over the next several years;"

- "Helping the DOE prime contractors respond…is expected to be an increasing segment of [the company's] business in 1992;" and

- "[T]he DOE Services Group is poised to carry the growth and success of 1991 well into the future." *Id.* at 288.

When, three months after making such statements, the defendant company announced a slowdown in DOE contracts, the plaintiff sued. *Id.* The Fourth Circuit affirmed dismissal, finding the statements "hardly material." *Id.* at 289. As it noted, "[t]he whole discussion of growth is plainly by way of loose prediction, and both the range of rates cited, as well as the time for their achievement, are anything but definite." *Id.* at 290.

The same is true here. Like the statement in *Raab* that the company was "poised to carry

14

[its] growth and success" forward, the Category D statements suggest that Enviva's recent results "set[] the stage for solid growth," give the company "tremendous confidence" and "conviction" in "[its] ability to deliver on [its] long-term growth objectives," and lead to a belief that the company will be "in fantastic shape." ¶¶ 111, 114, 134, 137. Because "the market price of a share is not inflated by vague statements predicting growth," these statements "lack materiality" and are inactionable. *Raab*, 4 F.3d at 289.[14] Indeed, this is especially true here where Defendants also disclosed the risks that the Company faced in achieving these results.[15]

Separately, in addition to corporate puffery, Plaintiffs take issue with references in Statements 20 and 22 to Enviva's Southampton plant. Specifically, Statement 20 notes that two recently renovated plants "now deliver volumes at an elevated rate." ¶ 134. Plaintiffs contend that assertion was misleading because the Southampton plant faced various operational challenges that prevented it from reaching its "maximum production level." ¶ 73. But this is beside the point: That Southampton did not reach its production "maximum" does not show that it was not delivering "volumes at an elevated rate," which is all the statement says. ¶ 134. Similarly, Statement 22 suggests that "many of our expansion projects hit the necessary nameplate capacities." ¶ 146. Plaintiffs contend this statement was untrue because Southampton did not hit its "nameplate capacity." ¶ 147. But Statement 22 does not assert that *Southampton* reached its nameplate capacity, and the Complaint contains no facts contradicting what the statement does

---

[14] *See also MacroGenics*, 61 F.4th at 382, 386 (statements that data was "trending" "positive," that defendants were "very excited," and that "activity observed to date…[was] promising" were inactionable since Rule 10b–5 does not "prohibit any misrepresentation—no matter how willful, objectionable, or flatly false—of immaterial facts, even if it induces reactions from investors that, in hindsight or otherwise, might make the misrepresentation appear material."); *Longman v. Food Lion, Inc.*, 197 F.3d 675, 685 (4th Cir. 1999) (similar).

[15] *See, e.g.*, *supra* n.9 (citing Ex. 8, at 29 (A0462) (Mar. 1, 2023 Press Release) (in addition to risks noted above, also cautioning investors that its "forward-looking statements are subject to risks and uncertainties" including (i) uncertainty regarding future "prices at which we are able to sell…our products," and (ii) "the possibility that current market prices may not continue in the future and therefore, in the future, we may not be able to make spot sales and may need to make spot purchases at higher prices")).

say: that *some* Enviva plants did reach nameplate capacity. These portions of Statements 20 and 22 are thus also inactionable. *Marriott*, 31 F.4th at 902.

> **5. Category E: Statements about Enviva's dividend and liquidity (Statements 23–27 (¶¶ 108, 142, 150, 152, 177)).**

The statements Defendants have grouped into Category E note, at various points in 2023, Defendants' belief that Enviva had sufficient liquidity to "protect [its] stable dividend" and "invest in projects" "[w]ithout issuing additional equity." *See* ¶¶ 108, 142, 150, 152, 177. Plaintiffs contend that these statements proved misleading when, in May 2023, Enviva suspended its dividend and, in November 2023, concluded that there was substantial doubt about its ability to continue as a going concern. ¶ 157.

The Fourth Circuit considered strikingly similar statements in *Marsh Grp. v. Prime Retail, Inc.*, 46 F. App'x 140 (4th Cir. 2002). There, in the second half of 1999, the defendant company "assured the investment community repeatedly that [its] current dividend [wa]s sacred," that it was "committed to the current dividend," and that there were "no circumstances under which the dividend would be cut." *Id.* at 142–43. At the same time, but undisclosed to investors, "company insiders were aware that the company was deteriorating." *Id.* at 142. "Internal company reports allegedly showed that vacancies [at the rental properties that provided its income] were rising, and revenues were falling." *Id.* Investors sued when, in mid-January 2000, an analyst report publicized the company's "eroding fundamentals," and the company "announced that it would not pay a dividend for the fourth quarter of 1999." *Id.* at 143–44. "Later in the year, most of the company's officers left or were terminated by the board[.]" *Id.* at 144.

The district court dismissed the claims "finding the alleged misstatements immaterial as a matter of law," and the Fourth Circuit affirmed. *Id.* at 144; *see also id.* at 146 (under Fourth Circuit precedent "we are constrained to find that the alleged misstatements in this case are immaterial

and hence not actionable"). Specifically, the Court of Appeals found that the statements "lack the factual specificity necessary to make them actionable in this circuit." *Id.*[16]

The Category E statements are inactionable for the same reason. As in *Marsh*, these statements express management's then-current confidence in its ability to pay a dividend and pursue future growth projects. Because investors do not rely on such "expressions of optimism from company spokesmen" in making investment decisions, a plaintiff may not attempt to base a securities fraud claim on such a statement. *Raab*, 4 F.3d at 290.[17] The Court need go no further in its analysis to find the Category E statements inactionable.

But there is more. Statements about a company's ability to pay a dividend and meet future liquidity needs are also "a type of opinion and prediction of future events." *Miller v. Premier Corp.*, 608 F.2d 973, 981 (4th Cir. 1979). "[S]tatements of opinion can be actionable only if they were 'both false and not honestly believed when they were made.'" *MacroGenics*, 61 F.4th at 387. Plaintiffs have no particularized allegations whatsoever suggesting that the Category E statements were "not honestly believed when they were made." *Id.* Nor could they. The far more plausible explanation is the one Defendants consistently gave: that financial conditions unexpectedly worsened after such statements were made.[18] *See, e.g.,* Ex. 5, at 2 (A0375) (May 3, 2023 Press Release).

Moreover, these statements "are immune from liability under the Safe Harbor provision of

---

[16] *See also In re Humphrey Hospitality Trust, Inc. Securities Litigation*, 219 F. Supp. 2d 675, 683 (D. Md. 2002) (statement "we expect to maintain our current dividend rate" is "not actionable"); *In re BHP Billiton Ltd. Sec. Litig.*, 276 F. Supp. 3d 65, 86 (S.D.N.Y. 2017) (statement that the company's dividend policy would be abandoned over CEO's "dead body" was not actionable, including because it was forward-looking and had accompanying cautionary statements).

