**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| ANDREW DAVIS, et al., | Civil Action No. 8:23-cv-02474-MJM |
| Plaintiffs, | |
| v. | |
| JOHN K. KEPPLER, et al., | |
| Defendants. | |

**<u>PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS</u>**

## TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................ 1

II.     STATEMENT OF FACTS ................................................................................... 2

        A.      In 2022 Enviva Suffered Serious, Undisclosed Problems And Manipulated
                Its Earnings To Meet Aggressive Financial Guidance .......................................... 2

        B.      Enviva Entered The Disastrous Fourth Quarter 2022 Purchase Agreements
                At Concealed, Above-Market Prices ..................................................................... 3

        C.      In 2023 Enviva's Financial Problems Began To Emerge While Defendants
                Still Concealed The 4Q 2022 Purchase Agreement Prices ..................................... 4

        D.      Enviva's Board Investigates The 4Q 2022 Purchase Agreements, And
                Bankrupt Enviva Now Plans To Sue The Defendants ............................................ 4

III.    LEGAL STANDARDS ....................................................................................... 5

IV.     DEFENDANTS MADE MATERIALLY MISLEADING STATEMENTS ..................... 5

        A.      Defendants Misleadingly Concealed The Financially Ruinous 4Q 2022
                Purchase Agreement Prices ................................................................................... 6

        B.      Defendants Made Numerous Other Misleading Statements Concealing
                Enviva's Operational Problems And Financial Distress ....................................... 11

V.      DEFENDANTS' FALSITY ARGUMENTS FAIL ................................................. 14

        A.      The Concealed Facts About Manufacturing Problems And Inflationary
                Pressures Contradicted Defendants' Public Statements ...................................... 14

        B.      Defendants' Wood Pellet Trading Statements Were Misleading ........................ 15

        C.      Defendants Concealed The 4Q 2022 Purchase Agreements' Existing,
                Onerous Price Terms .......................................................................................... 16

        D.      Defendants' Statements Were Material, Not Puffery .......................................... 17

        E.      Statements Touting Enviva's Purported Financial Strength Are Actionable ....... 19

        F.      Defendants' "Forward-Looking" Statements Knowingly Concealed Present
                Facts And Lacked A Reasonable Basis ............................................................... 20

        G.      Defendants' Certifying The Accuracy Of Enviva's SEC Reports Was
                Actionably Misleading ........................................................................................ 21

VI.     DEFENDANTS ACTED WITH SCIENTER ...................................................... 22

A.  Enviva's Co-Founder And CEO Thomas Meth .................................................... 22

B.  Enviva's CFO Shai Even ................................................................................. 27

C.  Enviva's Co-Founder, Chairman and Initial CEO John Keppler ......................... 27

D.  Enviva's Chief Accounting Officer Michael Johnson ......................................... 29

VII.  DEFENDANTS FAIL TO ESTABLISH A MORE COMPELLING INNOCENT INFERENCE OF SCIENTER ................................................................................... 29

VIII.  PLAINTIFFS REQUEST LEAVE TO AMEND, IF NECESSARY ............................... 30

IX.  CONCLUSION ..................................................................................................... 30

## TABLE OF AUTHORITIES

CASES

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) .................................................................................................... 5

*Bos. Ret. Sys. v. Alexion Pharms., Inc.*,
   556 F. Supp. 3d 100 (D. Conn. 2021) ....................................................... 21, 22, 28

*Cambridge Ret. Sys. v. Jeld-Wen Holding, Inc.*,
   496 F. Supp. 3d 952 (E.D. Va. 2020) ............................................................. 15, 26

*Direct Benefits, LLC v. TAC Fin. Inc.*,
   2014 WL 671616 (D. Md. Feb. 20, 2014) ...................................................................... 5

*Direct Benefits, LLC v. TAC Fin. Inc.*,
   2020 WL 2769982 (D. Md. May 28, 2020) .............................................................. 20

*Dodona I, LLC v. Goldman, Sachs & Co.*,
   847 F. Supp. 2d 624 (S.D.N.Y. 2012) .......................................................................... 7

*Immune Therapeutics, Inc. v. Handley*,
   2022 WL 16720196 (E.D. Va. Nov. 4, 2022) ......................................................... 30

*In re 2U, Inc. Sec. Class Action*,
   2021 WL 3418841 (D. Md. Aug. 5, 2021) ........................................... 17, 18, 20, 23

*In re Banco Bradesco S.A. Sec. Litig.*,
   277 F. Supp. 3d 600 (S.D.N.Y. 2017) ..................................................................... 22

*In re Crown Am. Realty Tr. Sec. Litig.*,
   1997 WL 599299 (W.D. Pa. Sept. 15, 1997) .......................................................... 19

*In re Emergent BioSolutions Inc. Sec. Litig.*,
   2023 WL 5671608 (D. Md. Sept. 1, 2023) ....................................................... *passim*

*In re Gen. Elec. Co. Sec. Litig.*,
   857 F. Supp. 2d 367 (S.D.N.Y. 2012) .................................................................... 19

*In re Genworth Fin. Inc. Sec. Litig.*,
   103 F. Supp. 3d 759 (E.D. Va. 2015) .............................................................. *passim*

*In re Ironnet, Inc.*,
   2023 WL 5110932 (E.D. Va. Aug. 9, 2023) ................................................ 9, 22, 28

*In re James River Grp. Holdings, Ltd. Sec. Litig.*,
    2023 WL 5538218 (E.D. Va. Aug. 28, 2023)........................................ 19, 24, 28

*In re SCANA Corp. Sec. Litig.*,
    2019 WL 1427443 (D.S.C. Mar. 29, 2019) ...................................................... 21

*In re Smith Barney Transfer Agent Litig.*,
    884 F. Supp. 2d 152 (S.D.N.Y. 2012).................................................. 21, 28

*In re Under Armour Sec. Litig.*,
    540 F. Supp. 3d 513 (D. Md. 2021) .................................................................. 5

*In re Willis Towers Watson plc Proxy Litig.*,
    937 F.3d 297 (4th Cir. 2019) ..................................................... 9, 18, 19

*Kiken v. Lumber Liquidators Holdings, Inc.*,
    155 F. Supp. 3d 593 (E.D. Va. 2015) ...................................................... 6, 26

*Laber v. Harvey*,
    438 F.3d 404 (4th Cir. 2006) ......................................................................... 30

*Latham v. Matthews*,
    662 F. Supp. 2d 441 (D.S.C. 2009)................................................................. 23

*Makor Issues & Rts., Ltd. v. Tellabs Inc.*,
    513 F.3d 702 (7th Cir. 2008) ......................................................................... 30

*Marsh Grp. v. Prime Retail, Inc.*,
    46 F. App'x 140 (4th Cir. 2002) ................................................................... 19

*McIntyre v. Pedder*,
    2015 WL 5039431 (W.D.N.C. Aug. 26, 2015)............................................. 10

*Meyer v. Jinkosolar Holdings Co.*,
    761 F.3d 245 (2d Cir. 2014).......................................................................... 15

*Morgan Stanley Cap. Grp. Inc. v. Pub. Util. Dist. No. 1 of Snohomish Cnty., Wash.*,
    554 U.S. 527 (2008)......................................................................................... 9

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
    575 U.S. 175, (2015)...................................................................................... 20

*R2 Invs. LDC v. Phillips*,
    401 F.3d 638 (5th Cir. 2005) ......................................................................... 17

*Roofer's Pension Fund v. Papa*,
2018 WL 3601229 (D.N.J. July 27, 2018) ................................................................. 6

*San Antonio Fire & Police Pension Fund v. Syneos Health Inc.*,
75 F.4th 232 (4th Cir. 2023) .................................................................................... 24

*Singer v. Reali*,
883 F.3d 425 (4th Cir. 2018) ..................................................................... 14, 15, 18

*Sinnathurai v. Novavax, Inc.*,
645 F. Supp. 3d 495 (D. Md. 2022) ...................................................... 15, 16, 23, 25

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
551 U.S. 308 (2007) ................................................................................................ 22

*Turka v. S.C. Pub. Serv. Auth.*,
2020 WL 901965 (D.S.C. Feb. 25, 2020) ................................................................ 19

*United States v. Aiyer*,
470 F. Supp. 3d 383 (S.D.N.Y. 2020) ....................................................................... 9

*Zak v. Chelsea Therapeutics Int'l, Ltd.*,
780 F.3d 597 (4th Cir. 2015) ............................................................................ *passim*

## STATUTES

15 U.S.C. § 78u–4(b) ...................................................................................................... 5

15 U.S.C. § 78u–5(c)(1) ................................................................................................. 21

15 U.S.C. §§ 78j(b) ......................................................................................................... 6

## RULES

Fed. R. Civ. P. 9(b) ......................................................................................................... 5

Fed. R. Civ. P. 15(a)(2) ................................................................................................. 30

## REGULATIONS

17 C.F.R. § 240.10b-5(b) ........................................................................................... 6, 22

Plaintiffs respectfully submit this opposition to Defendants' motion to dismiss (ECF 49-1, "MTD") the amended complaint (ECF 48, "Complaint," cited herein as "¶__").[1]

## I.    INTRODUCTION

This is a straightforward case of securities fraud in which Defendants, the former senior executives of Enviva, Inc. ("Enviva"), concealed from public stock market investors multiple grave problems with Enviva's failing business. Foremost among these problems was that in the fourth quarter of 2022 Enviva agreed to buy vast quantities of wood pellets over 2023-25 at *undisclosed* above-market prices (the "4Q 2022 Purchase Agreements"), for an *undisclosed* total purchase price of over $641 million. Pellet demand promptly declined, and by March 2023 market prices showed that Enviva would lose over $250 million on those agreements. Almost immediately after entering the 4Q 2022 Purchase Agreements, and throughout 2023, Enviva secretly tried to renegotiate them. By August 2023, Enviva was already in breach of those agreements for failing to purchase $113 million of pellets, which Defendants also concealed.

