**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

| | |
|---|---|
| **ANDREW DAVIS**, et al., | **Case No. 8:23-CV-02474-MJM** |
| Plaintiffs, | |
| v. | |
| **JOHN K. KEPPLER,** et al., | |
| Defendants. | |

**DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION TO DISMISS**
**PLAINTIFFS' SECOND AMENDED CLASS ACTION COMPLAINT**

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................................................. ii

I.    INTRODUCTION ................................................................................................... 1

II.   ARGUMENT ........................................................................................................... 2

    A.    Plaintiffs' claims against Mr. Johnson should be dismissed........................................ 2

        1.    Plaintiffs have failed to show that any of the 2022 10-K statements are actionably misleading. ...................................................................................... 3

        2.    Plaintiffs have failed to plead that Mr. Johnson acted with scienter. .................. 4

    B.    Plaintiffs' claims against Mr. Keppler should be dismissed. ....................................... 5

        1.    Plaintiffs have not alleged particularized facts showing that any of Mr. Keppler's statements was false or misleading. ............................................ 5

        2.    Plaintiffs have not alleged that Mr. Keppler spoke with scienter. ...................... 7

    C.    Plaintiffs' claims against Mr. Even should be dismissed. ........................................... 9

        1.    Plaintiffs fail to state a claim against Mr. Even based on Statement 15. .............. 9

        2.    Plaintiffs fail to state a claim against Mr. Even based on Statement 27. ........... 10

        3.    Mr. Even's Sarbanes-Oxley certifications are not actionable........................... 11

    D.    Plaintiffs' claims against Mr. Meth should be dismissed. ......................................... 12

        1.    Plaintiffs fail to state a claim against Mr. Meth based on his purported knowledge of the 4Q 2022 Purchase Agreements. ........................................... 12

        2.    Plaintiffs fail to state a claim against Mr. Meth based on his purported knowledge of Enviva's manufacturing plants.................................................... 14

        3.    Plaintiffs fail to state a claim against Mr. Meth based on his purported knowledge of Enviva's guidance. .................................................................... 15

III.  CONCLUSION....................................................................................................... 15

CERTIFICATE OF SERVICE ......................................................................................... 17

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aramic LLC v. Revance Therapeutics, Inc.*,
2024 WL 1354503 (N.D. Cal. Apr. 2, 2024) .............................................................................. 14

*Cozzarelli v. Inspire Pharm. Inc.*,
549 F.3d 618 (4th Cir. 2008) .......................................................................................... 8, 9

*Emps.' Ret. Sys. of the City of Baton Rouge v. Macrogenics*, Inc.,
61 F.4th 369 (4th Cir. 2023) ............................................................................................. 14

*Fanucchi v. Enviva Inc.*,
2024 WL 3302564 (D. Md. July 3, 2024) ......................................................................... 4, 9, 12

*Firemen's Ret. Sys. of St. Louis v. Telos Corp.*,
2023 WL 1512207 (E.D. Va. Feb. 1, 2023).......................................................................... 14

*Frazier v. VitalWorks, Inc.*,
341 F. Supp. 2d 142 (D. Conn. 2004).................................................................................. 13

*Greebel v. FTP Software, Inc.*,
194 F.3d 185 (1st Cir. 1999)................................................................................................ 8

*Greenhouse v. MCG Capital Corp.*,
392 F.3d 650 (4th Cir. 2004) .............................................................................................. 12

*In re Astea Int'l Inc. Sec. Litig.*,
2007 WL 2306586 (E.D. Pa. Aug. 9, 2007) ......................................................................... 9

*In re Celgene Corp., Inc. Sec. Litig.*,
2024 WL 3503486 (D.N.J. July 23, 2024)............................................................................ 2

*In re First Union Corp. Sec. Litig.*,
128 F. Supp. 2d 871 (W.D.N.C. 2001) ................................................................................. 8

*In re K-tel Int'l, Inc. Sec. Litig.*,
300 F.3d 881 (8th Cir. 2002) ............................................................................................... 8

*In re Marriott Int'l, Inc. Customer Data Sec. Breach Litig.*,
543 F. Supp. 3d 96 (D. Md. 2021)....................................................................................... 11

*In re Marriott Int'l, Inc.*,
31 F.4th 898 (4th Cir. 2022) ............................................................................................. 1, 13

*In re Plains All Am. Pipeline, LP Sec. Litig.*,
307 F. Supp. 3d 583 (S.D. Tex. 2018) ................................................................................. 11

*In re Triangle Capital Corp. Sec. Litig.*,
|988 F.3d 743 (4th Cir. 2021)............................................................................................... 10

*Janus Cap. Grp., Inc. v. First Derivative Traders*,
564 U.S. 135 (2011)............................................................................................................. 2

*Magruder v. Halliburton Co.*,
359 F. Supp. 3d 452 (N.D. Tex. 2018) .................................................................................. 7

*Maguire Fin., LP v. PowerSecure Int'l, Inc.*,
876 F.3d 541 (4th Cir. 2017) ............................................................................ 1, 2, 10, 15

*McDonald v. Kinder-Morgan, Inc.*,
287 F.3d 992 (10th Cir. 2002) .......................................................................................... 13

*Okla. Firefighters Pension & Ret. Sys. v. K12, Inc.*,
66 F. Supp. 3d 711 (E.D. Va. 2014) ................................................................................... 3

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
575 U.S. 175 (2015).......................................................................................................... 11

*Phillips v. LCI Int'l, Inc.*,
190 F.3d 609 (4th Cir. 1999) ........................................................................................... 3, 7

*Plumbers & Pipefitters Local Union 719 Pension Fund v. Zimmer Holdings, Inc.*,
679 F.3d 952 (7th Cir. 2012) ............................................................................................ 15

*Proter v. Medifast, Inc.*,
No. CIV.A. GLR-11-720, 2013 WL 1316034 (D. Md. Mar. 28, 2013) .................................... 9

*Raab v. Gen. Physics Corp.*,
4 F.3d 286 (4th Cir. 1993) ........................................................................................... 12, 13

*Road Dawgs Motorcycle Club of the U.S., Inc. v. Cuse Road Dawgs, Inc.*,
679 F. Supp. 2d 259 (N.D.N.Y. 2009)................................................................................. 10

