**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

|  |  |  |
|---|---|---|
| | * | |
| **ANDREW DAVIS,** | * | |
| | * | |
| **Plaintiff,** | * | |
| | * | **Civ. No. MJM-23-2474** |
| **v.** | * | |
| | * | |
| **JOHN K. KEPPLER,** *et al.*, | * | |
| | * | |
| **Defendants.** | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \*

**MEMORANDUM OPINION**

This federal securities class action was filed on behalf of a putative class of persons and entities who purchased the publicly traded common stock of Enviva during the period of November 3, 2022, through November 8, 2023 ("Class Period"). Lead plaintiff Andrew Davis alleges on behalf of the putative class that defendants John K. Keppler, Thomas Meth, Shia S. Even, and Michael A. Johnson (collectively, "Defendants") violated the Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Securities and Exchange Commission ("SEC") Rule 10b–5 by, among other things, concealing the terms of purchase agreements Enviva entered in the fourth quarter of 2022, which led to significant losses to investors. *See generally* ECF 48 (Second Amended Complaint or "SAC").

This matter is before the Court on Defendants' Motion to Dismiss. ECF 49. The motion is fully briefed and ripe for disposition. No hearing is necessary. *See* Local Rule 105.6 (D. Md. 2025). For the reasons set forth below, Defendants' motion shall be GRANTED in part and DENIED in part.

## I.    FACTUAL BACKGROUND[1]

### A.  Enviva and Defendants

Enviva is the world's largest producer of industrial wood pellets. SAC ¶ 2. The company is incorporated in Delaware with its principal place of business in Bethesda, Maryland. *Id.* ¶ 21. From facilities located in the Southeastern United States, Enviva processes trees into wood pellets and, pursuant to long-term contracts, sells and ships the wood pellets to utilities in Europe and Asia, which burn the pellets to generate heat and electricity. *Id.* ¶¶ 26–29. Enviva also purchases wood pellets for resale, which has historically accounted for approximately 15% to 20% of its annual pellet sales. *Id.* ¶ 30.

Defendants were senior executives at Enviva during the Class Period. John Keppler served as Chief Executive Officer ("CEO") at the beginning of the Class Period until he was replaced by Thomas Meth, Enviva's President, in November 2022. *Id.* ¶¶ 3, 18. Meth was replaced as CEO by Glenn Nunziata in November 2023. *Id.* ¶ 30. Shai Even served as Chief Financial Officer ("CFO") until Enviva terminated his employment in August 2023. *Id.* ¶¶ 3, 19. Michael Johnson served as Chief Accounting Officer until his resignation in March 2023. *Id.*

### B.  Q4 2022 Purchase Agreements and Other Financial Pressures

According to Plaintiff, "[l]eading up to and during the Class Period, Defendants sought to attract investors and increase Enviva's stock price by portraying Enviva as a rapidly growing company that generated reliable cash flows." *Id.* ¶ 32. In the fourth quarter ("Q4") of 2022, Enviva

---

[1] The following facts are drawn primarily from the SAC and are assumed to be true for purposes of evaluating the motion to dismiss. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007). Additionally, "[i]n a securities fraud action, the Court may … consider statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the Securities and Exchange Commission, analyst reports, documents upon which Plaintiffs relied in bringing suit, and matters of which the Court may take judicial notice." *In re Hum. Genome Scis. Inc. Sec. Litig.*, 933 F. Supp. 2d 751, 753 n.1 (D. Md. 2013) (citing *Tellabs v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007)).

entered into a series of transactions with its existing customer RWE Supply & Trading GmbH ("RWE"), a German energy company, agreeing to sell RWE 340,000 metric tons of wood pellets in Q4 2022 and to purchase approximately 1,760,000 metric tons from RWE between 2023 and 2025 (the "Q4 2022 Purchase Agreement(s)" or "Q4 2022 Transaction(s)"). *Id.* ¶ 40. At the time, prices for wood pellets in the spot market (for delivery within 90 days) and for one-year delivery were "abnormally high." *Id.* ¶¶ 56–60. The prices Enviva agreed to pay, which were not disclosed to investors until after the Class Period, averaged approximately $377.29 per metric ton—far exceeding the sales prices of $200 to $235 per metric ton that Enviva contracted to receive from other customers through long-term contracts, *id.* ¶¶ 44, 65, and the prices for 2- and 3-year delivery of wood pellets prevailing in the industry in Q4 2022, *see id.* ¶ 61. The agreements with RWE obligated Enviva to pay a total of $641,359,115.50. *Id.* ¶ 45. Plaintiff alleges this arrangement exposed Enviva to hundreds of millions of dollars in losses, which was known by Defendants "at all times." *Id.* ¶ 62.

Enviva's current CEO, Glenn Nunziata, identified the Q4 2022 Transactions as a key event leading to the company's bankruptcy after the Class Period. Nunziata filed a declaration in Enviva's bankruptcy proceeding in which he stated that

> the longer-dated and fixed-price purchase components of the Q4 2022 Transactions were unhedged, and because the price for the to-be-purchased future volumes was significantly higher than the sales prices under pre-existing sales contracts for corresponding periods, the profitability of the Q4 2022 Transactions ultimately depended on the Company's ability to resell the to-be-purchased wood pellets under future short-term contracts or spot agreements at sales prices higher than the fixed future purchase price.

*In re: Enviva Inc., et al.*, Case No. 24-10453 (Bankr. E.D. Va.), ECF 27 (the "Nunziata Declaration"). Mr. Nunziata continued:

> In early 2023, however, market prices for wood pellets fell well below the prices experienced in the fourth quarter of 2022 and significantly lower than the fixed prices at which the Company agreed to purchase pellets from [RWE]. Those prices have not recovered. The purchase components of the Q4 2022 Transactions thus failed to produce positive economic results and, if completed as scheduled, would have put significant liquidity pressure on the Company.

*Id.*

The Nunziata Declaration also identifies other events leading to Enviva's bankruptcy, such as: (1) equipment failures at Enviva's manufacturing plants; (2) high employee turnover; and (3) "a failure of contractual escalators to appropriately scale with actual costs." *See* SAC ¶¶ 67–79, 81–85, 88–90. Former Enviva employees stated that, by late 2022, operational problems at Enviva's plants in Greenwood, South Carolina and Southampton, Virginia "had become apparent to most people at the Company and were a significant focus." *Id.* ¶ 70. Operational issues were also observed by analysts from J.P. Morgan and RBC Capital Markets when they took a tour of Enviva's Southampton, Virginia plant in September 2023. *Id.* ¶¶ 77–79. Another former employee recounted a "toxic work environment" in the company and recalled that the finance team had approximately 15 analysts, four different managers, and two different VPs over the span of employee's three years at Enviva. *See id.* ¶ 85.

### C. Events During the Class Period

Plaintiff alleges that Defendants made misleading statements throughout the Class Period to conceal the financial impact of the Q4 2022 Purchase Agreements, significant operational expenses, and associated risks. These allegedly misleading statements occurred in press releases, earnings calls, SEC filings, investor presentations, and media interviews.

On November 2, 2022, Enviva issued a press release titled "Enviva Reports 3Q 2022 Results." SAC ¶ 94. President and soon-to-be CEO Thomas Meth noted improvements in

productivity, supply chain conditions, and "the constructive pricing environment" that were expected to drive "incremental margin and cash flow and "set the stage for substantial growth in 2023 and beyond." *Id.* ¶ 95. The next day, during an earnings call, Meth emphasized strong market dynamics and "accretive" opportunities, and reinforced confidence in the company's long-term outlook. *Id.* ¶ 98.

Throughout the following months, Enviva continued to project optimism. At a presentation to investors on November 28, 2022, Meth, now CEO, underscored favorable pricing conditions and expressed confidence in Enviva's long-term financial durability. *Id.* ¶ 105. In a January 2023 interview, Meth reiterated his priority for the company to continue to grow and issue dividends. *Id.* ¶¶ 107–08. This messaging was reinforced in a press release on February 8, 2023, which quoted Meth as saying, "the continued market tailwinds we are experiencing provide us tremendous confidence in our ability to deliver on our long-term growth objectives." *Id.* ¶¶ 110–11.

On March 1, 2023, Enviva reported full-year 2022 results, claiming strong fourth-quarter cash generation and operational progress. *Id.* ¶¶ 113–14, 134. During an earnings call on the same date, Meth forecasted significant productivity increases for 2023, citing improvements in plant utilization, staffing, and supply chain conditions. *Id.* ¶ 134. During the same call, Meth also disclosed the Q4 2022 Purchase Agreement with RWE, discussing the expected deferred revenue from the agreement and describing the transaction as "attractive." *Id.* ¶¶ 126–30. Plaintiff alleges that by March 1, 2023, the Q4 2022 Purchase Agreement exposed Enviva to $263–$282 million in losses based on then-current market prices. *Id.* ¶ 127.

In early April 2023, Meth again reiterated optimism in an interview on YouTube and, along with Keppler and Even, at Enviva's Investor Day, assured investors that growth was achievable without issuing new equity or jeopardizing Enviva's dividend. *See id.* ¶¶ 137, 140, 142. Meth also

reminded investors of the Q4 2022 Transaction, explaining that the company's spot market transactions strategy was a minor but "accretive" part of Enviva's business model. *Id.* ¶¶ 144–48. Plaintiff alleges, however, that Enviva had been attempting to renegotiate the Q4 2022 Purchase Agreements with RWE since the first quarter of 2023. *Id.* ¶ 138.

Enviva's messaging took a sharp turn a few weeks later. On May 3, 2023, Enviva issued a press release revealing poor Q1 2023 results, drastically reduced earnings guidance for 2023, and eliminated its dividend. *Id.* ¶¶ 157–61. In the press release and during an earnings call on the same date, Meth attributed the poor performance to high operating costs, maintenance issues, and underperformance at several plants, including problems with drying equipment and labor turnover. *Id.* ¶¶ 157–74. On May 4, Enviva filed with the SEC its Form 10-Q for Q1 2023.[2] The Form 10-Q was signed by Even and Meth and stated that the Q4 2022 Purchase Agreements were priced at "market prices in effect at the time of the agreements." *Id.* ¶¶ 171–72. The fallout from the May 3 press release and earnings call was swift. Enviva's stock plummeted by $14.34, or 67%, closing at $7.01 on May 5, on "exceptionally" high trading volume. *Id.* ¶ 167. Analysts criticized the company's "poor execution and messaging" and questioned the company's prior optimism, considering its sudden and severe reversal. *Id.* ¶¶ 168–69.