[17] *See also Hillson Partners Ltd. P'ship v. Adage Inc.*, 42 F.3d 204, 206, 211–12 (4th Cir. 1994) (statements that company was "on target toward achieving the most profitable year in its history," that "significant sales gains should be seen as the year progresses," and that a project was "on schedule" were "not material as a matter of law").

[18] Defendants later explained that when the earlier statements were made, the Company did "not have March results or April results yet" and that while Enviva, in March 2023, "had pressure of about $15 million in our cost position . . . it ended up being closer to $30 million in that cost position." Q1 2023 Earnings Call Transcript at 5.

[the] PSLRA." *Humphrey*, 219 F. Supp. 2d at 683. Like in *Humphrey*, Defendants specifically warned investors that Enviva could "provide no assurance that it will continue to pay dividends or authorize stock repurchases at the current rate or at all," and that its ability to do so was subject to numerous risks. Ex. 4, at 14 (A0244) (2022 10-K).[19] The PSLRA's "'Safe Harbor' for forward-looking statements" thus "immunize[s]" the Category E statements from liability. *Humphrey*, 219 F. Supp. 2d at 682.

### 6.    Category F: Forward-looking projections about Enviva's financial performance (Statements 28–32 (¶¶ 95, 116, 180, 182, 184)).

The statements grouped into Category F are statements about the financial performance Defendants projected for Enviva in 2023. ¶¶ 95, 116, 180, 182, 184. Under longstanding Fourth Circuit law, "future business predictions must constitute 'specific guarantees' to be material for the purposes of securities fraud." *Pipefitters Local No. 636 Defined Ben. Plan*, 2013 WL 1192004, at *8 (quoting *Raab*, 4 F.3d at 287).

The Category F statements are not guarantees. They state financial results that Defendants "expect" and "aim" to occur. Plaintiffs are thus left to contend that the projections "prove[d] to be wrong in hindsight." *Id.* at 290. For instance, Statements 28 and 29 project that Enviva "expect[ed] to drive increased output" from its production plants resulting in total production of over six million wood pellets in 2023. ¶¶ 95, 116. Plaintiffs contend that these statements were false because Enviva later reduced its "estimates for full-year volumes in 2023 to be approximately 5 million to 5.5 million MT." ¶ 160. But "hindsight does not establish fraud." *Raab*, 4 F.3d at 291. Instead, opinion statements such as these can only be actionable if Plaintiffs allege facts sufficient to show that they were "not honestly believed when they were made." *MacroGenics*,

---

[19] At the time each of the Category E statements were made, the Company reminded investors to consider these risk factors. *See* Ex. 13, at 2 (A0500) (Investor Day Presentation); Ex. 14, at 1 (A0581) (Q2 2023 10-Q); Ex. 15, at 1 (A0619).

61 F.4th at 387. Here, the Complaint fails to satisfy this stringent requirement.

As to Statements 28 and 29, the only basis for alleging these statements were misleading that Plaintiffs point to from the time they were made is that "Enviva suffered from severe equipment failures and excessive employee turnover that reduced production and increased costs." ¶¶ 96, 117. But such "[p]roblems and difficulties are the daily work of business people." *Ronconi v. Larkin*, 253 F.3d 423, 434 (9th Cir. 2001), *abrogated on other grounds by Matrixx Initiatives, Inc. v. Siracuasano*, 563 U.S. 27, 37–49 (2011). That they exist does not suggest that Defendants did not "honestly believe[]" that Enviva could approach its production capacity in 2023. *MacroGenics*, 61 F.4th at 387; *see also* ¶ 27 (conceding that Enviva had a "combined production capacity of 6.2 million metric tons per year").[20]

Similarly, Statement 30 estimates EBITDA for Q3 2023 in the range of $60 to $80 million. ¶ 180. Enviva's actual Q3 2023 results fell short of this projection. In announcing those results, Defendants acknowledged that "[s]pot market prices for wood pellets this year have not evolved in the way we anticipated and that weakness in the spot market caused us to significantly miss our expectations for the third quarter." Ex. 6, at 2 (A0401) (Q3 2023 Earnings Call Transcript). Specifically, as the Complaint notes, in 2022, wood pellet prices rose significantly during the third quarter. *See* ¶ 56. In 2023, wood pellet prices again began to rise in July (before Statement 30 was made), but they then stalled at a depressed level throughout the remaining two months of the quarter. *See id.* Statement 30 failed to anticipate this weakness. But a failure to accurately predict the future "does not establish fraud." *Raab*, 4 F.3d at 291 ("The market has risks; the securities laws do not serve as investment insurance.").

In fact, Statements 28–30 were each made in documents which contained detailed warnings

---

[20] Indeed, this is especially so here, where Defendants expressly warned investors about the very risks that Plaintiffs now claim caused disappointing results. *See supra*, n.9.

19

about the uncertainty inherent in statements regarding Enviva's "strategy, future operations, financial position, estimated revenues and losses, projected costs, prospects, plans, and objectives of management" and pointed to further information on risk factors associated with such forward-looking statements in SEC filings. Ex. 7, at 28 (A0432) (Nov. 2, 2022 Press Release); Ex. 8, at 29 (A0462) (Mar. 1, 2023 Press Release), Ex. 9, at 2 (A0465) (Q2 2023 Earnings Call Transcript ).[21] They thus also fail under the PSLRA's safe harbor for forward-looking statements. *See* 15 U.S.C. § 78u-5(c)(1) (forward-looking statements accompanied by "meaningful cautionary language" are not actionable); *see also MacroGenics*, 61 F.4th at 389; *Boykin*, 54 F.4th at 184.

Next, in Statement 31, Defendant Meth notes that if spot business "happens as part of the [Company's] commercial activity, it will happen in Q4." ¶ 182. Taking this statement in isolation, Plaintiffs contend that it is a guarantee that no spot sales at all would occur in Q3 2023, and thus contends that the statement was false based on later statements acknowledging that some such sales were contemplated. *See* ¶ 183. But, in its full context, that is clearly not the intended meaning of the statement. Earlier on the same call, Meth reminded investors that "20% of our annual EBITDA comes from general commercial activity [i.e., spot sales] that is back *half* weighted" and "particularly *pronounced* in Q4." Ex. 9, at 10 (A0473) (Q2 2023 Earnings Call Transcript) (emphasis added). Any reasonable investor would understand that Defendant Meth was not denying that spot sales would occur in Q3, but simply noting that the bulk of them were expected to occur in Q4. *See Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 615 (4th Cir. 1999) (statements must be examined in context).