Defendants repeatedly discussed the 4Q 2022 Purchase Agreements in communications to investors throughout the November 3, 2022 – November 8, 2023 Class Period, disclosing key terms such as the quantities and timing of the required purchases. However, in *every* such communication Defendants chose *not* to disclose the above-market prices and Enviva's ballooning obligations under those agreements. This was not a coincidence—it was a conscious decision to conceal Enviva's financial distress. Defendants misled investors about the 4Q 2022 Purchase Agreements by, *inter alia*, claiming that they were "priced at market prices" and "very attractive to do for future periods," and that Enviva's wood pellet trading was "accretive," *i.e.*, profitable.

In November 2023 Enviva's new management, which by then had replaced the Defendants,

---

[1] Capitalized terms that are not otherwise defined have the same meanings as in the Complaint. Unless otherwise noted, internal alterations, citations and quotation marks are omitted and emphasis is added throughout this brief.

finally revealed the 4Q 2022 Purchase Agreements' prices and the resulting $283 million of expected losses. Enviva's stock price plummeted, losing 77% of its value in a single day. Soon after, Enviva was forced into bankruptcy, and has now determined to pursue claims against the Defendants "arising from nondisclosure of," the 4Q 2022 Purchase Agreements.

Defendants' motion fails to engage with Plaintiffs' key allegations, ignoring some and mischaracterizing others, to present a skewed version the Complaint. Defendants' central argument that the Complaint alleges "fraud by hindsight" is wrong—*at all relevant times* Defendants knew of the extremely high 4Q 2022 Purchase Agreement prices, and that the far lower prevailing market prices showed Enviva would lose hundreds of millions of dollars on those purchases. Plaintiffs plausibly allege Defendants' misleading statements and raise a strong inference of their scienter. Defendants' motion should be denied, and this case should proceed on its compelling merits.

## II.    STATEMENT OF FACTS

### A.    In 2022 Enviva Suffered Serious, Undisclosed Problems And Manipulated Its Earnings To Meet Aggressive Financial Guidance

In 2022 Enviva's pellet manufacturing plants, most notably the Southampton, Virgina plant, suffered from chronic equipment failures which led to work stoppages, decreased production, and increasing maintenance costs. ¶¶67-80. These problems were compounded by excessive employee turnover (as high as 55%), due in part to a hostile work environment created by managers including Defendant Keppler. ¶¶81-85. Prices for Enviva's manufacturing inputs became much more expensive, which Enviva's contractual inflation protections were insufficient to offset, further worsening Enviva's bottom line. ¶¶88-90. Defendants concealed these mounting problems, and issued aggressive earnings guidance to investors, implying over $100 million in Adjusted EBITDA for the fourth quarter of 2022. ¶229. Leading up to that period, Enviva had routinely issued inflated financial guidance and then resorted to earnings manipulation to try to

meet the unrealistic numbers, which set Enviva up for a large shortfall in 4Q 2022. ¶¶217-36.

> **B.    Enviva Entered The Disastrous Fourth Quarter 2022 Purchase Agreements At Concealed, Above-Market Prices**

In 4Q 2022 Enviva made agreements with its existing customer RWE Supply & Trading GmbH ("RWE"), under which (i) Enviva would sell RWE approximately 340,000 additional metric tons of wood pellets in 4Q 2022, and (ii) Enviva agreed to purchase approximately 1,760,000 metric tons of wood pellets from RWE between 2023 and 2025. ¶¶40-41. Enviva's additional sales to RWE represented 33% of Enviva's 4Q 2022 sales by weight, and even more by dollar amount, without which Enviva would have fallen far short of its 2022 guidance. ¶¶230-35.

Unknown to investors, Enviva had agreed to purchase the 1.7 million-plus metric tons of wood pellets at weighted average prices of approximately $377 per metric ton, meaning Enviva was obligated to pay $641 million in total. ¶¶44-45. The $377 price was far higher than Enviva's long-term contracted sales prices of $200 to $235 per metric ton, meaning Enviva could not profitably sell these pellets under the long-term contracts that made up 80-85% of its business. ¶65. During 4Q 2022, prices for 2-year and 3-year delivery of wood pellets (*i.e.*, 2024 and 2025 forward prices) were far below the prices Enviva had agreed to pay of approximately $388 per metric ton for 2024 and $372 per metric ton for 2025. ¶¶44, 56-58, 61. The highest 2024 or 2025 forward prices reported during 4Q 2022 were approximately $290 per metric ton. ¶61.

Prices for spot market (within 90 days) and 1-year forward delivery of wood pellets were abnormally high during 4Q 2022, and by February 2023 had returned to their prior levels, where they remained throughout 2023. ¶¶56-60, 66. While Enviva stood to lose millions of dollars from the outset of the 4Q 2022 Purchase Agreements due to their above-market prices *when made*, the early 2023 price decline substantially worsened the problem. By February 2023 Enviva was already facing at least $244 million in losses. ¶¶62, 112. Defendants repeatedly admitted that they

did not expect prices to return to the high levels seen in late 2022. ¶64. Enviva secretly sought to renegotiate the 4Q 2022 Purchase Agreements "since the first quarter of 2023." ¶63.

**C.       In 2023 Enviva's Financial Problems Began To Emerge While Defendants Still Concealed The 4Q 2022 Purchase Agreement Prices**

Over May 3-4, 2023, Defendants released Enviva's first quarter 2023 results, partially revealing its problems and sending its stock price down 67% in a single day, while still concealing the 4Q 2022 Purchase Agreement prices. ¶¶157-75. Defendants eliminated Enviva's dividend "to preserve liquidity" (¶157). Defendants blamed factors including severe equipment problems at Enviva's plants including Southampton, and high costs for wood fiber and temporary contract workers. ¶¶158, 162-66. While misleadingly discussing the 4Q 2022 Purchase Agreements, Defendants continued to conceal their purchase prices. ¶¶172-75. On November 9, 2023, Enviva's new CEO, who replaced Defendant Meth, finally revealed the prices Enviva had agreed to pay in the 4Q 2022 Purchase Agreements, and the resulting expected losses of $283 million. ¶¶192-93. Enviva admitted that there was "substantial doubt regarding the Company's ability to continue as a going concern." ¶190. On the day of these revelations, Enviva's stock price fell by 77%. ¶194.

**D.       Enviva's Board Investigates The 4Q 2022 Purchase Agreements, And Bankrupt Enviva Now Plans To Sue The Defendants**

In November 2023 Enviva's Board began investigating the 4Q 2022 Purchase Agreements because, "[d]espite their magnitude, the Q4 2022 Transactions *were not disclosed* to . . . the Board when entered into by management." ¶198. On March 12, 2024, Enviva filed for bankruptcy. ¶203. The Board's counsel reviewed Defendants' emails, documents, and electronic chats, and interviewed Keppler and Meth. ¶201. Enviva's Board has now concluded "that colorable claims exist" against each Defendant "arising from the decision to enter into the Q4 2022 Transactions," including breach of fiduciary duty claims "arising from *nondisclosure* of, and failure to seek Board approval for," the 4Q 2022 Purchase Agreements. *See* Spencer Decl. Ex. A (filed herewith).

4

### III.   LEGAL STANDARDS

A complaint need only "contain sufficient factual matter . . . to state a claim that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Plaintiffs must plead facts "that allow[] the court to draw the reasonable inference that the defendant is liable." *Id.* at 678. "[T]his Court must construe the complaint in the light most favorable to the plaintiff, read the complaint as a whole, and take the facts asserted therein as true." *Direct Benefits, LLC v. TAC Fin. Inc.*, 2014 WL 671616, at *3 (D. Md. Feb. 20, 2014). "The purpose of Rule 12(b)(6) is to test the sufficiency of a complaint and not to resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *In re Under Armour Sec. Litig.*, 540 F. Supp. 3d 513, 518 (D. Md. 2021).

Pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA") and Federal Rule of Civil Procedure 9(b), securities fraud claims must be pled with particularity, identify each challenged statement and why it is misleading, and plead a "strong inference" of defendants' scienter. *See* 15 U.S.C. § 78u–4(b). However, this "does not require the elucidation of every detail of the alleged fraud." *Under Armour*, 540 F. Supp. 3d at 519. "[N]either Rule 9(b) nor the PSLRA requires plaintiff[s] to set forth facts which, because of the lack of discovery, are in the exclusive possession of the Defendants." *Direct Benefits*, 2014 WL 671616, at *8.