*Roofer's Pension Fund v. Papa*,
2018 WL 3601229 (D.N.J. July 27, 2018).......................................................................... 12

*S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*,
713 F.3d 175 (4th Cir. 2013) .............................................................................................. 5

*San Antonio Fire & Police Pension Fund v. Syneos Health Inc.*,
75 F.4th 232 (4th Cir. 2023) ............................................................................................. 14

*Smith v. Circuit City Stores, Inc.*,
286 F. Supp. 2d 707 (E.D. Va. 2003) .................................................................................. 4

*United States v. Flores*,
730 F. App'x 216 (5th Cir. 2018) ...................................................................................... 10

*Yates v. Mun. Mortg. & Equity, LLC*,
744 F.3d 874 (4th Cir. 2014) ............................................................................................ 15

**Rules**

Fed. R. Evid. 201(b).......................................................................................................... 10

**Regulations**

17 CFR § 240.10b-5............................................................................................................ 2

## I.   <u>INTRODUCTION</u>

Throughout their Opposition, Plaintiffs employ misleading tactics to recast innocuous public statements as intentional fraud. Plaintiffs repeatedly take statements out of context that were not false or misleading when the total mix of information or obvious interpretations are taken into account. Plaintiffs attribute groups of statements to "Defendants" generally, rather than focusing on the Defendant who *made* each statement, in order to sidestep the requirement under Rule 10b-5 that each Defendant can be held liable only for statements he himself made. And Plaintiffs stretch (and at times mischaracterize) their own allegations and judicially noticeable facts to improperly claim an inference of fraudulent intent. But a careful review of the allegations regarding each Defendant—including the statements he is alleged to have made and the specific allegations (or lack thereof) regarding his knowledge and intent—demonstrates that Plaintiffs have failed to state a claim against any of them.

Ultimately, the core of Plaintiffs' fraud theory is that Defendants omitted certain facts about Enviva's business operations from their public statements that, according to Plaintiffs, investors were entitled to know. But to state a Rule 10b-5 claim it is not enough to identify information— even "material information"—that the defendants failed to disclose. *In re Marriott Int'l, Inc.*, 31 F.4th 898, 902 (4th Cir. 2022). Instead, a plaintiff must show that particular statements that each defendant *did* make were affirmatively misleading. *Id.* Plaintiffs ignore this binding precedent in the Opposition. Instead, they suggest that generalized statements tangentially related to the facts Plaintiffs claim should have been disclosed are actionable not because the additional information contradicts the affirmative statements, but simply because it bore on the same general subject. Accepting this argument would enlarge Rule 10b-5 to the full disclosure dictate that the Fourth Circuit has made clear it is not. *Id.*

Separately, Plaintiffs' claims also warrant dismissal because they fail to offer *any* basis to conclude that any Defendant spoke with scienter. *See Maguire Fin., LP v. PowerSecure Int'l, Inc.*, 876 F.3d 541, 548 (4th Cir. 2017). Plaintiffs' principal argument is that, as executive officers at Enviva, Defendants *must have* known the prices at which Enviva agreed to repurchase wood pellets

1

from RWE; combined this information with publicly available assessments about the future market price for wood pellets to forecast that the transactions would generate significant losses for Enviva; and *intended to deceive* investors about that forecast. But the Fourth Circuit has made clear that such an attenuated chain of inferences *cannot* satisfy the PSLRA's pleading standards: "stacking inference upon inference in this manner violates the [PSLRA's] mandate that the strong inference of scienter be supported by facts, not other inferences." *Id.* Instead, scienter requires particularized allegations sufficient to support a "strong inference" that each Defendant affirmatively "intended…to deceive" investors—allegations that the Complaint conspicuously lacks. *Id.*

## II.    <u>ARGUMENT</u>

The only person who can be held liable for a false statement under Rule 10b-5 is the person who made the statement.[1] "For purposes of Rule 10b–5, the maker of a statement is the person or entity with *ultimate authority* over the statement, including its content and whether and how to communicate it." *Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011). Thus, a corporate officer cannot be liable for a challenged statement simply by virtue of holding a senior position or helping to craft the language of another's statement. *In re Celgene Corp., Inc. Sec. Litig.*, 2024 WL 3503486, at *6 (D.N.J. July 23, 2024) ("The caselaw is clear and uniform on this point."). Instead, in the ordinary course, a statement must be (i) uttered by, (ii) signed by, or (iii) expressly adopted by or attributed to a defendant for him to be its "maker." *Id.* at *5-6 (canvassing caselaw).[2] Here, an examination of the challenged statements allegedly "made" by each Defendant confirms that Plaintiffs have failed to meet the PSLRA's high burden to identify a single materially misleading statement "made" by any Defendant with scienter.

### A.    **Plaintiffs' claims against Mr. Johnson should be dismissed.**

The only challenged statements made by Mr. Johnson appear in Enviva's 2022 10-K

---

[1] Capitalized terms not defined herein have the meaning given to them in Defendants' Memorandum in Support of their Motion to Dismiss (ECF 49-1) (the "Motion" or "MTD").

[2] Here, although the Opposition occasionally attributes statements to "Defendants" collectively, the specific challenged statements "made" by each Defendant under *Janus* are clear: *only* those statements the Defendant actually uttered or that are contained in documents he actually signed are considered. *Janus*, 564 U.S. at 142–43 ("[I]n the ordinary case, attribution...is strong evidence that a statement was made...only by...the party to whom it is attributed.").

(Statements 3, 7, and 10 (¶¶ 119, 121, 123)), of which Mr. Johnson was one of several signatories. ¶ 118. But Plaintiffs cannot show that any of these statements were materially misleading, let alone that Mr. Johnson intended to deceive investors by signing a 10-K containing them.

### 1.    Plaintiffs have failed to show that any of the 2022 10-K statements are actionably misleading.

The first statement that Plaintiffs challenge from Enviva's 2022 10-K is Statement 3 (¶ 121). It observes that while Enviva's facilities were "designed to operate 24 hours per day, 365 days per year" with "no regularly required major turnarounds or overhauls," they do have "15 days of planned maintenance" each year. ¶ 121. Without confronting that this statement "may have been literally true," Plaintiffs argue it somehow suggested that Enviva's plants would not suffer from unplanned outages. Opp. at 14. But "statements must be examined in context." *Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 615 (4th Cir. 1999). Statement 3 is drawn from a section of the 10-K that is not touting Enviva's plants' immunity from outages, but merely providing a general description of the plants' "design" and planned "maintenance." *See* MTD Ex. 4, at 11 (A0227) (2022 10-K). A reasonable investor reading Enviva's 10-K would not conclude that Enviva's plants—unlike those of every other manufacturing company ever known—would always operate at their full, planned capacity, without a single unexpected incident or outage.