In August 2023, Enviva attempted to stabilize investor sentiment during its Q2 earnings call. *Id.* ¶ 180. Meth stated that the company was maintaining its full year adjusted EBITDA guidance but stepping down short-term expectations for the third quarter. *Id.* Meth claimed confidence in achieving year-end targets and downplayed the importance of spot business opportunities in meeting those goals. *Id.* ¶ 182–84.

---

[2] Form 10-Q is a comprehensive unaudited report of financial performance that must be submitted quarterly by all publicly traded companies to the SEC.

### D. Events After the Class Period

Enviva's troubles came to a head on November 9, 2023. The company revealed in its "Enviva Reports 3Q 2023 Results" press release that the Q4 2022 Transaction had locked Enviva into massive losses. Specifically, the press release revealed that Glenn Nunziata would replace Meth as CEO and reported very poor Q3 2023 results, which were well below the company's then-recent guidance. *Id.* ¶ 186. The company also withdrew its 2023 guidance and disclosed that it expected $283 million in losses on the Q4 2022 Purchase Agreements. *Id.* The press release further disclosed that "the Q4 2022 Transactions have had a significant negative impact on the Company's profitability, cash flows, and liquidity due to the negative current spread between the sale and purchase prices of the agreements and the anticipated loss on resale of those volumes within an unfavorable pricing environment in the wood pellet spot market." *Id.* ¶ 189. Additionally, it stated, "During the third quarter of 2023, the Company determined that the Southampton plant operated most cost effectively with a single dryer line. Therefore, it permanently shut down the second, underperforming dryer line and as a result, it recognized an impairment expense of $21.2 million." *Id.* ¶ 188. Enviva also issued a "going concern" warning, casting doubt on the company's ability to remain in business. *Id.* ¶ 190.

That same day, Enviva filed its Form 10-Q for Q3 2023 with the SEC. The Form 10-Q revealed that the Q4 2022 Transactions obligated Enviva to purchase approximately 1.7 million metric tons of wood pellets through 2025 for a total of approximately $641.4 million. *Id.* ¶ 192. The Form 10-Q also disclosed that, assuming sales based on the forward Argus prices[3] published

---

[3] Argus Media ("Argus") is an independent provider of price information, consulting services, and industry conferences for commodities markets and the global energy industry. SAC ¶ 46. Via its weekly Biomass Markets newsletter, Argus provides pricing information for wood pellets based on location, delivery date, and standard contract terms. *Id.* ¶ 47. Plaintiff alleges that Defendants regularly followed wood pellet price indices such as those published by Argus, *id.* ¶ 55, and Enviva used Argus wood pellet pricing data in some of its contracts and investor presentations, *id.* ¶ 53–54.

on November 1, 2023, the aggregate sales value of these volumes would be approximately $156.9 million in 2023, $134.1 million in 2024, and $67 million in 2025. As a result, resales of these volumes into the spot market were expected to have a negative impact on the company's profitability, cash flows, and liquidity, amounting to $139.4 million in 2023, $99.2 million in 2024, and $44.8 million in 2025. *Id.* ¶ 193.

Following this news, Enviva's share price dropped significantly, falling by $2.99—or 77%—to close at $0.85 on November 9, 2023, on "extraordinarily" high trading volume. *Id.* ¶ 194. Analysts linked this decline to the recent revelation of Enviva's financial and operational difficulties. On November 10, a J.P. Morgan analyst published a note stating, "4Q22 transaction update – previously unknown: Per EVA's 10-Q filing released yesterday, EVA agreed to purchase the 1.8mm MTs on a fixed-contract at ~$377/MT, a price near the all-time high spot prices from 2H22 and well-above EVA's existing average contracted off-take ($215-225/MT) and current spot rates (~$200/MT)." *Id.* ¶ 196. The analyst continued, "[w]e believe the price/cost delta implied in the transaction was paramount to the company's going concern notice." *Id.* Additionally, the analyst noted a discrepancy between the company's previous messaging and the financial realities of the business: "Despite consistent messaging downplaying the spot market's importance to achieving FY23 guidance/medium-term targets and the company placing outsized focus on internal operational improvements, the YTD spot market deterioration has proven too severe for cost reductions to offset and, more importantly, shed additional light on the large 4Q22 transaction that is set to cost EVA hundreds of millions." *Id.* ¶ 197.

The board of directors of Enviva initiated an independent investigation in November 2023. *Id.* ¶ 198. On March 12, 2024, Enviva and several of its subsidiaries and affiliates filed for bankruptcy. *Id.* ¶ 203. As revealed by filings in the bankruptcy proceedings, the board of directors'

investigation focused in part on the Q4 2022 Transactions, *id.* ¶ 199, and included searching Meth, Keppler, Even, and Johnson's Microsoft Office365 accounts for relevant information, *id.* ¶ 201. Search terms used to identify potentially relevant documents included "RWE*", "dirty hedge," and "meet guidance." *Id.* ¶ 202. The filings also revealed that the board's investigators requested and received from Enviva documents such as: (i) "relevant RWE contracts from Q4 2022"; (ii) "earnings call transcripts" and "investor presentations"; and (iii) documents relating to Defendants' "compensation and stock trading (e.g., '[i]nformation on how bonus is determined and when a bonus is paid,' and '[p]olicy/procedures/guidance on insiders ability to trade')." *Id.* ¶ 202.

## II.    PROCEDURAL HISTORY

An initial complaint was filed by plaintiff Taje Dhatt, individually and on behalf of all others similarly situated, against Enviva, Keppler, Meth, Even, and Johnson alleging securities fraud in violation of Section 10(b) of the Exchange Act and SEC Rule 10b–5. ECF 1. Several members of the putative class filed motions for appointment as lead plaintiff, and the Court granted the motion filed by plaintiff Andrew Davis. ECF 28 & 29.

On March 13, 2024, Enviva filed a suggestion of bankruptcy, ECF 35, and was voluntarily dismissed from the action, ECF 37. Plaintiff filed an Amended Complaint on April 30, 2024, ECF 41, and a Second Amended Complaint on August 2, 2024, ECF 48. Thereafter, Defendants filed a motion to dismiss the SAC. ECF 49. Plaintiff filed a response in opposition to the motion, ECF 50, and Defendants filed a reply, ECF 51.

## III.    DISCUSSION

The Second Amended Complaint alleges securities fraud and seeks remedies under Section 10(b) of the Exchange Act and SEC Rule 10b–5. Defendants move to dismiss this action pursuant to Federal Rule of Civil Procedure 12(b)(6) and the heightened pleading standard of the Private

Securities Litigation Reform Act of 1995, Pub. L. No. 104-67, 109 Stat. 737 ("PSLRA"), arguing that Plaintiff fails to state a plausible securities fraud claim under the Exchange Act. Specifically, Defendants contend that Plaintiff has not identified a false statement or material omission by any Defendant and has not plausibly alleged that Defendants acted with the requisite scienter. *See* ECF 49. Plaintiff contends that Defendants, the former senior executives of Enviva, intentionally deceived investors by concealing multiple serious problems with Enviva's business that ultimately led to bankruptcy. The Court concludes that Plaintiff has met its burden with respect to certain comments and omissions made by Meth regarding the Q4 2022 Purchase Agreements and the operations of the Southhampton plant, as well as the statement made by Meth and Even in Enviva's SEC Form 10-Q for Q1 2023 indicating that the Q4 2022 Purchase Agreements were priced "at market prices in effect at the time of the agreements."

### A.  Legal Standards

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) constitutes an assertion by a defendant that, even if the facts alleged by a plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive a motion to dismiss under Rule 12(b)(6), the complaint must allege enough facts to state a plausible claim for relief, *Ashcroft v. Iqbal*, 556 U.S. 662, 678, (2009), and to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests[,]" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A claim is plausible when the facts pleaded allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "The Court must examine the complaint as a whole, consider the factual allegations in the complaint as true, and construe the factual allegations in the light most favorable to the plaintiff." *Sinnathurai v. Novavax, Inc.*, 645 F. Supp. 3d 495, 512 (D. Md. 2022) (citations omitted); *see also Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007) (Rule 12(b)(6) motion requires

the court to "consider the complaint in its entirety" and "accept all factual allegations in the complaint as true").

The Exchange Act "was 'designed to protect investors against manipulation of stock prices' through a philosophy of public disclosure." *Longman v. Food Lion, Inc.*, 197 F.3d 675, 682 (4th Cir. 1999) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 230 (1988)). Section 10(b) of the Exchange Act makes it "unlawful for any person, directly or indirectly" to use "in connection with the purchase or sale of any security registered on a national securities exchange . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). SEC Rule 10b–5 "encompasses only conduct already prohibited by § 10(b)." *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 157 (2008). To state a claim under Section 10(b) and Rule 10b–5, a plaintiff must plead the following elements: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Maguire Fin., LP v. PowerSecure Int'l, Inc.*, 876 F.3d 541, 546 (4th Cir. 2017) (quoting *Stoneridge*, 552 U.S. at 157).

Federal Rule of Civil Procedure 9(b) and the PSLRA impose heightened pleading standards upon claims for securities fraud under Section 10(b) of the Exchange Act. Rule 9(b) requires a complaint to "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b); *see also Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 783 (4th Cir. 1999) (Rule 9(b) requires pleading "the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby") (citing 5 Charles Alan Wright and Arthur R. Miller, *Federal Practice and Procedure: Civil* § 1297,

at 590 (2d ed. 1990)). In a private securities fraud action, the PSLRA requires the complaint to "specify each statement alleged to have been misleading," "state the reason or reasons why the statement is misleading," and "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(1)(B), (b)(2)(A). Importantly, to avoid dismissal under Rule 12(b)(6), a securities fraud complaint under Section 10(b) and Rule 10b–5 must set forth "*sufficient* facts to support a *reasonable belief* in the allegation that the defendant's statement was misleading . . . ." *Teachers' Ret. Sys. Of LA v. Hunter*, 477 F.3d 162, 174 (4th Cir. 2007) (emphasis in original).