Finally, Statement 32 provides that no "incremental deferred gross margin transactions" were projected for Enviva in Q3 or Q4 2023. ¶ 184. Plaintiffs do not argue that Enviva engaged

---

[21] *See also supra* nn. 9, 15.

20

in any new deferred gross margin transactions during those periods. Instead, Plaintiffs claim these statements were false because of problems with deferred gross margin transactions from 4Q *2022*. ¶ 185. But as the statement at ¶ 184 was not about *prior* deferred gross margin transactions, but potential *future* ones, this allegation cannot render it false or misleading.

### 7.    Category G: SOX Certifications (Statement 33–34 (¶¶ 171, 176)).

Last, Plaintiffs claim that, in connection with Enviva's Q1 and Q2 2023 Form 10-Qs filed with the SEC, Defendants Meth and Even signed certifications stating that "based on [their] knowledge," the filing did "not contain any untrue statement of a material fact" or "omit to state a material fact" necessary to render the statements made not misleading. ¶¶ 171, 176. These statements are part of routine, statutorily required certifications under regulations promulgated under the Sarbanes-Oxley Act and are focused on Enviva's financial statements, which are not alleged to be false or misleading in the Complaint. *See* 17 C.F.R. §§ 240.13a-14, 240.15d-14.

The statements merely say that, based on the speaker's "***knowledge***," the 10-Q does not have a "***material***" misstatement. Given these qualifiers, to sufficiently allege that these statements were false, Plaintiffs would have to have alleged that (1) Defendants Meth and Even had ***actual knowledge*** that the Form 10-Q was (2) ***materially*** misleading. *See, e.g.*, *In re Veon Ltd. Sec. Litig.*, 2018 WL 4168958, at *14 (S.D.N.Y. Aug. 30, 2018) (so holding); *In re Marriott*, 543 F. Supp. 3d at 141–42 (similar). Here, Plaintiffs have done neither. As explained in the preceding sections, Plaintiffs have not identified a single materially misleading statement—let alone one made in Enviva's Form 10-Q with actual knowledge of its falsity. The Complaint thus falls short of alleging that these statements were misleading or untrue.[22]

---

[22] Separately, because they are drawn from SOX certifications, these statements are inactionable as a matter of law. *E.g., Lorusso v. Boulder Brands, Inc.*, 2017 WL 4365180, at *14 (D. Colo. Mar. 1, 2017); *Anderson v. StoneMor Partners, L.P.*, 296 F. Supp. 3d 693, 702 (E.D. Pa. 2017) (similar).

21

**B.     Plaintiffs fail to satisfy the PSLRA's high standards for pleading scienter.**

Plaintiffs' Section 10(b) claims should also be dismissed for failing to satisfy the PSLRA's high standards for pleading scienter.  Scienter is "a mental state embracing intent to deceive, manipulate, or defraud," *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007), and cannot be shown through "simple, or even inexcusable negligence."  *In re Cryomedical Scis., Inc. Sec. Litig.*, 884 F. Supp. 1001, 1013 (D. Md. 1995) (citation omitted).  Instead, a plaintiff must plead facts sufficient to establish at least "severely reckless conduct," which "is a slightly lesser species of intentional misconduct, and is satisfied only by factual allegations demonstrating such an extreme departure from the standard of ordinary care that the danger of misleading the plaintiff must have been either known to the defendant or so obvious that the defendant must have been aware of it." *Janies*, 816 F. App'x at 749.  Under this standard, an allegation will survive dismissal only if the inference of scienter is "cogent" and "at least as compelling as any opposing inference one could draw from the facts alleged." *Id*.

The facts that give rise to an inference of scienter must be alleged with particularity, meaning that a plaintiff must plead the "who, what, where, when, and how" of their contentions. *In re Acterna Corp. Sec. Litig.*, 378 F. Supp. 2d 561, 575 (D. Md. 2005).  Thus, Plaintiffs "may not group the defendants together." *Iron Workers Local 16 Pension Fund v. Hilb Rogal & Hobbs Co.*, 432 F. Supp. 2d 571, 594 (E.D. Va. 2006) ("Group pleading fails to satisfy the requirement that the who, what, where, why, and when of the fraud be specified.").  Instead, "plaintiffs must plead specific facts concerning, for example, when *each* defendant or other corporate officer learned that a statement was false, how *that* defendant learned that the statement was false, and *the particular* document or other source of information from which the defendant came to know that the statement was false." *Id.* (emphasis added and citation omitted); *see also In re Plains All Am. Pipeline, LP Sec. Litig.*, 307 F. Supp. 3d 583, 642 (S.D. Tex. 2018) (similar).  In short, the PSLRA

22

"unequivocally raised the bar for pleading scienter," and clearing this bar "is no small burden" for plaintiffs. *Cozzarelli*, 549 F.3d at 624.

This is particularly so in the Fourth Circuit. The Fourth Circuit has rejected the theory "that an inference that [the speaker] knew his statement was false is sufficient to show that [he] acted intentionally or recklessly to deceive, manipulate, or defraud." *Maguire*, 876 F.3d at 547. Such an "argument fuses an inference that [the speaker] knew enough to realize that his characterization was technically incorrect with an inference that he intended it to deceive." *Id.* at 548. Rather, to allege scienter in the Fourth Circuit, a complaint must not only (i) allege detailed facts showing that the speaker knew his statement was incorrect, but also (ii) allege facts sufficient to "show that [the speaker] affirmatively sought to advance [an untruth] or calculatedly sought to obscure th[e] reality." *Id.*

Plaintiffs' scienter allegations, which say very little about the state of mind of any particular Defendant, fall far short of this standard, requiring dismissal of Plaintiffs' § 10(b) claim.

> **1. The Complaint does not plead particularized facts establishing that any Defendant made any statement with scienter.**
>
> **a. The Complaint all but ignores Defendants Keppler and Johnson in its attempts to allege scienter.**

As to Defendants Keppler and Johnson, the Complaint makes very little effort to allege scienter. Plaintiffs instead rely on the boilerplate allegation that by virtue of their positions "as Enviva's senior executive officers," Keppler and Johnson had "responsibility for and access to information concerning" the alleged misstatements. ¶ 205; *see also* ¶¶ 206, 208.