"Generally, a plaintiff asserting a claim under [Securities Exchange Act of 1934 ("Exchange Act")] Section 10(b) must establish: (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 605 (4th Cir. 2015). The Complaint more than sufficiently alleges each element of Plaintiffs' claims.

### IV.   DEFENDANTS MADE MATERIALLY MISLEADING STATEMENTS

"The Exchange Act and related regulations ensure that public companies release

5

information that will permit investors to make informed investment decisions." *Chelsea Therapeutics*, 780 F.3d at 605. Under Exchange Act § 10(b) and SEC Rule 10b-5 promulgated thereunder, it is unlawful "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b); 15 U.S.C. §§ 78j(b).

To allege falsity, "the complaint must plead *sufficient facts* to support a *reasonable belief* in the allegation that a defendant's statement was misleading." *Kiken v. Lumber Liquidators Holdings, Inc.*, 155 F. Supp. 3d 593, 601 (E.D. Va. 2015) (emphasis in original). "It is not necessary for Plaintiff to prove absolute, incontrovertible falsity at the motion to dismiss stage," rather the "plaintiff is only required to allege facts and circumstances that, drawing reasonable inferences in their favor, would render their claims [of falsity] plausible." *Id.* "As a general rule, the trier of fact decides whether a public statement is misleading." *Id.*

### A.   Defendants Misleadingly Concealed The Financially Ruinous 4Q 2022 Purchase Agreement Prices

Over and over again, throughout the Class Period, Defendants touted the purported profitability of Enviva's pellet trading and made misleading statements about the 4Q 2022 Purchase Agreements. All the while Defendants concealed those agreements' above-market purchase prices that created hundreds of millions of dollars in expected losses for Enviva.

*3Q 2022 Results.* On November 3, 2022, Meth stated that "the same tailwinds that drive the longer-term contracts are driving new *highly-accretive* near-term opportunities with existing and new customers" that "will *continue to drive value* over the long term." ¶98. However, Enviva had already entered into the first of the 4Q 2022 Purchase Agreements with existing customer RWE (¶41) at above-market prices for 2024 and 2025 forward purchases (¶61), which was therefore *dilutive* and *value-destroying* to Enviva. *See Roofer's Pension Fund v. Papa*, 2018 WL

3601229, at *14 (D.N.J. July 27, 2018) (statements about "accretive" merger were misleading).

*4Q 2022 Results.* On March 1, 2023, Meth, Even, and Johnson signed Enviva's annual report on SEC Form 10-K, which touted "opportunities to optimize our gross margin when we . . . purchase third-party volumes during times when spot market prices are depressed." ¶119. But under the 4Q 2022 Purchase Agreements Enviva had to do exactly the opposite—buy large volumes of wood pellets from RWE at elevated, unprofitable prices. ¶¶64-66. Meth stated on Enviva's earnings call that, although it typically bought 15-20% of its pellets from third parties, "2022 was a little different because . . . the spike in pellet prices made it uneconomical for us to procure the same level of third-party pellets this past year. During the fourth quarter, we entered into a long-term purchase agreement with 1 of . . . our long-standing customers." ¶126. When Meth said Enviva *did not* make uneconomical purchases at 2022's elevated prices, and in the same breath touted the 4Q 2022 Purchase Agreements, reasonable investors would understand that those agreements were *not* set at elevated prices and *were* "economical," *i.e.*, profitable. In fact, those agreements were economically irrational even when made, due to their above-market prices. ¶127.[2]

Responding to a question about Enviva's fourth quarter transactions with RWE, Meth stated, "we found an opportunity to buy volumes for future periods from that same counterparty . . . [a]nd in this particular case, *it was very attractive to do for future periods*." ¶130. But far from being "very attractive," Enviva's purchase obligations were set at far above-market prices from the outset. ¶61. *See Dodona I, LLC v. Goldman, Sachs & Co.*, 847 F. Supp. 2d 624, 645-48 (S.D.N.Y. 2012) (omission of known risks made statements including "attractive" nature of investments inaccurate). Responding to another analyst's question about "your 2023 guidance for

---

[2] Defendants' reason for causing Enviva to enter the economically irrational 4Q 2022 Purchase Agreements appears to have been to induce RWE to buy pellets from Enviva in 4Q 2022, in an effort to boost Enviva's 4Q 2022 earnings to "meet guidance." ¶¶202, 228-36. The 4Q 2022 Purchase Agreements were made at the same time and as part of the same transactions in which Enviva *sold* RWE $175 million of pellets in 4Q 2022. ¶¶40-42.

the spot shipments," Meth stated "not only today, but also *from a future forward curve perspective*, we do see a very favorable pricing environment." ¶132. However, forward price curves already showed Enviva would lose over $260 million on the 4Q 2022 Purchase Agreements. ¶133.

*April 2023 Investor Day.* Because the 4Q 2022 Purchase Agreements were made with existing customer RWE, at the same time as RWE agreed to buy additional pellets from Enviva, they resulted in complex accounting treatment that Defendants cryptically referred to as "deferred gross margin transactions." *E.g.*, ¶¶148, 174, 215, 236. At Enviva's April 3, 2023 Investor Day event, referring to Enviva's 4Q 2022 transactions with RWE and the resulting accounting treatment, Defendant Keppler stated "that's *not going to be a significant part of our business going forward* that created so much of the confusion, I think, as part of 2022 financials." ¶140.[3] Similarly, Meth stated that the quantity of Enviva's pellet trading would increase in proportion to earnings, "but *the importance will not go up* . . . we are solving issues in the supply chain *that are accretive for us*." ¶144. Again, the 4Q 2022 Purchase Agreements were *not* accretive. ¶145. Keppler's and Meth's statements concealed the critically important fact that Enviva was still required to pay $641 million under the 4Q 2022 Purchase Agreements at far above-market prices. ¶141.

*1Q 2023 Results.* On May 4, 2023 Enviva filed its Form 10-Q report for the first quarter of 2023 with the SEC, signed by Defendant Even, with its accuracy certified by Defendant Meth. ¶171. The report stated "[i]n the fourth quarter of 2022, we entered into agreements with a customer to purchase approximately 1.8 million MT of wood pellets between 2023 and 2025 . . . The new purchase agreements *were priced at market prices in effect at the time of the agreements*." ¶172. This was false. Most of the purchases were due in 2024-25, Enviva agreed to pay on average

---

[3] Defendants argue that this statement does not relate to the 4Q 2022 Purchase Agreements. MTD at 10-11. But when Keppler discussed the "confusion" in the 2022 financials he was referring to the complex accounting for Enviva's transactions with RWE, including the 4Q 2022 Purchase Agreements. *See* ¶¶148, 163, 174, 212, 215, 232, 236.

$388 per metric ton in 2024 and $372 in 2025, and when Enviva entered the 4Q 2022 Purchase Agreements forward market prices for 2024-25 were $290 per metric ton or less. ¶¶43, 56-58, 61.

Defendants argue that this statement referred to *spot market* prices (*i.e.*, prices for immediate delivery in 4Q 2022). MTD at 13.[4] But that is not what the statement says, and not how a reasonable investor would understand it, because the relevant market for those future purchases was the *forward market*.[5] A "market price" is "[t]he prevailing price at which something is sold *in a specific market*." PRICE, Black's Law Dictionary (12th ed. 2024). The "spot market" and the "forward market" are "different (but related) market[s]," and "spot-market prices" frequently differ from "forward market prices." *Morgan Stanley Cap. Grp. Inc. v. Pub. Util. Dist. No. 1 of Snohomish Cnty., Wash.*, 554 U.S. 527, 553-54 (2008).[6] When Enviva's new CEO belatedly revealed the 4Q 2022 Purchase Agreement prices Enviva's stock price fell precipitously, showing that investors had *not* previously understood the prices for Enviva's purchases in 2024-25 to be based on elevated 4Q 2022 spot market prices. ¶196 (JP Morgan analyst noting "the *previously unknown*: Per EVA's 10-Q filing released yesterday, EVA agreed to purchase the 1.8mm MTs on a fixed-contract *at ~$377/MT, a price near the all-time high spot prices from 2H22*"); ¶¶194-97.

Defendants attempt to question the accuracy of the Argus Media wood pellet price data revealing that they entered the 4Q 2022 Purchase Agreements at above-market prices and stood to lose hundreds of millions of dollars. MTD at 13. But such "factual disputes . . . are not proper grist for a motion to dismiss." *In re Willis Towers Watson plc Proxy Litig.*, 937 F.3d 297, 305 n.6 (4th

---

[4] While Defendants are incorrect, this is *at most* a disputed factual issue that should not be resolved against Plaintiffs at the pleading stage. *See In re Ironnet, Inc.*, 2023 WL 5110932, at *10 (E.D. Va. Aug. 9, 2023); *In re Genworth Fin. Inc. Sec. Litig.*, 103 F. Supp. 3d 759, 775, n.9 (E.D. Va. 2015).

[5] Defendants knew how to differentiate between these two markets. When Defendants made statements contemplating "spot market prices" or "spot prices" they explicitly said so. ¶¶55, 64, 119, 123, 214.

[6] *See, e.g.*, *United States v. Aiyer*, 470 F. Supp. 3d 383, 393 n.4 (S.D.N.Y. 2020) (distinguishing spot and forward markets for currencies); Thomas H. Jackson, *"Anticipatory Repudiation" and the Temporal Element of Contract Law*, 31 Stan. L. Rev. 69, 82 (1978) (discussing damages theories based on spot market prices versus forward market prices).