The situation is similar to *Okla. Firefighters Pension & Ret. Sys. v. K12, Inc.*, 66 F. Supp. 3d 711 (E.D. Va. 2014), which the Opposition does not address. *See* MTD at 10. There, a company's 10-K stated that it had "developed management systems and processes designed to ensure that schools we serve are in compliance with all applicable requirements." *K12*, 66 F. Supp. 3d at 725. Like here, the plaintiffs contended that this statement, while perhaps literally true, was actionable because it failed to note that the company's systems "did not perform the required compliance in a sufficiently timely or efficient manner." *Id.* The court rejected this argument because it did not contradict the general statement that the company "had developed the described compliance systems." *Id.* The Court should reach the same result here.

The only other statement from the 2022 10-K that the Opposition addresses is Statement 7

3

(¶ 119).[3] Statement 7 notes that "dislocations in the marketplace…can create opportunities to optimize our gross margin when we…purchase third-party volumes during times when spot market prices are depressed." ¶ 119. Plaintiffs argue this was untrue because it does not describe the 4Q 2022 RWE transactions. Opp. at 7. This is a non sequitur. Statement 7 does not purport to describe the 4Q 2022 RWE transactions. It merely observes a textbook economic concept: market dislocations can create arbitrage opportunities.[4] Because the Opposition cannot—and does not attempt to—contest the existence of this economic reality, Statement 7 is not actionable.

**2.      Plaintiffs have failed to plead that Mr. Johnson acted with scienter.**

Plaintiffs relegate their arguments about Mr. Johnson's purported scienter to a single, conclusory paragraph. Opp. at 29. Plaintiffs' primary argument is that "[a]s Chief Accounting Officer, Johnson was responsible for the accounting treatment of the 4Q 2022 Purchase Agreements, which necessarily required him to know their prices." *Id*. But as Defendants pointed out in the Motion—and the Opposition ignores—Fourth Circuit courts have repeatedly held that to allege scienter a securities plaintiff must make "detailed allegations establishing the defendants' actual exposure" to information contradicting their public statements. MTD at 23-24 (collecting cases). Plaintiffs cannot sidestep this requirement by relying on "[g]uesswork…based on the position of the Defendants." *Smith v. Circuit City Stores, Inc.*, 286 F.Supp. 2d 707, 715 (E.D. Va. 2003). Yet here, that is exactly what Plaintiffs seek to do.

Moreover, even if Plaintiffs had made competent allegations of Mr. Johnson's knowledge of the prices in these agreements, that would do nothing to suggest that Mr. Johnson acted with scienter. *See Maguire*, 876 F.3d at 548. After all, these prices do not remotely contradict either of the statements Johnson is alleged to have "made," specifically Statement 3 (which is about how

---

[3] The Complaint also challenges Statement 10 (¶ 123) from the 2022 10-K. But this statement merely observes publicly available biomass prices and that Enviva sold some volumes at these prices in 2022. ¶ 123. The Opposition does not refute Defendants' showing that this accurate observation was not materially misleading "and has therefore conceded the point." *Fanucchi v. Enviva Inc.*, 2024 WL 3302564, at *8 (D. Md. July 3, 2024); *see also id.* at *9, *11 n.14, *12,*13 n.17.

[4] The same 10-K also disclosed the inherent risk associated with these long-term contracts, stating that "during periods when the prevailing market price of wood pellets exceeds the prices under our long-term off-take contracts, our revenues could be significantly lower than they otherwise would have been were we not party to such contracts." MTD Ex. 4, at 23 (A0240) (2022 10-K).

4

Enviva's *plants* were "designed") or Statement 7 (which discusses the possibility of market dislocation transactions *in general* with no reference to the RWE transactions).[5]

Plaintiffs argue that the fact that Mr. Johnson left Enviva in March 2023 contributes to an inference of scienter. Opp. at 60-61. But as the Motion points out, and the Opposition ignores, "[f]or a corporate departure to strengthen an inference of scienter, there must be particularized allegations connecting the departures to the alleged fraud." MTD at 29. Here, Plaintiffs make no such allegations. Indeed, Plaintiffs affirmatively suggest a reason for Mr. Johnson's departure—the "unanticipated accounting treatment" of the RWE transactions, *see* Opp. at 29—that has no connection whatsoever with Statements 3 and 7, which are not about accounting treatments.[6]

Finally, Plaintiffs argue that "Enviva's Board has also decided to pursue claims against Johnson." Opp. at 29. But the bankruptcy filings the Opposition attaches never reference such a decision. Instead, those filings state that, as part of Enviva's bankruptcy, the company transferred certain of its potential state-law claims against Defendants (and others) to a trust rather than release them. That development has no bearing on whether Mr. Johnson—or any other Defendant—made misleading statements with intent to deceive investors.[7]

### B.    Plaintiffs' claims against Mr. Keppler should be dismissed.

The Complaint challenges just three statements made by Mr. Keppler: Statements 1, 8, and 24. ¶¶ 102, 140, 142. Plaintiffs have failed to show that any of them was false or misleading, let alone that Mr. Keppler uttered them with scienter.

#### 1.    Plaintiffs have not alleged particularized facts showing that any of Mr. Keppler's statements was false or misleading.

*First*, Plaintiffs have failed to allege that Statement 1 (¶ 102)—which relates to inflation

---

[5] That the 2022 10-K stated that "forward curve pricing of certain European indices[] have exceeded $345 per MT" against Enviva's portfolio of "roughly $200 to $235 per MT" adds nothing to scienter for the same reasons discussed in connection with Mr. Keppler. *See infra* § II.B.2. First, it does nothing to contradict Statement 3 or 7. Second, this information was publicly disclosed in the same document Johnson's alleged misstatements were made. *See id.*

[6] In any event, Enviva also publicly disclosed the unexpected accounting treatment in the 2022 10-K—the *same* document in which Statements 3 and 7 appear. *See* ¶ 212. As a result, Mr. Johnson could not possibly have been motivated to make Statements 3 or 7 to conceal this (simultaneously disclosed) treatment.