To allege a material misrepresentation or omission, Plaintiff "must point to a *factual* statement or omission—that is, one that is demonstrable as being true or false." *Longman*, 197 F.3d at 682 (emphasis in original) (citation omitted). "[T]he statement must be *false*, or the omission must render statements *misleading*." *Id.* (emphasis in original). For an omitted fact to be material, "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *Paradise Wire & Cable Defined Benefit Pension Plan v. Weil*, 918 F.3d 312, 318 (4th Cir. 2019) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)). Section 10(b) and Rule 10b–5 "do not create an affirmative duty to disclose any and all material information[,]" but "disclosure of material information is required 'when necessary to make statements made, in the light of the circumstances under which they were made, not misleading.'" *Singer v. Reali*, 883 F.3d 425, 440 (4th Cir. 2018) (quoting *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011)); *see also* 17 C.F.R. § 240.10b–5(b).

The scienter element requires a plaintiff to "prove that the defendant acted with 'a mental state embracing intent to deceive, manipulate, or defraud.'" *Yates v. Mun. Mortg. & Equity, LLC*,

744 F.3d 874, 884 (4th Cir. 2014) (quoting *Tellabs*, 551 U.S. at 319). "At the pleading stage," allegations of "intentional or severely reckless conduct" suffice. *Id.* A plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with intentional or reckless deception with respect to each act or omission alleged." *San Antonio Fire & Police Pension Fund v. Syneos Health Inc.*, 75 F.4th 232, 241 (4th Cir. 2023). "In the § 10(b) context, a reckless act is one that is 'so highly unreasonable and such an extreme departure from the standard of ordinary care as to present a danger of misleading the plaintiff to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'" *Yates*, 744 F.3d at 884 (quoting *Matrix Cap. Mgmt. Fund, LP v. BearingPoint, Inc.*, 576 F.3d 172, 181 (4th Cir. 2009)).  "The inquiry . . . is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 322–23. "In sum, the reviewing court must ask: When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?" *Id.* at 326. "[T]o the extent a plaintiff alleges fraud claims against individual defendants, the plaintiff must allege facts supporting a strong inference of scienter as to each defendant." *BearingPoint*, 576 F.3d at 182.

The court must "consider the complaint in its entirety, as well as . . . documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs*, 551 U.S. at 322. When deciding a Rule 12(b)(6) motion in a securities fraud action, the court may consider "legally required public disclosure documents filed with the Securities and Exchange Commission . . . [and] documents upon which Plaintiffs relied in bringing suit[.]" *In re Hum. Genome Scis. Inc. Sec. Litig.*, 933 F. Supp. 2d 751, 753 n.1 (D. Md. 2013) (citing *Tellabs*, 551 U.S. at 322). The court may also consider "newspaper articles, analysts'

reports, and press releases in order to assess what the market knew at particular points in time, even where the materials were not specifically referenced in the complaint[,]" if there is no dispute as to the authenticity of such materials. *Shah v. GenVec, Inc.*, Civ. No. DKC 12-0341, 2013 WL 5348133, at *1 n.2 (D. Md. Sept. 20, 2013) (quoting *In re Human Genome Sciences*, 933 F. Supp. 2d at 758).

### B. Analysis

The Second Amended Complaint ("SAC") alleges that Defendants made dozens of false statements or omissions of material fact. Below, the Court addresses Plaintiff's key allegations in chronological order. Ultimately, the Court concludes that Plaintiff sufficiently alleges that Meth acted with the requisite scienter when he (1) omitted material facts during the March 2023 earnings call by failing to disclose terms of the Q4 2022 Purchase Agreements that exposed Enviva to hundreds of millions of dollars in losses while touting the deal as "attractive"; and (2) made misrepresentations during the March 2023 earnings call and April 2023 Investor Day event concerning the significant manufacturing and production challenges at the Southampton plant that hindered Enviva's productivity and profitability. The Court further concludes that Plaintiff sufficiently alleges that both Meth and Even acted with the requisite scienter when they (3) mispresented that the Q4 2022 Purchase Agreements were priced "at market prices in effect at the time of the agreements" in Enviva's SEC Form 10-Q for 1Q 2023.

### 1. November 2, 2022

After the close of stock market trading on November 2, 2022, Enviva published a press release titled "Enviva Reports 3Q 2022 Results." SAC ¶ 94. The press release quoted Meth stating:

> Productivity improvements across our manufacturing facilities, including debottlenecking, asset utilization increases, and the capacity expansions we have underway, are resulting in production rates that we expect to translate to over 6 million tons next year, and

> when combined with our improving supply chain conditions and the constructive pricing environment, particularly in Europe, are expected to not only provide modest opportunities in fourth-quarter 2022 to drive incremental margin and cash flow, but also set the stage for substantial growth in 2023 and beyond.

*Id.* ¶ 95.

Plaintiff argues that the preceding paragraph was materially false or misleading because Enviva's manufacturing facilities suffered from severe equipment failures that decreased production and increased expenses, which created material risks to Enviva's growth. *Id.* ¶ 96. But Plaintiff has alleged no specific facts to demonstrate the falsity of either Meth's statement about Enviva's production rates at the time of the statement or his forward-looking statements about his expectations for Enviva's future performance. "[P]rojections of future performance not worded as guarantees are generally not actionable under the federal securities laws." *In re Humphrey Hosp. Tr., Inc. Sec. Litig.*, 219 F. Supp. 2d 675, 683 (D. Md. 2002) (quoting *Raab v. Gen. Physics Corp.*, 4 F.3d 286, 289 (4th Cir. 1993) (citing *Krim v. BancTexas Group, Inc.*, 989 F.2d 1435, 1446 (5th Cir. 1993))). Meth's forward-looking statements are not worded as guarantees, are not shown to be false by the surrounding circumstances alleged in the SAC, and, therefore, are not actionable. *See id.* (statement "we expect to maintain our current dividend rate" is "not actionable").

### 2. November 3, 2022

Defendants held Enviva's 3Q 2022 earnings call on November 3, 2022. During the call, Meth stated:

> And in addition to our continuous long-term contracting activities, the same tailwinds that drive the longer-term contracts are driving new highly-accretive near-term opportunities with existing and new customers. And although the near-term opportunities don't reflect the same tenor of our long-term contracts, they and other transactions where we are managing dislocations within our customers' demand profile are a durable component of our business and will continue to drive value over the long term.

SAC ¶ 98.

Meth also stated during the earnings call:

> Enviva has a demonstrated track record of procuring volumes from different suppliers and geographies and selling them profitably into spot market opportunities in our long-term contracts. Market data suggests that volumes can be purchased on an FOB basis in the Pacific Rim for less than $200 per metric ton. Market data also points to trading prices currently north of $400 per metric ton in European markets. For companies like Enviva with large-scale portfolios of customers and shipping partners, these types of market dislocations can provide an opportunity to drive incremental value while meeting the needs of our customers. This is a market tailwind that we may talk more frequently about in the future.

*Id.* ¶ 100.

Plaintiff alleges that statements in the preceding paragraphs were materially false or misleading because Enviva had already entered into the Q4 2022 Purchase Agreements with existing customer RWE at above-market prices for 2024 and 2025 forward purchases, which undermined Enviva's ability to resell those volumes at a profit and thus was value-destroying to Enviva. *See id.* ¶¶ 99, 101; ECF 50 at 12. Although Meth's statements did not disclose the existence of the Q4 2022 Purchase Agreements, Plaintiff fails to demonstrate that disclosure was necessary to make Meth's statements "not misleading" under the circumstances. *See Singer*, 883 F.3d at 440. Meth's statement that unspecified "near-term opportunities" were driven by unspecified market forces is too vague to be material and, therefore, is not actionable. Similarly, his statements that these "near-term opportunities" would "continue to drive value" over an undefined "long term" amount to mere puffery about future expectations and, therefore, are non-actionable. *See Howard v. Haddad*, 962 F.2d 328, 331 (4th Cir. 1992) ("[P]uffery . . . lacks the materiality essential to securities fraud allegations."); *Nat'l Elevator Indus. Pension Fund v. Conagra Brands, Inc.*, 2022 WL 1449184, at *1 (7th Cir. May 9, 2022) (statement that entity would "serve as a catalyst to

accelerate value creation for shareholders" dismissed as puffery); *Novavax*, 645 F. Supp. 3d at 514

("'Vague statements' consisting of 'commonplace commercial puffery' are not material.")

(quoting *Raab*, 4 F.3d at 289–90 & n.1) (citation modified). Omitting discussion of the Q4 2022

Purchase Agreements did not render Meth's statements misleading.

On the same earnings call, Keppler also addressed pricing and margins:

> The headline price increases, obviously, headline price increases margin. And it's an all-of-the-above impact, right? The fact that the inflationary provisions within each of our contracts are providing meaningful, durable pricing increases and increased margin at frankly, a faster rate than we're seeing some of the impact on the cost tower. But that's why the business model works well, right?

SAC ¶ 102.

Plaintiff asserts that the preceding paragraph was materially false or misleading because

Keppler knew or recklessly disregarded that the inflationary provisions in Enviva's contracts were

not sufficient to offset its rising costs. *Id.* ¶ 103. But Plaintiff has alleged no specific facts to

demonstrate Enviva's rising costs at the time of this statement, nor facts to show that Keppler knew

or should have known that the inflationary provisions in Enviva's contracts would turn out to be

insufficient to offset any cost increases that had not yet occurred and that he intended to deceive

investors with the remarks he made. *See In re Triangle Cap. Corp. Sec. Litig.*, 988 F.3d 743, 753

(4th Cir. 2021) (noting that pleading fraud by hindsight is "precisely what Congress intended for

the PSLRA to eliminate"); *In re Under Armour Sec. Litig.*, 342 F. Supp. 3d 658, 680 (D. Md. 2018)

("To be actionable, a statement or omission must have been misleading at the time it was made;

liability cannot be imposed on the basis of subsequent events." (citation omitted)).

### 3.  November 28, 2022

During an investor presentation on November 28, 2022, Enviva signaled favorable cost

and pricing dynamics. Meth stated, "The combination of pricing escalators in our contracts, our

repricing of certain of our historical contracts, our entry into new, higher priced contracts, and a production and cost position that continues to improve, means that our margins are expanding significantly and durably." SAC ¶ 105.