But, "[g]uesswork of this kind, based on the position of the Defendants is insufficient under the [PSLRA]." *Smith v. Circuit City Stores, Inc.*, 286 F. Supp. 2d 707, 715 (E.D. Va. 2003) (rejecting "attempt to plead scienter by referencing the individual Defendants' positions'"); *see also Fanucchi*, 2024 WL 3302564, at *14 (same). "Courts have routinely held that corporate

executives' access to information and internal affairs is not enough to demonstrate scienter under the PSLRA." *Lerner v. Nw. Biotherapeutics*, 273 F. Supp. 3d 573, 593 (D. Md. 2017); *see also In re Criimi Mae, Inc.*, 94 F. Supp. 2d 652, 661 (D. Md. 2000).  Rather, to allege scienter, a plaintiff must make "additional detailed allegations establishing the defendants' actual exposure" to information contradicting their public statements. *Yates v. Mun. Mortg. & Equity, LLC*, 744 F.3d 874, 890 (4th Cir. 2014).

Here, however, the only allegation Plaintiffs even raise in this regard (tellingly not included in the scienter section of the Complaint) is that Keppler and Johnson signed SEC filings that refer to "biomass spot market prices, as well as the forward curve pricing of certain European indices." ¶ 55.  But that a Defendant signed an SEC filing that "refers" to the concept of prices for biomass does not suffice to allege with particularity that he was aware of any particular such price.  The allegation thus fails at the outset.

Moreover, even if Plaintiffs had alleged that Keppler and Johnson were aware of particular biomass prices (and they have not), this would still fail to allege scienter, for two reasons:

*First*, as shown above, Plaintiffs have not shown that biomass prices contradicted any statement at issue.  *Supra* § IV.A.3.  And the Complaint certainly does not show, as it must for such an allegation to allege scienter, that Defendants "knew (or were reckless to the risk that) [their statements] would be *misleading* without including that information."  *Syneos*, 75 F.4th at 243.

*Second*, the biomass prices the Complaint refers to were published by "an independent provider" named Argus Media in a "weekly newsletter that provides…price information for biomass markets including wood pellets."  ¶ 46.  These prices were thus not private information available only to Defendants, but information interested investors could obtain themselves.  As a result, Argus-published prices cannot add anything to the scienter calculus.  *See id.*; *In re Pfizer,*

*Inc. Sec. Litig.*, 538 F. Supp. 2d 621, 637 (S.D.N.Y. 2008) ("[C]ontradictory information must have been non-public in order to raise a strong inference of intent."); *Phillips*, 190 F.3d at 617 (in a securities fraud case, investors are charged with knowledge of all available information).

        **b.**        **The Complaint does not plead particularized facts establishing that Defendant Even made any statements with scienter.**

The Complaint's attempts to plead scienter as to Defendant Even fail for similar reasons. For starters, its attempt to allege scienter based on Even's position, ¶¶ 205, 207, fares no better than the same allegation against Johnson and Keppler. Likewise, the Complaint's attempt to allege scienter based on Even's purported knowledge of "wood pellet market price data," ¶ 214, fails for the same reasons that allegation failed as to Johnson and Keppler.

This leaves just one purported scienter allegation unique to Even: that he was "knowledgeable concerning matters relating to the 4Q Purchase Agreements." ¶ 215. But the only facts about the agreements about which the Complaint alleges Even was "knowledgeable" are facts that he ***disclosed*** to investors early in the proposed Class Period. *Id.* The Complaint fails to explain how the disclosure of such information could possibly suggest scienter. Nor could it have: disclosing this information suggests an intent to inform investors, not deceive them. And it certainly is not a particularized allegation of Even's knowledge of "non-public" facts contrary to his statements, not only because the disclosure does not contradict any statement at issue, but also because the very act of disclosure made it public. *Pfizer*, 538 F. Supp. 2d at 637. It thus fails to add anything to the scienter calculus. *Id.*

        **c.**        **The Complaint does not plead particularized facts establishing that Defendant Meth made any statements with scienter.**

The scant scienter allegations against Defendant Meth likewise fail for similar reasons. As with the other Defendants, Plaintiffs argue that Meth's position and purported acquaintance with Argus price estimates establish scienter. ¶¶ 209–210. These allegations fare no better as to Meth

than as to the other Defendants. In addition, Plaintiffs argue that Meth disclosed information regarding the 4Q Purchase Agreements. ¶ 212. But, as with Even, allegations that Meth was aware of facts he made publicly known to investors cannot contribute to a strong inference of scienter.

Plaintiffs' contention that "Defendant Meth was responsible for and involved in Enviva's contract negotiations," ¶ 211, likewise does not contribute to a strong inference of scienter. The Fourth Circuit faced similar allegations in *Syneos*. There, the plaintiffs alleged that the defendants were involved in "a series of meetings" to discuss a potential merger. *Syneos*, 75 F.4th at 242. Based on their attendance at these meetings, the plaintiffs asked the Court "to infer specific knowledge" inconsistent with their public statements. *Id.* The Fourth Circuit found that it could not do so. *Id.* It held that the mere fact that defendants were involved in such discussions "does not support that Defendants learned any specific information." *Id.*

The same is true here. That Defendant Meth was "involved in Enviva's contract negotiations," ¶ 211, does not establish that he "learned any specific information" through that involvement—let alone that he learned specific information that is inconsistent with the challenged statements. *Syneos*, 75 F.4th at 242. As a result, it does not add to the scienter calculus.

Finally, Plaintiffs allege that Defendant Meth signed master agreements in 2010 and 2011 with RWE. ¶¶ 50–52. But knowledge of these master contracts is irrelevant here, as none of the challenged statements deny that such historic contracts exist nor misrepresent their terms.

### 2.     The Complaint's remaining scienter allegations fall far short of alleging an intent to defraud with particularity.

Unable to make particularized allegations of scienter, Plaintiffs next attempt to make allegations of a vaguer sort—concerning Defendants' purported "access" to information or "motives" to defraud. But to sufficiently allege scienter, "'at a minimum,' the PSLRA 'requires that…for each alleged misstatement or omission, plaintiffs must plead facts concerning, for

26

example, ***when*** each defendant or other corporate officer learned that a statement was false, ***how*** that defendant learned that the statement was false,…and ***the particular document or other source*** of information from with the defendant came to know that the statement was false.'" *In re Acterna Corp.*, 378 F. Supp. 2d at 575 (emphasis added and citation omitted). Plaintiffs' "additional scienter allegations" cannot mask their failure to make such allegations here. In fact, as explained below, Plaintiffs' "additional scienter allegations" have been repeatedly rejected by federal courts as a basis for alleging scienter.