Cir. 2019). Regardless, while Defendants wrongly assert that the Argus forward prices do not "come from any actual 'market'," (MTD at 13), their sole support is the Argus "Methodology and Specifications Guide" filed with their motion. *See* ECF No. 49-16.[7] The Guide states that "[f]or the forward curve, Argus uses *transactions*, market survey results and various types of other market information," but Defendants omit the reference to "transactions" to try to make the forward price sound like mere guesswork. *Compare id.* at A0495 *with* MTD at 13. As shown by the Guide, there are real transactions in the forward market for wood pellets (*e.g.*, the 4Q 2022 Purchase Agreements). ECF No. 49-16 at A0495. Moreover, Defendants and Enviva themselves relied on Argus price data, including forward market price data, further confirming the reliability of such information. ¶¶46-47, 53-55, 123, 132, 193, 214. Defendants' statement that the 4Q 2022 Purchase Agreements "were priced *at market prices in effect at the time of the agreements*" was false, notwithstanding Defendants' premature and unpersuasive factual disputes. ¶172.

*2Q 2023 Results.* On August 3, 2023, Enviva filed its Form 10-Q report for the second quarter of 2023 with the SEC, signed by Defendant Even, with its accuracy certified by Defendant Meth. ECF No. 49-18 at A0615-16. Defendants reiterated the statement from Enviva's first quarter 10-Q that the 4Q 2022 Purchase Agreements "*were priced at market prices in effect at the time of the agreements.*" *Id.* at A0601. That claim remained false. That same day, on Enviva's earnings call, an analyst expressed relief that Enviva did not report any "deferred margin transactions" in the second quarter, *i.e.* transactions like the 4Q 2022 Purchase Agreements, and asked if Defendants anticipated any more of them. ¶¶179, 184. Meth responded "our forecast does not

---

[7] This Guide is nowhere referenced in the Complaint, and is not a type of document subject to judicial notice on a motion to dismiss, and so cannot be used to contradict Plaintiffs' well-pled allegations. *Chelsea Therapeutics*, 780 F.3d at 607; *McIntyre v. Pedder*, 2015 WL 5039431, at *6 (W.D.N.C. Aug. 26, 2015).

include any incremental deferred gross margin transactions." ¶184.[8] Meth misleadingly concealed that under the 4Q 2022 Purchase Agreements Enviva was still obligated to execute over $640 million of purchases at above-market prices. ¶¶43-45, 185. Reasonable investors would understand his statement to mean that the negative financial impacts of the 4Q 2022 Purchase Agreements were already disclosed. That could not have been further from the truth.

### B.    Defendants Made Numerous Other Misleading Statements Concealing Enviva's Operational Problems And Financial Distress

*Manufacturing Plants.* Defendants repeatedly touted Enviva's pellet manufacturing plants while concealing serious problems, most notably at the Southampton plant. Unknown to investors, Enviva completed a botched expansion at Southampton in 2021 that "caus[ed] frequent extended down times, sporadic daily outputs, and material cash burn," and resulted in "~$100mm Of Burned Capital." ¶78. Southampton struggled to achieve consistent production, experienced significant down time due to equipment breaking, Enviva's attempt to expand the plant had failed, and it was nowhere close to its intended production level. ¶¶70, 73.

Despite all this, on March 1, 2023 Meth stated "we had *very accretive upsizing* opportunities over the last year or 2 in some of our existing plants. They have been completed. And those plants have shown that *they have broken through previous bottlenecks* to now deliver volumes at an elevated rate." ¶134. At Enviva's Investor Day Meth stated that "[t]he remainder of the other expansions have come to a conclusion last year. *We hit the necessary daily numbers*, September, October, November of last year *in some of the plants like Southampton*." ¶154. But Southampton's 2021 "upsizing" lost $100 million and *worsened* its problems, it was not

---

[8] Defendants argue that this statement was literally true, because Enviva had not executed "incremental" transactions like the 4Q 2022 Purchase Agreements. MTD at 20-21. However, "Plaintiffs need not . . . allege that a statement was *literally false*," Defendants are liable if the statements made were *misleading* in light of the concealed facts. *In re Emergent BioSolutions Inc. Sec. Litig.*, 2023 WL 5671608, at *13 (D. Md. Sept. 1, 2023).

"accretive" and did not break through bottlenecks. *See Emergent BioSolutions*, 2023 WL 5671608, at \*15 ("the Plaintiffs plausibly allege that . . . Emergent's statements touting Bayview's manufacturing capabilities misleadingly omitted the facility's persistent, serious issues.").

Defendants argue these statements may have been literally true (Plaintiffs dispute this, and expect discovery to show otherwise). MTD at 9-10, 15. But that Enviva completed Southampton's botched expansion *in 2021*, and it suffered "frequent extended down times, sporadic daily outputs, and material cash burn," made Defendants' statements misleading regardless of their *literal* truth or falsity. ¶¶73, 78; *Chelsea Therapeutics*, 780 F.3d at 609. While Defendants assert Southampton was only producing below its stated capacity "*in 2023*" (MTD at 10), Southampton's dire problems began in 2021, and persisted throughout 2022 and 2023. ¶¶70, 73, 75, 77-80.

***Contractual Inflation Protection.*** On Enviva's November 3, 2022 earnings call, Keppler stated that "the inflationary provisions within each of our contracts are providing meaningful, durable pricing increases and increased margin *at frankly, a faster rate than we're seeing some of the impact on the cost tower*." ¶102. But Enviva's costs were then rising *faster* than the inflation adjustments under Enviva's sale contracts. Meth admitted in August 2023 that "our whole industry has been suffering from cost . . . increases that have outpaced sales price increases *over the past couple of years*," *i.e.* since 2021. ¶90. Enviva's new CEO, Glenn Nunziata, admitted in March 2024 that "[o]ver roughly the past 18 months," *i.e.* since about September 2022, Enviva faced significant financial pressure due to factors including "a failure of contractual escalators to appropriately scale with actual costs." ¶¶67, 88-89; ECF 49-7 at ¶¶77, 83. Defendants fail to address Meth's admission. Their argument rests on a misreading of Nunziata's statement that "[i]n early 2023, spot prices for wood pellets fell significantly, and at the same time the combined effect of increased production costs and historically high inflation reduced the Company's margins." *See*

12

ECF No. 49-7 at ¶83. That statement says that spot prices for wood pellets fell in "early 2023," *not* that "historically high inflation" began in early 2023. In fact, there was historically high inflation *throughout 2021-22*. *See* Spencer Decl. Ex. B (inflation chart).

***Financial Stability.*** Defendants touted Enviva's supposed financial strength while concealing that the 4Q 2022 Purchase Agreement prices, losses from the botched Southampton expansion, and myriad other undisclosed problems, created severe financial risks. At Enviva's Investor Day Meth stated, "[w]e don't need to raise additional equity, and *we will continue to pay the dividend* at current levels." ¶¶152. Only one month later, Defendants announced that Enviva was eliminating its dividend "to preserve liquidity." ¶157. A JP Morgan analyst noted "the short time frame since the early-April Analyst Day financial update," and the "*significantly inaccurate* 1Q earnings commentary at the April analyst day." ¶168. Even *after* Enviva breached its contract to buy $113 million of pellets from RWE by July 31, 2023, Defendants professed to believe that Enviva had cash "sufficient to meet our primary liquidity requirements." ¶¶43-45, 177. As shown by the ongoing but concealed breach, Enviva did *not* have sufficient cash to meet its obligations.

***3Q 2023 Guidance.*** On Enviva's second quarter 2023 earnings call Meth gave guidance for third quarter adjusted EBITDA of "$60 million to $80 million." ¶180. An analyst asked, "just help me understand the guidance for the rest of the year, what percent of that is based on some of this potential spot business that you referenced?" ¶182. Meth replied, "if some of that happens as part of the commercial activity, *it will happen in Q4*," meaning that Enviva's third quarter guidance did *not* depend on Enviva making spot market sales. *Id*. However, Enviva's new CEO later admitted that "[i]n August 2023, when we reaffirmed our expectations for third quarter, including an adjusted EBITDA range of $60 million to $80 million, *we factored in a significant volume of spot sales*," directly contradicting Meth's misleading statement. ¶¶91-92.

Defendants argue that Meth's other comments on the call disclosed that his 3Q 2023 guidance included spot sales. Not so. Meth stated that Enviva's pellet trading *generally*, on an "annual" basis, is "back half weighted." ECF No. 49-13 at A0473. Meth confusingly continued, "[i]t's particularly pronounced in Q4. That can include some -- an opportunity to free up some volume to benefit from expected higher prices in Q4. It's certainly nowhere near as pronounced as we have seen in Q4." *Id.* Meth never stated that his 3Q 2023 guidance assumed any spot sales, let alone substantially depended on "a significant volume of spot sales" at above-market prices.