[7] Separately, the bankruptcy filings are not referenced in the Complaint, and the Complaint cannot be amended to include them via an opposition to a motion to dismiss. *S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 184-85 (4th Cir. 2013).

escalator provisions in Enviva's contracts—was false or misleading. Mr. Keppler made Statement 1 on Enviva's 3Q 2022 conference call. ¶ 102. Early in the conference call, it had been disclosed that Enviva's "[a]djusted gross margin for the third quarter of 2022" had increased significantly as compared to "the third quarter of 2021." MTD Ex. 2, at 5 (A0057) (Q3 2022 Earnings Call Transcript). Plaintiffs never dispute, nor could they, that this increase occurred between 3Q 2021 and 3Q 2022. Instead, Plaintiffs target Mr. Keppler's answer to an analyst's question about whether "inflation escalators" were the "biggest driver" of the increase in margin. *Id.* at 12 (A0064). Mr. Keppler answered that the increase was an "all-of-the-above" phenomenon, one factor in which was "inflationary provisions" in Enviva's sale contracts, which helped increase prices at a "faster rate than we're seeing some of the impact on the cost tower." *Id.*

Plaintiffs argue that this answer was false because, in August 2023, Mr. Meth stated that the "whole industry has been suffering from cost…increases that have outpaced sales price increases over the past couple of years." Opp. 12. But Plaintiffs *do not dispute* that, notwithstanding this industry-wide trend, *Enviva's* adjusted gross margin increased between 3Q 2021 and *3Q 2022*. Mr. Meth's statement does not suggest otherwise, and it certainly does not undermine Mr. Keppler's statement that inflationary provisions played a role in the increase.

Plaintiffs also point to Glenn Nunziata's bankruptcy declaration, which they accuse Defendants of "misreading." Opp. at 12. There, Mr. Nunziata discusses issues Enviva faced "[i]n early 2023," including that contractual "price escalators…proved to be insufficient to offset the cost increases occurring at the time." MTD Ex. 3, at ¶ 83 (A0100) (Nunziata Declaration). Although Plaintiffs attempt to use this declaration to undermine Mr. Keppler's statement in 2022, *see* Opp. at 12, Defendants respectfully direct the Court to the relevant paragraph of the declaration, which plainly states that the issues it is describing arose "[i]n early 2023," *not* in 2022. MTD Ex. 3, at ¶ 83 (A0100); *see also id.* (noting issues that arose "at the same time"—i.e., in "early 2023").[8]

---

[8] Plaintiffs' observation that high inflation existed in 2021-22, Opp. at 13, is irrelevant. The issue is not when inflation was high but when the "Company's margins" were reduced, which Nunziata makes clear was in "early 2023."

*Second*, Plaintiffs have failed to allege anything false or misleading about Statement 8, in which Mr. Keppler, at Enviva's "Investor Day" on April 3, 2023, stated that while short-term contracts aimed at managing dislocations were, in 2022, "a larger part of the business than it has been historically," Enviva did not expect that to be "a significant part of our business going forward." ¶ 140. Plaintiffs argue that this "concealed" that most of Enviva's purchase obligations under the 4Q 2022 Purchase Agreements had not yet come due. Opp. at 8. But, read in context, Statement 8 clearly referred to the extent to which Enviva would engage in *additional* such transactions in the future—not to preexisting transactions. After all, Enviva had repeatedly disclosed—including in the same presentation in which Statement 8 was made—that the 4Q 2022 transactions required it "to purchase approximately 1.8 million MT of wood pellets between 2023 and 2025." MTD Ex. 13, at 66 (A0564) (Investor Day Presentation); MTD Ex. 4, at 59 (A0276) (2022 10-K); *see also Phillips*, 190 F.3d at 617 (statements are not actionable where investors "possess[] sufficient information" to call their purported misunderstanding "into question").

The only other statement made by Mr. Keppler that the Complaint challenges is Statement 24 (¶ 142). But the assertion that Enviva had "plenty of liquidity" is a paradigmatic example of inactionable corporate "puffery." MTD at 16-17. The Opposition never directly addresses this argument. Instead, Plaintiffs assert that statements about Enviva's financial strength could be actionable where they contain "the factual specificity necessary to make them actionable." Opp. at 19. But such "factual specificity" is exactly what Statement 24 lacks, rendering it inactionable as a matter of law. *E.g. Magruder v. Halliburton Co.*, 359 F.Supp. 3d 452, 461 (N.D. Tex. 2018) ("Statements that Halliburton had 'plenty of'…liquidity are too general and vague to cause a reasonable investor to rely on them.").

### 2.      Plaintiffs have not alleged that Mr. Keppler spoke with scienter.

Like with Mr. Johnson, Plaintiffs' primary scienter argument against Mr. Keppler is that he held high positions at Enviva when he made his challenged statements. *See* Opp. at 27. This argument fares no better against Mr. Keppler than it does against Mr. Johnson. *See* MTD at 23-24.

Plaintiffs next note that Mr. Keppler signed Enviva's 10-Q for 3Q 2022, which referenced

7

certain wood pellet prices observed during 3Q 2022. But those prices add nothing to the scienter calculus both because they do not contradict any of Mr. Keppler's challenged statements[9] and also because they were publicly disclosed in the 10-Q itself. *See* MTD at 24-25 (knowledge of public facts adds nothing to scienter). Nor does the 10-Q's disclosure of these prices show Mr. Keppler's knowledge of any *other* prices: Plaintiffs cannot use Mr. Keppler's knowledge of specific prices during a certain time period to show knowledge (let alone intentional concealment) of *different* prices during a *different* time period.[10]