Plaintiff alleges that this statement was false because "pricing escalators in Enviva's contracts failed to offset increased costs of production; Enviva's production and cost position were harmed by severe equipment failures and excessive employee turnover; and these facts created material risks to Enviva's margins." *Id.* ¶ 106. Again, the challenged statement is forward-looking and not worded as a guarantee about Enviva's future performance. Plaintiff does not allege facts to establish the materiality of omissions regarding information about employee turnover and equipment failures. Plaintiff fails to demonstrate that the omission of this information rendered Meth's statement misleading. "It is well-established that the accurate reporting of historic successes does not give rise to a duty to further disclose contingencies that might alter the revenue picture in the future*." See McDonald v. Kinder-Morgan, Inc.*, 287 F.3d 992, 998 (10th Cir. 2002). Without more, Meth's statement here did not obligate him to list all risks affecting Enviva's business. The Court finds the challenged statement, as pled, to be non-actionable.

### 4.  January 26 and February 8, 2023

On January 26, 2023, The Wall Street Transcript published excerpts of an interview with Meth. When asked about his priorities for the coming years, Meth responded: "In addition to growing and developing our infrastructure, we're paying a healthy dividend. We can do both and we'll certainly continue to do that." SAC ¶¶ 107–08. On February 8, 2023, Enviva issued a press release titled "Enviva Declares Quarterly Dividend," which again quoted Meth: "As we execute our strategic plan, our goal is to achieve new levels of durable cash flow, and the continued market tailwinds we are experiencing provide us tremendous confidence in our ability to deliver on our

long-term growth objectives." *Id.* ¶¶ 110–11. Plaintiff alleges that these statements were false or misleading because the Q4 2022 Purchase Agreements obligated Enviva to pay above-market prices for wood pellets, equipment failures and employee turnover increased costs and decreased production, and these and other facts "created material risks to Enviva's ability to grow and pay dividends." *Id.* ¶¶ 109, 112. These circumstances do not establish the falsity of Meth's remarks or that he made them with a deceptive intent. Meth's remarks about his priorities and future plans for Enviva to develop its infrastructure while paying a dividend is not an actionable statement absent more specific allegations by Plaintiff demonstrating how the remarks are false or misleading. Without more, Plaintiff cannot base a securities fraud claim on Meth's statements about future plans, goals, and priorities for Enviva. *See Raab*, 4 F.3d at 289; *In re Humphrey Hosp. Tr.*, 219 F. Supp. 2d at 683.

### 5.  March 1, 2023

#### a.  *Press Release*

On March 1, 2023, Enviva issued a press release titled "Enviva Reports 4Q and Full-Year 2022 Results, Provides 2023 Guidance, and Announces New Customer Agreements." Meth was quoted as stating that in 2022, Enviva "generated significant cash, especially in the fourth quarter, which sets the stage for solid growth in 2023 and beyond." SAC ¶¶ 113–14. He further stated:

> I am most focused on improving operational performance and cost management in our plants and ports. In 2023, we expect to drive increased output from these assets, and together with procured volumes, we aim to sell close to 7 million metric tons at higher prices than we have seen historically, and at a meaningfully lower cost position, achieved by higher plant utilization, a stable and fully staffed workforce, and improved supply chain conditions relative to the challenges of 2022.

*Id.* ¶ 116.

Plaintiff does not claim the statement that Enviva generated significant cash in the fourth quarter of 2022 is false. And, as before, Meth's forward-looking statement regarding his expectations for 2023 is not actionable. *See Raab*, 4 F.3d at 289; *In re Humphrey Hosp. Tr.*, 219 F. Supp. 2d at 683.

>    b. *Form 10-K*

Also on March 1, Enviva filed its 2022 Form 10-K with the SEC, signed by Meth, Even, and Johnson.[4] The Form 10-K stated:

> In addition to generating durable cash flow from long-term take-or-pay off-take contracts, we monitor sustained dislocations in the marketplace, and opportunistically transact when pricing dynamics and contract flexibility provide avenues to generate incremental gross margin. Furthermore, our off-take contracts generally provide us with the opportunity to flex a certain percentage of contracted shipments up or down. That flexibility, enabled by our multi-plant profile, multi-deep water marine terminals and our long-term shipping contracts, can create opportunities to optimize our gross margin when we sell under short-term contracts in times when spot market prices are elevated or, conversely, when we purchase third-party volumes during times when spot market prices are depressed.

SAC ¶ 119. Plaintiff contends that the preceding statements were false because, in the Q4 2022 Purchase Agreements with RWE, Enviva had committed to purchase large volumes of wood pellets at elevated prices when the spot market was near all-time highs. *Id.* ¶ 120. But the above statements do not describe the Q4 2022 Transactions. Rather, the statement describes Enviva's general business model and practice of monitoring market dislocations for arbitrage opportunities. That Enviva's Form 10-K indicates its business model "can create [profitable] opportunities" is not materially misleading.

---

[4] Form 10-K in annual financial report that publicly-traded companies must file with the SEC. The form provides a comprehensive overview of the company's business and financial condition and includes audited financial statements.

In the same Form 10-K, Defendants further emphasized Enviva's operational reliability and cost structure: "Our facilities are designed to operate 24 hours per day, 365 days per year, although we schedule up to 15 days of planned maintenance for our wood pellet production plants during each calendar year. There are no regularly required major turnarounds or overhauls." *Id.* ¶ 121. Defendants also stated that "recent biomass spot market prices, as well as the forward curve pricing of certain European indices, have exceeded $345 per MT, representing a substantial premium to the current long-term contracted pricing of roughly $200 to $235 per MT weighted average across our portfolio, and we were able to capture some of that differential during the year ended December 31, 2022." *Id.* ¶ 123.

Plaintiff alleges that the statement regarding Enviva's facilities was false or misleading because Enviva suffered from severe equipment failures and Enviva's plants regularly experienced outages to rebuild equipment. *Id.* ¶ 122. Plaintiff also contends that the statement about recent biomass spot market prices was false because, as of March 1, 2023, spot market prices for "European indices were approximately $203-$215 per metric ton, the highest forward price for those indices was approximately $235 per metric ton, and such spot market and forward prices had not exceeded $345 per metric ton since December 2022." *Id.* ¶ 124.

Allegedly misleading statements must be read "in context." *Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 615 (4th Cir. 1999). Viewed in its context, the statement that Enviva's facilities were "designed to operate 24 hours per day" was a generic description of the plants' "design" and planned "maintenance." *See* ECF 49-8 at 11. Plaintiff does not dispute that the statement may have been "literally true." *See* ECF 50 at 20–21. And although Enviva's plants may have failed to perform as designed, omissions with respect to specific challenges facing specific plants did not render the statement misleading. *See Oklahoma Firefighters Pension & Ret. Sys. v. K12, Inc.*, 66

F. Supp. 3d 711, 725 (E.D. Va. 2014) (alleged compliance program shortcomings "do not make false any of [defendant's Form 10-K] statements that it had developed the described compliance systems"). Plaintiff also fails to allege sufficient facts to show that the statement concerning spot market prices for European indices was materially misleading and made with deceptive intent. The statement did not purport to rely on March 1, 2023, spot market prices. The context of the statement suggests that it referred to prices *before* March 1, 2023, continuing, ". . . we were able to capture some of that differential during the year ended December 31, 2022." SAC ¶ 123. Accordingly, the Court finds that the allegations in the SAC fall short of showing that the challenged statements in Paragraphs 121 and 123 were materially false or misleading and made with the requisite scienter.

### c. *Earnings Call—Statements About Q4 2022 Purchase Agreements*

During the earnings call on March 1, Meth addressed the Q4 2022 Purchase Agreements with RWE:

> [D]uring the fourth quarter of 2022, we planned our third-party pellet purchases for 2023 and beyond. As many of you know, historically, about 15% to 20% of our annual volumes sold are sourced from third parties . . . 2022 was a little different because the war in Ukraine shot up about 10% of the world's biomass supply. And the spike in pellet prices made it uneconomical for us to procure the same level of third-party pellets this past year. During the fourth quarter, we entered into a long-term purchase agreement with 1 of the largest biomass trading companies in the world who is also 1 of the largest consumers of biomass in Europe and is 1 of our long-standing customers.

SAC ¶ 126.

Meth also addressed deferred revenue:

> [R]oughly $89 million of gross margin and adjusted EBITDA is not being recognized in fourth quarter 2022 results but will be recognized in future years. And our current expectation is that approximately half of the deferred benefit will be recognized in 2024 with the other half in 2025. Again, no change to our business.

> Cash collected in full -- just a change in reporting periods as to when the benefit of the sales will be recognized.

*Id.* ¶ 128.

When RBC Capital Markets analyst Elvira Scotto asked for more details on the deferred gross margin, Meth responded:

> [W]e sold 450,000 tons to this customer. And the underlying margin that we would have generated from the customer was about $32 million in incremental margin. At the same time, we found an opportunity to buy volumes for future periods from that same counterparty. And we do that routinely. As we've said, 15% to 20% of our volumes come from third-party purchases. And in this particular case, *it was very attractive to do for future periods*.

*Id.* ¶ 130 (emphasis added).

Scotto also inquired as to what was "embedded in [Enviva's] 2023 guidance for the spot shipments . . . ." *Id.* ¶ 132. Meth replied: "As you've heard us talk about the contracting environment that we're in, given the alternatives of the high-priced alternatives of any fossil fuel plus carbon pricing for the -- not only today, but also from a future forward curve perspective, *we do see a very favorable pricing environment*. We have executed some of these contracts that will flow through our revenue line." *Id.* (emphasis added).

Plaintiffs plausibly claim that Meth made misleading omissions of material fact by failing to acknowledge, during this March 2023 earnings call, that Enviva faced hundreds of millions of dollars in costs as a result of the Q4 2022 Purchase Agreements. Although Section 10(b) and SEC Rule 10b–5 "do not create an affirmative duty to disclose any and all material information," *Matrixx Initiatives*, 563 U.S. at 44, "disclosure of material information is required 'when necessary to make statements made, in the light of the circumstances under which they were made, not misleading[,]'" *Singer*, 883 F.3d at 440 (quoting *Matrixx Initiatives*, 563 U.S. at 44). *See also Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 250 (2d Cir. 2014) ("Even when there is no

23

existing independent duty to disclose information, once a company speaks on an issue or topic, there is a duty to tell the whole truth."), *quoted in Singer*, 883 F.3d at 440; *Paradise Wire*, 918 F.3d at 318 (omitted fact is material if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available") (citations omitted). Therefore, in discussing the Q4 2022 Purchase Agreements and Enviva's activities in Q4 2022, Meth was required to disclose truthful information necessary to avoid rendering what statements he made misleading.