*First*, Plaintiffs make a half-hearted attempt to argue that Defendants' incentive compensation and stock trading supports an inference of scienter. ¶¶ 237–245. But, "[i]ncentive compensation can hardly be the basis on which an allegation of fraud is predicated." *Tuchman v. DSC Commc'ns Corp.*, 14 F.3d 1061, 1068–69 (5th Cir. 1994); *see also Plumbers & Pipefitters Local Union 719 Pension Fund v. Zimmer Holdings, Inc.*, 679 F.3d 952, 956 (7th Cir. 2012). Indeed, "accepting such allegations as proof of scienter 'would effectively eliminate the state of mind requirement as to all corporate officers and defendants.'" *Phillips*, 190 F.3d at 622; *see also e.g.*, *Tuchman*, 14 F.3d at 1068–69 (similar); *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 54 (2d Cir. 1995) (same).

As to stock sales, Plaintiffs point only to a December 5, 2022 "sale by Keppler of 200,000 shares." ¶ 237. But as the Complaint concedes, the sale amounted to only a fraction (20.5%) of Keppler's total holdings. ¶ 237; *see also KBC Asset Mgmt. NV v. DXC Tech. Co.*, 19 F. 4th 601, 611 (4th Cir. 2021) (finding sale of 17% of CFO's stock comparable to other "nearly *de minimis*" sales). Moreover, the sale occurred less than three weeks after Keppler announced his departure from Enviva's CEO role to focus on a personal health issue. In connection with that departure,

Keppler obtained over 240,000 shares of Enviva stock. Ex. 10 (A0484) (Nov. 16, 2022 Form 4).[23]

He then sold 200,000 shares to another Enviva director, Jeffrey D. Ubben. Ex. 11 (A0486) (Dec.

5, 2022 Form 4). In short, Keppler **obtained** more shares than he sold during the Class Period,

**increasing** his net exposure to potential declines in Enviva stock. Keppler's stock transactions

thus undermine, rather than support, any possible inference of scienter. *See Proter v. Medifast,*

*Inc.*, 2013 WL 1316034, at *20 (D. Md. Mar. 28, 2013) ("[A]ny inference of scienter is clearly

eviscerated by the fact that [the defendant's] common stock holdings over the Class Period

increased.").[24]

Besides, Plaintiffs do not allege that any other Defendants engaged in suspicious stock

sales, a fact that "in itself dooms Plaintiffs' claims." *In re First Union Corp. Sec. Litig.*, 128 F.

Supp. 2d 871, 899 (W.D.N.C. 2001).[25] Plaintiffs have thus failed to adequately allege that any

Defendant had a financial motive to defraud investors. This fact is not merely neutral, it "'weighs

heavily' **against** them in the scienter analysis." *Syneos*, 75 F.4th at 242.

*Second*, Plaintiffs argue that Defendants held themselves out as knowledgeable and "had

access to" the purportedly concealed facts. ¶ 205. But federal "[c]ourts have routinely held that

corporate executives' access to information and internal affairs is not enough to demonstrate

scienter under the PSLRA." *Lerner*, 273 F. Supp. 3d at 593 ("[A] defendant's position of control

---

[23] *See Ash v. PowerSecure Int'l, Inc.*, 2015 WL 5444741, at *5 (E.D.N.C. Sept. 15, 2015) (where securities plaintiff alleges suspicious trading, the court may take judicial notice of Form 4s); *see also In re Plug Power, Inc. Sec. Litig.*, 2022 WL 4631892, at *15 n.10 (S.D.N.Y. Sept. 29, 2022) (same).

[24] *See Smallen v. The Western Union Co.*, 950 F.3d 1297, 1310 (10th Cir. 2020) (stock sales do not support scienter where defendants "increased their aggregate holdings during the Class Period, and their respective sales yield from the identified transactions constituted only a fraction of their respective holdings"); *see also Fire & Police Pension Ass'n of Colo. v. Abiomed, Inc.*, 778 F.3d 228, 246 (1st Cir. 2015) (noting that a net increase in a defendants' holdings during the Class Period "negates any inference" of scienter).

[25] *See San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 811 (2d Cir. 1996) ("[T]he fact that other defendants did not sell their shares during the relevant class period sufficiently undermines plaintiffs' claim regarding motive."); *Conagra*, 2022 WL 1449184, at *1 (similar); *see also In re PEC Solutions Sec. Litig.*, 2004 WL 1854202, at *16 (E.D.Va. May 25, 2004) (similar).

28

in a company, without more, is insufficient to establish scienter."); *see also In re Criimi Mae, Inc.*, 94 F. Supp. 2d at 661 (similar). Rather, to allege scienter, a plaintiff must make "additional detailed allegations establishing the defendants' actual exposure" to the subject of the fraud. *Yates*, 744 F.3d at 890. This is exactly what Plaintiffs have failed to do here.

*Third*, Plaintiffs argue that Defendants were motivated to enter into the 4Q 2022 transactions in order to meet their prior earnings guidance. ¶¶ 217–218. But "allegations of defendants' desire to meet revenue projections contributes little to a strong inference of fraudulent intent." *S.E.C. v. Espuelas*, 579 F. Supp. 2d 461, 477 (S.D.N.Y. 2008).[26] And this is especially true here because Plaintiffs do not argue that Defendants misrepresented any financial results. Instead, they argue that they were motivated to enter into transactions that Plaintiffs think were unwise. But entering into ill-advised transactions is not fraud. *See, e.g.*, *Andropolis v. Red Robin Gourmet Burgers, Inc.*, 505 F. Supp. 2d 662, 682–83 (D. Colo. 2007) (collecting authorities on this point); *Triangle*, 988 F.3d at 753 (same). As such, a purported motivation to enter into such a transaction adds nothing to the scienter calculus.

*Fourth*, Plaintiffs argue that Defendants' departures from Enviva support an inference of fraud, noting that they occurred shortly after various disclosures of bad news such as "bleak performance, mounting financial pressures and a cost-cutting corporate restructuring." ¶ 247. "But executive departures are, at best, weak evidence of scienter." *Syneos*, 75 F.4th at 244, and here, there is no evidence at all. "[F]or corporate departures to strengthen an inference of scienter, there must be particularized allegations connecting the departures to the alleged fraud." *In re Hertz Glob. Holdings Inc.*, 905 F.3d 106, 118 (3d Cir. 2018). Here, Plaintiffs offer no such

---

[26] *Espuelas*, *abrogated on other grounds as recognized in S.E.C. v. Wey*, 246 F. Supp. 3d 894 (S.D.N.Y. 2017); *see also In re Alamosa Holdings, Inc.*, 382 F. Supp. 2d 832, 858 (N.D. Tex. 2005) ("[D]esirability for growth [by management] is too universal a corporate goal to constitute a basis for scienter."); *Triangle*, 988 F.3d at 754 (motive to "keep share prices and dividends high" not evidence of fraudulent intent).

allegations, instead focusing only on the timing shortly after announcements of bad news. *See* ¶¶ 247–50. But the timing of executive departures "is not, in itself, a symbol of fraud," and thus departures do not support an inference of scienter absent allegations that they "resulted from the relevant executives' knowing or reckless involvement in a fraud." *In re Hertz*, 905 F. 3d at 119. Such allegations are entirely absent here.