## V.    DEFENDANTS' FALSITY ARGUMENTS FAIL

### A.    The Concealed Facts About Manufacturing Problems And Inflationary Pressures Contradicted Defendants' Public Statements

Defendants claim that certain statements about Enviva's manufacturing plants may have been literally true. MTD at 9-10. As shown *supra* in Part IV.B, such statements misleadingly concealed the severe problems Southampton had faced since its botched expansion was completed in 2021. ¶¶70, 73, 75, 77-80. After the expansion Southampton's equipment uptime was "in the low-80% range," meaning it only worked about 300 days out of the year. *See* ¶79. These concealed facts rendered misleading Defendants' statement that *"*[o]ur facilities are designed to operate *24 hours per day, 365 days per year*, although we schedule up to 15 days of planned maintenance." ¶121; *see Emergent BioSolutions*, 2023 WL 5671608, at *15 (statement that manufacturing facility was "designed" to handle certain operations, concealing that it failed to do so, was misleading).[9]

Defendants argue their statements about Enviva's plants were not "guarantees." But guarantees are not required for a statement to be misleading. *See id.* at *19 ("it is one thing for

---

[9] Defendants claim in a footnote that the falsity of their statements is dispelled by a generic risk disclosure that "the volume and quality of products that we are able to produce . . . *could* be adversely affected by . . . operating or technical difficulties at our wood pellet production plants." MTD at 9 n.9. But this statement is itself materially misleading for concealing that such production shortfalls were a present *reality*, not merely a hypothetical *possibility*. *See Singer v. Reali*, 883 F.3d 425, 442 (4th Cir. 2018) ("A generic warning of a risk will not suffice when undisclosed facts on the ground would substantially affect a reasonable investor's calculations of probability.").

Emergent to state that it never *guaranteed* that issues would not arise . . . It is another thing entirely for Emergent to fail to disclose risks that *actually materialized*."); *Singer v. Reali*, 883 F.3d 425, 432-33 and 439 (4th Cir. 2018) (falsity alleged for statements including that defendants did not expect "any significant additional headwind"); *Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 251 (2d Cir. 2014) (statements that "did not *guarantee* 100% compliance" were misleading); *Singer*, 883 F.3d at 442 ("We agree with the Second Circuit's cogent analysis" in *Meyer*).[10]

### B.      Defendants' Wood Pellet Trading Statements Were Misleading

Defendants claim that their statements about Enviva's wood pellet trading cannot be actionable unless they specifically referred to the 4Q 2022 Purchase Agreements. MTD at 10-11. That is not the law. "[T]he Fourth Circuit has found that . . . when a company officer made statements giving a positive impression of the company's prospects, the failure to disclose *related adverse information* could constitute a material omission." *Sinnathurai v. Novavax, Inc.*, 645 F. Supp. 3d 495, 518 (D. Md. 2022); *Singer*, 883 F.3d at 442 ("by choosing to speak about its reimbursement practices, the Company possessed a duty to disclose its alleged illegal conduct."). "[O]nce a party speaks on a topic, they have an obligation to tell *the whole truth*." *Cambridge Ret. Sys. v. Jeld-Wen Holding, Inc.*, 496 F. Supp. 3d 952, 963 (E.D. Va. 2020).

The 4Q 2022 Purchase Agreements are inextricably intertwined with the topic of Enviva's pellet trading business, of which those agreements were by far the most important part. Under those agreements, Enviva had to pay $641 million for 1.7 million metric tons of wood pellets over 2023-25, with purchases of 800,000 metric tons for $296 million in 2023 alone. ¶43. Enviva's obligation to buy 800,000 metric tons from RWE in 2023 equalled 17% of Enviva's *total* 2022 pellet sales of 4,654,000 metric tons, even though in a typical year Enviva's pellet purchases from

---

[10] Defendants also argue their statements about contractual protections were accurate because they did not fail to offset inflation until 2023. MTD at 8-9. As discussed in Part IV.B, that is incorrect. ¶¶67, 88-90; Spencer Decl. Ex. B.

*all* third parties made up 15-20% of its sales. ¶¶126, 231. That is, Enviva's obligations under the 4Q 2022 Purchase Agreements for 2023 *alone* were roughly equal to the quantity of pellets Enviva traded, *from all sources*, in an average year. As such, the success or failure of Enviva's entire pellet trading business would rise or fall with the 4Q 2022 Purchase Agreements.

In light of these facts, Defendants' statements about Enviva's pellet trading business that it had "new *highly-accretive* near-term opportunities with existing and new customers" (¶98), "has a demonstrated track record of procuring volumes from different suppliers and geographies and *selling them profitably*" (¶100), "purchase[s] third-party volumes during times when spot market prices are *depressed*" (¶119), and that pellet trading is "just a repeatable part of our business because we are solving issues in the supply chain that are *accretive* for us" (¶144), were materially misleading. The 4Q 2022 Purchase Agreements, which dwarfed Enviva's other pellet trading, required Enviva to buy at elevated prices and were highly dilutive and unprofitable, which made Enviva's entire pellet trading business dilutive and unprofitable. By choosing to tout the profitability of Enviva's pellet trading, Defendants had a duty to disclose the "related adverse information" of the 4Q 2022 Purchase Agreement prices. *Novavax*, 645 F. Supp. 3d at 518.[11]

### C.  Defendants Concealed The 4Q 2022 Purchase Agreements' Existing, Onerous Price Terms

Defendants argue their statements about the 4Q 2022 Purchase Agreements merely "failed to predict" future losses. MTD at 12. Defendants concealed *present* facts—the *fixed prices* Enviva was required to pay under the 4Q 2022 Purchase Agreements. That contemporaneous market data showed Enviva would lose over $250 million on the 4Q 2022 Purchase Agreements made those

---

[11] Defendants argue in a footnote that certain excerpts of these statements are immaterial "puffery." MTD at 11 n.11. That is false because it is highly important to investors whether a major business segment is profitable or unprofitable, and it can be objectively disproven that Enviva's pellet trading, inclusive of the 4Q 2022 Purchase Agreements, was "accretive" or "profitabl[e]." Defendants' puffery arguments are further addressed *infra* at Part V.D.

present facts highly material to reasonable investors. *See In re 2U, Inc. Sec. Class Action*, 2021 WL 3418841, at *13 (D. Md. Aug. 5, 2021) ("it does not matter whether Defendants specifically knew that the . . . projections would come true in the future . . . [w]hat matters is that [defendant] knew of material information that would have significantly altered the total mix of information available to investors"). Defendants rely heavily on *R2 Invs. LDC v. Phillips*, 401 F.3d 638 (5th Cir. 2005), but that case is entirely inapposite. The *Phillips* defendants *repeatedly disclosed* the company's obligation to make a payment in the amount of $160 million. *See id.* at 642. *Phillips* does not entitle Defendants to conceal the 4Q 2022 Purchase Agreement prices.

Defendants argue they disclosed that the price at which Enviva had to buy pellets from RWE "exceed[s] the original selling prices of the pellets under [Enviva's] modified contract with RWE." MTD 12. But this disclosure was meaningless because Defendants never disclosed what the "original selling prices" of those pellets were. Based on the limited information Defendants disclosed, the best *guess* investors could have made was that those prices were around the $200 to $235 per metric ton average prices for Enviva's long-term sales contracts. *See* ¶65. Defendants' "disclosure" did not inform investors that Enviva had to pay anywhere near $377 per metric ton.

Defendants mistakenly assert that Plaintiffs do not dispute the literal accuracy of any of their statements about the 4Q 2022 Purchase Agreements. As discussed *supra* at Part IV.A, it was outright false for Defendants to state that those agreements "*were priced at market prices in effect at the time of the agreements*" (¶172), and that "*it was very attractive to do for future periods*" (¶130). Defendants' remaining statements about the 4Q 2022 Purchase Agreements were misleading for omitting the critical, known fact of the agreements' above-market purchase prices.

### D.    Defendants' Statements Were Material, Not Puffery

Statements of vague optimism, or "puffery," may be deemed immaterial, but this doctrine has sharp limits. First, puffery is a question of a statement's materiality, and "[m]ateriality requires

17

an inherently fact-specific finding." *Willis Towers Watson*, 937 F.3d at 304. As such, "a complaint may not properly be dismissed on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Singer*, 883 F.3d at 440. Second, statements with a "specific factual basis" are not puffery. *See 2U*, 2021 WL 3418841, at \*11 and \*16. Third, statements that "could be proven true or false . . . cross the line from puffery into material statements." *Emergent BioSolutions*, 2023 WL 5671608, at \*17.

Defendants contend that certain of their statements were puffery by isolating mere snippets that omit the statements' material context. For example, Defendants highlight the single word "conviction" from the statement in paragraph 134 while omitting its specific factual bases that, "we had very accretive upsizing opportunities over the last year or 2 in some of our existing plants. They have been completed. And those plants have shown that they have broken through previous bottlenecks to now deliver volumes at an elevated rate." ¶134. Whether Southampton's expansion was accretive and had overcome previous bottlenecks (it wasn't, and it hadn't) are objectively verifiable facts that are material to reasonable investors. *See Emergent BioSolutions*, 2023 WL 5671608, at \*14 ("It is plausible that a reasonable investor deciding whether to invest in Emergent would find it important that Bayview was not equipped for mass production").