Finally, Plaintiffs harp on Mr. Keppler's sale of Enviva stock on December 5, 2022, which they characterize as "highly unusual" and thus supposedly suspicious. Opp. at 28. But Plaintiffs ignore an obvious innocent explanation for Mr. Keppler's "highly unusual" stock sale: just three weeks earlier, he had resigned as CEO to focus on a life-threatening heart condition. *See* ¶ 17; *see also* MTD, Ex. 4 at 56 (A0273) (2022 10-K). In light of this innocent explanation for Mr. Keppler's stock sale—which Plaintiffs simply fail to address—Plaintiffs cannot argue that the stock sale supports a strong inference of scienter. *See, e.g.*, *Cozzarelli v. Inspire Pharm. Inc.*, 549 F.3d 618, 628 (4th Cir. 2008) (finding no strong inference of scienter because defendants "resigned from [the company] around the time of their sales, indicating that their departures, rather than an intent to defraud, may have prompted them to sell their stock").[11] Furthermore, Mr. Keppler's net exposure to Enviva's stock price actually *increased* during the Class Period. *See* MTD at 28. As the Fourth Circuit has observed, a defendant's allowing his financial exposure to a stock drop to increase over the Class Period "hardly suggest[s] that [he] sought to dump [his] shares at an inflated price." *Cozzarelli*, 549 F.3d at 628. Plaintiffs attempt to dismiss Mr. Keppler's net increase because it was largely the result of his options vesting, and according to Plaintiffs, "Mr. Keppler's receipt

---

[9] *See* ¶ 102 (Statement 1) (about inflationary provisions), ¶ 140 (Statement 8) (about whether Enviva planned future transactions to manage dislocations), ¶ 142 (Statement 24) (about Enviva's liquidity).

[10] In fact, the prices in the 10-Q undermine Plaintiffs' argument. Enviva's 10-Q from 3Q 2022 references prices "exceed[ing] $400 per MT," which shows that Enviva was referencing a different forward price curve than the Argus assessments on which Plaintiffs base their arguments. *Cf.* ¶¶ 56-61 (showing Argus "forward" curves at lower prices).

[11] *See In re K-tel Int'l, Inc. Sec. Litig.*, 300 F.3d 881, 896 (8th Cir. 2002) (sales by resigning officer "should not materially impact the scienter analysis" because it is "not unusual for individuals leaving a company…to sell shares") (quoting *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 206 (1st Cir. 1999)); *In re First Union Corp. Sec. Litig.*, 128 F.Supp. 2d 871, 898 (W.D.N.C. 2001) (similar).

8

of free stock does nothing to diminish the culpable inference from his insider trading." Opp. at 29. But in *Cozzarelli* the defendants' increase also came from the vesting of options. *See* 549 F.3d at 622; *Proter v. Medifast, Inc.*, 2013 WL 1316034, at \*21 n.21 (D. Md. Mar. 28, 2013) (citing *Cozzarelli* to reject attempt to avoid "nullifying effect" of a "holdings increase [that] was due to vested stock options as opposed to an actual purchase of stock").[12] And, in any event, here Mr. Keppler separately *paid* for stock later in the class period.[13] The facts surrounding Mr. Keppler's stock sale thus come nowhere near supporting a "strong inference" of scienter.

### C.    Plaintiffs' claims against Mr. Even should be dismissed.

The Complaint challenges eight statements attributed to Mr. Even. ¶¶ 119, 121, 123, 150, 171, 172, 176, 177 (Statements 3, 7, 10, 15, 25, 27, 33, 34). Three (Statements 3, 7, and 10 (¶¶ 119, 121, 123)) are also attributed to Mr. Johnson and fail for the same reasons as they did as to him. *Supra* § II.A.1. Another (Statement 25 (¶ 150)), is never addressed in the Opposition, waiving the Complaint's challenge to it. *Fanucchi*, 2024 WL 3302564, at \*8.[14] And Mr. Even's remaining statements (Statements 15, 27, and 33-34 (¶¶ 171-72, 176-77)) fail for the reasons discussed below.

#### 1.    Plaintiffs fail to state a claim against Mr. Even based on Statement 15.

Statement 15 states that Enviva entered into the 4Q 2022 Purchase Agreements and they "were priced at market prices in effect at the time of the agreements." ¶ 172. Plaintiffs do not dispute that these agreements were priced at prices prevailing in the marketplace for exchanges of wood pellets in the fourth quarter of 2022. *See* MTD at 13. Instead, they complain that the 4Q 2022 Purchase Agreements were not priced at what Plaintiffs call "forward market prices." Opp. at 9. But, as Plaintiffs admit, a "market price" is "[t]he prevailing price at which something is sold *in a specific market*." *Id.* And what Plaintiffs call "forward market prices" do not come from a "specific market." They come from "forward price assessments" of a third party named Argus. *Id.*;

---

[12] Plaintiffs' conclusory assertion that Keppler's 2022 compensation supports scienter also fails. *In re Astea Int'l Inc. Sec. Litig.*, 2007 WL 2306586, at \*12 (E.D. Pa. Aug. 9, 2007) ("Increased officer compensation is a noted example of a motive allegation too generalized to demonstrate scienter." (collecting cases)).

[13] *See* Enviva, 03/27/2023 8-K, https://tinyurl.com/yf835wws (last visited Dec. 9, 2025).

[14] Even if they had not been waived, Plaintiffs' claims about Statement 25 fail for the reasons discussed in the Motion and those discussed below as to Meth's Category E statements. *See* MTD at 15-17; *infra* II.D.1.

MTD Ex. 12, at A0495.[15] As nothing in Statement 15 suggests Mr. Even was referring to Argus' "assessments," Plaintiffs miss the mark in relying on them to argue Statement 15 is misleading.[16]

Moreover, even if the phrase "market prices" was ambiguous and could be construed to mean Argus' forward-curve assessments, instead of the "spot *market* price," Plaintiffs have pleaded nothing to suggest that Mr. Even "affirmatively sought" to deceive investors by signing an SEC filing containing phrasing susceptible to such a misinterpretation. *Maguire*, 876 F.3d at 548 (such an "argument fuses an inference that Hinton knew enough to realize that his characterization was technically incorrect with an inference that he intended it to deceive"); *id.* ("an investor's view of a statement is not itself evidence of the speaker's state of mind"). Indeed, Plaintiffs' sole attempt to argue that Mr. Even was motivated to defraud investors is nonsensical. Plaintiffs argue that Mr. Even was motivated to increase his compensation "[i]n 2022." Opp. at 27. But Statement 15 was made in May 2023. Indeed, *none* of Mr. Even's statements that Plaintiffs challenge were made before March 2023. Mr. Even could not have been motivated to make them to increase his 2022 compensation.[17] *See also supra* n.12.