Under the Q4 2022 Purchase Agreements, Enviva was obligated to pay $641 million for 1.7 million metric tons of wood pellets over the period between 2023 and 2025, with purchases of 800,000 metric tons for $296 million in 2023 alone. SAC ¶ 43. Plaintiff alleges that by March 1, 2023, forward curves for future market prices of wood pellets indicated that Enviva would lose approximately $263 to $282 million on the deal. *Id.* ¶ 133. Plaintiff further alleges that Enviva's obligation to buy 800,000 metric tons from RWE in 2023 equaled 17% of Enviva's total 2022 pellet sales of 4,654,000 metric tons, even though, in a typical year, Enviva's pellet purchases from all third parties made up 15–20% of its sales. *Id.* ¶¶ 126, 231. Plaintiff argues that the success or failure of Enviva's entire pellet trading business would rise or fall with the Q4 2022 Purchase Agreements due to the scale of Enviva's purchase obligation. *See* ECF 50 at 15–16. Accordingly, Meth's statements describing the purchases Enviva promised to make in the Q4 2022 Purchase Agreements as "very attractive to do for future periods" and describing the pricing environment as "very favorable" "from a future forward curve perspective[]" were misleading or at least triggered Meth's duty to disclose the terms Enviva had locked itself into. *See Ottmann v. Hanger Orthopedic Group, Inc.*, 353 F.3d 338, 352 (4th Cir. 2003) (shareholders adequately alleged a material omission where company touted integration success following acquisition but failed to disclose

significant loss of referral business, holding that under the circumstances, defendants had a duty

to disclose the drop in referrals); *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 609–10

(4th Cir. 2015) (shareholders sufficiently alleged securities fraud where company made selectively

positive statements about FDA interactions and drug approval prospects while omitting critical

adverse information, including FDA staff's recommendation against approval); *Dodona I, LLC v.

Goldman, Sachs & Co.*, 847 F. Supp. 2d 624, 64548 (S.D.N.Y. 2012) (omission of known risks

made statements about "attractive" nature of investments inaccurate). Viewing the facts alleged in

the light most favorable to Plaintiff, there is a substantial likelihood that a reasonable investor

would consider the terms of the Q4 2022 Purchase Agreements, had they been disclosed, to have

"significantly altered the total mix of information" Meth provided during the earnings call on

March 1, 2023. *Paradise Wire*, 918 F.3d at 318. Plaintiff thus sufficiently alleges material

misrepresentations and/or omissions based on Meth's statements about the Q4 2022 Purchase

Agreements during the earnings call.

Plaintiff also sufficiently alleges that Meth acted with requisite mental state. Meth co-

founded Enviva's predecessor in 2004 with Keppler and served as Enviva's CEO beginning in

November 2022. SAC ¶¶ 18, 209. According to Enviva's SEC filings, "Mr. Meth led the Company

to grow to become the largest wood pellet supplier in the world and is widely regarded as one of

the key industry experts globally." *Id.* ¶ 209. The SAC includes allegations that Meth regularly

monitored wood pellet market prices in both the spot and forward markets, was generally

responsible for and involved in Enviva's contract negotiations, and had extensive knowledge

relating to the Q4 2022 Purchase Agreements. *Id.* ¶¶ 209–12. Meth initialed each page of the 2011

Master Agreement between Enviva and RWE, which governed the vast majority of Enviva's

liabilities to RWE pursuant to the Q4 2022 Purchase Agreements. *Id.* ¶¶ 49–52. Under the Q4 2022

Purchase Agreements, Enviva committed to pay $641 million between 2023 and 2025, *id.* ¶ 43, which dwarfed Enviva's reported earnings ($116 million in 2021), *id.* ¶ 34. According to the SAC, by March 1, 2023, market prices indicated that Enviva would lose approximately $263 to $282 million on the Q4 2022 Purchase Agreements, *id.* ¶ 115, which Enviva began trying to renegotiate sometime in the first quarter of 2023, *id.* ¶ 138. These allegations support a reasonable inference that, on March 1, 2023, Meth was aware that pricing terms of the Q4 Purchase Agreements were not "very attractive" or favorable to Enviva and that the projected future pricing environment was not "very favorable" to Enviva's position under the Q4 Purchase Agreements.

Plaintiff further alleges that Meth had financial incentives to mislead investors with the aim of attracting investment and increasing Enviva's share price. According to the SAC, most of Meth's compensation was from incentive plans based on adjusted EBITDA targets and Enviva's stock price. *Id.* ¶¶ 242–43. Leading up to the Class Period, Enviva "had a history of issuing artificially inflated financial guidance for Enviva in order to attract investment and increase Enviva's share price." *Id.* ¶ 219. According to Enviva's former head of wood fiber procurement for seven of Enviva's manufacturing plants, identified in the SAC as "FE1," Enviva executives routinely changed FE1's internal forecasted fiber prices to drastically lower numbers when creating Enviva's quarterly and annual projections, despite being repeatedly informed by FE1 that the lower numbers were not possible. *Id.* ¶ 221. In January 2019, FE1 described the practice in an email as "cooking the books." *Id.* A former Enviva financial analyst, identified in the SAC as "FE2," worked on projects including preparation for monthly financial review meetings that were often attended by some or all of Meth, Keppler, and Even. *Id.* ¶ 223. The topics at such meetings often included shortfalls in Enviva's results as compared to its financial projections. *Id.* In FE2's experience, Enviva management repeatedly "implemented changes" and relied on "unreasonable

assumptions" to try to meet earnings targets. *Id.* ¶ 225. According to the SAC, "Enviva's history of earnings manipulation had set up a substantial shortfall as compared to Defendants' financial guidance for the full year 2022 and 4Q 2022." *Id.* ¶ 228. Eventually, when the Board investigated the Q4 2022 Purchase Agreements one of the terms used to search Meth's documents was "meet guidance," and the documents reviewed included "[i]nformation on how bonus is determined and when a bonus is paid." *Id.* ¶ 202.[5]

In sum, allegations in the SAC concerning Meth's personal involvement with the Q4 2022 Purchase Agreements and negotiating Enviva's contracts generally, his monitoring of future market prices for wood pellets, his expertise within the industry, his personal incentives to meet guidance, the sheer magnitude of the obligations placed on Enviva by Q4 2022 Purchase Agreements, and his knowledge about the substantial risk those obligations created for the company all support a strong inference that Meth acted with either an intent to mislead investors or reckless disregard as to whether they would be misled by his statements. *See Latham v. Matthews*, 662 F. Supp. 2d 441, 467 (D.S.C. 2009) (scienter found where defendant was "personally involved in the sales, marketing and production activities that the Plaintiffs allege were false and misleading"); *In re 2U, Inc. Sec. Class Action*, Civ. No. TDC-19-3455, 2021 WL 3418841, at *17 (D. Md. Aug. 5, 2021) (scienter supported where allegations from former employees allowed the Court to infer that the defendant had knowledge of "declining enrollment

---

[5] Plaintiff alleges in the SAC that, for 2022, Defendants' bonuses were conditioned on Enviva achieving $275 million of adjusted EBITDA. *Id.* ¶ 243. Although Enviva did not meet that threshold, it nonetheless awarded Defendants substantial bonuses in the form of equity-based awards. According to an SEC filing, these discretionary bonuses were given "to reward adjusted EBITDA within the revised guidance range for 2022, excluding the impact of certain accretive sales transactions in fourth-quarter 2022 which required different accounting treatment as compared to our guidance assumptions, as well as adjusted EBITDA growth year-over-year." *Id.* Plaintiff further alleges that Enviva's Long-Term Incentive Plan ("LTIP") provides further equity-based incentive compensation, 50% of which is performance-based and dependent on Enviva's stock price performance. *Id.*

projections" and that omission of such information would mislead investors); *In re James River Grp. Holdings, Ltd. Sec. Litig.*, No. 3:21cv444 (DJN), 2023 WL 5538218, at *22 (E.D. Va. Aug. 28, 2023) (scienter supported by magnitude of "$170 million adverse reserve charge . . . totaling three times the Company's reported profit for the prior 2.5 years"). Defendants fail to identify any opposing inference supported by the foregoing facts.

### d.  Earnings Call—Statements About Manufacturing Plants

During the same earnings call on March 1, after noting the "very favorable pricing environment" "from a future forward curve perspective," Meth continued as follows:

> [N]ow let's turn to the cost side. I think the biggest difference you will see comes from improved fixed cost absorption. Why do we have such conviction around that fixed cost absorption is because our plants have proven that they can do it in the later part of 2022 . . . . In addition to that, we had very accretive upsizing opportunities over the last year or 2 in some of our existing plants. They have been completed. And those plants have shown that they have broken through previous bottlenecks to now deliver volumes at an elevated rate. That fixed cost absorption will be a major driver for our conviction in our increased guidance range for 2023.

SAC ¶ 134 (emphasis added).

Plaintiff states a plausible securities fraud claim based upon Meth's misrepresentations concerning the significant manufacturing and production challenges that hindered Enviva's productivity and profitability. Plaintiff plausibly claims that Meth misled investors by describing Enviva's upsizing of existing plants as "very accretive" while omitting information about the significant manufacturing and production problems Enviva faced by March 1, most notably at the plant in Southampton, Virginia. Specifically, Plaintiff alleges that Enviva completed a botched expansion at the Southampton plant in 2021 that "created bottlenecks[,]" SAC ¶ 135, and "caus[ed] frequent extended down times, sporadic daily outputs, and the loss of approximately $100 million, *id.* ¶ 78. A former Maintenance and Reliability Manager for Enviva with access to Southampton's

28

financial information ("FE3") noted that, as a result of its poor condition, the plant was "not even close to achieving its stated maximum production level." *Id.* ¶ 73. FE3 reported that the Southampton plant was in "poor condition with equipment falling apart," and that its operational problems and cost overruns were "due in part to a failed expansion after which its equipment did not work properly." *Id.* Plaintiff further alleges that substantial losses due to equipment failures and maintenance costs were sustained at other Enviva plants, including plants in Hamlet, North Carolina, and Greenwood, South Carolina. *Id.* ¶¶ 72, 76. A former Enviva engineer ("FE4") recounted that problems at the Southampton and Greenwood plants were "apparent to most people at the Company" by late 2022, and the Southampton plant's operational problems were the focus of an all hands meeting in early 2023. *Id.* ¶ 70.