*Finally*, the Fourth Circuit has made clear that "'bare allegations' that officers have 'knowledge of key facts'…because such knowledge relates to the business's core operations are not enough, standing alone, 'to support a strong inference of scienter.'" *KBC Asset Mgmt. NV*, 19 F.4th at 612. Rather, to allege scienter, there must be "additional detailed allegations establishing the defendants' actual exposure to" information contradicting the challenged statements. *Yates*, 744 F.3d at 890. Here, as explained above, Plaintiffs have made no such "detailed allegations" demonstrating the Defendants' "actual exposure" to information contradicting the challenged statements. *Id.* The core operations theory is thus no help to Plaintiffs' attempt to allege scienter.

\*             \*             \*

In sum, taking all of the Complaint's scienter allegations holistically, they do not support a strong inference that Defendants spoke with intent to defraud investors. *See Tellabs*, 551 U.S. at 326. The far more cogent and compelling inference is the non-culpable one that Defendants accurately reported facts about Enviva, including the negative news that was followed by declines in its stock price.

## V.    CONCLUSION

For all these reasons, the Complaint should be dismissed in its entirety and with prejudice. In the alternative, Defendants request that the Court dismiss from this action all statements and Defendants for which the Court concludes there is no actionable claim.

30

Dated:  October 4, 2024

Respectfully submitted,

*/s/ Ronald J. Tenpas*
Ronald J. Tenpas (#14448)
  State Bar No. 24002307
VINSON & ELKINS L.L.P.
2200 Pennsylvania Avenue NW
Suite 500 West
Washington, DC 20037
Telephone: (202) 639-6500
Telephone: (202) 639-6791
Fax: (202) 879-8981
rtenpas@velaw.com

Jeffrey S. Johnston (admitted *pro hac vice*)
VINSON & ELKINS L.L.P.
845 Texas Avenue
Suite 4700
Houston, TX 77002
Telephone: (713) 758-2198
jjohnston@velaw.com

Robert Ritchie (admitted *pro hac vice*)
VINSON & ELKINS L.L.P.
2001 Ross Avenue
Suite 3900
Dallas, Texas 75201
Telephone: (214) 220-7823
rritchie@velaw.com

*Attorneys for Defendants*

*/s/ Graeme W. Bush*
Graeme W. Bush (#02171)
Ezra B. Marcus
ZUCKERMAN SPAEDER LLP
1800 M Street, NW, Suite 1000
Washington, DC 20036
Telephone: (202) 778-1800
Fax: (202) 822-8106
gbush@zuckerman.com
emarcus@zuckerman.com

*Attorneys for Defendant John K. Keppler*

31

32

## CERTIFICATE OF SERVICE

I, Ronald J. Tenpas, hereby certify that on October 4, 2024, true copies of the foregoing were served on all counsel of record via the Court's ECF system in compliance with Fed. R. Civ. P. 5(a).


*/s/ Ronald J. Tenpas*
Ronald J. Tenpas

32

**<u>Davis v. Enviva Inc., et al.</u>**
**Statements Challenged by the Amended Complaint[1]**

| # | AC ¶ | Date | Statement[2] | Source |
|---|---|---|---|---|
| | | | **<u>Category A: Statements regarding inflationary pressures and facility capacity</u>** | |
| 1 | 102 | November 3, 2022 | [**Elvira Scotto, RBC Capital Markets:** "Your adjusted gross margin per metric ton of $75 in the fourth quarter. Can you quantify what the biggest drivers are of that increase to $75? I mean, is it the fact that you have inflation escalators? Is it? What is the biggest driver?"]<br><br>**Keppler:** "The headline price increases, [and] obviously, headline price increases margin[ a]nd it's an all[ ]of[ ]the[ ]above impact[s], right? The fact that the inflationary provisions within each of our contracts are providing meaningful[] durable pricing increases [that] increased margin at frankly[] a faster rate than we're seeing some of the impact on the cost [tower]. But that's why the business model works [so] well, right?" | 3Q 2022 Earnings Call (Keppler) |
| 2 | 105 | November 28, 2022 | "The combination of pricing escalators in our contracts, our repricing of certain of our historical contracts, our entry into new, higher priced contracts, and a production and cost position that continues to improve, means that our margins are expanding significantly and durably[ . . . .]" | Investor Presentation: 3Q 2022 Update (Meth) |
| 3 | 121 | March 1, 2023 | "Our facilities are designed to operate 24 hours per day, 365 days per year, although we schedule up to 15 days of planned maintenance for our wood pellet production plants during each calendar year. There are no regularly required major turnarounds or overhauls." | 2022 10-K |
| 4 | 154 | April 3, 2023 | "So the biggest part is volume. We've built Lucedale . . . [. ]The remainder of the other expansions have come to a conclusion last year. We hit the necessary daily numbers, September, October, November of last year in some of the plants like Southampton and so on and so forth. And that will flow through as well." | April 3, 2023 Investor Day (Meth) |
| | | | **<u>Category B: Statements regarding dislocation transactions in general</u>** | |
| 5 | 98 | November 3, 2022 | "And in addition to our continuous long-term contracting activities, the same tailwinds that drive the longer-term contracts are driving new highly[ ]accretive[,] near-term opportunities with existing and new customers. And although the near-term opportunities don't reflect the same tenor of our long-term contracts, they and other transactions where we are managing dislocations | 3Q 2022 Earnings Call (Meth) |

---

[1] Defendants do not admit the content of any of the allegations in the Second Amended Complaint (ECF 48) ("Complaint") or this Appendix A.  The purpose of Appendix A is to organize the allegations in the Complaint for the Court.

[2] For certain quotations, Defendants have added the context of the statements, indicating such change using brackets [ ], based on the source material.