Defendants do not even discuss their assertion that "from a future forward curve perspective, we do see a very favorable pricing environment" (¶132) is puffery. While *in isolation* a statement of a "favorable" environment might be considered puffery, here Defendants supplied a specific factual basis (the "future forward [price] curve") which allows the statement to be proven false—the pricing environment was extremely *unfavorable* to Enviva because the forward curve

18

showed it would lose over $260 million on the 4Q 2022 Purchase Agreements. ¶133.[12]

The materiality of these misleading statements and concealed facts is further shown by Enviva's dramatic 67% and 77% stock price declines when the truth emerged. ¶¶167, 194; *Chelsea Therapeutics*, 780 F.3d at 610 n.6 ("the change in Chelsea stock prices after Chelsea's statements is relevant to the element of materiality"); *Turka v. S.C. Pub. Serv. Auth.*, 2020 WL 901965, at *7 (D.S.C. Feb. 25, 2020) ("the majority rule indicates that the negative market reaction to the disclosures . . . supports that these misstatements and omissions were material").

### E.    Statements Touting Enviva's Purported Financial Strength Are Actionable

Defendants provide no analysis of the statements about Enviva's liquidity and ability to continue paying its dividend, merely contending that they are categorically inactionable under the non-binding *Marsh Grp. v. Prime Retail, Inc.*, 46 F. App'x 140 (4th Cir. 2002).[13] But *Marsh* did not hold statements about dividends are never misleading, it merely held the specific statements at issue "lack the factual specificity necessary to make them actionable." *Id.* at 146.[14] Here, Meth's statement that "[w]e don't need to raise additional equity, and *we will continue to pay the dividend at current levels*" (¶152) is the type of factually specific and unequivocal statement that reasonable investors would rely on. Investors should be allowed to take Enviva's CEO at his word.

Defendants also fail to analyze their statement in August 2023 that "[w]e believe cash on

---

[12] Defendants imply in a footnote that generic disclosures of "uncertainty" about market prices renders some, unspecified statements immaterial. MTD at 15 n. 15. But truisms such as "current market prices may not continue" tell investors nothing. *See Willis Towers Watson*, 937 F.3d at 307 ("general disclosure" does not "immunize [defendant] from liability for making a misleading statement"); *Emergent BioSolutions*, 2023 WL 5671608, at *18 ("Vague, boilerplate disclaimers will not cut it."). And even when considering more informative risk disclosures, "district courts in the Fourth Circuit have hesitated to rule on the adequacy of cautionary language at the motion to dismiss stage." *In re James River Grp. Holdings, Ltd. Sec. Litig.*, 2023 WL 5538218, at *16 (E.D. Va. Aug. 28, 2023).

[13] *Marsh* is unpublished and issued before 2007, and so its citation "is disfavored, except for the purpose of establishing res judicata, estoppel, or the law of the case." Fourth Circuit Local Rule 32.1.

[14] Other courts have found statements about a company's ability to maintain its dividend actionably misleading. *E.g.*, *In re Gen. Elec. Co. Sec. Litig.*, 857 F. Supp. 2d 367, 389 (S.D.N.Y. 2012); *In re Crown Am. Realty Tr. Sec. Litig.*, 1997 WL 599299, at *11 (W.D. Pa. Sept. 15, 1997).

hand, cash generated from our operations and the availability of our senior secured revolving credit facility will be sufficient to meet our primary liquidity requirements." ¶177. Although framed as a statement of opinion, such a statement is actionable if it "omits material facts about the issuer's inquiry into or knowledge concerning a statement of opinion, and if those facts conflict with what a reasonable investor would take from the statement itself." *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 189, (2015). That Enviva was in breach for failing to buy $113 million of pellets from RWE by July 31, 2023 shows that it did *not* have sufficient cash to meet its liquidity requirements, conflicting with what a reasonable investor would take from Defendants' statement. ¶¶43-45, 178. *See 2U*, 2021 WL 3418841, at *16.

Defendants argue their statements were true because "financial conditions *unexpectedly* worsened *after* such statements were made." MTD at 17. That is another premature factual dispute. *See 2U*, 2021 WL 3418841, at *13; *Genworth*, 103 F. Supp. 3d at 776 ("the Court cannot engage in a factual dispute at this stage of litigation"). It is also incorrect—Enviva's financial distress arose primarily from the 4Q 2022 Purchase Agreements, as known to Defendants at all times.[15]

### F.    Defendants' "Forward-Looking" Statements Knowingly Concealed Present Facts And Lacked A Reasonable Basis

Defendants contend various statements are protected as forward-looking. Such protections are narrowly limited, and Defendants' statements do not qualify for them. "[O]missions of present or historical fact . . . generally *are* actionable." *Emergent BioSolutions*, 2023 WL 5671608, at *18. Projections of future performance are actionable if "(1) they are supported by specific statements of fact that are themselves false or misleading, (2) they are worded as guarantees, or (3) the company otherwise lacked a reasonable basis for making the projection." *Direct Benefits*, 2020

---

[15] Defendants cite excuses about $15 million in ostensibly unexpected expenses (MTD at 17 n.18), but that pales in comparison to the true sources of Enviva's financial distress including $250 million in losses on the 4Q 2022 Purchase Agreements (¶127) and "~$100mm Of Burned Capital" at Southampton (¶78).

WL 2769982, at *11. The PSLRA safe harbor only protects forward-looking statements that are "accompanied by meaningful cautionary statements," and does not apply if the defendant had "actual knowledge . . . that the statement was false or misleading." 15 U.S.C. § 78u–5(c)(1). "[C]autionary language is meaningless if it warns only of risks that have already materialized." *In re SCANA Corp. Sec. Litig.*, 2019 WL 1427443, at *7 (D.S.C. Mar. 29, 2019).

Defendants contend that Meth's statement misrepresenting the basis for his 3Q 2023 earnings guidance ("if some of that [spot business] happens as part of the commercial activity, it will happen in Q4," ¶182) is inactionable because it was not a "guarantee" that his guidance did not depend on spot sales. But, there can be no "reasonable basis" for Meth to misrepresent the assumptions underlying his own earnings guidance. Defendants argue that Meth's statement "our forecast does not include any incremental deferred gross margin transactions" (¶184), is a future projection. But this statement is misleading for omitting the *present fact* that the 4Q 2022 Purchase Agreements, which gave rise to Enviva's "deferred gross margin" accounting treatment, required Enviva to buy over $640 million of pellets at above-market prices. ¶¶43-45, 185.

G.    **Defendants' Certifying The Accuracy Of Enviva's SEC Reports Was Actionably Misleading**

Enviva's SEC Form 10-Qs for the first and second quarters of 2023 were signed by Defendant Even (¶¶171, 176), making him liable for misrepresentations contained therein. *See In re Smith Barney Transfer Agent Litig.*, 884 F. Supp. 2d 152, 163–64 (S.D.N.Y. 2012). Meth signed Sarbanes-Oxley certifications filed with both 10-Qs stating that "[b]ased on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made . . . not misleading." ¶¶171, 176; ECF No. 49-18 at A0616. Because Meth knew the 10-Qs contained materially misleading statements, his certification was actionably misleading. *See Bos. Ret. Sys. v. Alexion Pharms., Inc.*, 556 F. Supp. 3d 100, 129 (D.

21

Conn. 2021). Defendants claim these certifications are merely "focused on Enviva's financial statements" and imply that they do not extend to the other portions of the 10-Q. MTD at 21. That is wrong. While *other* portions of the certification specifically refer to the "financial statements," the portions quoted by Plaintiffs state that "[b]ased on my knowledge, *this report* does not contain any untrue statement," where "this report" refers to "this quarterly report on Form 10-Q of Enviva Inc." ECF No. 49-18 at A0616. *See Alexion Pharms.*, 556 F. Supp. 3d at 129.[16]

## VI.   DEFENDANTS ACTED WITH SCIENTER

Allegations of deliberate conduct or severe recklessness are sufficient to plead scienter. *Chelsea Therapeutics*, 780 F.3d at 606. "Courts in this circuit draw a 'strong inference' from allegations that a defendant benefited in a concrete and personal way from the fraud . . . [or] knew facts or had access to information suggesting his public statements were not accurate." *Ironnet*, 2023 WL 5110932, at *10. "Proof of scienter . . . may be inferred from circumstantial evidence." *Id.* "The inference that the defendant acted with scienter need not be irrefutable, *i.e.,* of the 'smoking-gun' genre." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 324 (2007). The scienter inquiry considers "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 323. "[A] complaint will not be dismissed so long as the malicious inference is at least as compelling as any opposing innocent inference." *Chelsea Therapeutics*, 780 F.3d at 606.

### A.   Enviva's Co-Founder And CEO Thomas Meth

Meth's pattern of "numerous . . . misleading statements and omissions," combined with his

---

[16] Defendants assert in a footnote that Sarbanes-Oxley certifications are supposedly "inactionable as a matter of law" (MTD at 21 n. 22), but that is contrary to SEC Rule 10b-5 and the weight of authority holding Sarbanes-Oxley certifications to be actionable when the underlying SEC filing contains misleading statements. 17 C.F.R. § 240.10b-5(b) (it is unlawful "[t]o make *any* untrue statement of a material fact"); *e.g.*, *In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 655 (S.D.N.Y. 2017); *Alexion Pharms.*, 556 F. Supp. 3d at 129.

knowledge and motives, gives rise to a strong inference that he acted with intent to deceive investors. *Novavax*, 645 F. Supp. 3d at 524 (quoting *Chelsea Therapeutics*, 780 F.3d at 610).