### 2.    Plaintiffs fail to state a claim against Mr. Even based on Statement 27.

Next, the Opposition takes issue with Mr. Even's August 3, 2023 statement of "belie[f]" that Enviva had access to cash that "will be sufficient to meet our primary liquidity requirements."

---

[15] Plaintiffs argue that the Court should ignore Argus' own explanation of the meaning of its reports because they conveniently failed to attach it to their Complaint. Opp. at 10 n.7. But Plaintiffs cannot—and do not try to—contest that Argus' methodology is accurately reflected by *its own statement* of the methodology it uses. The Court can thus take judicial notice of Argus' methodological definition. Fed. R. Evid. 201(b); *see also United States v. Flores*, 730 F.App'x 216, 220 (5th Cir. 2018) (Haynes, J. concurring) (taking judicial notice of information from a Bushmaster owner's manual under Rule 201(b)) (collecting cases). Indeed, courts routinely take judicial notice of far less authoritative online sources' definitions of relevant terms. *E.g.*, *Road Dawgs Motorcycle Club of the U.S., Inc. v. Cuse Road Dawgs, Inc.*, 679 F.Supp. 2d 259, 276 n.41 (N.D.N.Y. 2009) (citing print and online sources for judicial notice of the slang meaning of the phrase "road dawg").

[16] In an effort to conflate Argus' assessments with "market prices," Plaintiffs argue that one (of many) inputs into Argus' "assessments" were "real transactions." Opp. at 10. But this only proves the point. If Argus were providing a "market price," then it would simply *report* the actual price of the transactions in the marketplace. *Cf. id.* at 9 (defining "market price" as "the price at which something *is sold*"). Indeed, Plaintiffs point to no example of anyone referring to Argus forward-curve "assessments" as "market prices." Instead, they point to statements in which Defendants distinguished between "biomass spot *market* prices" and "forward curve pricing." *E.g.* ¶¶ 55, 123, 214.

[17] The lack of a competent motive allegation "'weigh[s] heavily' in the scienter analysis." *In re Triangle Capital Corp. Sec. Litig.*, 988 F.3d 743, 752 (4th Cir. 2021). Plaintiffs' arguments about Mr. Even's "termination" and the Board's "decision to pursue claims against Even," Opp. at 27, fail, just as they did against Johnson. *See supra* § II.A.2.

10

¶ 177 (Statement 27). Plaintiffs argue that this statement was misleading because "Enviva was in breach for failing to buy $113 million of pellets from RWE by July 31, 2023." Opp. at 13, 20. But Statement 27 must be read "in its full context." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 190 (2015). It was made on August 3, 2023—*after* Enviva had advised investors that it "was eliminating its dividend 'to preserve liquidity,' slashing its full year 2023 guidance, and had achieved very poor 1Q 2023 results." ¶ 157. Investors were thus well aware that Enviva was facing severe liquidity challenges and would expect that Enviva was reworking its contracts. Statement 27 does not suggest otherwise, instead limiting itself to a "belie[f]" about Enviva's "*primary*" liquidity requirements. *Id.*[18]

In any event, Statement 27 is a statement of belief about the future. "For forward-looking statements, the required level of scienter is 'actual knowledge.'" *See In re Marriott Int'l, Inc. Customer Data Sec. Breach Litig.*, 543 F.Supp. 3d 96, 142 (D. Md. 2021). Plaintiffs pleaded no particularized facts at all suggesting that, on August 3, 2023, Mr. Even knew of Enviva's alleged July 31, 2023 breach. *In re Plains All Am. Pipeline, LP Sec. Litig.*, 307 F.Supp. 3d 583, 642 (S.D. Tex. 2018) (the PSLRA's scienter standards require "specific allegations about which corporate officer learned what facts, from what source, on what date"). Thus, even if this fact did contradict Statement 27, Plaintiffs' claims would require dismissal for failing to adequately allege scienter.

### 3. Mr. Even's Sarbanes-Oxley certifications are not actionable.

Last, Plaintiffs take issue with Mr. Even's Sarbanes-Oxley certifications to Enviva's 1Q and 2Q 2023 10-Qs. ¶¶ 171, 176 (Statements 33-34). But for these certifications to be actionable Plaintiffs were required show that Mr. Even had (1) actual knowledge that the Form 10-Q was (2) materially misleading. MTD at 21. Here, the only statements Plaintiffs even challenge from a Form 10-Q are Statements 15 and 27. Plaintiffs have not shown that these statements were untrue at all, let alone that Mr. Even had *actual knowledge* that they were *materially* misleading.

---

[18] As of June 30, 2023, Enviva had $565.5 million of liquidity, which included cash on hand and availability under its revolving credit facility. MTD Ex. 14, at 29 (A0609) (Q2 2023 10-Q). Enviva had $155.6 million in cash, cash equivalents, and restricted cash as of June 30, 2023. *Id.* at 9 (A0589).

**D.      Plaintiffs' claims against Mr. Meth should be dismissed.**

Plaintiffs argue that Mr. Meth had "knowledge" of facts contradicting his public statements in three areas: (i) the 4Q 2022 Purchase Agreements, (ii) Enviva's manufacturing plants, and (iii) Enviva's 3Q 2022 guidance.[19] Opp. at 23-25. Each fails to state a claim.