Defendants argue that, while the SAC generally alleges various problems at the Southampton plant following an expansion project started in 2021, "it is devoid of particularized allegations about Southampton's daily production" and does not contain allegations showing that "Enviva's overall production was not 'at an elevated rate' in early 2023." ECF 51 at 19 (cleaned up). This argument misses the mark. It was misleading for Meth to suggest to investors that the recent expansion at Enviva's existing plants was "very accretive" and had enabled the plants to overcome previous bottlenecks and "deliver volumes at an elevated rate," when the recent expansion at the Southampton plant had, in fact, resulted in bottlenecks, operational failures, and "substantial losses" amounting to approximately $100 million. SAC ¶¶ 70, 73, 78. Viewing the facts alleged in the light most favorable to Plaintiff, there is a substantial likelihood that a reasonable investor would consider the foregoing information about Enviva's failed expansion efforts at the Southampton plant and its broader operational failures, had this information been disclosed, to have "significantly altered the total mix of information" Meth provided during the

earnings call on March 1, 2023. *Paradise Wire*, 918 F.3d at 318. *Cf. In re Emergent BioSolutions Inc. Sec. Litig.*, Civ. No. DLB-21-955, 2023 WL 5671608, at *14 (D. Md. Sept. 1, 2023) ("It is plausible that a reasonable investor deciding whether to invest in Emergent would find it important that Bayview [manufacturing facility] was not equipped for mass production and that it remained unequipped after the FDA deemed insufficient Emergent's efforts to address the deficiencies."); *Novavax*, 645 F. Supp. 3d at 520 ("Had the problems at the Texas and North Carolina Facilities been disclosed, that information would have 'significantly altered the total mix of information' available to a reasonable investor because such an investor would have understood that Novavax's ability to [] produce the vaccine at scale was in jeopardy.") (citation modified). The materiality of Meth's omission is further supported by the fact that, when Enviva disclosed significant problems at its plants, including at Southhampton, on May 4, 2023, SAC ¶¶ 158–66, the company's stock fell by 67% on the same date, *id.* at ¶¶167–68. *See Zak*, 780 F.3d at 610 n.6 (noting that "the change in Chelsea stock prices after Chelsea's statements is relevant to the element of materiality").

Plaintiff has met his burden of pleading scienter with respect to the statements by Meth quoted in Paragraph 134 of the SAC.  According to the SAC, the issues at Southampton had "become apparent to most people at the Company" by late 2022. SAC ¶ 70. On and before March 1, 2023, Meth made a series of detailed comments about the state of Enviva's manufacturing facilities, including Southampton in particular, reflecting his intimate knowledge of this topic. *See* SAC ¶¶ 95, 116, 121, 134, 213. He was quoted in the press release issued on March 1, 2023, as stating, "I am most focused on improving operational performance and cost management in our plants and ports." *Id.* ¶ 116. Additionally, during Enviva's Q2 2023 earnings call on August 3, 2023, Meth admitted that, "[p]rior to the operational changes that started to take hold in June,

30

Southampton [had] been operating unprofitably for a number of quarters." SAC ¶ 116. Prior to that admission, however, Meth had publicly stated during Enviva's April 3, 2023, Investor Day that, "as a leader of [Enviva]," creating more volume is "one of my key areas of focus and it has been for the last couple of months[;]" that many of Enviva's expansion projects "hit the necessary nameplate capacities" and showed "really, really good progress in making more tons at lower cost" in March and April; and that he went to the plants "basically every week with the team to make sure that the team knows how important it is to hit the numbers." *Id.* ¶¶ 146, 213.

"Although not sufficient to establish scienter by itself, the fact that the subject of the alleged fraud was a core business or operation of the company is relevant to the analysis of scienter because under such circumstances it would be fair to infer that the company officers responsible for public statements were aware of facts relating to that activity." *Novavax*, 645 F. Supp. 3d at 527 (citing *Yates*, 744 F.3d at 890). *See also No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America West Holding Corp.*, 320 F.3d 920, 943 n.21 (9th Cir. 2003) (finding sufficient allegations of scienter based in part on the conclusion that it would be "absurd" to suggest that the Board of Directors would not discuss issues related to a Federal Aviation Administration investigation which could have resulted in substantial penalties). Here, viewing the facts in the light most favorable to Plaintiff, the Southampton plant—if not a "core" operation of Enviva—was at least a significant enough operation within the company to support a reasonable inference that, on March 1, 2023, Meth was aware of the operational and financial problems generated by the effort to expand the plant. Enviva operated only ten pellet manufacturing plants, SAC ¶ 27, and Southampton was one of Enviva's larger plants, with a theoretical production capacity of 760,000 metric tons per year, or 12% of Enviva's total capacity, *see* ECF 49-17 (Investor Day Presentation) at A0513.

Facts alleged in the SAC, and those established by other materials of which this Court may take judicial notice, support a strong inference that Meth was aware of the problems facing Enviva's plants, particularly Southhampton, and therefore acted either intentionally or recklessly in making misleading remarks about the "very accretive" character of Enviva's upsizing of its existing plants without disclosing the associated financial losses and operational failures. Plaintiff's claim does not depend on any specific plant's production volumes in any given month. Rather, Plaintiff states a plausible claim based on the Meth's representations that "very accretive upsizing opportunities" had been "completed" and "shown" to "have broken through previous bottlenecks," while omitting the substantial losses and operational problems upsizing caused at Southampton.

***

In sum, reading the Complaint in its entirety and in the light most favorable to Plaintiff, Meth's alleged omissions and misrepresentations regarding the Q4 2022 Purchase Agreements and the failed Southampton plant expansion during the March 1, 2023, earnings call were materially misleading and made with the intent to mislead, or reckless disregard that they would mislead, investors about the financial and operational risks and failures faced by Enviva at the time, of which Meth was actually aware. Accordingly, the Court finds these statements and omissions by Meth to be actionable under Section 10(b) of the Exchange Act and SEC Rule 10b–5.

### 6. April 2, 2023

On April 2, 2023, Enviva posted a video to YouTube in which Meth was interviewed by Enviva's Chief Administrative & People Officer, Roxanne Klein. In the video, Klein asks, "[w]e have seen a dip in the market recently. From your seat, from your vantage point, how do you view this change, and what do you see as the path forward?" Meth responded, in part:

> I know we're going to see tremendous growth. Not only from a volumetric perspective, but also from a margin perspective. Our cost position will come down to more historic levels, and at the same time our revenues will grow because the ability to pay of our customers is much higher. Both of those together, I think we are going to be in fantastic shape, and our valuation will certainly see the benefit of that. Let's talk about the revenue side. We have very healthy inflationary adjustments in our contracts with our customers.

SAC ¶ 137. Meth continued, "[w]ith that, when costs go down, revenues go up, margins expand. The tailwinds of growth that we see in Asia, in the U.S. and in Europe, I think our investors will also see that this is a fantastic investment. And with that, certainly I would think that the stock price will show a recovery." *Id.*

Plaintiff alleges that Meth's statements in the preceding paragraph were false or misleading because market prices for wood pellets were far below the prices Enviva had agreed to pay in the Q4 2022 Purchase Agreements; Enviva suffered from severe equipment failures and excessive employee turnover that decreased production; price escalation features in Enviva's contracts did not offset its rising production costs; and these facts created material risks to Enviva's growth, margins, valuation, and stock price. *Id.* ¶ 138. But Meth's indefinite and optimistic predictions of "tremendous growth" and cost containment are not actionable because "[n]o reasonable investor would rely on [them]." *Raab*, 4 F.3d at 290. And while Plaintiff alleges that Nunziata later identified "a failure of contractual escalators to appropriately scale with actual costs" as a source of significant financial pressure, *see* SAC ¶ 88, Meth's statement that "healthy inflationary adjustments" exist in Enviva's contracts is a statement of opinion that Plaintiff does not allege was "false and not honestly believed" when made. *Employees' Ret. Sys. of the City of Baton Rouge & Par. of E. Baton Rouge v. MacroGenics, Inc.*, 61 F.4th 369, 387 (4th Cir. 2023). The challenged statements of April 2 are not actionable.

7.  **April 3, 2023**

    a.  *Investor Day—Statements About Liquidity, Growth, and Paying Dividend*

On April 3, 2023, Defendants hosted Enviva's Investor Day at the New York Stock Exchange, made presentations, and answered questions from analysts. SAC ¶ 139. Keppler emphasized that Enviva's core business remains selling volumes of wood pellets under long-term contracts and that there was "plenty of liquidity" to support dividends and growth. *Id.* ¶¶ 140, 142. Separately, Even commented that "Enviva can execute its growth program" without "rais[ing] additional equity" and that Enviva "will continue to pay the dividend at current levels." *Id.* ¶¶ 150, 152. Plaintiff argues these statements are actionable because the financial pressures confronting Enviva by April 2023 hindered Enviva's ability to grow and pay dividends and market prices indicated that Enviva would lose approximately $262 to $281 million on the Q4 2022 Purchase Agreements. *Id.* ¶¶ 151, 153. These statements are not actionable because they are "forward-looking," are "not guarantees," and "lack the factual specificity necessary to make them actionable in this circuit." *Marsh Grp. v. Prime Retail, Inc.*, 46 F. App'x 140, 146 (4th Cir. 2002) (holding that management's expression of a "commitment" to paying the quarterly dividend, which it alternatively described as "sacred," was immaterial as a matter of law); *see also Magruder v. Halliburton Co.*, 359 F.Supp. 3d 452, 461 (N.D. Tex. 2018) ("Statements that Halliburton had 'plenty of' … liquidity are too general and vague to cause a reasonable investor to rely on them.").

    b.  *Investor Day—Statements About Commercial Activity*

At Investor Day, Meth and Keppler also referred to the Q4 2022 Transaction with RWE. Meth first explained that Enviva's commercial activity historically accounted for 15–20% of overall EBITDA, which he expected would continue in the future. SAC ¶ 144. He further explained: "As our EBITDA growth, the absolute number will go up, but the importance will not

go up, right? It's just a repeatable part of our business because we are solving issues in the supply chain that are accretive for us." *Id.* Meth then specifically reminded investors of the Q4 2022 Transaction with RWE: "I want to remind you, and we talked about this, that we have this deferred gross margin transaction last year of a total of $89 million. And there is an overhang of $12 million in Q1, and that's the last of those that we have to put our balance sheet and regain through our income statement over '24 and '25." *Id.* ¶ 148. Keppler also stated:

> [T]he physical liquidity challenges in this market means that from time to time, we can make incremental margin associated with managing the dislocations in that business . . . 2022, that part of the business was a larger part of the business than it has been historically . . . But our core business is selling volumes under long-term contracts to our customer set. So that's not going to be a significant part of our business going forward that created so much of the confusion, I think, as part of 2022 financials.