**Appendix A**

| # | AC ¶ | Date | Statement[2] | Source |
|---|------|------|-----------|--------|
| | | | within our customers[] demand profile[,] are a durable component of our business[,] and will continue to drive value over the long term." | |
| 6 | 100 | November 3, 2022 | "Enviva has a demonstrated track record of procuring volumes from different suppliers and geographies and selling them profitably into spot market opportunities in our long-term contracts. Market data suggests that volumes can be purchased on an FOB basis in the Pacific Rim for less than $200 per metric ton. Market data also points to trading prices currently north of $400 per metric ton in European markets. For companies like Enviva with large-scale portfolios of customers and shipping partners, these types of market dislocations can provide an opportunity to drive incremental value while meeting the needs of our customers. This is a market tailwind that we may talk more frequently about in the future." | 3Q 2022 Earnings Call (Meth) |
| 7 | 119 | March 1, 2023 | "In addition to generating durable cash flow from long-term take-or-pay off-take contracts, we monitor sustained dislocations in the marketplace, and opportunistically transact when pricing dynamics and contract flexibility provide avenues to generate incremental gross margin. Furthermore, our off-take contracts generally provide us with the opportunity to flex a certain percentage of contracted shipments up or down. That flexibility, enabled by our multi-plant profile, multi-deep water marine terminals and our long-term shipping contracts, can create opportunities to optimize our gross margin when we sell under short-term contracts in times when spot market prices are elevated or, conversely, when we purchase third-party volumes during times when spot market prices are depressed." | 2022 10-K |
| 8 | 140 | April 3, 2023 | "[T]he physical liquidity challenges in this market means that from time to time, we can make incremental margin associated with managing the dislocations in that business . . . [. ]2022, that part of the business was a larger part of the business than it has been historically . . . [. ]But our core business is selling volumes under long-term contracts to our customer set. So that's not going to be a significant part of our business going forward that created so much of the confusion, I think, as part of 2022 financials." | April 3, 2023 Investor Day (Keppler) |
| 9 | 144 | April 3, 2023 | "I will take a few minutes and explain what is commercial activity. Where is that coming from? And why is it accretive and happens every year and is about 15% to 20% of our overall EBITDA historically, and we expect that in the future. As our EBITDA growth, the absolute number will go up, but the importance will not go up, right? It's just a repeatable part of our business because we are solving issues in the supply chain that are accretive for us." | April 3, 2023 Investor Day (Meth) |
| | | | **Category C: Statements about particular market dislocation transactions** | |
| 10 | 123 | March 1, 2023 | "Recent biomass spot market prices, as well as the forward curve pricing of certain European indices, have exceeded $345 per MT, representing a substantial premium to the current long-term contracted pricing of roughly $200 to $235 per MT weighted average across our portfolio, and we were able to capture some of that differential during the year ended December 31, 2022." | 2022 10-K |

**Appendix A**

| # | AC ¶ | Date | Statement[2] | Source |
|---|---|---|---|---|
| 11 | 126 | March 1, 2023 | "[D]uring the fourth quarter of 2022, we planned our third-party pellet purchases for 2023 and beyond. As many of you know, historically, about 15% to 20% of our annual volumes sold are sourced from third parties . . . [. "]22 was a little different because the war in Ukraine shot up about 10% of the world's biomass supply. And the spike in pellet prices made it uneconomical for us to procure the same level of third-party pellets this past year. During the fourth quarter, we entered into a long-term purchase agreement with [one] of the largest biomass trading companies in the world who is also [one] of the largest consumers of biomass in Europe and is [one] of our long-standing customers." | 4Q 2022 Earnings Call (Meth) |
| 12 | 128 | March 1, 2023 | "It's important to note that we have collected cash in full for these sales the customers' biomass power generation facilities have fully consumed our pellets and nothing has changed with the underlying fundamentals and operating model of our business . . . [. ]roughly $89 million of gross margin and adjusted EBITDA is not being recognized in fourth quarter 2022 results[,] but will be recognized in future years. And our current expectation is that approximately half of the deferred benefit will be recognized in 2024 with the other half in 2025[, a]gain, no change to our business. Cash collected in full – just a change in reporting periods as to when the benefit of the sales will be recognized." | 4Q 2022 Earnings Call (Meth) |
| 13 | 130 | March 1, 2023 | "[W]e sold 450,000 tons to this customer. And the underlying margin that we would have generated from the customer was about $32 million in incremental margin. At the same time, we found an opportunity to buy volumes for future periods from that same counterparty. And we do that routinely. As we've said, 15% to 20% of our volumes come from third-party purchases. And in this particular case, it was very attractive to do for future periods." | 4Q 2022 Earnings Call (Meth) |
| 14 | 148 | April 3, 2023 | "I want to remind you, and we talked about this, that we have this deferred gross margin transaction last year of a total of $89 million. And there is an overhang of $12 million in Q1, and that's the last of those that we have to put our balance sheet and regain through our income statement over '24 and '25." | April 3, 2023 Investor Day (Meth) |
| 15 | 172 | May 4, 2023 | "In the fourth quarter of 2022, we entered into agreements with a customer to purchase approximately 1.8 million MT of wood pellets between 2023 and 2025 (the 'new purchase agreements'). The new purchase agreements were priced at market prices in effect at the time of the agreements." | Form 10-Q for 1Q 2023 |
| 16 | 174 | May 4, 2023 | "[W]e did have some shipments that were subject to the deferred gross margin transactions accounting with similar treatment to what we saw at year-end. This accounted for approximately $4.6 million, and we expect the deferral to reverse in 2024 and 2025." | 1Q 2023 Earnings Call (Meth) |

**Appendix A**

| # | AC ¶ | Date | Statement[2] | Source |
|---|------|------|-----------|--------|
| **Category D: Statements of generalized positivity about Enviva's recent results and future prospects** | | | | |
| 17 | 111 | February 8, 2023 | "As we execute our strategic plan, our goal is to achieve new levels of durable cash flow, and the continued market tailwinds we are experiencing provide us tremendous confidence in our ability to deliver on our long-term growth objectives." | Press Release: Enviva Declares Quarterly Dividend (Meth) |
| 18 | 114 | March 1, 2023 | Enviva "generated significant cash, especially in the fourth quarter, which sets the stage for solid growth in 2023 and beyond." | Press Release: Enviva Reports 4Q and Full-Year 2022 Results, Provides 2023 Guidance, and Announces New Customer Agreements (Meth) |
| 19 | 132 | March 1, 2023 | "As you've heard us talk about the contracting environment that we're in, given the alternatives of the high-priced alternatives of any fossil fuel plus carbon pricing for the -- not only today, but also from a future forward curve perspective, we do see a very favorable pricing environment. We have executed some of these contracts that will flow through our revenue line." | 4Q 2022 Earnings Call (Meth) |
| 20 | 134 | March 1, 2023 | "Now let's turn to the cost side. I think the biggest difference you will see comes from improved fixed cost absorption. Why do we have such conviction around that fixed cost absorption is because our plants have proven that they can do it in the later part of 2022[.] . . . In addition to that, we had very accretive upsizing opportunities over the last year or [two] in some of our existing plants. They have been completed. And those plants have shown that they have broken through previous bottlenecks to now deliver volumes at an elevated rate. That fixed cost absorption will be a major driver for our conviction in our increased guidance range for 2023." | 4Q 2022 Earnings Call (Meth) |
| 21 | 137 | April 2, 2023 | "I know we're going to see tremendous growth. Not only from a volumetric perspective, but also from a margin perspective. Our cost position will come down to more historic levels, and at the same time our revenues will grow because the ability to pay of our customers is much higher. Both of those together, I think we are going to be in fantastic shape, and our valuation will certainly see the benefit of that. Let's talk about the revenue side. We have very healthy inflationary adjustments in our contracts with our customers." | Meth Interview with Enviva's Chief Administrative & People Officer (Meth) |