***Knowledge Of 4Q 2022 Purchase Agreements.*** Meth was intimately involved in Enviva's pellet trading operations and the 4Q 2022 Purchase Agreements. *See Latham v. Matthews*, 662 F. Supp. 2d 441, 467 (D.S.C. 2009) (scienter found where defendant was "personally involved"). Meth stated concerning "marketing or the contracting activities and markets" that "*I'm closer than anybody else*" and "*I do this every day, and I'm in the middle of it*." ¶211; *see Genworth*, 103 F. Supp. 3d at 785 (scienter based on "Defendants' self-proclaimed personal involvement"). When Enviva terminated Meth as CEO, his replacement stated that "we have asked Thomas Meth to focus his energies almost exclusively on renegotiating our existing customer contracts, *given his long-standing relationships and understanding of each customer*." ¶211.

Meth initialled each page of the 2011 Master Agreement between Enviva and RWE which governed the vast majority (97%) of Enviva's liabilities to RWE pursuant to the 4Q 2022 Purchase Agreements. ¶¶49-52; ECF No. 48-2. Meth repeatedly discussed the 4Q 2022 Purchase Agreements and their accounting treatment. *See* ¶126, 128, 130, 148, 172, 174, 184, 212, 232; *see 2U*, 2021 WL 3418841, at *17 (that defendant "was prepared to and did discuss" the relevant information "with investors" supported scienter). Meth's "apparent command of these details" about the 4Q 2022 Purchase Agreements "illustrates that it is implausible that he would have been unaware" of their prices. *Id.* at *22. His repeated, detailed statements about those agreements while *not once* disclosing the critical fact of their far above-market prices were thus "a calculated effort to tiptoe around the truth." *Id.* Defendants argue that Meth's knowledge of the 4Q 2022 Purchase Agreement prices cannot be inferred from his public statements (MTD at 26), but ignore that he repeatedly certified the accuracy of statements that "[t]he new purchase agreements were priced at

23

market prices in effect at the time of the agreements." ¶¶171-72; ECF No. 49-18 at A0601, A0615-16. How could he certify the accuracy of those statements *unless he knew the prices*?[17]

Meth also knew that market prices showed Enviva would lose hundreds of millions of dollars on the 4Q 2022 Purchase Agreements, because he regularly monitored, and held himself out as knowledgeable about, wood pellet prices in both the spot and forward markets. *See* ¶¶64, 95, 100, 119, 123, 126, 132, 172, 210. Meth was familiar with Argus wood pellet price information in particular. Enviva's BayWa Agreement, signed and initialled by Meth, defines its sales prices based on the "Argus 'Industrial Wood Pellets 90 day Index CIF NWE USD/MT current month average'." ¶53. When Enviva's new CEO revealed the 4Q 2022 Purchase Agreement prices and expected losses, he did so in explicit comparison to "forward Argus prices published on November 1, 2023," and Meth certified the accuracy of those statements. ¶46; ECF No. 49-5 at A0050-52.[18]

Meth's knowledge is also supported by the enormous magnitude of Enviva's obligations and expected losses under the 4Q 2022 Purchase Agreements. *See James River Grp.*, 2023 WL 5538218, at \*22 (scienter supported by magnitude of "$170 million adverse reserve charge . . . totaling three times the Company's reported profit for the prior 2.5 years"); *Genworth*, 103 F. Supp. 3d at 786. Under the 4Q 2022 Purchase Agreements, Enviva committed to pay $641 million over 2023-25. ¶43. This dwarfed Enviva's reported earnings ($116 million in 2021). ¶34. The $641 million of payment obligations are so large that they could *only* have been authorized by Enviva's senior executive officers. As later stated by Enviva's replacement CEO, the 4Q 2022 Purchase

---

[17] Defendants rely on *San Antonio Fire & Police Pension Fund v. Syneos Health Inc.*, 75 F.4th 232 (4th Cir. 2023), which is inapposite. There the plaintiffs' allegations that defendants "*should have*" learned about certain problems with the target's business in pre-merger due diligence meetings were insufficient to allege they actually knew of those problems. *Id.* at 242. Here, in stark contrast, Plaintiffs advance numerous mutually reinforcing allegations that show Meth *actually did* know the prices of the 4Q 2022 Purchase Agreements. *E.g.*, ¶¶130, 171-72, 212.

[18] Defendants argue they cannot be liable for failing to earlier disclose the Argus prices, but this misconstrues Plaintiffs' theory. Defendants are liable for concealing the 4Q 2022 Purchase Agreement prices, which they ensured *were not* publicly available.

Agreements were "entered into by *management*," *i.e.*, Enviva's senior executives including Defendant Meth. ¶198; *see Emergent BioSolutions*, 2023 WL 5671608, at *23 ("The fact that the FDA investigator discussed his findings with '*firm management*' is probative of scienter.").

Enviva's Board, after an investigation including an interview with Meth and review of his emails, documents, and electronic chats, concluded that Enviva has "colorable claims" against Meth for breach of fiduciary duty "arising from nondisclosure of, and failure to seek Board approval for," the 4Q 2022 Purchase Agreements. *See* ¶¶198-202; Spencer Decl. Ex. A. The decision of Enviva's Board to pursue claims against Meth relating to nondisclosure of the 4Q 2022 Purchase Agreements strongly supports an inference of his scienter.

*Knowledge Of Manufacturing Plants.* Meth repeatedly made detailed comments concerning the state of Enviva's manufacturing facilities, and Southampton in particular. *See* ¶¶95, 116, 121, 134, 146, 154, 158, 162-66, 213. As he stated in March 2023, "I am most focused on improving operational performance and cost management in our plants and ports." ¶116. Enviva only operated ten pellet manufacturing plants. ¶27. Southampton plant was one of Enviva's larger plants, with a theoretical production capacity of 760,000 metric tons per year, or 12% of Enviva's total capacity. *See* ECF No. 49-17 at A0513. As such, Southampton was critically important to Enviva and it would be "absurd to think" that Meth was not aware of its problems. *See Novavax*, 645 F. Supp. 3d at 527 ("it would be absurd to think that the CEO and CFO of a pharmaceutical company would be unaware of the alleged substandard, noncompliant conditions" at its manufacturing plant). Furthermore, pellet manufacturing was Enviva's primary business, and the inference that executives know facts relating to their company's "core operations" adds to the holistic scienter analysis. *See id.*; *Emergent BioSolutions*, 2023 WL 5671608, at *26.

*Knowledge Of 3Q 2022 Guidance.* Meth personally delivered Enviva's 3Q 2023 guidance

on its August 3, 2023 earnings call, and discussed the factors informing that guidance. ¶¶180, 182. As such, a strong inference arises that when Meth falsely stated his guidance was not based on spot sales, he did so knowing this was untrue. *See Jeld-Wen*, 496 F. Supp. 3d at 967 (making false statements on earnings calls "further supports the Court's finding that the plaintiffs have adequately alleged scienter"). And if Meth *did not* know that his own 3Q 2023 guidance included a substantial volume of spot sales at above-market prices (¶¶91-92), then it was severely reckless for him to state that spot sales would only "happen in Q4." ¶182.

*Motive.* The inference of Meth's scienter is further strengthened by his financial motives. *See Genworth*, 103 F. Supp. 3d at 785–86 (executive bonuses added to strong inference of scienter); *Lumber Liquidators*, 155 F. Supp. 3d at 607. In 2022 Enviva paid Meth $1.8 million, or 29 times the compensation of its median employee. ¶¶242, 245. Most of Meth's compensation was from incentive plans based on Adjusted EBITDA targets and Enviva's stock price. ¶¶242-43. Therefore, Meth had motives to manipulate Enviva's earnings (including through Enviva's transactions with RWE in 4Q 2022), and to maintain an inflated stock price (by concealing adverse information). When the Board investigated the 4Q 2022 Purchase Agreements one of the terms used to search Meth's documents was "meet guidance," and among the documents reviewed were "[i]nformation on how bonus is determined and when a bonus is paid." ¶202. Defendants argue that Meth's lack of stock sales undermines his scienter, but "allegations of unusual stock sales are not required to demonstrate a strong inference of scienter." *Chelsea Therapeutics*, 780 F.3d at 607. This is particularly the case where, as here, "the nature of the alleged misstatements and omissions themselves give rise to a strong inference of scienter." *Id.* at 610 n.7.

*Termination As CEO.* Enviva's Board replaced Meth as CEO on November 9, 2023, the same day that Enviva's new interim CEO revealed the 4Q 2022 Purchase Agreement prices and

expected losses, and also revealed that Meth had misrepresented the basis for Enviva's 3Q 2023 guidance on the August 2, 20232 earnings call. ¶250. Although Meth was allowed to remain at Enviva, his role was greatly diminished from running the Company to merely attempting to get customers to renegotiate Enviva's loss-making contracts. *Id.* Meth's termination as CEO, supports a strong inference of his scienter. *See Emergent BioSolutions*, 2023 WL 5671608, at *26.