**1.      Plaintiffs fail to state a claim against Mr. Meth based on his purported knowledge of the 4Q 2022 Purchase Agreements.**

Plaintiffs first argue that Mr. Meth must have known the prices of the 4Q 2022 Purchase Agreements because of his oversight of Enviva's contracts and statements about the agreements. Opp. at 23. This fails to state a claim against Mr. Meth, however, because the 4Q 2022 Purchase Agreements' prices "do not contradict" any of Mr. Meth's alleged misstatements. *Marriott,* 31 F.4th at 902. For instance, Plaintiffs contend that Mr. Meth's purported knowledge of the 4Q 2022 Purchase Agreements' prices renders his Category B statements misleading. Opp. at 16. But the Category B statements are not about the 4Q 2022 Purchase Agreements. Instead, they are about Enviva's *general* tendency to enter into contracts for "managing dislocations," and state that market forces are driving "accretive…opportunities" for such transactions and that such transactions "will continue to drive value over the long term." ¶ 98; *see also* ¶¶ 100, 119, 144 (similar). No reasonable investor would interpret these general sentiments as an assertion about the *specific* prices of *specific* agreements.[20] Indeed, no reasonable investor would rely on these statements at all, because vague positivity suggesting a company program is beneficial is a textbook example of inactionable puffery. *See* MTD at 11 n.11.[21]

Plaintiffs' arguments regarding Mr. Meth's Category C statements are similar. Opp. at 16-17. For Statements 10-12, 14, and 16 (¶¶ 123, 126, 128, 148, 174), Plaintiffs' claim is not that

---

[19] Plaintiffs do not address Statements 2, 18, 21, or 23 (¶¶ 105, 108, 114, 137) in the Opposition, waiving their claims on these statements. *Fanucchi*, 2024 WL 3302564, at *8.

[20] Plaintiffs' citation to *Roofer's Pension Fund v. Papa*, Opp. at 6-7, only emphasizes the point. There, the defendants had described a *specific merger* as accretive despite extensive problems that rendered that *specific merger* unprofitable. 2018 WL 3601229, at *13 (D.N.J. July 27, 2018).

[21] Plaintiffs also suggest that Enviva's stock drops at the end of the class period suffice to show these statements were material. Opp. at 19. But every securities fraud case involves a back-end stock drop. Thus, if Plaintiffs' theory were accepted, no statement would ever be inactionable puffery. This is plainly not the law. *E.g. Fanucchi,* 2024 WL 3302564, at *5 n.6 (rejecting the same argument); *Raab v. Gen. Physics Corp.*, 4 F.3d 286, 288 (4th Cir. 1993) (finding puffery despite 36% back-end price drop); *Greenhouse v. MCG Capital Corp.*, 392 F.3d 650, 661 (4th Cir. 2004) (cautioning judges to "be chary of theories that purport to discern precisely what caused stock prices to rise or fall").

these statements were inaccurate or untrue, but that they omitted material information on the same subject by not also divulging the 4Q 2022 Purchase Agreements' prices. *Id.* But "[a]lthough investors would surely prefer to know everything about a company, Section 10(b) and Rule 10b-5 do not create an affirmative duty to disclose any and all material information." *Marriott*, 31 F.4th at 902; MTD at 11. Rather, an omitted fact must "alter the meaning of the statement" for the statement to be actionably misleading. *McDonald v. Kinder-Morgan, Inc.*, 287 F.3d 992, 998 (10th Cir. 2002); *see also Marriott* 31 F.4th at 902 ("companies can control what they have to disclose by controlling what they say to the market"). Plaintiffs make no attempt to distinguish *Marriott*, the Fourth Circuit's most recent discussion of this topic. But *Marriott* is fatal to their claims based on Statements 10-12, 14, and 16, because the additional pricing details that Plaintiffs allege were omitted *do not alter* the meaning of these statements about the 4Q 2022 RWE transactions.

The one remaining Meth statement in Category C is Statement 13 (¶ 130). The objective information in Statement 13 is also undisputedly accurate. And Mr. Meth's characterization of the opportunity as "very attractive to do for future periods" is precisely the kind of vague, subjective assertion that courts routinely dismiss as inactionable puffery. *Frazier v. VitalWorks, Inc.*, 341 F.Supp. 2d 142, 153 (D. Conn. 2004) ("Saying that a product is...'attractive'...is merely 'puffery,' not actionable securities fraud."). Statements 17-19 and 21 (¶¶ 111, 114, 132, 137) from Category D[22] —asserting Mr. Meth's "tremendous confidence" in Enviva's prospects—also are puffery and thus fail for the same reason. *See* MTD at 15 (citing *Raab*, 4 F.3d 286). Indeed, Plaintiffs never address *Raab*, the Fourth Circuit's seminal opinion on this issue, which is fatal to their claims.[23]

Finally, the Opposition takes issue with Mr. Meth's Category D and E projections about Enviva's dividend and future earnings. Plaintiffs contend that these statements are not immune from liability under the PSLRA's safe harbor provision because they were not accompanied by sufficient cautionary language. Opp. at 21. But even if Plaintiffs' criticisms of Enviva's cautionary

---

[22] Mr. Meth's other statements concerning Category D are discussed in the following section.
[23] Plaintiffs argue that Statement 19 (¶ 132) was not puffery because it referenced "future forward curve" pricing. But, as Plaintiffs elsewhere argue, the "future forward curve" was publicly disseminated by Argus. Thus the only new information made available to investors by this statement was Mr. Meth's subjective characterization of that information as "very favorable," which is puffery.

language had merit (and they do not, *see* MTD at 19-20), they overlook that the PSLRA's safe harbor is disjunctive: It immunizes statements from liability if *either* "(1) they are 'accompanied by meaningful cautionary language,' *or* (2) if 'Plaintiffs have failed to plead that the speaker had actual knowledge of the statements' falsity at the time the statements were made." *Emps.' Ret. Sys. of the City of Baton Rouge v. Macrogenics*, Inc., 61 F.4th 369, 389 (4th Cir. 2023). Here, Plaintiffs allege no particularized facts showing that Mr. Meth had "actual knowledge" that his projections were untrue. Instead, Plaintiffs' allegations at most suggest that he knew the 4Q 2022 Purchase Agreements' prices and *should have* used that information and his purported knowledge of what future market prices would be[24] to deduce that the projections would not be achieved. But such an argument about what Mr. Meth "*should have known*" does not establish even recklessness—let alone the "actual knowledge" of falsity required here. *San Antonio Fire & Police Pension Fund v. Syneos Health Inc.*, 75 F.4th 232, 242 (4th Cir. 2023).[25, 26]

### 2. Plaintiffs fail to state a claim against Mr. Meth based on his purported knowledge of Enviva's manufacturing plants.

Statements 28 and 29 (¶¶ 95, 116) are statements of projections and fail for the same reasons just discussed: Plaintiffs have not alleged facts suggesting that they were "not honestly believed when they were made." *Macrogenics*, 61 F.4th at 387. Instead, Plaintiffs suggest that Mr. Meth should have deduced from his purported awareness of Southampton's "problems" that Enviva's overall production capacity would fall short of these projections. Opp. at 25. Such allegations fall far short of alleging the requisite "actual knowledge" of falsity. *See* MTD at 18-19.