*Id.* ¶ 140.

Plaintiff alleges that Meth's and Keppler's statements were misleading because they knew or disregarded, and failed to disclose, the extent to which Q4 2022 Purchase Agreements created a substantial financial burden to Enviva and the fact that the Q4 Purchase Agreements would have a significant negative impact on Enviva's business going forward. *Id.* ¶¶ 141, 149.

None of the above statements are actionable. First, Meth's statement describing Enviva's spot market transaction business as "accretive" is not a reference to the Q4 2022 Transaction with RWE, but rather a general overview covering part of Enviva's business model. Before making the alleged misleading statement, Meth stated that he would "take a few minutes and explain" the company's "commercial activity." SAC ¶ 144. In that context, Meth's comment was not specific enough to trigger a duty to disclose details regarding a specific transaction. *See Singer*, 883 F.3d at 440. Second, while Meth later noted the "deferred gross margin transaction last year," this statement about the Q4 2022 Purchase Agreements is not misleading. In Part III.B.5.c *supra*, the

Court found Meth's comments on the March 1, 2023, earnings call actionable because, by omitting pertinent details and known risks associated with the Q4 2022 Purchase Agreements, his comments about anticipated revenue and description of the deal as "attractive" in response to an analyst's question were misleading. Here, by contrast, Meth's comments were not made in the context of a discussion of business strategy or questions specific to the Q4 2022 Transactions. The context of Meth's remarks at Investor Day did not trigger a duty to disclose more information about the Q4 2022 Transactions, and there was no material misrepresentation among those remarks.

Finally, Keppler's statement is not false or misleading. Keppler stated that short-term and spot market transactions aimed at managing dislocations played a larger part of Enviva's business in 2022 than historically but that would not be the case going forward. Plaintiff suggests that Keppler's comments "concealed" the fact that most of Enviva's purchase obligations under the Q4 2022 Purchase Agreements had not yet come due. *See* ECF 50 at 8. But viewed in context, Keppler's comment only concerned the extent to which Enviva would engage in additional short-term transactions in the future. Plaintiff fails to explain what makes this statement false. Keppler was not required to detail Enviva's purchase obligations under the Q4 2022 Purchase Agreements to keep his comment from misleading investors.

### c.   Investor Day—Statements About Production Rates

During the Q&A session at Investor Day, Enviva's VP of Investor Relations, Kate Walsh, read a question from an investor asking, "can you just give us a bit more detail on how you see that $100 million being driven out of our cost tower?" Meth responded, in part, "So the biggest part is volume. We've built Lucedale . . . [t]he remainder of the other expansions have come to a conclusion last year. We hit the necessary daily numbers, September, October, November of last

year in some of the plants like Southampton and so on and so forth. And that will flow through as well." SAC ¶ 154.

Plaintiff has plausibly alleged that the foregoing statement by Meth was materially misleading because the expansion of the Southampton plant had failed, and the plant was producing well below its stated capacity. *Id.* ¶ 155. Defendants' arguments that the SAC is devoid of particularized allegations about Southampton's "daily [production] numbers" during September, October, November 2022 and does not allege that Enviva's "overall production was not 'at an elevated rate' in early 2023" are unpersuasive. ECF 51 at 19. The SAC alleges that the problems at Southampton were persistent and known to Meth by late 2022—well before his comments at Investor Day attempting to assure investors that Southampton enabled cost savings. *See* SAC ¶¶ 70–74. Plaintiff plausibly alleges that Meth's statements "touting [Southhampton]'s manufacturing capabilities misleadingly omitted the facility's persistent, serious issues." *Emergent BioSolutions*, 2023 WL 5671608, at *15. And for the same reasons discussed in Part III.B.5.d *supra*, the Court finds that Plaintiff adequately alleges that Meth made his remarks with either an intent to mislead investors or reckless disregard that they would be misled.

### 8. May 4, 2023

In a press release issued on May 3, 2023, titled, "Enviva Reports First-Quarter 2023 Results, Updates 2023 Guidance, Changes Capital Allocation Priorities, and Announces New Contract," Enviva reported poor Q1 2023 results, including substantial operating cost overages and production challenges, and announced, among other things, that it was eliminating its dividend to preserve liquidity and substantially reducing its full-year 2023 guidance. SAC ¶¶ 157–60. Enviva held an earnings call on May 4, during which Meth confirmed the production and

operational problems the company was facing, including those plaguing the Southhampton plant. *Id.* ¶¶ 161–66.

The same day, Enviva filed its Form 10-Q for Q1 2023 with the SEC. The Form 10-Q was signed by Even and was accompanied by certifications signed by Even and Meth. *Id.* ¶ 171. The Form 10-Q stated, "In the fourth quarter of 2022, we entered into agreements with a customer to purchase approximately 1.8 million MT of wood pellets between 2023 and 2025 (the 'new purchase agreements'). The new purchase agreements were priced at market prices in effect at the time of the agreements." *Id.* ¶ 172 (emphasis added).

Plaintiff alleges that this statement was false because Enviva agreed to pay on average $388 per metric ton in 2024 and $372 in 2025, which were significantly higher than the highest reported *forward-market prices* for 2024 and 2025 ($290 per metric ton or less) and Enviva's long-term contracted sales prices. SAC ¶¶ 43, 56–58, 61, 171. Defendants argue that "market prices in effect at the time of the agreements" referred to *spot-market prices* (i.e., prices for immediate delivery in Q4 2022), not forward market prices, and, in any event, Plaintiff's estimated forward market prices during Q4 2022 are not reliable. *See* ECF 49-1 at 19. Plaintiff contends that a reasonable investor would understand the relevant market for the future purchases provided in the Q4 2022 Purchase Agreements to be the forward market, not the spot market. Moreover, Plaintiff argues, statements by Defendants quoted in the SAC demonstrate that when Defendants made statements about "spot market prices" or "spot prices," they explicitly said so. *See* SAC ¶¶ 55, 64, 119, 123, 214.

Viewed in context and in the light most favorable to Plaintiff, the statement in the Form 10-Q that the Q4 2022 Agreements were priced at "market prices in effect at the time of the agreements" was a material misrepresentation. Because the relevant transactions were purchases to be made in the future, a reasonable investor would interpret this statement as a reference to

forward-market prices at the time of the Q4 2022 Agreements. The SAC alleges that when Enviva entered the Q4 2022 Purchase Agreements and agreed to pay $388 per metric ton in 2024 and $372 in 2025, forward market prices for 2024 and 2025 were $290 per metric ton or less.[6] *Id.* ¶¶ 43, 56–58, 61, 173. When, in November 2023, Enviva revealed that the prices Enviva was obligated to pay for future purchases under the Q4 2022 Purchase Agreements were based on the spot-market prices at the time of the deal, Enviva's stock price fell precipitously, indicating that this information was previously unknown yet material to investors. *See id.* ¶ 196 (JP Morgan analyst noting on November 10, 2023, "the previously unknown: Per EVA's 10-Q filing [for Q3 2023] released yesterday, EVA agreed to purchase the 1.8mm MTs on a fixed-contract at ~$377/MT, a price near the all-time high spot prices from 2H22"). Accordingly, Plaintiff alleges a material misrepresentation by Even and Meth in Enviva's Form 10-Q for Q1 2023.[7]

Plaintiff also sufficiently alleges that Even and Meth acted with the requisite scienter. The Form 10-Q signed by Even and Meth contained a certification that "[b]ased on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report." *See* SAC ¶ 171. But, considering the allegations in the SAC as a whole and accepting them as true, Meth and Even were

---

[6] Defendants' contention regarding the accuracy of the forward-market prices alleged by Plaintiff is a factual dispute not appropriately resolved at the pleading stage. *See In re Willis Towers Watson plc Proxy Litig.*, 937 F.3d 297, 305 n.6 (4th Cir. 2019); *In re Ironnet, Inc.*, No. 1:22-cv-449, 2023 WL 5110932, at *10 (E.D. Va. Aug. 9, 2023).

[7] Defendants contend that because the misrepresentation is "drawn from [Sarbanes-Oxley] certifications," it is "inactionable as a matter of law." ECF 49-1 at 27 n.22 (first citing *Lorusso v. Boulder Brands, Inc.*, 2017 WL 4365180, at *14 (D. Colo. Mar. 1, 2017), then *Anderson v. StoneMor Partners, L.P.*, 296 F. Supp. 3d 693, 702 (E.D. Pa. 2017)). But the cases Defendants rely on are inapposite. In *Lorusso* and *Anderson*, the plaintiffs claimed that the certifications *themselves* were false. Here, by contrast, Plaintiff alleges that a separate statement within the SEC filing—not the certification—was materially misleading.

aware that the phrase "market prices in effect at the time of the agreements" would likely mislead investors to believe that they were referring to forward-market prices for the future purchases required by the Q4 2022 Purchase Agreements. As discussed in Part III.B.5.c *supra*, Meth was personally involved with the Q4 2022 Purchase Agreements and the negotiation of Enviva's contracts generally, monitored of future market prices for wood pellets, and was considered an expert within the industry. By May 4, 2023, market prices that Meth monitored indicated that Enviva would lose approximately $256–$298 million on the Q4 2022 Purchase Agreements. *See* SAC ¶ 175. Meth had been attempting to renegotiate the terms of the Q4 2022 Purchase Agreements before May 4, 2023. The SAC includes plausible allegations that had investors known the extent of Enviva's exposure—due to being locked into near all-time high spot market prices under the Q4 2022 Transactions—Enviva's stock price would have fallen, which would have impacted Meth's compensation. Thus, Meth had both an incentive to mislead investors into believing that the prices Enviva was obligated to pay under the Q4 2022 Purchase Agreements for future purchases was based on forward-market prices rather than the spot-market prices at the time of the deal.[8]

Like Meth, Even repeatedly made statements about Enviva's contracts and market prices for wood pellets. *See* SAC ¶¶ 55, 64–65, 118–19, 123, 172. Even also made statements reflecting the fact that he, like Meth, regularly monitored market price data for wood pellets. *Id.* ¶ 214. Even's statements, many of which were made in SEC filings, demonstrate that he consistently used terms like "spot market prices" or "spot prices"—not simply "market prices"—when he intended to refer

---

[8] Notably, complaints like Plaintiff's "will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324. Here, taking all the facts alleged "collectively," *id.* at 323, I find that a reasonable person would deem the inference that the statement in Form 10-Q was intended to "deceive, manipulate, or defraud," *Yates*, 744 F.3d at 884, at least as compelling as Defendants' assertion their statement was innocent yet susceptible to misinterpretation.

to spot-market prices. For example, Enviva refers to the recent levels of "biomass spot market prices, as well as the forward curve pricing of certain European indices" in its SEC Form 10-Q filing for Q2 2022 (signed by Even), Q3 2022 (signed by Even), and in its Form 10-K filing for full year 2022 (signed by Meth and Even). Thus, when Even used the phrase "market prices in effect at the time of the agreements" in the Form 10-Q filed on May 4, he would have known, or recklessly disregarded, the likelihood that investors would be misled to believe that he and Meth were referring to forward-market prices for the future purchases required by the Q4 2022 Purchase Agreements. Even, as CFO, was familiar with the Q4 2022 Purchase Agreements prior to May 4, 2023, having made detailed statements about the Q4 2022 Purchase Agreements during the earnings call on March 1. *See id.* ¶ 215. Finally, like Meth, a significant portion of Even's compensation depended on meeting adjusted EBITDA guidance and Enviva's stock price performance. *See id.* ¶ 242.