4

**Appendix A**

| # | AC ¶ | Date | Statement[2] | Source |
|---|---|---|---|---|
| | | | "With that, when costs go down, revenues go up, margins expand. The tailwinds of growth that we see in Asia, in the U.S. and in Europe, I think our investors will also see that this is a fantastic investment. And with that, certainly I would think that the stock price will show a recovery." | |
| 22 | 146 | April 3, 2023 | "[F]or 2023, and I said this earlier, our focus is to execute in operations to drive costs down, and the big part of how you drive cost down is creating more volume. As the leader of this company, that is one of my key areas of focus and it has been for the last couple of months. In 2022, many of our expansion projects hit the necessary nameplate capacities, right? As we come out of the early days of this year, and we've produced in March and April, seen really, really good progress in making more tons at lower cost." | April 3, 2023 Investor Day (Meth) |
| Category E | | | **Category E: Statements about Enviva's dividend and liquidity** | |
| 23 | 108 | January 26, 2023 | "[I]n addition to growing and developing our infrastructure, we're paying a healthy dividend. We can do both and we'll certainly continue to do that." | January 26, 2023 Meth Interview with Wall Street Transcript (Meth) |
| 24 | 142 | April 3, 2023 | "[W]e have plenty of liquidity, complemented by growing long-term cash flows that protect our stable dividend, and enable us to invest in projects with strong returns." | April 3, 2023 Investor Day (Keppler) |
| 25 | 150 | April 3, 2023 | "We recognize that you have questions. Can Enviva execute this growth program without issuing additional equity? Can Enviva execute this growth program while maintaining the dividend, is a dividend safe? Enviva can execute its growth program, building 4 plants over the next 4 years. [w]ithout issuing additional equity. We can do both. We can build the 4 plants over the next 4 years and pay dividend."<br><br>"And now before I turn it back to Thomas for wrap up and Q&A, I would like to remind you that Enviva can execute on its growth plan program, building 4 plants over the next 4 years without issuing additional equity. Our dividend is safe. We can do both. We can grow the company, build the 4 plants over the next 4 years, while maintaining and having the potential for the dividend to grow over time." | April 3, 2023 Investor Day (Even) |
| 26 | 152 | April 3, 2023 | "We don't need to raise additional equity, and we will continue to pay the dividend at current levels." | April 3, 2023 Investor Day (Meth) |
| 27 | 177 | August 3, 2023 | "Our primary liquidity needs are to fund working capital, service our debt, invest in maintenance capital expenditures, expansion and optimization of our plants, and greenfield construction projects, or, secondarily, where determined in the discretion of the board of directors of the | Form 10-Q for 2Q 2023 |

**Appendix A**

| # | AC ¶ | Date | Statement[2] | Source |
|---|------|------|-----------|--------|
| | | | Company (the 'Board'), to pay dividends or repurchase our common stock . . . We believe cash on hand, cash generated from our operations and the availability of our senior secured revolving credit facility will be sufficient to meet our primary liquidity requirements." | |
|  | | | **Category F: Forward-looking projections about Enviva's financial performance** | |
| 28 | 95 | November 2, 2022 | "Productivity improvements across our manufacturing facilities, including debottlenecking, asset utilization increases, and the capacity expansions we have underway, are resulting in production rates that we expect to translate to over 6 million tons next year, and when combined with our improving supply chain conditions and the constructive pricing environment, particularly in Europe, are expected to not only provide modest opportunities in fourth-quarter 2022 to drive incremental margin and cash flow, but also set the stage for substantial growth in 2023 and beyond." | Press Release: Enviva Reports 3Q 2022 Results (Meth) |
| 29 | 116 | March 1, 2023 | "I am most focused on improving operational performance and cost management in our plants and ports. In 2023, we expect to drive increased output from these assets, and together with procured volumes, we aim to sell close to 7 million metric tons at higher prices than we have seen historically, and at a meaningfully lower cost position, achieved by higher plant utilization, a stable and fully staffed workforce, and improved supply chain conditions relative to the challenges of 2022." | Press Release: Enviva Reports 4Q and Full-Year 2022 Results, Provides 2023 Guidance, and Announces New Customer Agreements (Meth) |
| 30 | 180 | August 3, 2023 | "As we look to the second half of this year and what we expect to achieve, we are maintaining our full 2023 adjusted EBITDA guidance range of $200 million to $250 million, and we're updating our quarterly expectations for third and fourth quarter adjusted EBITDA. For third quarter, we're stepping down our expectations from the previous range of $70 million to $90 million of adjusted EBITDA to a range of $60 million to $80 million[ . . . .]"<br><br>"The significant step-up in earnings expected in the quarter over third quarter is underpinned by a number of factors that we have good visibility into[ . . . .]" | Earnings Call 2Q 2023 (Meth) |
| 31 | 182 | August 3, 2023 | **Elvira Scotto, RBC Capital Markets:** "[J]ust help me understand the guidance for the rest of the year, what percent of that is based on some of this potential spot business that you referenced?" | Earnings Call 2Q 2023 (Meth) |

6

**Appendix A**

| # | AC ¶ | Date | Statement[2] | Source |
|---|---|---|---|---|
| | | | **Meth:** "Look, I think the way to look at this is that if some of that happens as part of the commercial activity, it will happen in Q4. And if we're successful in that, it certainly helps us to get to the higher end of the range. That's the order of magnitude that we're seeing for that part of the business." | |
| 32 | 184 | August 3, 2023 | "Jordan, we -- our forecast does not include any incremental deferred gross margin transactions." | Earnings Call 2Q 2023 (Meth) |
|  | | | **Category G: Sarbanes-Oxley Certifications** | |
| 33 | 171 | May 4, 2023 | "Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report[.]" | Form 10-Q for 1Q 2023 (Meth, Even) |
| 34 | 176 | August 3, 2023 | "Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report[.]" | Form 10-Q for 2Q 2023 (Meth, Even) |