### B.       Enviva's CFO Shai Even

Defendant Even was Enviva's CFO, leading its finance and accounting groups. ¶¶19, 207. Like Meth, Even repeatedly spoke about Enviva's pellet contracts, pellet market prices, and the 4Q 2022 Purchase Agreements. *See* ¶¶55, 64-65, 118-19, 123, 172, 214-15. Defendants argue that Even did not know *any* facts about the 4Q 2022 Purchase Agreements other than the ones he publicly disclosed (MTD at 25), but that claim is implausible on its face. Even repeatedly stated that "[t]he new purchase agreements were priced at market prices in effect at the time of the agreements," showing his knowledge of the 4Q 2022 Purchase Agreement prices. ¶172; ECF No. 49-18 at A0601. Enviva's Board also decided to pursue claims against Even relating to his role in the 4Q 2022 Purchase Agreements. *See* ¶¶198-202; Spencer Decl. Ex. A.

Like Meth, Even's termination and incentive compensation bolster the strong inference of his scienter. On August 30, 2023, Enviva announced that Even "was separated from his position" as CFO, and replaced him with an outside hire, Glenn Nunziata. ¶¶19, 248. Even's termination occurred in the midst of severe, undisclosed financial problems. In 2022 Enviva paid Defendant Even $1.7 million, most of which was from incentive plans based on Adjusted EBITDA targets and Enviva's stock price, giving him motives to manipulate those metrics. ¶¶202, 242-43, 245.

### C.       Enviva's Co-Founder, Chairman and Initial CEO John Keppler

Defendant Keppler served as CEO and Chairman until November 2022. ¶17. From April 2023 to September 2023 Keppler served as Executive Chairman of Enviva's Board. *Id.* Keppler

27

spoke about Enviva's pellet contracts, pellet market prices, and the 4Q 2022 Purchase Agreements. ¶¶55, 64-65, 140. Enviva's Board has also decided to pursue claims against Keppler relating to his role in the 4Q 2022 Purchase Agreements. *See* ¶¶198-202; Spencer Decl. Ex. A.[19] Defendants, citing no authority, argue that Keppler's signed certification of accuracy for statements concerning recent levels of "biomass spot market prices, as well as the forward curve pricing of certain European indices," does not show his knowledge of "any particular such price." MTD at 24; See Spencer Decl. Ex. C. On the contrary, executives are accountable for the accuracy of SEC filings and certifications that they sign. *See Smith Barney*, 884 F. Supp. 2d at 163–64; *Alexion Pharms.*, 556 F. Supp. 3d at 129. If, as Defendants imply, Keppler certified the accuracy of such statements without knowing whether they were true or false, that would prove his severe recklessness.

Keppler's generous incentive compensation based on Adjusted EBITDA and stock price gave him motives that add to the strong inference of his scienter. ¶¶242-43, 245. This inference is further bolstered by Keppler's insider trading. *See Emergent BioSolutions*, 2023 WL 5671608, at *25. On December 5, 2022, Keppler sold $11 million worth of Enviva stock, or 20.5% of his holdings. ¶237. This sale was highly unusual, because he had never previously reported any such sales. ¶238. Keppler's $11 million stock sale supports a strong inference of his scienter. *See James River*, 2023 WL 5538218, at *23 (defendants' "stock sales each constituted over 20 percent of their shares, generating $2.9 million and $702,423.29 in proceeds"); *Ironnet*, 2023 WL 5110932, at *12. While Keppler's mandatory SEC form disclosing his stock sale vaguely claimed that it was for "estate planning and charitable purposes," that Keppler chose to *sell* the stock rather than to

---

[19] Enviva's Board has only determined to pursue claims relating to Keppler's breach of fiduciary duty as relates to the first of the four 4Q 2022 Purchase Agreements, which was executed while he was still CEO (¶41). This does not show that Keppler was unaware of the other three agreements when he made misleading statements to investors in April 2023 (¶140, 142) after returning as Enviva's Executive Chairman. At most, the Board's decision shows that Keppler may not have been involved in *execution* of the three agreements executed in his absence.

*donate* it to charity or *retain* it for his estate adds to the strong inference that he knew undisclosed, adverse facts threatened Enviva's stock price. ¶240. Defendants argue that Keppler's ownership of Enviva stock increased, but that is only because Enviva issued him *free* stock. ECF No. 49-14 at A0484 (listing "Price" of "$0"). Keppler's receipt of free stock does nothing to diminish the culpable inference from his insider trading. *See Emergent BioSolutions*, 2023 WL 5671608, at *26.

### D.      Enviva's Chief Accounting Officer Michael Johnson

Defendant Johnson was Chief Accounting Officer. ¶¶20, 208. Like his co-Defendants, Johnson made detailed statements about Enviva's pellet contracts and pellet market prices. ¶¶55, 65, 118-19, 123. As Chief Accounting Officer, Johnson was responsible for the accounting treatment of the 4Q 2022 Purchase Agreements, which necessarily required him to know their prices. On March 27, 2023 Enviva announced Johnson's "resignation," only three weeks after Enviva first announced that its GAAP results for 4Q 2022 were far below guidance due in part to "unanticipated accounting treatment" for its 4Q 2022 transactions with RWE. ¶247. Enviva's Board has also decided to pursue claims against Johnson. *See* ¶¶198-202; Spencer Decl. Ex. A.

## VII.    DEFENDANTS FAIL TO ESTABLISH A MORE COMPELLING INNOCENT INFERENCE OF SCIENTER

Defendants' proposed innocent inference is that at the time of the 4Q 2022 Purchase Agreements they supposedly believed wood pellet prices would rise over 2023-25, and that their statements about those transactions were an earnest effort to inform investors. *See* MTD at 1, 4, 6, 25-26, 29-30. But this offers *no explanation whatsoever* for why Defendants consistently withheld from their public statements about the 4Q 2022 Purchase Agreements the single most important fact about those agreements—the above-market prices that Enviva was obligated to pay. *Even if* Defendants genuinely believed in 4Q 2022 that pellet prices would rise and Enviva would profit from the 4Q 2022 Purchase Agreements, Defendants' proposed inference utterly fails to explain

why even *after* prices plummeted in early 2023 and Enviva began trying to renegotiate those agreements, Defendants *still* concealed the financially ruinous prices Enviva was obligated to pay.

Plaintiffs' straightforward culpable inference, that Defendants wished to conceal Enviva's known financial distress, is far stronger than Defendants' implausible innocent inference. *Chelsea Therapeutics*, 780 F.3d at 610-11 (finding the "inference that the defendants either knowingly or recklessly misled investors by failing to disclose critical information" stronger than "the opposing inference that [defendants] . . . simply failed to provide further details."). While Defendants no doubt *hoped* that future events would rescue Enviva, that *hope* does not authorize them to mislead investors, and does not negate their scienter. *See Makor Issues & Rts., Ltd. v. Tellabs Inc.*, 513 F.3d 702, 710 (7th Cir. 2008) ("It is like embezzling in the hope that winning at the track will enable the embezzled funds to be replaced before they are discovered to be missing"). Defendants' failure to provide *any* explanation for their repeated concealment of the 4Q 2022 Purchase Agreement prices weighs heavily against their motion. *See Immune Therapeutics, Inc. v. Handley*, 2022 WL 16720196, at *6 (E.D. Va. Nov. 4, 2022).

## VIII.   PLAINTIFFS REQUEST LEAVE TO AMEND, IF NECESSARY

If the Court grants Defendants' motion, Plaintiffs respectfully request leave to amend. *See* Fed. R. Civ. P. 15(a)(2). "[L]eave to amend a pleading should be denied only when the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or the amendment would have been futile," none of which are present here. *Laber v. Harvey*, 438 F.3d 404, 426 (4th Cir. 2006). This is the first time that the Court has evaluated Plaintiffs' allegations, so they request an opportunity to address any deficiencies identified by the Court.

## IX.   CONCLUSION

Plaintiffs respectfully request that the Court deny Defendants' motion in its entirety.

DATED: December 5, 2024

**WEISBROD MATTEIS & COPLEY PLLC**

By: */s/ William E. Jacobs*
Stephen A. Weisbrod (# 14795)
William E. Jacobs (#21975)
3000 K Street NW, Suite 275
Washington, D.C. 20007
Telephone: (202) 499-7900
Email:  sweisbrod@wmclaw.com
wjacobs@wmclaw.com

*Liaison Counsel for Lead Plaintiff Andrew Davis,
Named Plaintiffs Christine Alloro and Ted Goldstein,
and the Proposed Class*

**GLANCY PRONGAY & MURRAY LLP**

By: */s/ Garth Spencer*
   (signed by William E. Jacobs with permission of
   Garth Spencer)
Robert V. Prongay (*pro hac vice*)
Charles H. Linehan (*pro hac vice*)
Pavithra Rajesh (*pro hac vice*)
Garth Spencer (*pro hac vice*)
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email:  rprongay@glancylaw.com
clinehan@glancylaw.com
prajesh@glancylaw.com
gspencer@glancylaw.com

*Lead Counsel for Lead Plaintiff Andrew Davis, Named
Plaintiffs Christine Alloro and Ted Goldstein, and the
Proposed Class*

**PROOF OF SERVICE**

I, the undersigned say:

I am not a party to the above case and am over eighteen years old.

On December 5, 2024, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the District of Maryland, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on December 5, 2024.


*s/ William E. Jacobs*
William E. Jacobs