Mr. Meth's other statements about Enviva's Southampton plant state that it "hit the

---

[24] Mr. Meth, of course, could not possibly have "actual knowledge" of what *future* wood pellet prices would be. Plaintiffs are thus left to suggest that Mr. Meth *should have* assumed that Argus' forward price "assessments" would turn out correct. Opp. at 12. But it is not fraud to expect wood pellet prices to continue their rise that began in July 2023—especially since, in 2022, prices did follow that trajectory. *See* MTD at 19.

[25] Plaintiffs respond to *Syneos* by arguing that Mr. Meth "actually did know the prices of the 4Q 2022 Purchase Agreements." Opp. at 24 n.17. But even if this were so, it is beside the point. The question is whether he had actual knowledge that his projections were incorrect, and his knowledge of the prices is irrelevant to that question.

[26] *See also Firemen's Ret. Sys. of St. Louis v. Telos Corp.*, 2023 WL 1512207, at *8 (E.D. Va. Feb. 1, 2023) (dismissing forward-looking statements where plaintiffs made no direct allegations of the speaker's actual knowledge of its falsity); *Aramic LLC v. Revance Therapeutics, Inc.*, 2024 WL 1354503, at *6 (N.D. Cal. Apr. 2, 2024) (no actual knowledge because "[a]lthough in hindsight, the projections may have been overly optimistic, Plaintiffs have not alleged that Defendants knew that the projected timeline for BLA approval was not possible") (collecting cases).

necessary daily numbers [in] September, October, November" of 2022 and that Enviva's plants in general "now deliver volumes at an elevated rate" in 2023. ¶ 134, 154 (Statements 4, 20). But while the Complaint generally alleges that Southampton faced various problems following an expansion project started in 2021, it is devoid of particularized allegations about Southampton's "daily [production] numbers" during three months in late 2022. ¶ 134, 154. Nor does it contain allegations showing that Enviva's overall production was not "at an elevated rate" in early 2023. ¶ 154. And it certainly does not contain "detailed allegations establishing [Mr. Meth's] actual exposure" to facts contrary to these statements. *Yates v. Mun. Mortg. & Equity, LLC*, 744 F.3d 874, 890 (4th Cir. 2014). These statements are accordingly inactionable.

### 3. Plaintiffs fail to state a claim against Mr. Meth based on his purported knowledge of Enviva's guidance.

Finally, Plaintiffs' claims regarding Statements 31 and 32 (¶¶ 182, 184) also fail. Statement 31 concerns spot sale transactions in 2023. Earlier in the same conference call, Mr. Meth suggested that spot sales *would* occur in the second-half of 2023 and be "particularly pronounced" in the 4Q. MTD at 20. Because Plaintiffs allege nothing to suggest that Mr. Meth "affirmatively sought" to deceive investors about an issue he had spoken accurately to them about just moments before, their claims about Statement 31 fail. *Maguire*, 876 F.3d at 548. As to Statement 32, Plaintiffs cannot dispute that Enviva's forecast in the 2Q 2023 did not include any "incremental" (*i.e.*, new) deferred gross margin transactions. ¶ 184. And they provide no basis for their argument that investors would misunderstand Statement 32 to mean that the *previous* such transactions would have no impact on future quarters—let alone that Mr. Meth intended for investors to do so. *Cf.* Opp. at 11.[27]

### III.   CONCLUSION

Defendants' Motion to Dismiss should be granted in its entirety.

---

[27] Plaintiffs' generalized allegations about Mr. Meth's compensation, changing role at Enviva, and the potential for fiduciary duty claims against him, Opp. at 26-27, fare no better against Meth than they do against the other Defendants. *E.g. Plumbers & Pipefitters Local Union 719 Pension Fund v. Zimmer Holdings, Inc.*, 679 F.3d 952, 956 (7th Cir. 2012) ("A similar assertion could be made about every firm in the world, but the fact that managers benefit from higher stock prices does not imply that any particular manager committed fraud. Quite the contrary. Managers usually do best when a firm has long-term success…. This aspect of plaintiffs' arguments thus undermines…scienter.").

Dated: January 10, 2025                          Respectfully submitted,


                                                 */s/ Ronald J. Tenpas*
                                                 Ronald J. Tenpas (#14448)
                                                  State Bar No. 24002307
                                                 VINSON & ELKINS L.L.P.
                                                 2200 Pennsylvania Avenue NW
                                                 Suite 500 West
                                                 Washington, DC 20037
                                                 Telephone: (202) 639-6500
                                                 Telephone: (202) 639-6791
                                                 Fax: (202) 879-8981
                                                 rtenpas@velaw.com

                                                 Jeffrey S. Johnston (admitted *pro hac vice*)
                                                 VINSON & ELKINS L.L.P.
                                                 845 Texas Avenue
                                                 Suite 4700
                                                 Houston, TX 77002
                                                 Telephone: (713) 758-2198
                                                 jjohnston@velaw.com

                                                 Robert Ritchie (admitted *pro hac vice*)
                                                 VINSON & ELKINS L.L.P.
                                                 2001 Ross Avenue
                                                 Suite 3900
                                                 Dallas, Texas 75201
                                                 Telephone: (214) 220-7823
                                                 rritchie@velaw.com

                                                 *Attorneys for Defendants*


                                                 */s/ Graeme W. Bush*
                                                 Graeme W. Bush (#02171)
                                                 Ezra B. Marcus
                                                 ZUCKERMAN SPAEDER LLP
                                                 1800 M Street, NW, Suite 1000
                                                 Washington, DC 20036
                                                 Telephone: (202) 778-1800
                                                 Fax: (202) 822-8106
                                                 gbush@zuckerman.com
                                                 emarcus@zuckerman.com

                                                 *Attorneys for Defendant John K. Keppler*


16

## CERTIFICATE OF SERVICE

I, Ronald J. Tenpas, hereby certify that on January 10, 2025, true copies of the foregoing were served on all counsel of record via the Court's ECF system in compliance with Fed. R. Civ. P. 5(a).

*/s/ Ronald J. Tenpas*
Ronald J. Tenpas

17