In sum, the SAC states a plausible securities fraud claim under Section 10(b) of the Exchange Act and SEC Rule 10b–5 against Meth and Even based on their statement in Form 10-Q for 1Q 2023 that the Q4 2022 Purchase Agreements were priced at "market prices in effect at the time of the agreements." Considering the allegations in the SAC as whole and in the light most favorable to Plaintiff, Meth and Even's statement was materially misleading, and each defendant acted with the requisite scienter.[9]

---

[9] Defendants' argument that Plaintiff was required to plead that Meth and Even had "actual knowledge that the Form 10-Q was [] materially misleading" is misplaced. ECF 49-1 at 21. The cases Defendants cite concern claims that a defendant's certification itself was false. For example, in *In re Veon Ltd. Sec. Litig.*, No. 15-CV-08672 (ALC), 2018 WL 4168958, at *14 (S.D.N.Y. Aug. 30, 2018), the court dismissed a claim seeking to hold a defendant liable for certifying that "based on [his] knowledge, this report does not contain any untrue statement of material fact," because the plaintiffs failed to allege that the defendant believed the certification was false or misleading when it was made. As explained in footnote 7 *supra*, Plaintiff here challenges a separate statement within the SEC filing—not the certification—and alleges that this statement was materially misleading.

**9. August 2, 2023**

On August 2, 2023, Enviva filed with the SEC its Form 10-Q for Q2 2023, signed by Meth and Even. The Form 10-Q stated:

> Our primary liquidity needs are to fund working capital, service our debt, invest in maintenance capital expenditures, expansion and optimization of our plants, and greenfield construction projects, or, secondarily, where determined in the discretion of the board of directors of the Company (the 'Board'), to pay dividends or repurchase our common stock . . . We believe cash on hand, cash generated from our operations and the availability of our senior secured revolving credit facility will be sufficient to meet our primary liquidity requirements.

SAC ¶ 177.

The SAC does not include enough facts to render any statement in the foregoing paragraph actionable. Meth and Even's stated belief that Enviva had enough access to cash to meet its "primary liquidity requirements" was a forward-looking statement of opinion. It is not a "guarantee[] and lack[s] the factual specificity necessary to make [it] actionable in this circuit." *Marsh*, 46 F. App'x at 146. To be sure, statements of opinion can be actionable, but only "if they are not honestly believed and lack a reasonable basis." *MacroGenics, Inc.*, 61 F.4th at 387. And the SAC does not include enough facts to show that the above forward-looking statement of belief was made dishonestly. Even assuming Meth and Even's stated belief that Enviva had enough access to cash to meet its "primary liquidity requirements" was false, Plaintiff does not allege enough facts to demonstrate that Meth and Even actually knew their statement was false. *See In re Marriott Int'l, Inc. Customer Data Sec. Breach Litig.*, 543 F. Supp. 3d 96, 142 (D. Md. 2021) ("For forward-looking statements, the required level of scienter is 'actual knowledge.'" (quoting 15 U.S.C. § 78u–5(c)(1)(B))). Plaintiff argues that Meth and Even knew their stated belief was false because Enviva had already failed to perform its obligations under the Q4 2022 Purchase

Agreement by not repurchasing the required amount of wood pellets from RWE at the agreed-upon price by July 31, 2023. SAC ¶¶ 43–45, 178; ECF 50 at 19. But, even assuming that Meth and Even were aware of this alleged breach, this allegation by itself does establish that Meth and Even understood the breach to contradict their stated belief that Enviva could meet its liquidity requirements. Plaintiff alleges that, by August 2023, "Enviva had been attempting to renegotiate the 4Q 2022 Purchase Agreements with RWE since the first quarter of 2023." SAC ¶¶ 178, 181. The SAC does not include any facts to suggest that Meth and Even knew Enviva's efforts to renegotiate terms of the Q4 2022 Purchase Agreements would be completely futile. Without more, any failure by Enviva to perform by July 2023 may have been owed to its efforts to renegotiate its agreements with RWE—and not to any liquidity issue. To reach Plaintiff's conclusion would require one to infer first that Enviva's failure to repurchase product by July 2023 was necessarily due to insufficient access to cash, further infer that Meth and Even were aware of Enviva's failure to perform, and then, based on those inferences, further infer that Meth and Even understood Enviva's failure to perform meant that the company lacked access to cash to meet its primary liquidity requirements. It is well established that "a plaintiff may not stack inference upon inference to satisfy the PSLRA's pleading standard." *Maguire Fin., LP v. PowerSecure Int'l, Inc.*, 876 F.3d 541, 548 (4th Cir. 2017).

### 10. August 3, 2023

Defendants held Enviva's Q2 2023 earnings call on August 3, 2023. SAC ¶ 179. During the call, Meth discussed the company's expectations for the second half of the year. He maintained Enviva's full 2023 adjusted EBITDA guidance of $200–$250 million but updated the quarterly expectations for the third and fourth quarters. *Id.* ¶ 180. Meth explained, "For third quarter, we're stepping down our expectations from the previous range of $70 million to $90 million of adjusted

EBITDA to a range of $60 million to $80 million." *Id.* He also stated, "The significant step-up in earnings expected in the quarter over third quarter is underpinned by a number of factors that we have good visibility into." *Id.* Scotto asked about the guidance for the rest of the year, specifically inquiring what percentage of it was based on potential spot business. Meth responded, "Look, I think the way to look at this is that if some of that happens as part of the commercial activity, it will happen in Q4. And if we're successful in that, it certainly helps us to get to the higher end of the range. That's the order of magnitude that we're seeing for that part of the business." *Id.* ¶ 182. When Truist Securities analyst Jordan Levy asked whether there would be any more deferred gross margin transactions in Q3 and Q4, Meth confirmed, "Our forecast does not include any incremental deferred gross margin transactions." *Id.* ¶ 184.

Plaintiff alleges that Meth's responses to Scotto and Levy were false because "Enviva's guidance assumed a significant volume of 3Q 2023 spot sales at an average sales price that was much higher than current market prices or Enviva's contracted sales prices; and market prices for wood pellets, and Enviva's long-term contracted sales prices, were far below the prices Enviva had agreed to pay in the 4Q 2022 Purchase Agreements." *Id.* ¶¶ 183, 185. Plaintiff supports his allegation by pointing to Nunziata's statement on Enviva's November 9, 2023, earnings call that, "[i]n August 2023, when we reaffirmed our expectations for third quarter, including an adjusted EBITDA range of $60 million to $80 million, we factored in a significant volume of spot sales. We assumed an average sales price on this volume that was much higher than our contracted book." *Id.* ¶ 91.

Plaintiff's allegations fall short of demonstrating that Meth's statements during the August 3 earnings call were materially false or misleading. Examining Meth's response to Scotto in context, *see Phillips*, 190 F.3d at 615, Meth merely stated that a higher proportion of the spot

business was expected to occur in Q4, relative to Q3. *See* ECF 49-13 (Q2 2023 Earnings Call Transcript) ("We've talked about the 20% of our annual EBITDA comes from general commercial activity [i.e., spot sales] that is back half weighted [i.e., weighted more heavily in Q4 than in Q3]. It's particularly pronounced in Q4."). Plaintiff claims Meth's response is false because the "guidance assumed a significant volume of 3Q spot sales at an average sales price that was much higher than current market prices or Enviva's contracted sales prices[,]" SAC ¶ 183, but the challenged statement does not contradict that proposition; it only indicates that the Q4 spot sales were expected to be of a higher volume than in Q3. Moreover, Meth's response to Levy only indicates that Enviva was not expected to engage in any incremental (i.e., additional or new) deferred gross margin transactions. Plaintiff does not claim that Enviva, in truth, planned to engage in such transactions; he only alleges that they had engaged in such transactions in Q4 2022 (the Q4 2022 Purchase Agreements). Therefore, Plaintiff fails to show that Meth's statements during the August 3 earnings call were materially false or misleading. But even if the challenged statements were false or misleading, Plaintiff fails to show that Meth knew his statements were false and made the statements with either an intent to deceive or reckless disregard.

## IV.    CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss (ECF 49) shall be GRANTED in part and DENIED in part. The motion is denied as to (1) Meth's omission of material facts during the March 2023 earnings call by failing to disclose terms of the Q4 2022 Purchase Agreements that exposed Enviva to hundreds of millions of dollars in losses while touting the deal as "attractive"; (2) Meth's misrepresentations during the March 2023 earnings call and April 2023 Investor Day concerning the significant manufacturing and production challenges at the Southampton plant that hindered Enviva's productivity and profitability; and (3) Meth and Even's misrepresentation that the Q4 2022 Purchase Agreements were priced "at market prices in effect

at the time of the agreements" in Enviva's SEC Form 10-Q for 1Q 2023. In all other respects,

Defendants' motion is granted.

     A separate Order will follow.


  12/29/2025                                   /s/                         
Date                                                    Matthew J. Maddox
                                                    United States District Judge